UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Magnetation LLC, | | Case No. 15-50307 |
| | Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | | Case No. 15-50308 |
| | Debtor. | Chapter 11 Case |
| Mag Finance Corp., | | Case No. 15-50309 |
| | Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | | Case No. 15-50310 |
| | Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | | Case No. 15-50311 |
| | Debtor. | Chapter 11 Case |

**DECLARATION OF JOSEPH A. BROKING IN SUPPORT OF THE DEBTORS'
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Joseph A. Broking declares and says:

1.      I am the Chief Financial Officer of Magnetation LLC ("**Mag LLC**"), a Delaware limited liability company headquartered in Grand Rapids, Minnesota.  I have been employed in this position by Mag LLC since March 2012.  Prior to 2012, I fulfilled roles in finance, compliance, audit, accounting and operations management at a number of large, publicly held companies and organizations, including serving as President and CEO of Itasca Economic Development Corporation, a non-profit corporation dedicated to the retention and creation of jobs in Itasca County, the Director of Operations at Bucyrus International Inc., a mining equipment manufacturing company acquired by Caterpillar Inc., the Director of Finance for Terex Corporation, an equipment manufacturer and as the Director of Financial Accounting at Stora Enso Corporation, a paper and board manufacturer.  I am familiar with the day-to-day operations, businesses and financial affairs of the Debtors (as defined below).

2.      I submit this declaration (this "**Declaration**") (i) in support of the petitions of the Debtors for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), (ii) pursuant to 28 U.S.C. § 1746 in support of the Debtors' petitions and contemporaneously-filed requests for relief in the form of motions and applications (the "**First Day Motions**") and (iii) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these chapter 11 cases.  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' businesses and to the Debtors' reorganization.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision or my opinion based upon experience, knowledge and information concerning the operations of the Debtors and the metals and mining industry as a whole.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

**COMMENCEMENT OF REORGANIZATION PROCEEDINGS**

4.      On May 5, 2015 (the "**Petition Date**"), Mag LLC and its four wholly-owned subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or "**Magnetation**"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.      Part I of this Declaration describes the Debtors' businesses; Part II describes the circumstances giving rise to the commencement of these chapter 11 cases; Part III describes the Debtors' prepetition restructuring initiatives; Part IV describes the Debtors' proposed DIP Financing (as defined below); and Part V sets forth the relevant facts in support of the First Day Motions.

## I.

## THE DEBTORS' BUSINESSES

### A.      Operations

6.      Magnetation is a natural resources company that focuses on the design, development, construction and operation of facilities that produce iron ore concentrate and fluxed iron ore pellets from previously abandoned iron ore waste stockpiles and tailings basins on the Mesabi Range in northern Minnesota.  The Debtors then sell the concentrate and pellets to steelmakers for use as a raw input in their steelmaking processes.  The core of Magnetation's business is an innovative process for the recovery of iron ore concentrate from previously unsalvageable mining remnants, allowing the economical extraction of iron ore from previously abandoned iron ore waste stockpiles and tailings basins on the Mesabi Range in Northern Minnesota, at a lower cost per tonne[1] of ore than traditional mining techniques.

7.      Magnetation is a joint venture of Magnetation, Inc. ("**Mag Inc.**")[2] and AK Iron Resources, LLC ("**AK Iron**"), a wholly-owned subsidiary of AK Steel Corporation ("**AK Steel**"), a leading North American steel producer.[3]

---

[1] Iron ore concentrate is conventionally measured in metric tons of 1,000 kilograms each, or approximately 2,204.6 pounds per tonne.

[2] Mag Inc. is also a 20% member of Mining Resources, LLC, a joint venture with Steel Dynamics, Inc. ("**Steel Dynamics**"), in which Steel Dynamics is the 80% member.  Mining Resources, LLC was formed for the operation of an iron ore concentrate production plant, Plant 3, in Chisholm, Minnesota, which also uses Mag Inc. technology.

8.      As of the Petition Date, the Debtors own plants located in Keewatin, Minnesota ("**Plant 1**"), Bovey, Minnesota ("**Plant 2**"), and Grand Rapids, Minnesota ("**Plant 4**" and, collectively with Plant 1 and Plant 2, the "**Iron Ore Plants**") where they produce iron ore concentrate using proprietary technology, such as the Rev3.1 Separator, and associated intellectual property (the "**Magnetation Process**") licensed from Mag LLC's majority member, Mag Inc., pursuant to a non-exclusive license agreement (the "**Technology License Agreement**").[4]  The Debtors also operate a rail load-out facility, the Jessie Load-Out, in Colerine, Minnesota, which serves as the primary means of rail transportation for the finished materials produced from the Iron Ore Plants and allows the Debtors to capitalize on the existing rail infrastructure in the Mesabi Range.

9.      In 2013, Magnetation commenced construction of an iron ore pellet plant near Reynolds, Indiana (the "**Pellet Plant**"), which allows Magnetation to process the majority of the iron ore concentrate it produces into iron ore pellets.  The Pellet Plant made its first shipment of pellets in October 2014.  The Pellet Plant is strategically located to service the blast furnaces of North American steelmakers in the Great Lakes region.  Since its completion in 2014, the Pellet Plant has been the primary source of revenue for Magnetation.

10.     The Debtors' current production capacity is supported by two long-term off-take agreements, a concentrate supply agreement (the "**AHMSA Contract**") with Altos Hornos de Mexico S.A.B. de C.V. ("**AHMSA**"), the largest integrated steel mill in Mexico, and a pellet off-take agreement with AK Steel (the "**AK Steel Contract**").  Pursuant to the AHMSA Contract,

(continued…)

[3] Mag LLC was formed on May 26, 2010.  The joint venture between Mag Inc. and AK Iron was effected in part through an amendment to Mag LLC's operating agreement entered into as of October 4, 2011.

[4] As discussed further herein, contemporaneously herewith, the Debtors have filed a motion seeking to assume the Technology License Agreement.

the Debtors sell AHMSA approximately 0.6 million tonnes of concentrate per year. The Debtors' remaining concentrate is supplied to the Pellet Plant for production of iron ore pellets.[5] Pursuant to the AK Steel Contract, AK Steel is required to purchase 100% of its annual requirements of iron ore pellets up to an amount equal to the actual capacity of the Pellet Plant, which is estimated to be 3 million tonnes, and is subject to a minimum off-take obligation of 1.5 million tonnes. The AK Steel Contract has a term of at least 20 years, which commenced on October 10, 2014.

11. The combination of low cost, cutting edge iron ore concentrate production at the Iron Ore Plants and state-of-the-art iron ore pellet production at the Pellet Plant has allowed Magnetation to achieve a cost per tonne of iron ore pellets significantly below the industry average. Likewise, through the use of the Jessie Load-Out, Magnetation is able to efficiently ship iron ore concentrate it produces at the Iron Ore Plants in northern Minnesota to the Pellet Plant for processing.

12. The Magnetation Process is the key to Magnetation's business. Economically accessible iron ore resources are a limited commodity, and have been substantially consumed over the last approximately 100 years, particularly in northern Minnesota and the upper Midwest. However, traditional iron ore mining, like the type practiced in Minnesota's iron range, has left behind an enormous quantity of "tailings," mined rock discarded after the extraction of iron ore. In the traditional iron mining process, ore-containing rock is blasted apart with explosives, and then further crushed and ground to allow the separation of iron ore. The tailings, accounting for as much as two-thirds of the mined rock, are discarded. It was impossible to economically extract the iron ore that remained in the tailings, which was nonetheless significant, until Mag

---

[5] The Debtors have arrangements allowing them to purchase additional concentrate from third-party suppliers, including Mining Resources, LLC, if needed.

Inc., including certain members of the Debtors' management team, developed the Magnetation Process.[6]

13.    Harvesting high quality iron ore concentrate from previously unsalvageable remnants of mineral rock through the Magnetation Process largely eliminates a number of issues that traditional iron ore producers must contend with.  First, the extraction cost of the raw inputs—the tailings themselves—is significantly lower than in the traditional iron ore extraction process, because the tailings have already been blasted and reduced to a processable form.  Second, resource scarcity is less of a concern for Magnetation, both because of the sheer volume of tailings in northern Minnesota, and because Mag Inc.'s licensees (which currently include only Mag LLC and Mining Resources, LLC) are the only enterprises able to economically harvest iron ore from them.  Third, unlike many producers in the global iron ore market, the Debtors are able to produce iron ore concentrate and pellets in the heart of the American steelmaking region, while other producers must source and process their inputs abroad, adding large transportation costs to servicing the American steel market.  In addition, separate from the benefits of working with tailings, the Magnetation Process overcomes barriers to extended operation that affect existing technology used in traditional iron ore beneficiation, allowing Magnetation to benefit from industry-leading uptimes (hours of plant feed time divided by total hours in a month) at the Iron Ore Plants.  Each of the Iron Ore Plants has achieved an average monthly uptime in excess of 92%.

---

[6] The Magnetation Process utilizes patented magnetic separators and proprietary plant designs that apply other common mineral processing techniques controlled with proprietary automation software to separate hematite goethite and limonite from non-magnetic materials (primarily silica) to yield iron ore concentrate product.  Unlike other magnetic separation processes, which rely primarily on large, rigid magnetic plates that are prone to a variety of maintenance issues, the Magnetation Process utilizes a simple carousel design and discrete matrix media that allows for the free flow of material and prevents plugging and clogging.

14. The principal use for iron ore concentrate is in sinter plants and pellet plants, which beneficiate the iron ore concentrate into raw inputs for pig iron processes, the products of which are ultimately converted into steel using either a basic oxygen furnace ("**BOF**") process or electric arc furnace ("**EAF**") process. For technical reasons related to the relative tolerances of the two processes for the presence of gangue minerals such as silica and alumina, Magnetation currently focuses primarily on supplying BOF operations. However, Magnetation is studying ways to economically produce merchant pig iron or a concentrate with low gangue content so that it will also be able to serve the EAF market.

15. Collectively, the Debtors employ approximately 361 people in active status, working in both full and part time positions (together with the current members of the Debtors' boards of directors, the "**Employees**"), and contract for an additional approximately 125 personnel (the "**Other Employees**") from Mag Inc. to provide management and certain other services pursuant to a management services agreement between the two parties.[7] The Debtors' Employees include operators, electricians, millwrights, pipefitters, lab technicians and administrative personnel. The Other Employees provide management, supervisory, human resources, finance, engineering, administrative and clerical services. Approximately 33.5% of the Employees are represented by Local 49 of the International Union of Operating Engineers, pursuant to two separate collective bargaining agreements, one of which applies to Employees at Plant 1 and one of which applies to Employees at Plant 2 and at the Jessie Load-Out. The Debtors provide healthcare and other benefits to their Employees and Other Employees. The Debtors are subject to the workers' compensation laws in the states in which they operate. The

---

[7] As discussed further herein, contemporaneously herewith, the Debtors have filed a motion seeking authority to continue to honor the management services agreement, including prepetition obligations associated therewith.

average monthly cost of the Debtors' workers' compensation programs total approximately $91,000[8] per month as of the Petition Date.

16.     For the fiscal year ending December 31, 2014, the Debtors earned revenues of approximately $96.2 million and recorded EBITDA of approximately $16.6 million.   The Debtors estimate that their net loss during the same period was approximately $16 million.

17.     As discussed further below, the Debtors operate in a challenging economic environment.  The commodity price of iron ore is a primary driver of operating results, in part because the Debtors' customer contracts contain quarterly price adjustment provisions linked to the world spot price for iron ore, and in part because certain of the leases under which the Debtors access tailings basins have price escalators linked to global iron ore spot prices.  Iron ore spot prices, in turn, are influenced heavily by global macroeconomic trends, including trends with regard to steel production in China, the world's largest producer of crude steel, and other factors influencing global demand for steel production.  China accounted for approximately 50% of the world's steel production in 2014, while the United States and Mexico, the Debtors' two largest geographic markets, produced only approximately 7% of the world's steel.  Another primary driver of iron ore spot market prices is the worldwide market balance of supply and demand of iron ore.  In 2014, the new capacity of iron ore supply outpaced the iron ore demand and shifted the global market from a market deficit to a market surplus.  As a result, iron ore spot market prices experienced an unprecedented decline in 2014.

---

[8] Of this, approximately $84,000 goes to pay workers' compensation obligations in respect of Employees, while the remaining approximately $7,000 is attributable to workers' compensation obligations in respect of Other Employees.

### B.    Corporate Structure

18.     Mag Inc. is the majority member of Mag LLC, holding 50.1% of the membership interests, while AK Iron holds the remaining 49.9%.  Mag LLC is the direct parent and 100% owner of each of the other Debtors.  It also owns the Jessie Load-Out and Plants 1 and 2.  Mag Pellet LLC ("**Mag Pellet**"), an Indiana limited liability company, owns the Pellet Plant; Mag Mining, LLC, a Delaware limited liability company, owns Plant 4; Mag Lands, LLC, a Delaware limited liability company, owns and leases various parcels of land; and Mag Finance Corp. ("**Mag Finance**"), a Delaware corporation, is the co-issuer of the Prepetition Notes (as defined below).

### C.    Capital Structure[9]

19.     Mag LLC, as borrower, and all of the other Debtors, as guarantors, are parties to that certain $65 million credit agreement, dated as of May 20, 2013, as modified by amendments dated as of July 11, 2014, December 15, 2014 and April 17, 2015 (as further amended, supplemented, modified, or amended and restated from time to time, the "**Prepetition Revolving Credit Agreement**", and the revolving credit facility thereunder, the "**Prepetition Revolving Facility**") by and among the Debtors, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "**Prepetition Revolving Agent**") and the lenders party thereto (the "**Prepetition Revolving Lenders**").  The Prepetition Revolving Facility provides for the issuance of letters of credit up to $20 million and direct borrowings up to $65 million, with outstanding letters of credit applied against the capacity for direct borrowings on a dollar-for-dollar basis.  Obligations arising under the Prepetition Revolving Facility are secured by first priority liens on substantially all of the Debtors' assets.  As of the Petition Date, approximately

---

[9] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits, which shall control in the event of any inconsistency.

$56 million in direct borrowings and approximately $8.9 million in letters of credit are outstanding under the Prepetition Revolving Facility.

20.     In May 2013, Mag LLC and Mag Finance issued $325 million of 11.0% senior secured notes due 2018 (the "**Prepetition Notes**"), and in July 2014, Mag LLC and Mag Finance issued a tack-on offering of $100 million of Prepetition Notes under the same indenture. The Prepetition Notes are guaranteed by each of the other Debtors. Interest on the Prepetition Notes is payable on May 15 and November 15 of each year, and the Debtors are required to maintain an interest escrow account (the "**Interest Escrow Account**") containing, at all times, an amount no less than the amount required to make the interest payment on the Prepetition Notes due on the next succeeding interest payment date. The Prepetition Notes are secured by first priority liens on substantially all of the Debtors' assets, ranking pari passu with the liens securing the obligations under the Prepetition Revolving Facility, except with respect to the Interest Escrow Account, which is for the exclusive benefit of the holders of the Prepetition Notes ("**Prepetition Noteholders**"). However, pursuant to an intercreditor agreement among the Prepetition Revolving Agent, the Prepetition Term Agent, Mag LLC and other parties, the Prepetition Term Lenders are junior in right of payment to the Prepetition Revolving Lenders, but senior in right of payment to the Prepetition Noteholders. As of the Petition Date, $425 million in aggregate principal amount of the Prepetition Notes remains outstanding.

21.     Mag Pellet is also party to a tax increment financing arrangement (the "**TIF Financing Arrangement**") with White County, Indiana, entered into on June 6, 2013. Pursuant to the TIF Financing Arrangement, Mag Pellet purchased a $23.5 million 0% bond from White County. Under an unsecured note made by Mag Pellet, White County loaned the net proceeds from the sale of the bond to Mag Pellet at 0% interest to finance the construction of the Pellet

Plant.  Mag Pellet's annual real and personal property tax payments are credited toward the payment of principal on the bond.  The TIF Financing is scheduled to mature in 2037.

22.     Finally, in the weeks prior to filing, on April 17, 2015, the Debtors entered into a term loan facility (the "**Prepetition Term Facility**") in the amount of $3,814,384.43 in order to fund operations while they continued to engage in discussions with certain of their stakeholders and prepare for an orderly chapter 11 filing if such discussions did not result in an out-of-court solution to the Debtors' liquidity and balance sheet restructuring needs.  The lenders under the Prepetition Term Facility are certain of the existing Prepetition Noteholders (the "**Ad Hoc Senior Secured Note Holder Committee**").  The Prepetition Term Facility is secured by liens on the same assets that secure the Prepetition Revolving Facility, which liens rank junior in right of payment to the Prepetition Revolving Lenders but senior in right of payment to Prepetition Noteholders.

## II.

## EVENTS LEADING TO THE CHAPTER 11 CASES

23.     The Debtors' current circumstances are best understood in the context of the long rally in iron ore prices of the last fifteen years.  The Platts Iron Ore Index ("**IODEX**"), the current benchmark for spot prices for iron ore concentrate, rose steadily in the early years of last decade before beginning a sharp ascent in 2004, which lasted until at least 2010.  During those years, the price of iron ore increased from less than $40 per tonne to more than $170 per tonne.  Between 2010 and 2013, the IODEX was volatile, but prices remained generally high, peaking over $187 per tonne and rarely falling below $100 per tonne.  It was at this peak that the Debtors embarked on the expansion of their operations, including the construction of the Pellet Plant and Plant 4.

11

24.     However, over the last eighteen months, there has been an unprecedented and unforeseen global collapse in many commodity prices, particularly iron ore.  Between January 2014 and March 2015, the IODEX fell over 50%, primarily as a result of oversupply in the global market caused by additional iron ore capacity, particularly due to increased production in Australia and Brazil, and a decreased rate of growth in Chinese steel production.  Additionally, demand for steel from domestic manufacturers—the Debtors' principal target customers—has been undercut by a flood of low price imports from abroad.  The rapid decline in the IODEX has significantly impacted the Debtors' revenues, while weakness in the domestic steel market has constrained opportunities for new revenue streams.  Unfortunately, both of these difficulties have arisen precisely as the Debtors' investments over the past several years have begun to bear fruit.

25.     The fundamentals of the Debtors' businesses remain strong: the world continues to build, and needs ever-increasing amounts of iron and steel, while existing economically accessible reserves of high quality iron ore are depleted more every year.  The Debtors not only produce iron ore at a significantly lower cost than most of their competitors, they do so from a readily available significant supply of tailings and other mining remnants accumulated over the last century of iron mining in the Minnesota Iron Range.  However, the combination of the prolonged pricing slump and significant leverage incurred during the build-out of the Debtors' facilities has necessitated a restructuring of the Debtors' obligations.

### III.

### PREPETITION RESTRUCTURING INITIATIVES

26.     The Debtors' management team has taken various actions in response to the challenges described above.

27.     As the price of iron ore fell over the course of 2014, the Debtors devised and implemented a number of measures to save costs and manage remaining capital expenditures.  In

order to increase liquidity during the build-out phase of Plant 4, in December 2014, the Debtors closed on a $15 million upsize of the Prepetition Revolving Facility, bringing that facility to its current $65 million commitment.  In March 2015, the Debtors idled Plant 1, their smallest and highest-cost facility, placing it in a care and maintenance program.  The Debtors have filled the production gap left by Plant 1 through increased production at their other facilities and outside purchases of iron ore concentrate.

28.     Unfortunately, the continued slump in the IODEX reduced revenue beyond the level of the new operational efficiencies and additional financing, and so the Debtors began exploring other options to improve their capital structure, reduce interest expense and put their businesses on a sustainable path through the commodities pricing slump.

29.     In January 2015, the Debtors retained Blackstone Advisory Partners L.P. ("**Blackstone**").  With the assistance of their advisors, the Debtors considered a range of strategies to deleverage and improve liquidity.  To that end, the Debtors engaged in discussions with the Ad Hoc Senior Secured Note Holder Committee, which consists of holders of more than 70% of the principal amount of the Prepetition Notes, AK Steel and Mag Inc. in the early months of 2015 to explore various alternatives, including restructuring the Prepetition Notes and renegotiating the AHMSA Contract and the AK Steel Contract.  By late March 2015, it became apparent that an out-of-court solution may not be feasible, and so the Debtors began to examine the possibility of a chapter 11 filing.  The Debtors and Blackstone then approached the Prepetition Revolving Agent and certain Prepetition Noteholders regarding their willingness to provide debtor-in-possession financing.  Additionally, the Debtors determined that, in order to effectuate an orderly filing that would provide immediate access to sufficient postpetition financing and avoid value loss, they needed to enter into the Prepetition Term Facility to provide limited interim financial assistance.

13

30.     While preparing for a potential chapter 11 filing and negotiating with potential DIP lenders, the Debtors simultaneously continued discussions with their key stakeholders in an effort to reach a consensual out-of-court restructuring both with respect to their capital structure and their two supply agreements.  The Debtors ultimately reached an agreement with AHMSA to amend the terms of the AHMSA Contract, resulting in a more economically beneficial contract for the Debtors.  Despite the Debtors' extensive efforts, at the time of filing, the Debtors have not yet reached agreement with AK Steel on possible amendments to the AK Steel Contract.  While the Debtors and the Ad Hoc Senior Secured Note Holder Committee intend to continue discussions with AK Steel postpetition, the Debtors cannot do so without liquidity relief.

## IV.

## DIP FINANCING

31.     Ultimately, the Debtors secured a $135 million debtor-in-possession financing facility (the "**DIP Financing**") provided by the members of the Ad Hoc Senior Secured Note Holder Committee (in such capacities, the "**DIP Lenders**") with Wilmington Trust, National Association acting as administrative agent.  The DIP Financing includes a roll-up of the Prepetition Term Facility and a roll-up of a portion of the Prepetition Notes held by the DIP Lenders, thereby providing the Debtors with approximately $63.7 million in incremental liquidity.  The proceeds of the DIP Financing will be used in accordance with a budget to finance operations and the Debtors' chapter 11 cases.

32.     As a condition to agreeing to provide the DIP Financing, the Ad Hoc Senior Secured Note Holder Committee required, among other things, that the Debtors agree to the principal terms of a plan of reorganization and to comply with certain milestones with respect to the progress of these chapter 11 cases.  To that end, in the days leading up to the filing of these cases, the Debtors and the Ad Hoc Committee of Senior Secured Note Holders negotiated the

principal terms of a plan of reorganization and post-reorganization capital structure as set forth in the term sheet attached to the Debtors' motion to approve the DIP Financing (the "**Plan Term Sheet**").  The parties intend to formalize the Plan Term Sheet through a restructuring support agreement in the coming weeks, which the Debtors will seek approval of from this Court.  In addition, the terms of the DIP Financing require, among other things, that the Debtors file a plan and disclosure statement within ninety days of the Petition Date.

33.    The Debtors have determined, in the prudent exercise of their business judgment, that the commencement of these chapter 11 cases at this time is the best available alternative in order to provide access to DIP financing and ensure that maximum value can be preserved and realized for the benefit of their estates.  The Debtors have been and continue to be focused on maximizing value for all of their stakeholders.  During the chapter 11 cases, the Debtors will marshal all of their resources to continue to operate their businesses in the ordinary course, honor their strong customer and vendor relationships and continue to grow and innovate.

34.    The Debtors also submit that the DIP Financing is in the best interests of the Debtors and their estates.  The Debtors did not receive any offer of committed postpetition financing other than from the Ad Hoc Committee of Senior Secured Note Holders.  The DIP Financing will provide the Debtors with sufficient liquidity to continue operations and administer these chapter 11 cases, as well as a framework for an expeditious emergence from chapter 11.  While the Debtors are cognizant of the costs associated with chapter 11, the Debtors believe that, by consummating a restructuring supported by their critical stakeholders under the protections of chapter 11, Magnetation will emerge as an even stronger leader in the metals and mining industry.

# V.

# **FIRST DAY MOTIONS**

35.     The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions.  The Debtors request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition into chapter 11.

36.     For a more detailed description of the First Day Motions than set forth below, the Debtors respectfully refer the Court to the respective First Day Motions.  To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.  Capitalized terms that are used in this Part V but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

### A.     **Administrative Motion**

   i.     *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing and (ii) Authorizing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**")*

37.     The Debtors seek entry of an order directing joint administration of these cases for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the District of Minnesota (the "**Local Rules**").  Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Magnetation LLC.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors to indicate the joint administration of the estates.

38.     Given the provisions of the Bankruptcy Code and the Debtors' affiliation, joint administration of these cases is warranted.  Joint administration will avoid the preparation, replication, service and filing, as applicable, of duplicative notices, applications and orders, thereby saving the Debtors considerable expense and resources.  The Debtors' financial affairs

and business operations are closely related.  Many of the motions, hearings and orders in these chapter 11 cases will affect each Debtor and their respective estates.  The rights of creditors will not be adversely affected, as this Motion requests only administrative, and not substantive, consolidation of the estates.  Moreover, each creditor can still file its claim against a particular estate.  In fact, all creditors will benefit by the reduced costs that will result from the joint administration of these chapter 11 cases.  The Court also will be relieved of the burden of entering duplicative orders and maintaining duplicative files.  Finally, supervision of the administrative aspects of these chapter 11 cases by the U.S. Trustee for the District of Minnesota will be simplified.

39.   I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates and their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

ii.    *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing and (ii) Modifying the Bar Date for Filing Proofs of Claim (the "**Bar Date Motion**")*

40.   The Debtors seek entry of an order (a) setting July 15, 2015 at 5:00 p.m. (prevailing Central time) as the bar date (the "**Proposed Bar Date**") by which proofs of claim must be received from each person or entity, other than any governmental unit (as defined in section 101(27) of the Bankruptcy Code) ("**Governmental Units**"), in respect of any prepetition claim (as defined in section 101(5) of the Bankruptcy Code), including, without limitation, claims entitled to priority under section 503(b)(9) of the Bankruptcy Code and (b) granting related relief.

17

41.     The Debtors have filed various motions seeking relief to aid their transition to debtors in possession and to support their chapter 11 reorganization efforts, including a motion seeking authorization to obtain postpetition financing (the "**DIP Motion**").  The proposed order granting the DIP Motion (the "**DIP Order**") sets forth certain milestones that, if the Debtors do not meet, constitute events of default under the Debtors' proposed postpetition credit facility. Specifically, the DIP Order provides that the Debtors must file a plan of reorganization and a disclosure statement on or before the 90th day after the Petition Date.  To meet this milestone, the Debtors must have an opportunity to review and analyze all of the non-Governmental Unit proofs of claim filed in these cases in advance of filing a plan and disclosure statement.  The DIP Order also includes a milestone that requires the Debtors to obtain court approval of their disclosure statement within 120 days after the Petition Date.  Accordingly, the Proposed Bar Date would give the Debtors an opportunity to examine the proofs of claim filed in these cases and formulate an appropriate plan and disclosure statement that takes into account all such filed claims.

42.     I believe that the relief requested in the Bar Date Motion is in the best interests of the Debtors' estates and their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bar Date Motion should be granted.

**B.      Operational Motions Requesting Immediate Relief**

   i.      *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an
Expedited Hearing, (ii) Authorizing Maintenance of the Debtors' Existing
Cash Management System, Purchase Card Program and Existing Bank
Accounts and Business Forms and (iii) Authorizing Financial Institutions
to Honor and Process Related Checks and Transfers (the "**Cash
Management Motion**")*

43.     The Debtors seek entry of an order (a) authorizing, but not directing them, to
(i) continue to operate their prepetition cash management system with respect to intercompany
cash management and obligations, (ii) fund the operations of subsidiaries, (iii) maintain the
Debtors' existing bank accounts and (iv) maintain the Debtors' purchase card program,
(v) maintain the Debtors' existing business forms; and (b) granting administrative expense
priority to the Debtors' intercompany claims.  Without the requested relief, the Debtors would
have great difficulty maintaining their operations, which could cause grievous harm to the
Debtors and their estates.

44.     I believe that the relief requested in the Cash Management Motion is in the best
interests of the Debtors' estates and their creditors and all other parties in interest and constitutes
a critical element in achieving a successful and smooth transition into chapter 11.  Accordingly,
on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be
granted.

   ii.      *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an
Expedited Hearing, (ii) Authorizing Debtors to (a) Pay Prepetition Wages,
Salaries, Employee Benefits and Other Compensation, (b) Maintain
Employee Benefits Programs and Pay Related Administrative Obligations
and (c) Honor Management Services Agreement and Pay Prepetition
Obligations Related Thereto, (iii) Authorizing Magnetation Employees To
Proceed With Outstanding Workers' Compensation Claims and
(iv) Authorizing Financial Institutions to Honor and Process Related
Checks and Transfers (the "**Wages and Benefits Motion**")*

45.     The Debtors seek entry of interim and final orders (a) authorizing, but not
requiring, them to pay or cause to be paid, in their sole discretion, all or a portion of the amounts

19

owing (and associated costs) under or related to Wages, the Withholding Obligations, the Reimbursement Obligations, the Health and Welfare Plan Obligations, the Vacation and Sick Leave Obligations, the Pension Plan Obligations, the Savings Plans Obligations, the Workers' Compensation Obligations, the Contingent Workers Obligations, the Plant-Level Incentive Plan Obligations, the Allowance Program Obligations and the Management Services Obligations, (b) unless otherwise set forth in the Wages and Benefits Motion, authorizing, but not requiring, them to continue their plans, practices, programs and policies for their current and former Employees, as applicable, as those Employee Programs were in effect as of the Petition Date and as may be modified, terminated, amended or supplemented from time to time, in their sole discretion, and to make payments pursuant to the Employee Programs in the ordinary course of business, as well as to pay related administrative obligations, (c) authorizing, but not requiring, them to continue performing and exercising their respective rights and obligations under the Management Services Agreement in the ordinary course of business, (d) permitting Magnetation Employees holding claims under the Workers' Compensation Programs to proceed with such claims in the appropriate judicial or administrative fora and (e) authorizing applicable banks and other financial institutions to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts and automatic payroll and other transfers to the extent that those checks or transfers relate to any of the foregoing.

46.     If the requested relief is not granted, the Debtors' relationships with the Magnetation Employees would be adversely impacted and there could well be irreparable harm to the Magnetation Employees' morale, dedication, confidence and cooperation.  The Debtors' businesses hinge on their relationships with their customers, and the ability to provide superior services is vital.  The Magnetation Employees' support for the Debtors' efforts is critical to the success of these chapter 11 cases.  At this early stage, the Debtors simply cannot risk the

substantial damage to their businesses that would inevitably attend any decline in the Magnetation Employees' morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

47.    I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estate and their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages and Benefits Motion should be granted.

iii.    *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing (ii) Prohibiting Utilities from Altering, Refusing or Discontinuing Service, (iii) Deeming Utility Companies Adequately Assured of Future Performance and (iv) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "**Utilities Motion**")*

48.    The Debtors seek entry of an order (a) determining that the Debtors' proposed offer of deposits provides Utilities with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving procedures for resolving requests by Utilities for additional or different assurances beyond those set forth in the Motion and (c) prohibiting the Utilities from altering, refusing or discontinuing any Utility Services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

49.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations. Should any Utility refuse or discontinue service, even for a brief period, the Debtors' operations could be severely disrupted.  The impact of this disruption on the Debtors' day-to-day business operations and revenue would be extremely harmful and could jeopardize the value of the Debtors' assets.

50.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be granted.

      iv.    *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing, (ii) Authorizing Debtors to Pay Certain Prepetition Claims of Shippers, Warehousemen and Service Providers and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "**Shippers Motion**")*

51.    The Debtors seek entry of an order (a) authorizing, but not requiring, the Debtors to pay all or a portion of those prepetition labor, shipping and delivery charges to Shippers, Warehousemen and Service Providers that the Debtors determine to be necessary or appropriate to obtain the release of goods, raw materials, parts, components, materials, equipment or other items held by any such Shippers, Warehousemen or Service Providers and (b) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing.

52.    The services provided by the Shippers and Warehousemen are essential to the Debtors' day-to-day operations in that they are necessary for the Debtors to transport tailings to the Iron Ore Plants, iron ore concentrate from the Iron Ore Plants to dock or rail terminals and from there to the Pellet Plant, and iron ore concentrate from these terminals and iron ore pellets from the Pellet Plant to the Debtors' domestic and international customers.

53.    I believe that the relief requested in the Shippers Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers Motion should be granted.

v.      *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing, (ii) Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Vendors and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "**Critical Vendors Motion**")*

54.     The Debtors seek an entry of interim and final orders (a) granting them the authority, but not requiring them, to pay all or a portion of their prepetition obligations of certain Critical Vendors up to the Critical Vendor Claim Cap, (b) granting them the authority, but not requiring them, to pay certain claims of Critical Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date, which are likely entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code and (c) authorizing financial institutions to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing.

55.     The Debtors operate in a competitive, highly specialized and closely regulated industry.  The unique nature of the iron ore industry, and in particular the Debtors' one-of-a-kind iron ore extraction process, leaves the Debtors with few options (and often no practical alternatives) when shopping for vendors.  Certain suppliers and service providers at various venues are the only option available to the Debtors.  As a result, if the requested relief is not granted and certain essential trade vendors refuse to continue to supply goods and services to the Debtors postpetition, the Debtors may be unable to continue their operations, thereby endangering the Debtors' successful chapter 11 efforts and substantially harming all creditors.

56.     I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Critical Vendors Motion should be granted.

23

vi.     *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing, (ii) Granting Administrative Expense Status to Debtors' Undisputed Obligations to Vendors Arising From the Postpetition Delivery of Goods Ordered Prepetition, (iii) Authorizing Debtors to Pay Those Obligations in the Ordinary Course of Business and (iv) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "**Postpetition Goods Motion**")*

57.     In the ordinary course of the Debtors' businesses, the Debtors rely on numerous vendors and suppliers to provide the Debtors with parts, inventory, supplies, equipment and other goods for use in the regular operation of the Debtors' iron ore processing businesses.  The Debtors seek entry of an order (a) granting Vendors administrative priority status under section 503(b) of the Bankruptcy Code for those undisputed obligations arising from outstanding prepetition purchase orders for Goods delivered after the Petition Date, (b) authorizing the Debtors to pay such obligations in the ordinary course of business under section 363(c) of the Bankruptcy Code and (c) authorizing all applicable banks and financial institutions to pay all checks presented for the payment of such obligations.

58.     I believe that the relief requested in the Postpetition Goods Motion will help ensure a continuous supply of materials indispensable to the Debtors' operations, is in the best interests of the Debtors' estates and their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Postpetition Goods Motion should be granted.

vii.     *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing, (ii) Authorizing Debtors to Continue and Renew Their Liability, Property, Casualty and Other Insurance Programs and Honor All Obligations in Respect Thereof and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "**Insurance Motion**")*

59.     The Debtors seek entry of an order authorizing (a) the Debtors to maintain, continue and renew the Insurance Programs on an uninterrupted basis and in accordance with the

24

same practices and procedures as were in effect before the Petition Date and (b) financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay the foregoing.  This would include (i) paying all amounts arising under the Insurance Programs or the financing thereof and (ii) renewing or obtaining new insurance policies as needed in the ordinary course of business.

60.     The Debtors maintain various liability, casualty, property and other insurance and risk control programs through several private insurance carriers in the ordinary course of the Debtors' businesses.  If the requested relief is not granted and the Insurance Programs lapse or terminate, the Debtors may well be unable to continue large portions of their operations, thereby endangering the value of the Debtors' assets and substantially harming all creditors.  The Debtors believe that all material amounts related to the Insurance Programs that were due and payable on or prior to the Petition Date have been fully paid but, out of an abundance of caution and to avoid irreparable harm to their businesses, the Debtors seek authority to satisfy any such prepetition obligations through the Insurance Motion.

61.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates and their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be granted.

      viii.          *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing and (ii) Authorizing Debtors to Assume the Technology License Agreement (the "**TLA Assumption Motion**")*

62.     The Debtors seek entry of an order authorizing the Debtors to assume the Technology License Agreement, which grants Mag LLC a non-exclusive license to use the Magnetation Process, the fundamental technology driving its business.  The Technology License Agreement is a fully paid license, costing the Debtors only pass-through payments to the State of

Minnesota owed under a royalty agreement among Mag Inc., the Office of the Commissioner of Iron Range Resources and Rehabilitation, an agency of the State of Minnesota, and the Minnesota Department of Employment and Economic Development, a department of the State of Minnesota.  There are no prepetition defaults under the Technology License Agreement, and upon assumption the Debtors will secure the primary means with which to operate their businesses at no additional cost.

63.    I believe that the relief requested in the TLA Assumption Motion is in the best interests of the Debtors' estates and their creditors and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the TLA Assumption Motion should be granted.

ix.    *Debtors' Notice of Hearing and Joint Motion for an Order (i) Granting an Expedited Hearing, (ii) Authorizing Debtors to Pay Certain Prepetition Taxes, Governmental Assessments and Fees and (iii) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "**Taxes and Fees Motion**")*

64.    The Debtors seek entry of an order (a) authorizing the Debtors, but not requiring them, to pay any Covered Taxes and Fees, whether asserted prior to, on or after the Petition Date and (b) authorizing the Debtors' financial institutions to receive, process, honor and pay checks or wire transfers used by the Debtors to pay such Covered Taxes and Fees.

65.    In connection with the normal operations of their businesses, the Debtors collect, withhold and incur production taxes, environmental and safety fees and assessments, sales taxes, use taxes, employment and wage-related taxes and property taxes, as well as other taxes, fees and charges described in the Taxes and Fees Motion.  The Debtors remit Covered Taxes and Fees to various federal, state and local governments, including taxing and licensing authorities.  The Covered Taxes and Fees are remitted by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions.

26

66.    I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition into chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes and Fees Motion should be granted.

         x.       *Debtors' Notice of Hearing and Joint (i) Motion for an Order Granting an Expedited Hearing and (ii) Application for an Order Appointing Donlin, Recano & Company, Inc. as the Claims, Noticing and Balloting Agent for the Debtors, Effective Nunc Pro Tunc to the Petition Date (the "**DRC Retention Application**")*

67.    The Debtors seek entry of an order appointing Donlin, Recano & Company, Inc. ("**DRC**") as the claims, noticing and balloting agent in order to assume responsibility for, among other things, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  I believe that DRC's rates are competitive and reasonable given DRC's quality of services and expertise.  Accordingly, on behalf of the Debtors, I respectfully submit that the DRC Retention Application should be granted.

## V.

68.    I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted.

*[Signature page follows]*

27

I, the undersigned Chief Financial Officer of Magnetation LLC, declare under penalty of perjury that the foregoing is true and correct.

Dated: ___May 5___, 2015

_____

Joseph A. Broking
Chief Financial Officer

*[Signature Page to Officer Declaration]*