UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Magnetation LLC, | | Case No. 15-50307 |
| | Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | | Case No. 15-50308 |
| | Debtor. | Chapter 11 Case |
| Mag Finance Corp., | | Case No. 15-50309 |
| | Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | | Case No. 15-50310 |
| | Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | | Case No. 15-50311 |
| | Debtor. | Chapter 11 Case |

**NOTICE OF HEARING AND JOINT MOTION FOR AN ORDER (I) GRANTING AN
EXPEDITED HEARING, (II) AUTHORIZING THE DEBTORS TO PAY THE
PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND
(III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS**

TO: The parties in interest as defined in Local Rule 9013-3(a)(2).

1.     Magnetation LLC ("**Mag LLC**") and its subsidiaries, as debtors and debtors in possession in these proceedings (collectively, the "**Debtors**"), file this motion (this "**Motion**") requesting the relief described below, and give notice of hearing.

2.     The Court will hold a hearing on the Motion at 10:00 a.m. (prevailing Central time) on May 7, 2015 in Courtroom No. 2A, U.S. Courthouse, 316 North Robert Street, St. Paul, Minnesota 55101.

3.     Local Rule 9006-1(c) provides deadlines for responses to this Motion.  However, given the expedited nature of the relief sought herein, the Debtors do not object to written responses being served and filed up to two hours prior to the hearing.  **UNLESS A RESPONSE**

OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rule 1070-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  On May 5, 2015 (the "**Petition Date**"), each of the above-captioned Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**").  The cases are currently pending in this Court.

5.    This Motion arises under sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, and is filed under Local Rules 9013-1, 9013-2 and 9013-3.  Notice of the hearing on this Motion is provided pursuant to Bankruptcy Rule 9013 and Local Rules 9013-2(b) and 9013-3.

6.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed.

7.    Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of Joseph A. Broking, the Chief Financial Officer of Magnetation LLC, which is incorporated herein by reference.  Facts specific to the relief requested herein are set forth in the relevant sections below.

## RELIEF REQUESTED

8.    By this Motion, and pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors seek entry of an order substantially in the form filed herewith (the

"**Order**"): (a) granting them the authority, but not requiring them, to pay all or a portion of their prepetition obligations to certain Critical Vendors[1] (as defined below), (b) granting them the authority, but not requiring them, to pay claims of Critical Vendors for the value of goods received by the Debtors in the ordinary course of their businesses during the 20-day period prior to the Petition Date, which are likely entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code, (c) authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing and (d) granting related relief.

9.      If the requested relief is not granted and certain essential Critical Vendors refuse to continue to supply goods and services to the Debtors postpetition, the Debtors may (i) risk the health and safety of their employees, (ii) fall out of compliance with environmental and other regulations and (iii) be unable to continue portions of their operations, thereby endangering the Debtors' successful reorganization and substantially harming all creditors.

## THE DEBTORS' CRITICAL VENDORS

10.      The Debtors purchase goods and services from certain vendors and independent contractors that are unaffiliated with the Debtors and are, by and large, sole-source or limited-source suppliers without which the Debtors could not operate (collectively, the "**Critical Vendors**"). The Debtors' businesses are based on a highly advanced, proprietary mineral processing technology used nowhere else in the world. As a result, many of these sole-source or limited-source suppliers are in the unique position of holding a virtual monopoly over the goods and services they provide in support of the Debtors' unique technology. Even if other

---

[1] Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors. To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Motion shall not apply to such prepetition claim.

comparable vendors exist, they usually are not close enough in proximity to the Debtors' remote northern Minnesota locations for them to adequately provide for the Debtors' needs in a timely or cost-efficient manner.   Replacement vendors, even where available, would likely result in substantially higher costs for the Debtors.   Even for equipment that is not customized for use by the Debtors, these critical equipment suppliers often operate with an effective regional monopoly over the parts and servicing of their equipment.   This precludes switching to any other vendor without an additional capital expenditure, which expenditure may be significant.

11.    If the Debtors can benefit from maintaining lower costs of goods and services purchased during the postpetition period and avoid the severe disruption to their businesses and safety risks to their employees that might be occasioned by the cessation of service therefrom, it is prudent for the Debtors to pay selected Critical Vendors some or all of their prepetition claims. However, except under extraordinary circumstances, such payment would be contingent on an agreement that the Critical Vendors continue to sell their goods or services to the Debtors on a going-forward basis on terms favorable to the Debtors.

12.    Importantly, the Debtors' ability to pay prepetition amounts to Critical Vendors is not unrestricted.  Before the Debtors can pay a prepetition amount to a Critical Vendor, they must first submit a payment request to the administrative agent under the Debtor-In-Possession Credit Agreement among Mag LLC, the lenders party thereto (the "**DIP Lenders**") and Wilmington Trust, National Association, as administrative agent (the "**DIP Credit Agreement**").  Specifically, section 5.3 of the DIP Credit Agreement requires that any Critical Vendor payment request include the name of the Critical Vendor, the proposed payment amount and a copy of any agreement to be entered into with such Critical Vendor or a description of the terms to be agreed with such Critical Vendor in exchange for payment.  Any single DIP Lender

may object to any proposed Critical Vendor payment within one business day of the Debtors' request, and only if no DIP Lender objects, or if over 50% of the DIP Lenders affirmatively consent in writing to the payment over a DIP Lender's objection, may the Debtors proceed to make such payment to the applicable Critical Vendor.  The Debtors submit that this procedure, and each DIP Lender's ability to effectively veto Critical Vendor payments, will function as a potent safeguard against any unnecessary payments to Critical Vendors on account of prepetition claims.

13.     The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates.  The preservation of key business relationships is among the Debtors' primary goals as they transition into chapter 11.

14.     The Debtors' Critical Vendors include, but are not limited to, (i) electrical maintenance and construction service providers; (ii) parts suppliers and equipment maintenance and service providers; (iii) environmental testing and service providers; (iv) proprietary mineral processing equipment and parts suppliers; (v) process-specific plant consumable and raw material suppliers; and (vi) technical and engineering service providers.  While the Debtors hope and expect to assure a continuing postpetition supply of goods and services by consensual negotiation with the vendors in the categories above, the Debtors recognize that their fiduciary duties bind them to consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid.

15.     As discussed in further detail below, the Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular services, even for a short duration, could disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share.  This irreparable harm to the Debtors and to the recovery of all of the

5

Debtors' creditors will far outweigh the cost of payment of the prepetition claims of the Critical
Vendors.

16.     <u>Electrical Maintenance and Construction Service Providers</u>.  Safe operation of the
Debtors' production plants requires periodic repair and maintenance of key electrical
infrastructure.  Failure to properly maintain the Debtors' production plants risks employee safety
and minimum break-even production levels.  Due to their isolated locations, the Debtors' iron
ore processing plants have a very limited supply of quality contractors.  Moreover, it is critical
for the Debtors to have vendors near their processing plants able to mobilize on short notice for
repairs.  The need for adequate mobility to deploy contractors on site on short notice to a remote
location in northern Minnesota severely limits the ability of the Debtor to switch vendors.

17.     <u>Equipment Maintenance and Parts Suppliers</u>.  The Debtors' key plant equipment
and process piping must be inspected and repaired frequently in order to maintain safe and
orderly working conditions.  Manufacturer-specific parts and service knowledge are required to
repair and maintain the Debtors' mobile equipment fleet, which is critical to plant operations.
Manufacturers regionalize parts distribution and services in a way that severely limits the choice
in vendors.  The Debtors' equipment represents a very large capital outlay, which precludes the
Debtors finding new equipment with different parts requirements for their processes.  The need
for adequate mobility to deploy contractors on site for repairs on short notice to a remote location
in northern Minnesota also severely limits the available vendors.  It can take years for the
Debtors to groom their suppliers for maximum efficiency and effectiveness in dealing with the
Debtors' highly specific and technologically sophisticated production processes.  Thus, a sudden
need to switch multiple equipment maintenance and parts suppliers would result, at the very least,

in significant inefficiencies and burdensome additional expenses, and would disrupt normal operations and distract the Debtors from their restructuring efforts at the most critical time.

18.    <u>Environmental Testing and Service Providers</u>.  The Debtors must meet a broad array of federal and state regulations in order to ensure safe working conditions for employees and to mitigate the potential environmental impact of their operations on the surrounding communities.[2]  For example, specific knowledge of Mag LLC processes for ore dust emissions control require the retention of specialized environmental service providers to meet Minnesota Pollution Control Agency (the "**MPCA**") and federal Clean Air Act regulations for air quality and to ensure the health and safety of the local communities where the Debtors operate.  Additionally, the Debtors' scram mining operations must maintain a State Disposal System permit issued by the MPCA to fulfill both state solid waste disposal requirements and the federal Clean Water Act.  This effort includes a detailed stormwater management program that ensures minimal water contact with industrial materials.  Without the State Disposal System, the Debtors would be subject to an even more stringent water disposal permit process to comply with the Clean Water Act.  To comply with these requirements, the Debtors must often rely on environmental vendors that occupy a highly specific niche in the market.  Thus, the supply of such vendors is extremely limited.  Without these and similarly specialized vendors, the Debtors could not continue their operations without risking non-compliance with important federal and state environmental regulations.  Preserving their access to these services is therefore critically important to the Debtors' business operations and to their restructuring efforts.

---

[2] These environmental laws and regulations include, but are not limited to, the Resource Conservation and Recovery Act, Pub L. No. 94-580, 90 Stat. 2795 (1976) (codified as amended at 42 U.S.C. §§ 6901–6992k (2012)), the Clean Air Act, 42 U.S.C. §§ 7401–7671q (2012), the Clean Water Act, 33 U.S.C. §§ 1251–1387 (2012), the Oil Pollution Act, 33 U.S.C. §§ 2701–2761 (2006) and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (2006).

19.    <u>Proprietary Mineral Processing Equipment and Parts Suppliers</u>.    The Debtors'
plants utilize a complex, one-of-a-kind process based on exclusive technology.    Consequently,
much of the Debtors' specialized plant processing equipment is proprietary or provided by
limited-source suppliers and service providers.    If the Debtors were unable to meet their
obligations to the suppliers for their equipment and parts or maintenance, then the Debtors would
face great difficulty locating adequate replacement vendors, severely hindering their operations.
This is especially true because the Debtors obtain a significant portion of their equipment and
maintenance services from vendors for which there exist no adequate replacements in the
marketplace.    Failing to pay these vendors would therefore significantly harm the Debtors'
operations, employees and creditors and would compromise their restructuring efforts.

20.    <u>Process-Specific Plant Consumable and Raw Material Suppliers</u>.    The Debtors'
technologically advanced processes use custom plant consumables such as ball mill charge,
which carries long-lead delivery times of three months or more.    These consumables cannot be
sourced by other suppliers without severely interrupting production.    The recipes of the Debtors'
products often include complex vendor-proprietary chemicals and ingredients that require
extensive tuning in the Debtors' plants.    In certain cases, switching suppliers would risk
equipment failure or a total production stoppage.    In the event the Debtors were forced to replace
their existing specialized raw material supply arrangements, the Debtors' raw material costs
could increase dramatically as they attempted to procure alternative sources.    Moreover, there
can be no assurance that the Debtors would even be able to timely obtain alternatives, potentially
disrupting essential operations or forcing expensive repair and experimentation efforts.    It is
therefore critical that the Debtors have the authority to pay their raw materials vendors to
continue these essential relationships.

21.    <u>Technical and Engineering Service Providers</u>. Engineers, technical services workers and other service providers are critical to the maintenance of the Debtors' machines, systems, properties and operations. The engineering and technical components of the Debtors' businesses require a number of products, such as software, technical hardware or related services. Maintenance of these services is critical to continuing smooth operations. The Debtors cannot simply replace these vendors without significant concerns that the new engineering services and information technology systems would be less than completely capable; replacement services and systems would require comprehensive and lengthy training and evaluation. Even if the Debtors could replace such suppliers and servicers, replacement would take substantial time and would come at great cost to the Debtors' businesses. The loss of one or more suppliers of goods or services relating to engineering, information technology or other technical operations would result in substantial downtime for the Debtors' business. The ultimate impact would be a loss of revenue and an increase in operating costs at a critical time in the Debtors' reorganization. The Debtors' businesses also require a complex constellation of management and information systems that must be able to communicate effectively with each other. The very nature of the business is information intensive and technically specialized, requiring the Debtors to rely upon a vast complement of interrelated computer software, hardware systems and other technical equipment. The Debtors rely on a number of systems to provide some of their most critical business functions. Without steady access to technical equipment, services and information, the Debtors would be unable to conduct their operations.

**PAYMENT OF CRITICAL VENDORS IS IN THE BEST INTERESTS
OF THE DEBTORS' ESTATES AND THEIR CREDITORS**

22.    While the Debtors expect to secure a continuing postpetition supply of goods and services in most cases through consensual negotiations with the Critical Vendors, the Debtors

recognize that their fiduciary duties bind them to consider and plan for the vendors that may refuse to provide future goods or services unless their prepetition claims are paid. The Critical Vendors are so essential to the Debtors' businesses that the lack of each of their particular goods and services, even for a short duration, would disrupt the Debtors' operations and cause irreparable harm to the Debtors' businesses, goodwill and market share. This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment of the prepetition claims of the Critical Vendors.

23.    The Debtors therefore seek authority to pay, in their business judgment, some or all of the prepetition obligations of certain Critical Vendors (the "**Vendor Claims**") to maintain their operations. Without this authority, these Critical Vendors may refuse to continue to supply goods and services to the Debtors postpetition. As described in detail above, the Critical Vendors are essential to the Debtors' continuing operations. The Debtors estimate the maximum amount needed to pay the prepetition claims (excluding those prepetition claims secured by trade liens or entitled to an administrative expense claim under section 503(b)(9) of the Bankruptcy Code) of Critical Vendors is approximately $27.5 million (the "**Vendor Claims Cap**").[3]

24.    In determining the amount of the Vendor Claims Cap, the Debtors have carefully reviewed their suppliers to determine, among other things, (a) which suppliers were sole-source or limited-source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers would present an unacceptable risk to the Debtors' operations or the safety of their employees should they cease the provision of truly essential services or supplies and (d) the extent to which suppliers may be able to obtain or have obtained trade liens on equipment, supplies or goods of

---

[3]  The Vendor Claims Cap does not include any prepetition claims that the Debtors have authority to pay under other orders entered by this Court in these cases.

the Debtors or an administrative expense claim pursuant to section 503(b)(9) of the Bankruptcy Code. The Debtors then considered the financial condition of each supplier, where that information was known, including the level of dependence each supplier has on the Debtors' continued businesses. After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services.

25.     The Vendor Claims Cap represents the Debtors' best estimate as to how much must be paid to such creditors to continue the supply of critical goods and services. The Debtors hope to pay far less than the requested amount.

26.     To minimize the amount of payments required, the Debtors request authority to identify Critical Vendors in the ordinary course of their businesses. Identifying the Critical Vendors now would likely cause all such vendors to demand payment in full. The Debtors propose that they may condition payment of the Vendor Claims of each Critical Vendor upon an agreement to continue to supply goods or services to the Debtors on such Critical Vendor's "**Customary Trade Terms**" for a period of time and on other such terms and conditions as are acceptable to the Debtors. As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor, (a) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs) that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors prior to the Petition Date or (b) such other trade terms as agreed by the Debtors and such Critical Vendor. However, as noted above, in determining the Vendor Claims Cap, the Debtors were careful to include only such payments that the Debtors, in their best estimate,

determined would be required to continue the supply of critical goods and services as a condition

of continued sales.  Further, in certain circumstances a Critical Vendor may refuse to provide

services to the Debtors on the Critical Vendor's Customary Trade Terms even after payment of

such Critical Vendor's claim.  To accommodate these circumstances, the Debtors seek approval

to enter into other agreements with each such Critical Vendor on a case-by-case basis.

27.    The Debtors further propose that if a Critical Vendor later refuses to continue to

supply goods or services to the Debtors on the Customary Trade Terms for the applicable period,

or on such terms as were individually agreed to between the Debtors and such Critical Vendor,

then the Debtors may, and without further order of the Court: (i) declare that the payment of the

creditor's Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the

Bankruptcy Code that the Debtors may recover from such Critical Vendor in cash or in goods

and (ii) demand that the creditor immediately return such payments in respect of the Vendor

Claim to the extent that the aggregate amount of such payments exceeds the postpetition

obligations then outstanding without giving effect to alleged setoff rights, recoupment rights,

adjustments or setoffs of any type whatsoever, and the creditor's Vendor Claim shall be

reinstated in such an amount as to restore the Debtors and the Critical Vendor to their original

positions, as if the agreement had never been entered into and the payment of the Vendor Claim

had not been made.  In sum, the Debtors will return the parties to their positions immediately

prior to the entry of the order approving the relief sought herein.

28.    To ensure that Critical Vendors transact business with the Debtors on Customary

Trade Terms, the Debtors propose the following procedures to be implemented as a condition to

paying any Critical Vendor: (a) that a letter or contract including provisions substantially in the

form of the letter attached hereto as Exhibit A (a "**Vendor Agreement**") be delivered to, and

executed by, the Critical Vendors along with a copy of the order granting the relief sought herein

and (b) that payment of Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the District of Minnesota, [dated _____, 2015] in the chapter 11 cases of Magnetation LLC, *et al.* (Cases No. 15-50307 (GFK) through 15-50311 (GFK)), entitled "Order (I) Granting an Expedited Hearing, (II) Authorizing the Debtors to Pay the Prepetition Claims of Certain Critical Vendors and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers" and submits to the jurisdiction of that Court for enforcement thereof.

29.     As a further condition of receiving payment on a Vendor Claim, the Debtors

propose that a Critical Vendor must agree to take whatever action is necessary to remove any

existing trade liens at such Critical Vendor's sole cost and expense and waive any right to assert

a trade lien on account of the paid Vendor Claim.

30.     The Debtors believe that payment of some or all Vendor Claims owed to Critical

Vendors will be necessary to preserve operations and successfully reorganize.  The need for the

flexibility to pay such claims is particularly acute in the period immediately following the

Petition Date.  During this period, the Debtors and their attorneys and financial advisors will be

focusing on stabilizing operations and developing a long-term business plan.  At the same time,

while the Debtors are distracted with stabilizing the businesses and long-term planning, Critical

Vendors may attempt to assert their considerable leverage and deny provision of goods and

services going forward, suddenly and without notice, in an effort to cripple operations and coerce

payment.

31.     Furthermore, if the relief sought herein is not granted, Critical Vendors will have

no incentive to continue to finance the Debtors on Customary Trade Terms.  Indeed, in the days

and weeks leading up to the Petition Date, many of the Debtors' Critical Vendors that became

concerned about the Debtors' financial condition have demanded that the Debtors pay for their

13

goods on accelerated payment terms or on a cash-in-advance and/or cash-on-delivery basis.

Certain other Critical Vendors ceased providing goods and services to the Debtors or threatened

to do so in the near term.  Any further expansion of these activities by other Critical Vendors

would be significantly detrimental to the Debtors, their estates and their creditors.

32.    The continued availability of trade credit, in amounts and on terms consistent with

those the Debtors have struggled to obtain over the years, is clearly advantageous to the Debtors.

It allows the Debtors to maintain and enhance necessary liquidity and focus on returning to

profitability.  The Debtors believe that preserving working capital through the retention and

reinstatement of their normally advantageous trade credit terms will enable the Debtors to

stabilize business operations at this critical time, to maintain their competitiveness and to

maximize the value of their businesses for the benefit of all interested parties.  Conversely, any

deterioration of trade credit or disruption or cancellation of deliveries of goods or provision of

essential services could spell disaster for the Debtors' restructuring efforts.  Finally, the relief

requested herein also may help to avert the institution of numerous reclamation claims, suits and

motions.  Avoiding the time and expense of evaluating and litigating such claims will provide

another incremental benefit for the Debtors, their estates and their creditors.  Any occurrence

affecting operations could prolong the Debtors' chapter 11 cases, increase administrative

expenses and jeopardize their reorganization.

## **REQUEST FOR AUTHORITY TO PAY CLAIMS UNDER SECTION 503(B)(9)**

33.    Under section 503(b)(9) of the Bankruptcy Code, claims of Critical Vendors for

the value of goods received by the Debtors in the ordinary course of their businesses during the

20-day period prior to the Petition Date are entitled to administrative claim status (the "**Twenty-**

**Day Administrative Claims**").  As administrative claims incurred in the ordinary course of the

Debtors' businesses, the Debtors believe that they are authorized to pay the Twenty-Day

Administrative Claims of Critical Vendors pursuant to section 363(c)(1) of the Bankruptcy Code (even if such payments are made to a Critical Vendor); however, the Debtors also believe that they are not required to reconcile or pay the Twenty-Day Administrative Claims prior to the conclusion of these cases.  Accordingly, for the avoidance of doubt, the Debtors request that the Court enter an order clarifying that the Debtors are authorized, but not required, to pay the Twenty-Day Administrative Claims, or any portion thereof, of any Critical Vendor in the ordinary course of the Debtors' businesses and on such terms and conditions as the Debtors deem appropriate.  The Debtors propose that payments of Twenty-Day Administrative Claims, even if made to Critical Vendors, shall not count against the Vendor Claims Cap.

### REQUEST FOR AUTHORITY FOR FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

34.     The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this motion, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date; *provided*, *however*, that: (a) funds are available in the Debtors' accounts to cover the checks and fund transfers and (b) all the banks and other financial institutions are authorized to rely on the Debtors' designation of any particular check as approved by the attached proposed order.

35.     To the extent an agreement relating to payments to Critical Vendors is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume such contract.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute postpetition assumption, reaffirmation or adoption of the programs, policies or agreements as executory

15

contracts pursuant to section 365 of the Bankruptcy Code.  The Debtors reserve all of their rights

under the Bankruptcy Code.  In addition, nothing in this Motion shall be an admission as to any

lien or interest, including any possessory lien.

## REQUEST FOR EXPEDITED RELIEF

36.    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary

to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the

petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an

obligation regarding property of the estate, including a motion to pay all or part of a claim that

arose before the filing of the petition . . . ."  Fed. R. Bankr. P. 6003.  For all the reasons set forth

herein, if the Debtors are not authorized to pay certain Critical Vendors, the Debtors' estates

would suffer immediate and irreparable harm.   Accordingly, the relief requested herein is

consistent with Bankruptcy Rule 6003.

37.    Pursuant to Local Rule 9013-2, this Motion is verified and is accompanied by a

memorandum of law, proposed order and proof of service.

38.    Pursuant to Local Rule 9013-2, the Debtors give notice that they may, if

necessary, call Joseph A. Broking, Chief Financial Officer of Magnetation LLC, an authorized

representative of the Debtors, to testify at the hearing on the Motion regarding the facts set out

herein.  The witness's business address is 102 NE 3rd Street, Suite 120, Grand Rapids, Minnesota

55744.

## REQUEST FOR WAIVER OF STAY

39.    In addition, by this Motion, the Debtors seek a waiver of any stay of the

effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n

order authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth

16

above, the Debtors require immediate relief to continue ordinary business operations for the benefit of all parties in interest. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## **NO PREVIOUS REQUEST**

40. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors request entry of an order:

A. granting expedited relief;

B. authorizing the Debtors to pay the prepetition claims of certain Critical Vendors;

C. authorizing the Debtors to pay claims of any creditors or claimants entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code;

D. authorizing financial institutions to honor and process related checks and transfers; and

E. granting such other relief as the Court deems just and equitable.

Dated:   May 5, 2015

FREDRIKSON & BYRON, P.A.

*/e/ Clinton E. Cutler*
Clinton E. Cutler (#158094)
James C. Brand (#387362)
Sarah M. Olson (#390238)
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
Telephone: (612) 492-7000
Facsimile:  (612) 492-7077
ccutler@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com

*Proposed Local Counsel to the Debtors*
*and Debtors in Possession*

-and-

DAVIS POLK & WARDWELL LLP
Marshall S. Huebner (NY #2601094)
Damian S. Schaible (NY #4086864)
Michelle M. McGreal (NY #4599031)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
marshall.huebner@davispolk.com
damian.schaible@davispolk.com
michelle.mcgreal@davispolk.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## **VERIFICATION**

I, Joseph A. Broking, Chief Financial Officer of Magnetation LLC, based upon my personal information and belief, declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: __May 5_____, 2015          Signed: _____

                                            Joseph A. Broking

# Exhibit A

**Magnetation LLC**

_____, 2015

TO:      [Critical Vendor]
[Name]
[Address]

Dear Valued Supplier:

As you are aware, Magnetation LLC and subsidiaries (collectively, the "**Company**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Cases**" and the "**Bankruptcy Court**," respectively) on May 5, 2015 (the "**Petition Date**").  On the Petition Date, the Company requested the Bankruptcy Court's authority to pay the prepetition claims of certain suppliers in recognition of the importance of the Company's relationship with such suppliers and its desire that the Bankruptcy Cases have as little effect on the Company's ongoing business operations as possible.  On [●], the Bankruptcy Court entered an order (the "**Order**") authorizing the Company, under certain conditions, to pay the prepetition claims of certain suppliers that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.

In order to receive payment on account of prepetition claims, you must agree to continue to supply goods and services to the Company based on "**Customary Trade Terms**."  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs) that were most favorable to the Company and in effect between you and the Company prior to the Petition Date, or such other trade terms as you and the Company agree.

For purposes of administration of this trade program as authorized by the Bankruptcy Court, you and the Company both agree that:

1.      The estimated balance of the prepetition claim (net of any setoffs, credits or discounts) (the "**Vendor Claim**") that you will receive from the Company is $_____.

2.      You will waive any remaining prepetition general unsecured claim against the Company.

3.      You will provide an open trade balance or credit line to the Company for shipment of postpetition goods in the amount of $_____ (which shall not be less than the greater of the open trade balance outstanding: (a) on _____, or (b) on normal and customary terms on a historical basis before and up to the Petition Date).

4.      The terms of such open trade balance or credit line are as follows (if more space is required, attach continuation pages):

_____

_____

_____

_____

_____

_____

5.      During the pendency of the Bankruptcy Cases you will continue to extend to the Company all Customary Trade Terms (as defined in the Order).

6.      You will not demand a lump-sum payment upon consummation of a plan of reorganization in the Bankruptcy Cases on account of any administrative expense priority claim that you assert, but instead agree that such claims will be paid in the ordinary course of business after consummation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

7.      The undersigned, a duly authorized representative of [Critical Vendor], has reviewed the terms and provisions of the Order and agrees that [Critical Vendor] is bound by such terms.

8.      You will not separately seek payment for reclamation and similar claims outside of the terms of the Order unless your participation in the Critical Vendor payment program authorized by the Order (the "**Critical Vendor Payment Program**") is terminated.

9.      You will not file or otherwise assert against the Company, the estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to you by the Company arising from agreements entered into prior to the Petition Date.  Furthermore, you agree to take (at your own expense) all necessary steps to remove any such lien as soon as possible.

10.     If either the Critical Vendor Payment Program or your participation therein terminates as provided in the Order, or you later refuse to continue to supply goods to the Company on Customary Trade Terms during the pendency of the Bankruptcy Case, any payments you receive on account of your Vendor Claim (including claims arising under section 503(b)(9) of the Bankruptcy Code) will be deemed voidable postpetition transfers pursuant to section 549(a) of the Bankruptcy Code.  You will immediately repay to the Company any payments made to you on account of your Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments or offsets of any type whatsoever.  Your Vendor Claim shall be reinstated in such an amount so as to restore the Company and you to the same positions as would have existed if payment of the Vendor Claim had not been made.

11.    Any dispute with respect to this letter agreement, the Order and/or your participation in the Critical Vendor Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our restructuring, please do not hesitate to call.

Sincerely,

Magnetation LLC

By:    _____
          [Name]
          [Title]

Agreed and Accepted by:
[Critical Vendor]

By:    _____
Its:    _____

Dated:    _____, 2015

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Magnetation LLC, | | Case No. 15-50307 |
| | Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | | Case No. 15-50308 |
| | Debtor. | Chapter 11 Case |
| Mag Finance Corp., | | Case No. 15-50309 |
| | Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | | Case No. 15-50310 |
| | Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | | Case No. 15-50311 |
| | Debtor. | Chapter 11 Case |

**MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER (I) GRANTING AN
EXPEDITED HEARING, (II) AUTHORIZING THE DEBTORS TO PAY THE
PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND
(III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS**

Magnetation LLC ("**Mag LLC**") and each of its subsidiaries that are debtors and debtors in possession in these chapter 11 cases (the "**Debtors**") submit this memorandum of law in support of the motion submitted herewith (the "**Motion**") in accordance with Local Rule 9013-2(a).

## BACKGROUND

The supporting facts are set forth in the Motion, verified by Joseph A. Broking, the Chief Financial Officer of Magnetation LLC.  All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

The Debtors seek the entry of an order (the "**Order**") substantially in the form filed herewith (i) granting an expedited hearing, (ii) authorizing, but not requiring, the Debtors to pay

the prepetition claims of certain critical vendors and (iii) authorizing applicable banks and other

financial institutions to receive, process, honor and pay checks or electronic transfers used by the

Debtors to pay such claims.  This relief will avoid delays in payment of prepetition obligations

and ensure as smooth a transition as possible into chapter 11; therefore, the Court should grant

the relief sought.

## LEGAL ANALYSIS

### I.    THE DEBTORS' REQUEST FOR EXPEDITED RELIEF SHOULD BE GRANTED.

The Debtors request expedited relief on the Motion.  Bankruptcy Rule 9006(c) provides

that the Court may reduce the notice period for a Motion "for cause shown."  Cause exists here

to grant the Motion on an expedited basis.  As described in the Motion, the Critical Vendors are

indispensable to the success of the Debtors' reorganization efforts under chapter 11.  Indeed, if

the Debtors' access to the Critical Vendors' goods or services is impeded or delayed, the Debtors

likely will have to be shut down to the severe detriment and prejudice of all parties in interest.  In

the days and weeks leading up to the Petition Date, certain of the Debtors' Critical Vendors

ceased providing goods and services to the Debtors, which will soon begin to negatively affect

operations if not remedied, and certain other Critical Vendors threatened to do so in the near

term.  Accordingly, expedited relief requested is necessary to avoid immediate and irreparable

harm.

### II.    THE PAYMENTS TO THE CRITICAL VENDORS SHOULD BE AUTHORIZED.

Authority to pay Critical Vendors has been granted in other chapter 11 cases in this

district.  *See, e.g.*, *In re Antioch Co.*, No. 13-41898 (DDO) (Bankr. D. Minn. Apr. 19, 2013)

[ECF No. 50] (order authorizing debtors to pay up to $350,000 in critical vendor claims); *In re*

*Wagstaff Minnesota, Inc.*, No. 11-43073 (RJK) (Bankr. D. Minn. May 5, 2011) [ECF No. 28]

2

(order authorizing debtors to pay up to $800,000 in critical vendor claims); *In re Duke and King Acquisition Corp.*, No. 10-38652 (Bankr. D. Minn. Dec. 8, 2010) [ECF No. 30] (order authorizing debtors to pay up to $1.4 million in critical vendor claims); *In re BMC Indus., Inc.*, No. 04-43515 (Bankr. D. Minn. June 28, 2004) [ECF No. 39] (order authorizing debtors to pay prepetition claims of a list of certain critical vendors).

Similar relief has been granted repeatedly in other districts as well. *See, e.g., In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Mar. 19, 2015) [ECF No. 95] (interim order authorizing debtors to pay up to $5 million in critical vendor claims); *In re Allied Nev. Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Mar. 11, 2015) [ECF No. 54] (interim order authorizing debtors to pay up to $10.9 million in critical vendor claims); *In re ProNerve Holdings, LLC*, No. 15-10373 (KJC) (Bankr. D. Del. Feb. 26, 2015) [ECF No. 36] (order authorizing debtors to pay prepetition claims of certain critical vendors); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. May 9, 2014) [ECF No. 243] (order authorizing debtors to pay up to $7.5 million in critical vendor claims); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 2, 2012) [ECF No. 257] (order authorizing debtors to pay up to $25 million in critical vendor claims).

Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). "Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor." *In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (stating that the bankruptcy court's use of equitable powers to "authorize the payment of prepetition debt when such payment is needed to

facilitate the rehabilitation of the debtor is not a novel concept"). "Courts have used their equitable power under section 105(a) of the Code to authorize the payment of prepetition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization." *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999).

In a long line of well-established cases, federal courts have consistently permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001); *In re Lehigh and N.E. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. at 825.

This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation); *In re Payless Cashways, Inc.*, 268 B.R. at 546 (Bankr. W.D. Mo. 2001); *In re Just for Feet, Inc.*, 242 B.R. at 824 ("While the doctrine [of necessity] was not codified in the Bankruptcy Code, courts have used their equitable power under Section 105(a) of the Code to authorize the payment of prepetition claims . . . ."); *In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (recognizing the doctrine of necessity as an equitable doctrine). The doctrine is frequently invoked early in a reorganization, particularly in connection with those chapter 11 sections that relate to payment of prepetition claims. The court in *In re Structurelite*

4

*Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" The court stated that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." *Id.* at 932. Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

Even under the stringent standard expressed by the U.S. Court of Appeals for the Seventh Circuit in *In re Kmart Corp.*, 359 F.3d 866 (7th Cir. 2004), the necessity of payments to the Debtors' Critical Vendors withstands scrutiny for the several reasons cited herein and in the Motion. The court in *Kmart* addressed the following considerations in determining the appropriateness of prepetition critical vendor payments: (1) whether the critical vendors would in fact cease delivery if the prepetition debts were left unpaid; (2) whether the critical vendors are legally obligated to continue to make delivery notwithstanding non-payment; and (3) the benefit to the estate and the other creditors. *See id.* at 873-74. First, the Debtors' Critical Vendors have in some cases already ceased delivery and expressed an unwillingness to continue deliveries until past-due payments have been made. As discussed herein, the cessation of delivery of such goods could completely shut down the Debtors' operations. Of course, to the extent that payments are not necessary to continue delivery of goods and services going forward, the Debtors will not make such payments. Second, to the extent a Critical Vendor is legally obligated to continue to perform notwithstanding non-payment, the Debtors will request that such Critical Vendor continue to perform in accordance with its legal obligations and will not pay such Critical

5

Vendor unless the Debtors determine, in their reasonable business judgment, that it is necessary to avoid immediate and irreparable harm to the Debtors' businesses. Third, as established herein and in the Motion, the Debtors and their creditors will be immediately and irreparably harmed without the authorization sought in the Motion.

Moreover, section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *see also In re Trilogy Dev. Co.*, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. Aug. 31, 2010); *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting the standard for determining a section 363(b) motion is "a good business reason").

Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action *appears* to enhance the debtor's estate.'" *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment

6

standard is "not a difficult standard to satisfy"). Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) and *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)).

The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment and is justified under sections section 105(a) and 363(b) of the Bankruptcy Code, and is also in line with the relief granted in this and other districts. The Debtors strongly believe that the uninterrupted supply of goods and services, on Customary Trade Terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors. Authority to pay the Critical Vendors in the ordinary course of the Debtors' businesses is in the best interests of the Debtors' estates and creditors. Absent such payment, the operations and value of the Debtors' estates will suffer, possibly precipitously. Thus, the requested relief is necessary to avoid immediate and irreparable harm to the Debtors and to the recovery of all creditors. This irreparable harm will far outweigh the cost of payment to Critical Vendors.

The Vendor Claims Cap represents the Debtors' best estimate as to how much must be paid to such creditors to continue the supply of critical goods and services. The Debtors hope to pay far less than the requested amount. The Debtors' proposed Vendor Claims Cap is within the

range of amounts awarded by courts in other chapter 11 cases. *See, e.g.*, *In re Allied Nev. Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. Apr. 15, 2015) [ECF No. 190] (authorizing debtors to pay up to $11 million in critical vendor claims); *In re Chassix Holdings, Inc.*, No. 15-10578 (MEW) (Bankr. S.D.N.Y. Apr. 14, 2015) [ECF No. 276] (authorizing debtors to pay up to $40 million of prepetition obligations of critical vendors); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Apr. 14, 2015) [ECF No. 197] (authorizing debtors to pay up to $5 million in critical vendor claims); *In re GT Advanced Technologies Inc.*, No. 14-11916 (HJB) (Bankr. D.N.H. Oct. 9, 2014) [ECF No. 84] (authorizing payments to critical vendors of up to $10 million on an interim basis); *In re Energy Future Holdings*, No. 14-10979 (CSS) (Bankr. D. Del. July 3, 2014) [ECF No. 1465] (authorizing debtors to pay up to $40 million in critical vendor claims); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. May 9, 2014) [ECF No. 243] (authorizing debtors to pay up to $8 million in critical vendor claims); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 2, 2012) [ECF No. 257] (authorizing debtors to pay up to $25 million in critical vendor claims); *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 23, 2009) [ECF No. 360] (authorizing up to $30 million in critical vendor payments); *In re Dana Corp.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y. Mar. 29, 2006) [ECF No. 722] (authorizing up to $52 million in critical vendor payments); *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Mar. 9, 2006) [ECF No. 197] (approving critical vendor payments to sole-source suppliers and certain other vendors up to a cap of $90 million); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) [ECF No. 30] (granting the debtor authority to pay $20 million in critical vendor claims); *In re Enron Corp.*, No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 3, 2001) [ECF No. 35] (approving payments of up to $48 million in critical vendor claims).

## **CONCLUSION**

For the foregoing reasons, the Debtor respectfully requests that the Court grant the relief

requested in the Motion.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

Dated:   May 5, 2015                    FREDRIKSON & BYRON, P.A.

                                        */e/ Clinton E. Cutler*
                                        _____
                                        Clinton E. Cutler (#158094)
                                        James C. Brand (#387362)
                                        Sarah M. Olson (#390238)
                                        200 South Sixth Street, Suite 4000
                                        Minneapolis, Minnesota 55402
                                        Telephone: (612) 492-7000
                                        Facsimile:  (612) 492-7077
                                        ccutler@fredlaw.com
                                        jbrand@fredlaw.com
                                        solson@fredlaw.com

                                        *Proposed Local Counsel to the Debtors
                                        and Debtors in Possession*

                                        -and-

                                        DAVIS POLK & WARDWELL LLP
                                        Marshall S. Huebner (NY #2601094)
                                        Damian S. Schaible (NY #4086864)
                                        Michelle M. McGreal (NY #4599031)
                                        450 Lexington Avenue
                                        New York, New York 10017
                                        Telephone: (212) 450-4000
                                        Facsimile:  (212) 701-5800
                                        marshall.huebner@davispolk.com
                                        damian.schaible@davispolk.com
                                        michelle.mcgreal@davispolk.com

                                        *Proposed Counsel to the Debtors
                                        and Debtors in Possession*

10

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Magnetation LLC, | | Case No. 15-50307 |
| | Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | | Case No. 15-50308 |
| | Debtor. | Chapter 11 Case |
| Mag Finance Corp., | | Case No. 15-50309 |
| | Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | | Case No. 15-50310 |
| | Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | | Case No. 15-50311 |
| | Debtor. | Chapter 11 Case |

**ORDER (I) GRANTING AN EXPEDITED HEARING, (II) AUTHORIZING THE
DEBTORS TO PAY THE PREPETITION CLAIMS OF CERTAIN CRITICAL
VENDORS AND (III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND
PROCESS RELATED CHECKS AND TRANSFERS**

Upon the motion (the "**Motion**")[1] of Magnetation LLC and its subsidiaries that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, for authority to pay in the ordinary course of business prepetition claims of critical vendors[2] (the "**Critical Vendors**"), as more fully described in the Motion; and upon consideration of the Declaration of Joseph A. Broking, Chief Financial Officer of Magnetation LLC, filed in support of the Debtors' first-day pleadings; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the requested

---

[1] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Motion.

[2] Certain parties may receive payment on account of their prepetition claims pursuant to other motions that have been or may be filed by the Debtors. To the extent that a party receives payment on account of its prepetition claim pursuant to an order approving any such motion, this Order shall not apply to such prepetition claim.

relief being a core proceeding the Bankruptcy Court can determine pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to parties in interest as specified in Local Rule 9013-3(a)(2), and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors, and the Court having reviewed the Motion and having held a hearing with appearances of parties in interest noted in the transcript thereof (the "**Hearing**"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein, and the Court having determined that immediate relief is necessary to avoid irreparable harm, and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS ORDERED:

1.    The Motion is granted, including the request for expedited relief.

2.    Pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of the Critical Vendors (the "**Vendor Claims**").

3.    The Debtors' payment of Vendor Claims shall not exceed $27.5 million in the aggregate (the "**Vendor Claims Cap**") unless otherwise ordered by the Court.

4.    The Debtors may condition payment of any Vendor Claims upon agreement by the Critical Vendor to continue to supply goods or services to the Debtors on such Critical Vendor's "**Customary Trade Terms**" for a period following the date of the agreement or on other such terms and conditions as are acceptable to the Debtors.  As used herein, "**Customary Trade Terms**" means, with respect to a Critical Vendor, (i) the normal and customary trade

2

terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, availability and other applicable terms and programs) that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors prior to the Petition Date or (ii) such other trade terms as agreed by the Debtors and such Critical Vendor.

5.      As a further condition of receiving payment on a Vendor Claim, the Debtors are authorized to require that such Critical Vendor agree to take whatever action is necessary to remove any existing trade liens at such Critical Vendor's sole cost and expense and waive any right to assert a trade lien on account of the paid Vendor Claim.

6.      After the date hereof, the Debtors shall determine, in the ordinary course of business, which entities are Critical Vendors by considering, among other things, (a) which suppliers were sole-source or limited-source suppliers, without whom the Debtors could not continue to operate without disruption, (b) which suppliers would be prohibitively expensive to replace, (c) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies and (d) the extent to which suppliers may be able to obtain or have obtained trade liens on equipment, supplies or goods of the Debtors.

7.      The Debtors may require Critical Vendors to enter into an agreement (the "**Vendor Agreement**") including provisions substantially in the form attached to the Motion as Exhibit A as a condition to paying a Vendor Claim.  Any such Vendor Agreements shall be provided to the counsel to the agent and the ad hoc committee of senior secured noteholders on a professionals' eyes-only basis within five business days of execution.

8.      The Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine that it is appropriate to do so in connection with making payments

3

to Critical Vendors.  However, the Debtors' inability to enter into a Vendor Agreement shall not preclude them from paying a Vendor Claim when such payment is necessary to the Debtors' operations.

9.     If the Debtors determine that a Critical Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Critical Vendor, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor as contained in this Order; *provided, however*, that the Vendor Agreement may be reinstated if (x) such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor, (y) the underlying default under the Vendor Agreement is fully cured by the Critical Vendor not later than five business days after the date the initial default occurred or (z) the Debtors reach a subsequent agreement with the Critical Vendor.

10.     If a Vendor Agreement is terminated as set forth above, or if a Critical Vendor that has received payment of a prepetition claim later refuses to continue to supply goods or services for the applicable period in compliance with the Vendor Agreement or this Order, then (a) the Debtors may declare that the payment of the creditor's Vendor Claim is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor, (b) the creditor shall immediately return such payments in respect of a Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments or offsets of any type whatsoever and (c) the

4

creditor's Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and

the Critical Vendor to their original positions as if the Vendor Agreement had never been entered

into and no payment of the Vendor Claim had been made.

11.     All Vendor Agreements shall be deemed to have terminated, together with the

other benefits to Critical Vendors as contained in this Order, upon entry of an order converting

the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

12.     The Debtors are authorized, but not required, in the exercise of their business

judgment, to pay claims of any creditors or claimants entitled to administrative priority pursuant

to section 503(b)(9) of the Bankruptcy Code (the "**Twenty-Day Administrative Claims**") in the

ordinary course of the Debtors' business and on such terms as the Debtors deem appropriate.

13.     Payments on account of any Twenty-Day Administrative Claims shall not count

against the Vendor Claims Cap.

14.     All applicable banks and other financial institutions are hereby authorized to

receive, process, honor and pay any and all checks, drafts, wires, check transfer requests or

automated clearing house transfers evidencing amounts paid by the Debtors under this Order,

whether presented prior to or after the Petition Date to the extent the Debtors have good funds

standing to their credit with such bank or other financial institution.  Such banks and financial

institutions are authorized to rely on representations of the Debtors as to which checks are issued

or authorized to be paid pursuant to this Order without any duty of further inquiry and without

liability for following the Debtors' instructions.

15.     Nothing contained in this Order shall be deemed to constitute (a) a rejection,

assumption or postpetition reaffirmation of any executory contract or to require the Debtors to

make any of the payments or to post any of the deposits authorized herein, (b) a grant of third-

party beneficiary status or bestowal of any additional rights on any third party or (c) a waiver of any rights, claims or defenses of the Debtors.

16.     Notwithstanding anything to the contrary contained herein, (i) any payment to be made, and any authorization contained, hereunder shall be subject to the applicable requirements imposed on the Debtors under any order approving the Debtors' postpetition financing facility (the "**DIP Order**") and the documentation in respect of the postpetition financing facility (the "**DIP Documents**"), (ii) nothing herein shall alter the rights of the secured parties under the DIP Order or DIP Documents and (iii) to the extent of any conflict between the terms of this Order and the terms of the DIP Order, the terms of the DIP Order shall govern.

17.     Nothing in this Order or the Motion shall be construed as prejudicing any rights the Debtors may have to dispute or contest the amount of or basis for any claims against the Debtors arising in connection with the Vendor Claims.

18.     The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

19.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

20.     This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

Dated: _____                _____
                                      The Honorable Gregory F. Kishel
                                      Chief United States Bankruptcy Judge

6