UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Magnetation LLC, | | Case No. 15-50307 |
| | Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | | Case No. 15-50308 |
| | Debtor. | Chapter 11 Case |
| Mag Finance Corp., | | Case No. 15-50309 |
| | Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | | Case No. 15-50310 |
| | Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | | Case No. 15-50311 |
| | Debtor. | Chapter 11 Case |

**NOTICE OF HEARING AND JOINT MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) GRANTING AN EXPEDITED HEARING, (II) AUTHORIZING
THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11
U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507 AND
(B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND
(III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507**

TO: The parties-in-interest as defined in Local Rule 9013-3(a)(2).

    1.    Magnetation LLC ("**Mag LLC**") and its subsidiaries, as debtors and debtors in

possession in these proceedings (collectively, the "**Debtors**"), file this motion (this "**Motion**")

requesting the relief described below, and give notice of hearing.

    2.    The Court will hold a hearing on the portion of this Motion seeking interim relief

at 10:00 a.m. on May 7, 2015 (the "**Interim Hearing**"), in Courtroom No. 2A, U.S. Courthouse,

316 North Robert Street, St. Paul, Minnesota 55101. A hearing on the portion of this Motion

seeking final relief will be held at a date, time and location to be determined (the "**Final

Hearing**").

3.      Local Rule 9006-1(c) provides deadlines for responses to this Motion.  However, given the expedited basis on which the Motion is being heard in connection with the **interim relief** requested, the Debtors hereby waive any objection to written responses thereto being served and filed up to two hours prior to the Interim Hearing.  Any response to the Motion in connection with the **final relief** requested herein must be filed and served in accordance with Local Rule 9006-1(c).  **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED HEREIN ON A FINAL BASIS WITHOUT HOLDING THE FINAL HEARING.**

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), and Local Rule 1070-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  On May 5, 2015 (the "**Petition Date**"), each of the above-captioned Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**").  The cases are currently pending in this Court.

5.      This motion arises under sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 4001, 6004 and 9014.  This Motion is filed under Local Rules 9013-1, 9013-2 and 9013-3.  Notice of the hearing on this Motion is provided pursuant to Local Rules 9013-2(a) and 9013-3.

6.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed.

7.     Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of Joseph A. Broking, Chief Financial Officer of Magnetation LLC (the "**Broking Declaration**"), which is incorporated herein by reference. Additional facts and circumstances supporting this Motion are set forth in the *Declaration of Mark Buschmann in Support of the Debtors' Joint Motion for Entry of Interim and Final Orders (i) Granting an Expedited Hearing, (ii) Authorizing the Debtors (a) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and (b) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (iii) Granting Adequate Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507* (the "**Buschmann Declaration**").

## RELIEF REQUESTED

8.     By this Motion, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of the Bankruptcy Code, Bankruptcy Rules 4001 and 6004 and Local Rules 4001-1 and 4001-2, the Debtors seek an interim order, substantially in the form filed herewith, and a final order (respectively, the "**Interim Order**" and the "**Final Order**" and each a "**DIP Order**", and collectively, the "**DIP Orders**"), substantially in the form filed herewith, (a) authorizing each of the Debtors, on an interim basis, to enter into the Debtor in Possession Credit Agreement, substantially in the form attached hereto as Exhibit A (the "**DIP Credit Agreement**" and, together with the schedules and exhibits attached thereto and all ancillary agreements executed in connection therewith, including, without limitation, the

Collateral and Guarantee Agreement attached hereto as Exhibit B, and the Security Documents (as defined in the DIP Credit Agreement), the "**DIP Documents**"), for postpetition financing up to an aggregate principal amount not to exceed $135 million (exclusive of interest and fees paid in kind but inclusive of the Roll-Ups (as defined below)), to (i) effectuate the Term Roll-Up (as defined below), (ii) effectuate the Prepetition Notes Roll-Up (as defined below), (iii) pay the fees, costs and expenses incurred by the Debtors in connection with these chapter 11 cases (these "**Cases**"), (iv) fund the operational and working capital needs of the Debtors, all in accordance with the budget, attached hereto as Exhibit C (the "**Budget**"), which also contains estimates of collateral value as of the Petition Date and over the period during which the Debtors seek authority to use Cash Collateral (as defined below), as required by Local Rule 4001-2(a), valued on a book value basis, without reference to and not being reflective of the market value and (v) to pay all adequate protection payments authorized under the DIP Orders; (b) authorizing the Debtors' use of cash collateral ("**Cash Collateral**"), and all other collateral; (c) granting senior liens and superpriority administrative expense claims; (d) authorizing the Debtors to incur indebtedness under the DIP Financing (as defined below) in order to replace and substitute for the indebtedness incurred under that certain term credit agreement dated as of April 17, 2015 (the "**Prepetition Term Credit Agreement**") by and among Mag LLC, the lenders party thereto (the "**Prepetition Term Lenders**") and Wilmington Trust, National Association, as administrative agent (in such capacity, the "**Prepetition Term Agent**"); (e) providing the adequate protection described herein to the Prepetition Secured Parties (as defined below) under or in connection with (i) that certain Credit Agreement, dated as of May 20, 2013 (as heretofore amended, supplemented or otherwise modified, the "**Prepetition Revolving Credit Agreement**"), by and

4

among Mag LLC and its Debtor subsidiaries, the lenders listed therein (the "**Prepetition Revolving Lenders**") and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "**Prepetition Revolving Agent**") and (ii) any senior secured notes (the "**Prepetition Notes**", the holders of the Prepetition Notes being the "**Prepetition Noteholders**", and the Prepetition Noteholders together with the Prepetition Revolving Lenders, the Prepetition Revolving Agent and the Prepetition Notes Trustee (as defined below), the "**Prepetition Secured Parties**") issued under that certain indenture dated as of May 20, 2013 (as heretofore amended, supplemented or otherwise modified, the "**Prepetition Notes Indenture**", and the indebtedness under the Prepetition Revolving Credit Agreement and Prepetition Notes Indenture, the "**Prepetition Secured Debt**") among Mag LLC and Mag Finance Corp. ("**Mag Finance**") as co-issuers, the other Debtors as guarantors and Wilmington Trust, National Association, as indenture trustee (in such capacity, the "**Prepetition Notes Trustee**"),[1] for the use of the personal and real property (the "**Prepetition Collateral**") securing all obligations under the Prepetition Revolving Credit Agreement and the Prepetition Notes Indenture, all as more fully described herein; (f) authorizing the Debtors to pay the fees, costs and expenses related to the transactions contemplated by the DIP Documents as more fully described herein and (g) authorizing the Debtors, subject to and effective upon entry of the Final Order granting the foregoing relief, to waive any right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code and any right under the "equities of the case" exception in section 552(b).  In support of this Motion, the Debtors respectfully represent as follows:

---

[1] As of April 17, 2015, Wells Fargo Bank, National Association resigned as Prepetition Notes Trustee, and Wilmington Trust, National Association became successor Prepetition Notes Trustee.

## PRELIMINARY STATEMENT

9.      By this Motion, the Debtors seek immediate access to their proposed postpetition financing in order to ensure their continued operations during these Cases as they seek to implement a value-maximizing restructuring.  The Debtors intend to preserve and enhance their businesses in chapter 11 and emerge as a going concern through the use of a postpetition credit facility consisting of a $135 million superpriority senior secured debtor in possession term loan (the "**DIP Financing**") pursuant to the DIP Documents, of which approximately $63.7 million represents additional incremental liquidity and approximately $71.3 million represents roll-ups of certain prepetition indebtedness.  The DIP Financing will provide the Debtors the necessary liquidity to fund their operations, working capital needs and general corporate purposes during the course of these Cases.

10.      The DIP Financing is essential to the continued operation of the Debtors' businesses and provides a clear framework for an expeditious and value-maximizing chapter 11 process.  In connection with the DIP Financing, the Debtors have reached an agreement with certain Prepetition Noteholders holding more than 70% of the principal amount of the Prepetition Notes (the "**Ad Hoc Senior Secured Note Holder Committee**") on the principal terms of a plan of reorganization and post-reorganization capital structure (the "**Plan Term Sheet**", attached hereto as Exhibit D).  As contemplated by the terms of the DIP Financing, the Debtors will continue to engage with the Ad Hoc Senior Secured Note Holder Committee and their other stakeholders in order to give effect to the Plan Term Sheet in accordance with certain specified milestones set forth in the DIP Credit Agreement (as defined below).

6

11.     Absent access to the DIP Financing, the Debtors will likely not have adequate liquidity to maintain uninterrupted operations.  Any cessation in operations would, in turn, likely result in immediate liquidation, the loss of hundreds of jobs and severe losses for vendors, customers and creditors.  Therefore, the Debtors' customers, their approximately 486 employees and all of the Debtors' other constituents depend on the Debtors' ability to access the DIP Financing so that the Debtors can continue operating and consummate a restructuring that will maximize recoveries for their estates and creditors.

12.     Obtaining the DIP Financing on the terms proposed is well within the sound discretion of the Debtors, as it will allow the Debtors to preserve and maximize the value of their estates for the benefit of all parties in interest.  The Debtors' financing capacity under the Prepetition Revolving Credit Agreement is exhausted, they have no significant unencumbered assets they can use to secure additional indebtedness, and, in light of current conditions in the iron ore and steel markets, it is uncertain whether they will be able to generate sufficient liquidity to meet their obligations as they come due.

13.     Importantly, the DIP Liens (as defined below) will not prejudice the Prepetition Secured Parties because the Prepetition Revolving Lenders will retain their senior position, and both the Prepetition Revolving Lenders' and the Prepetition Noteholders' interests in the Prepetition Collateral will be adequately protected, in each case as described more fully herein. Further, the Ad Hoc Senior Secured Note Holder Committee, which holds more than 70% of the principal amount of the Prepetition Notes, has already agreed to participate as lenders under the DIP Financing (in such capacities, the "**DIP Lenders**") and to backstop the DIP Financing. Upon entry of the Interim Order, all other Prepetition Noteholders will have the opportunity to

7

become DIP Lenders in accordance with the Solicitation Procedures attached hereto as <u>Exhibit E</u>,

provided that a Prepetition Noteholder may only participate in the Prepetition Notes Roll-Up if

that Prepetition Noteholder also participates in the NM DIP Loans (as defined in the DIP Credit

Agreement).   The DIP Financing reflects the best terms available given the Debtors' existing

secured indebtedness and the rapid and continuing deterioration of iron ore prices and steel

demand over the course of the last several months.

14.     For the reasons set forth herein, the Debtors believe that authorization to obtain

the DIP Financing, consummate the Roll-Ups and use the Cash Collateral, in each case on the

terms as described herein, is in the best interests of the Debtors and their estates and should be

granted.

<u>**RELIEF REQUESTED**</u>

15.     By  this  Motion, [2]  the  Debtors  respectfully  request  that  the  Court  grant  the

following relief:

- <u>**The DIP Financing**</u>:  Authorization for Mag LLC (the "**Borrower**") to enter into the
  DIP Documents to obtain the DIP Financing, and for all of Mag LLC's Debtor
  subsidiaries  to  guarantee  the  Borrower's  obligations  in  connection  with  the  DIP
  Financing:

    o  from the DIP Lenders, with Wilmington Trust, National Association acting as
       administrative agent and as collateral agent for the DIP Financing (in such
       capacities, the "**DIP Agent**") on behalf of the DIP Lenders;

    o  up to the aggregate principal amount of $135 million[3] to consist of a multi-draw
       term loan facility secured on a first priority senior priming lien basis, *provided*
       that such lien shall not (except with respect to the Funding Account and the

---

[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the
Interim Order.

[3] Including the Roll-Ups.

Carve-Out Account) prime (i) the liens securing indebtedness under the Prepetition Revolving Credit Agreement (the "**Prepetition Revolving Facility Liens**") or (ii) the adequate protection liens granted with respect to the Prepetition Revolving Credit Agreement (the "**Prepetition Revolving Facility Adequate Protection Liens**");

o  on an interim basis, to borrow from the DIP Lenders under the DIP Documents upon entry of the Interim Order up to an aggregate principal amount not to exceed $55[4] million, with the balance of the proceeds of the DIP Financing to be made available upon entry of the Final Order.

- **DIP Liens:**  Authorization to grant to the DIP Agent, for its own benefit and for the benefit of the DIP Lenders, the following security interests in and liens on (such liens collectively, the "**DIP Liens**") all of the property identified below (collectively, the "**DIP Collateral**"), which security interests and liens shall be (i) junior in lien and payment priority to the Prepetition Revolving Facility Liens and the Prepetition Revolving Facility Adequate Protection Liens, except for such liens on and security interests in the Funding Account and the Carve-Out Account, which at all times shall be subject to a first priority security interest and lien in favor of the DIP Lenders, and (ii) subject to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out as described herein:

o  pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected first priority security interest in and lien on all pre and postpetition property of the Debtors, including without limitation the Funding Account and the Carve-Out Account, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens (collectively, "**Unencumbered Property**"), and the proceeds of all the foregoing, other than the proceeds of the Funding Account and the Carve-Out Account, which are subject to the provisions of paragraph 11(a) of the Interim Order.  For the purposes of the Interim Order, Unencumbered Property does not include the Debtors' claims and causes of action (or any proceeds therefrom) under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or otherwise (collectively, the "**Avoidance Actions**"), but, subject to and effective upon entry of the Final Order, Unencumbered Property shall include all proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise (the "**Avoidance Proceeds**");

---

[4] Including the Term Roll-Up.

- o pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon all pre and postpetition property of the Debtors and their estates, whether now existing or hereafter acquired, that is subject to any liens in existence as of the Petition Date, except for (i) the Prepetition Revolving Facility Liens and the Prepetition Revolving Facility Adequate Protection Liens (other than with respect to the Funding Account and the Carve-Out Account) and (ii) the Permitted Senior Liens;

- o pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre and postpetition property of the Debtors (other than the property described in the preceding two bullet points, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence on the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interest and lien shall be immediately junior to such valid, perfected and unavoidable liens.

- **DIP Superpriority Claims:**  Pursuant to section 364(c)(1) of the Bankruptcy Code, allowing the DIP Obligations as claims against the Debtors with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims are secured by a judgment lien or other non-consensual lien, levy or attachment, which claims (the "**DIP Superpriority Claims**") shall be payable from and have recourse to all pre and postpetition property of the Debtors and the Debtors' estates and all proceeds thereof, including, effective upon entry of the Final Order, any Avoidance Proceeds (but excluding Avoidance Actions), subject, solely to (i) the Prepetition Revolving Facility Section 507(b) Claim (as defined below); (ii) the provisions of paragraph 16 of the Interim Order, and (iii) in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement), the payment of the Carve-Out, *provided, however*, that an amount of the DIP Superpriority Claims equal to the amount of all funds that shall have been funded to the Carve-Out Account from proceeds of the NM DIP Loans or the Funding Account and then actually applied to pay the Carve-Out (which amount shall not in any event exceed the Carve-Out Cap) (the "**Carve-Out Claim**") shall constitute a superpriority claim against the Debtors that is senior in priority to the Prepetition Revolving Facility Section 507(b) Claim.

- **Roll-Up of Prepetition Term Facility Debt:**  Authorization for the Debtors to immediately incur indebtedness under the DIP Financing to substitute for and be exchanged for approximately $3.8 million[5] in respect of borrowings, fees, expenses and other charges owed under the Prepetition Term Credit Agreement (the "**Term Roll-Up**");

- **Roll-Up of Prepetition Notes:**  Authorization for the Debtors to incur indebtedness under the DIP Financing in order to tender for and exchange up to $67,500,000.00 of aggregate principal amount of the Prepetition Notes for a portion of the DIP Financing in accordance with the DIP Credit Agreement and the Solicitation Procedures, resulting in a dollar-for-dollar roll-up of such Prepetition Notes on a pro rata basis (the "**Prepetition Notes Roll-Up**" and, together with the Term Roll-Up, the "**Roll-Ups**");

- **Adequate Protection:**  Approval of the form and manner of the adequate protection to be provided to the Prepetition Secured Parties;

- **Use of Cash Collateral:**  Authorization for the Debtors to use Cash Collateral within the meaning of section 361 of the Bankruptcy Code and all other collateral in which the Prepetition Secured Parties may have an interest, and the granting of adequate protection to the Prepetition Secured Parties with respect to, *inter alia*, such use of Cash Collateral;

- **Automatic Stay:**  Upon entry of the Interim Order, lifting the automatic stay arising under section 362 of the Bankruptcy Code with respect to the DIP Agent and DIP Lenders to the extent necessary to allow for each to protect its rights and remedies provided under the DIP Documents and the DIP Orders; and

- **Stipulations:**  Approval of certain stipulations by the Debtors with respect to the Prepetition Secured Debt and the claims, liens and security interests arising therefrom.

## RULE 4001 STATEMENT

16.     In accordance with Bankruptcy Rules 4001(b), (c) and (d), the following summarizes the significant terms of the DIP Credit Agreement and the Interim Order.[6] The

---

[5] The exact amount of the Term Roll-Up depends on the date on which the initial funding of the DIP Financing occurs, due to the continuing accrual of interest under the Prepetition Term Loan at a rate of $1,492.27 per diem. Assuming an initial funding date of May 7, 2015, the amount of the Term Roll-Up would be $3,841,747.55.

[6] The following summary is included for convenience only and is qualified in its entirety by reference to the definitive DIP Documents, which shall control in the event of any inconsistency.

Debtors believe that the following provisions of the DIP Credit Agreement and the Interim Order

are justified and necessary in the context and circumstances of these Cases.

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Magnetation LLC.<br><br>***See* DIP Credit Agreement Preamble; Interim Order Introduction.** |
| **Guarantor Subsidiaries**<br>*Bankruptcy Rule 4001(c)(1)(B)* | All of Mag LLC's Debtor subsidiaries.<br><br>***See* DIP Credit Agreement § 1.1.** |
| **DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Participating Prepetition Noteholders.<br><br>***See* DIP Credit Agreement Preamble; Interim Order Introduction.** |
| **Administrative Agent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Wilmington Trust, National Association.<br><br>***See* DIP Credit Agreement § 1.1; Interim Order Introduction.** |
| **Use of Proceeds**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The proceeds of the DIP Financing shall be used to: (i) effectuate the Term Roll-Up, (ii) effectuate the Prepetition Notes Roll-Up (iii) pay fees, costs and expenses associated with these Cases, (iv) fund the operational and working capital needs of the Debtors, (v) fund an indemnity escrow account for the Prepetition Notes Trustee, (vi) pay the fees, costs and expenses incurred in connection with the foregoing and (vii) make authorized adequate protection payments.<br><br>Although the Debtors seek access to $55 million of the DIP Financing immediately pursuant to the Interim Order, the proceeds of the DIP Financing, when initially disbursed, will be held in a blocked deposit account established by the Borrower (the "**Funding Account**") and subject to a separate Funding Account Control Agreement (as defined in the DIP Credit Agreement). The Funding Account Control Agreement will, among other things, limit the Borrower's access to the Funding Account in accordance with the DIP Credit Agreement, including compliance with the Budget. Further, $1,298,551.69 of the proceeds of the DIP Financing will be deposited into an indemnity escrow account for the benefit of the Prepetition Notes Trustee in connection with the Prepetition Term Facility Debt.<br><br>***See* DIP Credit Agreement §§ 2.3, 4.16; Interim Order Introduction.** |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Commitments**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Financing is a $135 million senior term loan facility, secured by first priority senior priming liens, *provided* that such liens shall not prime the Prepetition Revolving Facility Liens or the Prepetition Revolving Facility Adequate Protection Liens, to be drawn in an initial amount of up to $55 million upon entry of the Interim Order, subject to satisfaction of the terms set forth therein, with the balance to be made available upon entry of the Final Order.<br><br>*See* **DIP Credit Agreement §§ 1.1, 2.1.** |
| **Maturity and Termination Date**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **Maturity Date:**  The date that is the earliest of (i) 45 days after entry of the Interim Order, *provided* that no Final Order has been entered, (ii) seven months after the entry of the Interim Order, subject to extension for an additional three months at the request of the Debtors and with the consent of all DIP Lenders, *provided*, that the DIP Financing will allow the Debtors to replace any non-extending DIP Lender with a new or existing DIP Lender willing to consent to the extension request, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code), in each case, of (if any) a plan of reorganization or a plan of liquidation, (iv) the consummation of a sale of all or substantially all the Debtors' assets and (v) such earlier date on which all loans and other obligations for the payment of money under the DIP Credit Agreement shall become due and payable in accordance with the terms of the DIP Documents.<br><br>*See* **DIP Credit Agreement § 1.1.** |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **Backstop Fee:**  The fee payable to the DIP Lenders in the amount of 4.0% of the aggregate principal amount of the DIP Financing, excluding the Term Roll-Up and the Prepetition Notes Roll-Up, on the date commitments are provided, paid in cash to the DIP Lenders (allocated ratably) on the Closing Date.<br><br>**Commitment Fee:**  The fee payable to the DIP Lenders in the amount of 3.0% of the aggregate principal amount of the DIP Financing, excluding the Prepetition Notes Roll-Up, on the date commitments are provided, paid in kind (allocated ratably) as an increase to the stated principal amount of the DIP Financing on the Closing Date.<br><br>**Agency Fee:**  The fees and expenses payable to the Administrative Agent as set forth in that certain letter agreement by and between Magnetation LLC and Wilmington Trust, National Association, which include a $25,000 annual administration fee, and certain other fees and expenses as set forth therein.<br><br>*See* **DIP Credit Agreement § 2.5; Interim Order ¶ 6.** |
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Financing will bear interest at a fixed rate of 12% per annum, paid in kind.<br><br>**Default Rate:**  Upon an event of default, the interest rate shall increase to 14% per annum.<br><br>*See* **DIP Credit Agreement §§ 1.1, 2.10** |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Voluntary Prepayments/ Reductions of Commitments** | Provided that all obligations under or related to the Prepetition Revolving Credit Agreement have been paid in full in cash (including the 103% cash collateralization of undrawn letters of credit), the Debtors may, at any time prior to maturity, voluntarily (i) repay the loans under the DIP Financing (together with all accrued interest, fees and other amounts outstanding thereunder) and/or (ii) reduce the commitments in respect of the DIP Financing, in each case, in full but not in part. *See* **DIP Credit Agreement § 2.7(a).** |
| **Mandatory Prepayments** | In each case provided that all obligations under or related to the Prepetition Revolving Credit Agreement have been paid in full in cash (including the 103% cash collateralization of undrawn letters of credit): **Issuance of Debt:** No later than the first business day following receipt by Mag LLC or any of its subsidiaries of any cash proceeds from the incurrence of any indebtedness by Mag LLC or any of its subsidiaries (other than indebtedness permitted to be incurred under the DIP Credit Agreement), Mag LLC shall prepay the DIP Loans in an aggregate amount equal to 100% of such proceeds, net of discounts, costs and expense. **Issuance of Equity:** No later than the first business day following receipt by Mag LLC or any of its subsidiaries of any cash proceeds from the issuance of any equity (or similar transactions), Mag LLC shall prepay the DIP Loans in an aggregate amount equal to 100% of such proceeds, net of discounts, costs and expenses. **Casualty Events:** No later than the third business day following the date of receipt by Mag LLC or any of its subsidiaries of any cash proceeds from a casualty event in excess of $100,000, Mag LLC shall prepay, or cause to be prepaid, the DIP Loans in an aggregate amount equal to 100% of the net amount such cash proceeds. **Asset Dispositions**: No later than the third business day following the date of receipt by Mag LLC or any of its subsidiaries of any cash proceeds from dispositions of property in excess of $100,000 (other than dispositions permitted under the DIP Credit Agreement), Mag LLC shall prepay, or cause to be prepaid, the DIP Loans in an aggregate amount equal to 100% of the net amount of such cash proceeds. *See* **DIP Credit Agreement § 2.7** |
| **Collateral, Priority and Adequate Protection** *Bankruptcy Rule 4001(c)(1)(B)(i) and (ii)* | The DIP Financing is secured by a first-priority, fully perfected lien on the all assets of the Debtors (the "**DIP Collateral**"), provided that such liens shall not prime the Prepetition Revolving Facility Liens or the Prepetition Revolving Facility Adequate Protection Liens other than with respect to the Funding Account and the Carve-Out Account. *See* **DIP Credit Agreement § 1.1, Section 11; Interim Order Introduction, ¶ 8.** **Adequate Protection:** The Debtors will provide to the Prepetition Secured Parties, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, adequate protection of their interest in their respective Cash Collateral, as well as for (and equal in amount to) the aggregate diminution, if any, in the value of their respective interests |

| MATERIAL TERMS OF THE DIP FINANCING |
|---|

in the Prepetition Collateral, resulting, without limitation, from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the applicable Prepetition Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "**Adequate Protection Claims**"), in the following form:

a. effective and perfected upon the date of entry of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, in the amount of such diminution, a senior replacement security interest in and lien upon all DIP Collateral (the "**Adequate Protection Liens**"), subject and subordinate only (i) in the case of the Adequate Protection Liens granted to the Prepetition Revolving Agent (the "**Prepetition Revolving Facility Adequate Protection Liens**"), to the DIP Liens on the Funding Account and the Carve-Out Account, (ii) in the case of the Adequate Protection Liens granted to the Prepetition Notes Trustee (the "**Prepetition Notes Adequate Protection Liens**"), to the DIP Liens, the Prepetition Revolving Facility Liens, and the Prepetition Revolving Facility Adequate Protection Liens, and (iii) in the case of all Adequate Protection Liens, to the payment of the Carve-Out;

b. superpriority claims under section 507(b) of the Bankruptcy Code (the "**Section 507(b) Claims**"), (i) in the case of the Prepetition Revolving Agent, in the amount of the Adequate Protection Claim of the Prepetition Revolving Lenders (the "**Prepetition Revolving Facility Section 507(b) Claim**"), subject solely to (x) the Carve-Out Claim and (y) the payment of the Carve-Out, and (ii) in the case of the Prepetition Notes Trustee, in the amount of the Adequate Protection Claim of the Prepetition Noteholders (such claim, together with the DIP Superpriority Claim and the Prepetition Revolving Facility Section 507(b) Claim, the "**Superpriority Claims**"), subject to (w) the Carve-Out Claim, (x) the DIP Superpriority Claim, (y) the Prepetition Revolving Facility Section 507(b) Claim, and (z) the payment of the Carve-Out;

c. with respect to the Prepetition Revolving Credit Agreement: (i) upon entry of the Interim Order, immediate cash payment of all accrued and unpaid (A) fees and disbursements of counsel to the Prepetition Revolving Agent and the fees of counsel to Associated Bank, N.A., in each case, chargeable and reimbursable under the Prepetition Revolving Credit Agreement (with all fees and expenses invoiced as of the Petition Date being deemed reasonable and reimbursable under the Prepetition Revolving Credit Agreement), (B) all accrued interest (at the non-default interest rate) on loans outstanding under the Prepetition Revolving Credit Agreement that is due and owing pursuant to the Prepetition Revolving Credit Agreement as of the Petition Date, (C) all amounts under any swap agreements (other than termination payments), cash management arrangements and purchasing cards constituting Obligations (as such term is defined in the Prepetition Revolving Credit Agreement) under the Prepetition Revolving Credit Agreement, in each case, that are due and owing as of the Petition Date, and (D) all letter of credit fees and all other accrued and unpaid disbursements, in each case, due and owing to the

15

| **MATERIAL TERMS OF THE DIP FINANCING** | |
|---|---|
| | Prepetition Revolving Agent and the Prepetition Revolving Lenders pursuant to the Prepetition Revolving Credit Agreement as of the Petition Date; and (ii) thereafter, payment in cash (A) monthly of an amount equal to accrued postpetition interest and letter of credit fees under the Prepetition Revolving Credit Agreement at the non-default interest rate, (B) all amounts due and owing under any swap agreements, cash management arrangements and purchasing cards constituting Obligations (as such term is defined in the Prepetition Revolving Credit Agreement), and (C) monthly of the reasonable and documented costs, fees and disbursements of the Prepetition Revolving Agent and the Prepetition Revolving Lenders (including the reasonable and documented fees and expenses of one primary counsel and one local counsel to the Prepetition Revolving Agent, counsel to Associated Bank, N.A. (*provided* that, the postpetition fees and expenses of counsel to Associated Bank, N.A. shall not exceed $20,000 in the aggregate) and, after the occurrence of an Event of Default, one financial advisor to the Prepetition Revolving Agent, (it being understood that nothing in the DIP Order shall impair the right of the Prepetition Revolving Agent to seek approval of the Court to modify the adequate protection granted therein to include payment of the reasonable and documented fees and expenses of one financial advisor to the Prepetition Revolving Agent in the absence of or before the occurrence of an Event of Default or the right of the Debtors or any other party to object thereto) (the "**Prepetition Revolving Facility Adequate Protection Payments**"). With respect to the Prepetition Notes Indenture: upon entry of the Interim Order, (i) immediate cash payment of all accrued and unpaid costs, fees and expenses of the Prepetition Notes Trustee, including fees and disbursements of counsel to the Prepetition Notes Trustee chargeable and reimbursable under the Prepetition Notes Indenture and (ii) thereafter, payment in cash monthly of the reasonable and documented fees of the Prepetition Notes Trustee chargeable and reimbursable under the Prepetition Notes Indenture (including the reasonable and documented fees and expenses of one primary counsel and one local counsel). None of the costs, fees and expenses payable under paragraph 11 of the Interim Order shall be subject to separate court approval and the recipients shall not be required to file any fee applications therefor; provided, that this Court shall resolve any disputes as to the reasonableness of such fees and expenses; and<br><br>d. contemporaneous provision to the Prepetition Revolving Agent of any required periodic reporting or notices (other than any notices provided pursuant to Sections 2.2, 2.3, 5.3 or 5.4 of the DIP Credit Agreement) that are provided to the DIP Agent, the DIP Lenders, the Ad Hoc Senior Secured Note Holder Committee, or the Prepetition Notes Trustee pursuant to the DIP Credit Agreement or the Prepetition Notes Indenture, respectively.<br><br>*See* **Interim Order ¶ 11.** |
| **Carve-Out** | **Carve-Out:** The "**Carve-Out**" means (i) all fees required to be paid pursuant to 28 U.S.C. § 1930 and 31 U.S.C. § 3717, whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below); (ii) all reasonable fees and expenses |

| MATERIAL TERMS OF THE DIP FINANCING |
|---|
| incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, and whether before or after delivery of a Carve-Out Trigger Notice, all unpaid fees, costs, disbursements and expenses of professionals retained by the Debtors or the official committee of unsecured creditors appointed in these Cases (the "**Creditors' Committee**") (but excluding fees and expenses of any professionals employed individually by members of the Creditors' Committee) pursuant to sections 327 and 1103 of the Bankruptcy Code, respectively (collectively, the "**Professionals**") incurred at any time on or prior to the first Business Day (as defined in the DIP Credit Agreement) following the delivery by the DIP Agent or the Prepetition Revolving Agent, as applicable, of a Carve-Out Trigger Notice in accordance with the terms of the Interim Order; and (iv) to the extent allowed at any time by the Court, whether by interim order, procedural order or otherwise, the unpaid fees, costs, disbursements and expenses incurred by Professionals after the first Business Day following the delivery by the DIP Agent or the Prepetition Revolving Agent of the Carve-Out Trigger Notice not to exceed $3,500,000 (the "**Carve-Out Cap**").  Notwithstanding anything to the contrary in the Interim Order, all liens and claims (including claims with superpriority) granted pursuant to the Interim Order shall be subject to the Carve-Out as provided for therein. <br><br> **Carve-Out Trigger Notice:**  The "**Carve-Out Trigger Notice**" means a written notice delivered by the DIP Agent on behalf of the DIP Lenders or, in the case of a material violation of paragraph 11 or paragraph 16 of the Interim Order, the Prepetition Revolving Agent on behalf of the Prepetition Revolving Lenders (with a copy to the DIP Agent), to the Debtors' lead counsel, the U.S. Trustee, the lead counsel to the Creditors' Committee, and the lead counsel to the DIP Agent or the lead counsel to the Prepetition Revolving Agent, as applicable, following the occurrence and continuation of an Event of Default, describing the Event of Default that is alleged to have occurred and be continuing, or, in the case of the Prepetition Revolving Agent, the material violation that is alleged to have occurred and be continuing, and expressly stating that the Carve-Out Cap has been invoked.  Upon the receipt of a Carve-Out Trigger Notice, the Borrower shall (i) submit a Withdrawal Request (as defined in the DIP Credit Agreement) for the amount of the Carve-Out Cap and (ii) unless waived by the Required Lenders (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement, prepay DIP Loans in an amount equal to the amount of any funds in the Funding Account in excess of the Carve-Out Cap, in each case, in accordance with Section 2.3 of the DIP Credit Agreement.  Upon receipt of the amount described in clause (i) of the preceding sentence, the Borrower shall transfer such amount to the Carve-Out Account, the proceeds of which shall be available only to pay the Carve-Out.  The DIP Lenders shall not sweep or foreclose on the cash in the Funding Account to the extent the amount remaining therein thereafter would be less than the Carve-Out Cap (less any amounts already funded to the Carve-Out Account).  Upon payment in full of the amounts set forth in clause (iv) of paragraph 9(a) of the Interim Order, the Borrower shall promptly remit all amounts remaining in the Carve-Out Account, if any, to the Funding Account. <br><br> *See* **DIP Credit Agreement §§ 1.1, 2.3; Interim Order ¶ 9.** |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Conditions to Closing**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The conditions precedent to closing include the usual and customary conditions for financings of this type, including, among other things, delivery of financing documentation, payment of fees and expenses, governmental and third-party approvals and the receipt by the DIP Agent of a copy of the Budget and the 13-Week Forecast.<br><br>**DIP Credit Agreement § 5.01.** |
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)* | **Affirmative Covenants:**  Usual and customary for financings of this type, including, without limitation, compliance with all applicable laws, including Environmental Laws, payment of postpetition taxes and claims, provision of information regarding collateral, maintenance of properties and insurance, payment of any postpetition obligations, compliance with the Budget, provision of further assurances in connection with performance under the DIP Credit Agreement and obligations and notice regarding the Debtors' cash management system.<br><br>*See* **DIP Credit Agreement Section 6.**<br><br>**Negative Covenants:**  Usual and customary for financings of this type, including, without limitation, restrictions on liens, indebtedness, consolidation or merger, dispositions, affiliate transactions, dividends and distributions and other unrestricted payments, investments, sale and leaseback, changes in the nature of business, amendments to governing documents, modifications of indebtedness and cash management system.<br><br>*See* **DIP Credit Agreement Section 7.**<br><br>**Financial Covenants:**  the Debtors covenant to (i) use the proceeds of the DIP Loans in compliance with the Budget with a maximum permitted variance of 20% for the first week, 15% for the second week, and 10% thereafter, subject to certain exceptions and carry-forward amounts, (ii) maintain a minimum liquidity of $2,500,000, (iii) for each month beginning with May 2015, maintain total monthly production amounts of iron ore flux pellets within at least 90% of the projected amounts as set forth in Schedule 6.16(c) to the DIP Credit Agreement, (iv) not make or commit to make payments pursuant to the Critical Vendors Order (as defined in the DIP Credit Agreement) or the Shippers Order (as defined in the DIP Credit Agreement) in excess of $32,000,000 in the aggregate during these Cases.<br><br>*See* **DIP Credit Agreement § 6.16.** |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Usual and customary for financings of this type, including, without limitation, non-payment of principal, interest and fees when due, defaults under affirmative and negative covenants, breaches of representations and warranties, default as to other indebtedness, invalidity or impairment of documents, judgments, change of control, ERISA, failure of guaranty or lack of security interest, dismissal of cases or appointment of a chapter 7 or chapter 11 trustee, superpriority claims *pari passu* with the Superpriority Claims, non-entry of Final Order, challenge to the Interim Order or Final Order, relief from the automatic stay, non-compliance with Interim Order or Final Order, prepetition payments, filing of certain pleadings, failure to meet certain milestones (including with respect to the AK Steel Contract and the progress of these Cases on terms acceptable to the DIP Lenders and the Ad Hoc Committee), confirmation of certain plans of reorganization and non-occurrence of the Term Roll-Up or the Prepetition Notes Roll-Up.<br><br>*See* **DIP Credit Agreement Section 8.** |

| MATERIAL TERMS OF THE DIP FINANCING |
|---|

| | |
|---|---|
| **Limitations on Use of DIP Financing and Cash Collateral**<br>*Fed. R. Bankr. P. 4001-2(a)(9)* | Subject to the terms and conditions of the DIP Documents and the Interim Order, the Debtors may use the collateral of the Prepetition Secured Parties that constitutes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") in accordance with the Budget (as defined in the DIP Credit Agreement) and as otherwise provided in the DIP Credit Agreement.  The Debtors' right to use Cash Collateral shall terminate automatically on the Final Maturity Date (as defined in the DIP Credit Agreement).  In addition, (i) upon the occurrence of and during the continuance of an Event of Default by the Debtors of this Interim Order, the DIP Agent shall have the immediate right unilaterally to terminate the Debtors' right to use Cash Collateral subject to the giving of five Business Days' prior written notice to the Debtors (with a copy to counsel to the Creditors' Committee, the U.S. Trustee, the Prepetition Revolving Agent, and the Prepetition Notes Trustee) and (ii) upon the occurrence of material violation of paragraphs 11 or 16 of the Interim DIP Order, either the DIP Agent or the Prepetition Revolving Agent shall have the immediate right unilaterally to terminate the Debtors' right to use Cash Collateral subject to the giving of five Business Days' prior written notice to the Debtors (with a copy to counsel to the Creditors' Committee, the U.S. Trustee, the DIP Agent or the Prepetition Revolving Agent, as applicable, and the Prepetition Notes Trustee); *provided* that the Debtors reserve their rights to challenge such termination and/or seek to continue to use Cash Collateral under the terms determined by the Court at such time.<br><br>Specifically, under the DIP Credit Agreement, the Borrower may not request any Loan (as defined in the DIP Credit Agreement), or permit its Subsidiaries (as defined in the DIP Credit Agreement) or their respective directors, officers, employees and agents to use, the proceeds of any Loan:<br><br>    a.    (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person (as defined in the DIP Credit Agreement) in violation of any Anti-Corruption Laws (as defined in the DIP Credit Agreement), (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person (as defined in the DIP Credit Agreement), or in any Sanctioned Country (as defined in the DIP Credit Agreement), or (iii) in any manner that would result in the violation of any Sanctions (as defined in the DIP Credit Agreement) applicable to any party hereto;<br><br>    b.    for any purpose that is prohibited under the Bankruptcy Code or the DIP Order;<br><br>    c.    for the payment of fees, expenses, interest or principal with respect to any Prepetition Indebtedness (as defined in the DIP Credit Agreement) (other than payments made pursuant to Section 4.16 of the DIP Credit Agreement, Permitted Adequate Protection Payments (as defined in the DIP Credit Agreement) or as otherwise permitted pursuant to a First Day Order (as defined in the DIP Credit Agreement));<br><br>    d.    to make any distribution under a plan of reorganization in the Chapter 11 |

| MATERIAL TERMS OF THE DIP FINANCING | |
|---|---|
| | Cases (as defined in the DIP Credit Agreement); or |
| | e.  to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent acting at the direction of the Required Lenders (as defined in the DIP Credit Agreement). |
| | *See* **DIP Credit Agreement § 7.18; Interim Order ¶ 10.** |
| **Debtor Stipulations** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iii) and (viii)* | The Debtors make certain customary admissions and stipulations with respect to the amounts of the respective Prepetition Secured Debt and Prepetition Term Facility Debt, the validity, perfection, enforceability and priority of the liens and security interests securing the respective Prepetition Secured Debt, the value of the Prepetition Collateral, the non-existence of any grounds for the Debtors to challenge any aspect of the Prepetition Secured Debt or the Prepetition Term Facility Debt or the respective holders thereof and a release by the Debtors with respect to the foregoing, subject to a 30-day challenge period following entry of the Final Order. <br><br> *See* **Interim Order ¶¶ 4, 18, 23.** |
| **Automatic Stay** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The Interim Order provides for lifting of the automatic stay to allow the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court. <br><br> *See* **Interim Order ¶¶ 15(b), 16.** |
| **Waivers and Consents** <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(v);* <br> *Fed. R. Bankr. P. 4001(c)(1)(B)(vii-x)* | Subject to the entry of the Final Order, no costs or expenses of administration shall be surcharged or otherwise imposed against the DIP Lenders' collateral or the Prepetition Collateral of the Prepetition Secured Parties under section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent, the Prepetition Revolving Agent and the Prepetition Revolving Lenders, as the case may be with respect to their respective interests.  Also subject to entry of the Final Order, the Debtors waive any right under the "equities of the case" exception in section 552(b). <br><br> *See* **Interim Order ¶ 14.** |

| MATERIAL TERMS OF THE DIP FINANCING | |
| --- | --- |
| **Milestones**<br>*Fed. R. Bankr. P.*<br>*4001(c)(1)(B)(vi)* | Unless otherwise ordered by the Court or waived by the Required Lenders (as defined in the DIP Credit Agreement), the occurrence of any of the following shall be a default under the DIP Credit Agreement: (i) the Debtors shall not have hired a Chief Restructuring Officer that is acceptable to the Required Lenders on or before the 15th day after the Petition Date, (ii) the Debtors shall not have entered into a restructuring support agreement (the "**RSA**") with the Required Lenders giving effect to the Plan Term Sheet in form and substance acceptable to the Required Lenders on or before the 25th day after the Petition Date, (iii) the Debtors shall note have filed with the Court a motion to approve the RSA (the "**RSA Motion**") on or before the 40th day after the Petition Date, (iv) the Court shall not have entered the Final Order on or before the 45th day after the Petition Date, (v) the Court shall not have entered an order approving the RSA Motion on or before the 75th day after the Petition Date, (vi) the Debtors shall not have filed with the Court a plan of reorganization ("**Plan**") in form and substance acceptable to the Required Lenders that gives effect to the terms of the Interim Order with Respect to the Discharge of Prepetition Revolving Obligations and the Plan Term Sheet or, if executed, the RSA, and a disclosure statement ("**Disclosure Statement**") in form and substance acceptable to the Required Lenders on or before the 90th day after the Petition Date, (vii) at the election of the Required Lenders, either (x) the Disclosure Statement shall not have been approved by the Court or, in the alternative, (y) the Debtors shall not have filed a motion with the Court seeking approval of a sale of all, or substantially all, of the Debtors' assets on terms acceptable to the Required Lenders pursuant to section 363 of the Bankruptcy Code (the "**363 Sale**"), in either case on or before the 120th day after the Petition Date, (viii) at the election of the Required Lenders, either (x) the Plan shall not have been confirmed by the Court or, in the alternative, (y) an order approving the 363 Sale shall not have been entered by the Court, in either case on or before the 175th day after the Petition Date or (ix) the effective date of the Plan shall not have occurred on or before the 190th day after the Petition Date.<br><br>*See* **DIP Credit Agreement Section 8; Interim Order ¶ 20.** |

## THE DEBTORS' BUSINESSES[7]

17.     As set forth more fully in the Broking Declaration, the Debtors are a natural

resources company that focuses on the design, development, construction and operation of

---

[7] The financial information provided in this Motion has been prepared by the Debtors and their advisors for illustrative purposes only.  Such information is unaudited and subject to material change based on certain contingencies.  While this financial information is presented with numerical specificity, the Debtors caution that no representations or guarantee can be made as to the accuracy of this information.  The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

facilities that produce iron ore concentrate and fluxed iron ore pellets from previously abandoned iron ore waste stockpiles and tailings basins on the Mesabi Range in northern Minnesota. As of the Petition Date, the Debtors own plants located in Keewatin, Minnesota ("**Plant 1**"), Bovey, Minnesota ("**Plant 2**"), and Grand Rapids, Minnesota ("**Plant 4**" and, collectively with Plant 1 and Plant 2, the "**Iron Ore Plants**") where they produce iron ore concentrate using proprietary technology, such as the Rev3.1 Separator, and associated intellectual property (the "**Magnetation Process**") licensed from Mag LLC's majority member, Mag Inc., pursuant to a non-exclusive license agreement. The Debtors also operate a rail load-out facility, the Jessie Load-Out, in Colerine, Minnesota, which serves as the primary means of rail transportation for the finished materials produced from the Iron Ore Plants and allows the Debtors to capitalize on the existing rail infrastructure on the Mesabi Range. *See* Broking Decl. ¶¶ 6-8.

18.     For the fiscal year ending December 31, 2014, the Debtors estimate revenues of approximately $96.2 million and adjusted EBITDA of approximately $16.6 million. The Debtors estimate that their net loss during the same period was approximately $16 million. *See* Broking Decl. ¶ 16.

19.     Collectively, the Debtors employ approximately 361 people in active status, working in both full and part time positions (together with the current members of the Debtors' boards of directors, the "**Employees**"), and contract for an additional approximately 125 personnel from Mag Inc. to provide management, administrative and certain other services pursuant to a management services agreement between the parties (the "**Other Employees**"). The Debtors' Employees include operators, electricians, millwrights, pipefitters, lab technicians and administrative personnel. The Other Employees provide management, supervisory, human

resources, finance, engineering, administrative and clerical services.  Approximately 33.5% of the Employees are represented by Local 49 of the International Union of Operating Engineers, pursuant to two separate collective bargaining agreements, one of which applies to Employees at Plant 1, and one of which applies to Employees at Plant 2 and at the Jessie Load-Out.  The Debtors provide healthcare and other benefits to the Employees and the Other Employees, and are subject to the workers' compensation laws in the states in which they operate.  *See* Broking Decl. ¶ 15.

## OUTSTANDING PREPETITION INDEBTEDNESS

20.     The Debtors have approximately $493.7 million in secured indebtedness and related obligations, consisting principally of: (a) approximately $8.9 million in face amount of undrawn letters of credit outstanding, plus accrued and remaining commission charges thereon, and approximately $56 million in borrowings, fees, expenses and other charges outstanding owed under the Prepetition Revolving Credit Agreement, (b) approximately $3.8 million under the Prepetition Term Credit Agreement and (c) $425 million in aggregate principal amount of Prepetition Notes.  Additionally, the Debtors owe approximately $23.5 million owed under an unsecured note to White County, Indiana, entered into as part of an tax increment financing arrangement, (the "**Unsecured TIF Note**") described in further detail below.

### A.     THE PREPETITION REVOLVING CREDIT AGREEMENT

21.     Mag LLC, as Borrower, and each of the other Debtors, as Guarantors, are parties to the Prepetition Revolving Credit Agreement.  The Prepetition Revolving Credit Agreement

provides for the issuance of letters of credit[8] and direct borrowings in an aggregate amount of up to $65 million.  As of the Petition Date, there were approximately $56 million in borrowings outstanding under the Prepetition Revolving Credit Agreement, and approximately $8.9 million of outstanding undrawn letters of credit had been issued under the Prepetition Revolving Credit Agreement.

22.     Obligations arising under the Prepetition Revolving Credit Agreement are secured by first priority liens on substantially all of the Debtors' assets (the "**Prepetition Revolving Facility Liens**").

## B.     THE PREPETITION TERM FACILITY

23.     Mag LLC, as borrower, and the other Debtors, as guarantors, are party to the Prepetition Term Credit Agreement, under which the Ad Hoc Senior Secured Note Holder Committee (the members of which are also the initial DIP Lenders) extended critical short-term financing to bridge a liquidity shortfall prior to the Petition Date.  In the weeks leading up to the Petition Date, the Debtors vigorously pursued a consensual out-of-court restructuring with their stakeholders, while simultaneously preparing for the possibility of a chapter 11 filing.  However, during the course of these efforts, the Debtors determined that, in order to effectuate an orderly chapter 11 filing with immediate access to sufficient postpetition financing, they needed to incur the Prepetition Term Facility Debt.  The Prepetition Term Facility Debt is secured by liens on the

---

[8] The letters of credit issued and outstanding under the Prepetition Revolving Credit Agreement will remain in place without having to be cash collateralized.  This important and difficult-to-replace source of financing allows the Debtors to meet their regulatory obligations with respect to posting collateral and continue their businesses in the ordinary course without interruption.  If the Debtors had been required to cash collateralize the outstanding letters of credit, their liquidity would have been significantly reduced or the DIP Financing may have been more costly.  The Issuing Lenders will be under no obligation to extend, renew or otherwise modify any of the existing letters of credit.

same assets that secure the Prepetition Secured Debt, and, pursuant to an intercreditor agreement among the Prepetition Revolving Agent, the Prepetition Term Agent, the Borrower and other parties, the Prepetition Term Lenders are junior in right of payment to the Prepetition Revolving Lenders, but senior in right of payment to the Prepetition Noteholders.  But for the Prepetition Term Facility, the Debtors would have been forced to commence chapter 11 cases without adequate time to properly prepare an orderly filing and negotiate favorable terms for the DIP Financing.

### C.      THE SENIOR SECURED NOTES

24.      In May 2013, Mag LLC and Mag Finance co-issued $325 million in principal amount of Prepetition Notes, and in July 2014, Mag LLC and Mag Finance issued a tack-on offering of $100 million of Prepetition Notes under the same indenture.  The Prepetition Notes are guaranteed by each of the other Debtors.  Interest on the Prepetition Notes is payable on May 15 and November 15 of each year, and the Debtors are required to maintain an interest escrow account (the "**Interest Escrow Account**") containing, at all times, an amount no less than the amount required to make the interest payment on the Prepetition Notes due on the next succeeding interest payment date.  The Prepetition Notes are secured by first priority liens (the "**Prepetition Notes Liens**" and, together with the Prepetition Revolving Facility Liens, the "**Prepetition Liens**") on substantially all of the Debtors' assets, ranking *pari passu* with Prepetition Revolving Facility Liens, except with respect to the Interest Escrow Account, which is for the exclusive benefit of the Prepetition Noteholders.  However, pursuant to an intercreditor agreement among the Prepetition Revolving Agent, the Prepetition Notes Trustee, the Borrower and other parties, the Prepetition Revolving Lenders are senior in right of payment.  As of the

Petition Date, $425 million in aggregate principal amount of the Prepetition Notes remains outstanding.

### D.   THE UNSECURED TIF NOTE

25.   Mag Pellet LLC ("**Mag Pellet**") is party to an unsecured tax increment financing arrangement (the "**TIF Financing Arrangement**") with White County, Indiana, entered into on June 6, 2013.  Pursuant to the TIF Financing Arrangement, Mag Pellet purchased a $23.5 million 0% bond from White County.  Under the Unsecured TIF Note, White County loaned the net proceeds from the sale of the bond to Mag Pellet at 0% interest and on an unsecured basis to finance the construction of the Pellet Plant.  Mag Pellet's annual real and personal property tax payments are credited toward the payment of principal on the Unsecured TIF Note.  The TIF Financing is scheduled to mature in 2037.  As of the Petition Date, approximately $23.5 million remains outstanding under the Unsecured TIF Note.

### E.   OTHER LIENS

26.   In the ordinary course of business, the Debtors have incurred certain secured indebtedness as permitted under the Prepetition Revolving Credit Agreement and the Prepetition Notes Indenture.  These permitted liens will not be subordinated to the DIP Liens or Adequate Protection Liens.

### THE DEBTORS' LIQUIDITY NEEDS

27.   Without immediate access to the liquidity provided by the DIP Financing, the Debtors will be at serious risk of shutdown due to constrained liquidity and possible tightening of trade terms due to vendor uncertainty.  The Debtors now face an economic environment in which the price of, and demand for, iron ore have sharply and unexpectedly declined.  *See, e.g.,*

Broking Decl. ¶ 24 ("Between January 2014 and March 2015, the IODEX fell by over 50%."). These industry-specific pressures have forced the Debtors to idle one of their Iron Ore Plants, among other cost savings initiatives, in order to survive. *See* Broking Decl. ¶ 27. Additionally, prior to the Petition Date, the Debtors assiduously pursued negotiations with their major counterparties, including their primary customers Altos Hornos de Mexico, S.A.B. de C.V. ("**AHMSA**") and AK Steel Corporation. In the weeks prior to filing, the Debtors reached a favorable agreement with AHMSA to amend the terms of the long-term iron ore concentrate off-take agreement between the two parties, resulting in a more economically beneficial contract for the Debtors, and the Debtors intend to continue discussions with AK Steel Corporation postpetition in order to achieve a mutually agreeable amended supply contract.

## THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION FINANCING

28.     On or about January 19, 2015, the Debtors engaged Blackstone Advisory Partners L.P. ("**Blackstone**") to assist them in navigating the unexpected and severe decline in the iron ore and steel markets, and the challenges these conditions posed to the Debtors' businesses. The Debtors and Blackstone considered a variety of out-of-court solutions to the Debtors' liquidity demands and capital structure issues. However, continued deterioration in the markets quickly raised serious liquidity concerns, and the Debtors initiated a parallel process aimed at securing a source of postpetition financing in contemplation of these Cases.

29.     In light of the Debtors' increasing difficulty in meeting their liquidity needs and their highly-leveraged capital structure and lack of unencumbered assets, the Debtors determined, after consulting with their advisors, that the only reasonably available sources of DIP financing were their existing secured creditors. The Debtors and Blackstone approached both the

Prepetition Revolving Agent and certain Prepetition Noteholders to open discussions about possible DIP financing.[9]   The Ad Hoc Senior Secured Note Holder Committee presented a proposal that charted a path forward and contemplated sufficient liquidity to allow the Debtors to file these Cases and secure the breathing room necessary to engage in a value-maximizing restructuring of their businesses and their debt obligations under chapter 11.

30.     During these urgent and rigorous negotiations over the course of March and April 2015, the Debtors' liquidity needs continued to outpace cashflow, and the Debtors initiated parallel discussions with the Ad Hoc Senior Secured Note Holder Committee seeking a short-term credit facility to support their businesses while final terms were negotiated and definitive documents were drafted in connection with the commencing the Cases and the DIP Financing. The Prepetition Term Credit Agreement closed on April 17, 2015, and provided the Debtors with approximately $3.8 million in immediate liquidity, allowing them to bridge this near-term liquidity gap and commence these Cases in an orderly fashion.

31.     These arms'-length negotiations culminated in the parties agreeing upon the terms set forth in the DIP Credit Agreement, the other DIP Documents, including the Plan Term Sheet.

---

[9] As part of the process of these discussions, the Debtors required certain of these counterparties to enter into nondisclosure agreements (the "**NDAs**") in order to ensure that confidential information could be shared freely and to promote an efficient process.  Pursuant to these NDAs, the Debtors agreed to disclose publicly, after the expiration of a period set forth in each NDA, certain confidential information concerning the Debtors that the Debtors provided to these counterparties.  The information included in Exhibit F, attached hereto, is being furnished solely to comply with the Debtors' public disclosure obligations under the NDAs.  The inclusion of this material in this Motion should not be regarded as an indication that the Debtors or any other person considered, or now consider, this information to be necessarily predictive of actual future results, and does not constitute an admission or representation by any person that such information is material, or that the expectations, beliefs, opinions and assumptions that underlie these materials remain the same as of the date of this Motion, and readers are cautioned not to place undue reliance on these materials.

The DIP financing proposal that emerged from these rigorous negotiations represents the best financing option available to the Debtors.

## REQUEST FOR EXPEDITED RELIEF

32.     The Debtors request expedited relief on this Motion. The Debtors have scheduled and served a number of "first day" motions designed to facilitate an orderly transition to chapter 11. The granting of this Motion on an expedited basis will ensure the Debtors' continued uninterrupted operations. Any shutdown of the Debtors' operations would damage relationships with customers and vendors, cost the Debtors irreplaceable production time, undermine employee confidence and, at this critical juncture, further impair the Debtors' liquidity and financial position. Thus, expedited relief is essential to preserve the going-concern value of the Debtors' estates for their employees, customers, vendors, lenders and other parties in interest, and to induce stakeholders to continue working for or with the Debtors.

33.     Pursuant to Local Rule 9013-2, this Motion is verified and is accompanied by a memorandum of law, proposed order and proof of service.

34.     Pursuant to Local Rule 9013-2, the Debtors give notice that they may, if necessary, call (i) Joseph A. Broking, Chief Financial Officer of Magnetation LLC, an authorized representative of the Debtors, having a business address at 102 NE 3rd Street, Suite 120, Grand Rapids, Minnesota 55744 and/or (ii) Mark Buschmann, Senior Managing Director of Blackstone Advisory Partners L.P., having a business address at 345 Park Avenue, New York, New York 10154, to testify at the hearing on the Motion regarding the facts set out herein.

## REQUEST FOR WAIVER OF STAY

35.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent irreparable damage to the Debtors' operations and enterprise value. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NO PREVIOUS REQUEST

36.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors move the Court for an order

A.     granting expedited relief;

B.     approving on an interim and final basis the DIP Financing described herein;

C.     authorizing on an interim and final basis the use of Cash Collateral and the other Prepetition Collateral and the grant of adequate protection to the Prepetition Secured Parties on the terms described herein; and

D.     granting such other and further relief as the Court may deem just and equitable

Dated:  May 5, 2015

FREDRIKSON & BYRON, P.A.

*/e/ Clinton E. Cutler*
Clinton E. Cutler (#158094)
James C. Brand (#387362)
Sarah M. Olson (#390238)
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
Telephone: (612) 492-7000
Facsimile:  (612) 492-7077
ccutler@fredlaw.com
jbrand@fredlaw.com
solson@fredlaw.com

*Proposed Local Counsel to the Debtors*
*and Debtors in Possession*

– and –

DAVIS POLK & WARDWELL LLP
Marshall S. Huebner (NY #2601094)
Damian S. Schaible (NY #4086864)
Michelle M. McGreal (NY #4599031)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
marshall.huebner@davispolk.com
damian.schaible@davispolk.com
michelle.mcgreal@davispolk.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## **VERIFICATION**

I, Joseph A. Broking, Chief Financial Officer of Magnetation LLC, based upon my personal information and belief, declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: _____May 5_____, 2015          Signed: _____

                                                  Joseph A. Broking

Exhibit A

DIP Credit Agreement

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

MAGNETATION LLC,
as Borrower,

The Several Lenders from Time to Time Parties Hereto,

and

WILMINGTON TRUST, NATIONAL ASSOCIATION,
as Administrative Agent

Dated as of May [_], 2015

TABLE OF CONTENTS

Page

SECTION 1.   DEFINITIONS ................................................................................................ 1
  1.1    Defined Terms ................................................................................................ 1
  1.2    Other Definitional Provisions ....................................................................... 26
SECTION 2.   AMOUNT AND TERMS OF COMMITMENTS ........................................... 27
  2.1    Loans ............................................................................................................. 27
  2.2    Procedure for NM Loan Borrowing .............................................................. 29
  2.3    Funding Account ........................................................................................... 30
  2.4    Intentionally Omitted .................................................................................... 31
  2.5    Fees ............................................................................................................... 31
  2.6    Termination or Reduction of Commitments .................................................. 31
  2.7    Prepayments .................................................................................................. 32
  2.8    Intentionally Omitted .................................................................................... 33
  2.9    Intentionally Omitted .................................................................................... 33
  2.10   Interest Rates and Payment Dates ................................................................. 33
  2.11   Computation of Interest and Fees ................................................................. 33
  2.12   Intentionally Omitted .................................................................................... 34
  2.13   Pro Rata Treatment and Payments ................................................................ 34
  2.14   Requirements of Law .................................................................................... 35
  2.15   Taxes ............................................................................................................. 36
  2.16   Intentionally Omitted .................................................................................... 40
  2.17   Change of Lending Office ............................................................................. 40
  2.18   Replacement of Lenders ................................................................................ 40
  2.19   Defaulting Lenders ........................................................................................ 41
SECTION 3.   INTENTIONALLY OMITTED .................................................................... 41
SECTION 4.   REPRESENTATIONS AND WARRANTIES ............................................... 41
  4.1    Financial Condition ....................................................................................... 41
  4.2    No Change ..................................................................................................... 42
  4.3    Existence; Compliance with Law .................................................................. 42
  4.4    Power; Authorization; Enforceable Obligations ........................................... 42
  4.5    No Legal Bar .................................................................................................. 43
  4.6    Litigation ....................................................................................................... 43

| 4.7 | No Default | 43 |
|-----|-----------|-----|
| 4.8 | Ownership of Property; Liens | 43 |
| 4.9 | Intellectual Property | 43 |
| 4.10 | Taxes | 43 |
| 4.11 | Federal Regulations | 44 |
| 4.12 | Labor Matters | 44 |
| 4.13 | ERISA | 44 |
| 4.14 | Investment Company Act; Other Regulations | 44 |
| 4.15 | Subsidiaries | 44 |
| 4.16 | Use of Proceeds | 45 |
| 4.17 | Environmental Matters | 45 |
| 4.18 | Accuracy of Information, etc | 46 |
| 4.19 | Intentionally Omitted | 46 |
| 4.20 | Intentionally Omitted | 46 |
| 4.21 | Intentionally Omitted | 46 |
| 4.22 | Certain Documents | 46 |
| 4.23 | Anti-Corruption Laws and Sanctions | 46 |
| 4.24 | Secured, Super-Priority Obligations | 47 |
| 4.25 | DIP Order | 47 |
| 4.26 | Budget | 47 |
| SECTION 5. | CONDITIONS PRECEDENT | 48 |
| 5.1 | Conditions to Closing Date and Funding of Initial NM Loans | 48 |
| 5.2 | Conditions to Second Funding Date | 51 |
| 5.3 | Conditions to Withdrawal | 51 |
| 5.4 | Additional Conditions to Each Loan and Withdrawal | 52 |
| 5.5 | Determination of Compliance with Conditions | 53 |
| SECTION 6. | AFFIRMATIVE COVENANTS | 54 |
| 6.1 | Financial Statements | 54 |
| 6.2 | Certificates; Other Information | 54 |
| 6.3 | Payment of Obligations | 56 |
| 6.4 | Maintenance of Existence; Compliance | 56 |
| 6.5 | Maintenance of Property; Insurance | 56 |
| 6.6 | Inspection of Property; Books and Records; Discussions | 56 |
| 6.7 | Notices | 56 |

6.8      Environmental Laws ................................................................................ 57

6.9      Additional Collateral, etc ...................................................................... 58

6.10     Chapter 11 Cases Filings ...................................................................... 58

6.11     Chapter 11 Cases................................................................................... 59

6.12     Cash Management ................................................................................. 59

6.13     Funding Account.................................................................................... 59

6.14     Rolling 13 Week Cash Flow Reports.................................................... 60

6.15     Reporting of Budget Variance, Consolidated Liquidity and Production.............. 60

6.16     Financial Condition Covenants.............................................................. 60

6.17     Carve-Out Account ............................................................................... 62

SECTION 7.    NEGATIVE COVENANTS ............................................................... 62

7.1      Intentionally Omitted ............................................................................ 62

7.2      Indebtedness .......................................................................................... 62

7.3      Liens ...................................................................................................... 63

7.4      Fundamental Changes ........................................................................... 65

7.5      Disposition of Property ......................................................................... 65

7.6      Restricted Payments .............................................................................. 65

7.7      Investments ........................................................................................... 66

7.8      Optional Payments and Modifications of Certain Debt Instruments ............ 66

7.9      Transactions with Affiliates .................................................................. 67

7.10     Sales and Leasebacks ............................................................................ 67

7.11     Swap Agreements .................................................................................. 67

7.12     Changes in Fiscal Periods ..................................................................... 67

7.13     Negative Pledge Clauses ....................................................................... 67

7.14     Clauses Restricting Subsidiary Distributions........................................ 67

7.15     Lines of Business .................................................................................. 68

7.16     Modifications to Certain Documents ..................................................... 68

7.17     Intentionally Omitted ............................................................................ 68

7.18     Use of Proceeds..................................................................................... 68

7.19     Chapter 11 Claims; Adequate Protection .............................................. 68

SECTION 8.    EVENTS OF DEFAULT ................................................................... 69

SECTION 9.    THE AGENTS ................................................................................... 74

9.1      Appointment ......................................................................................... 74

9.2      Delegation of Duties and Consultation with Counsel............................ 75

iii

9.3     Exculpatory Provisions ........................................................................... 75

9.4     Reliance by Administrative Agent ........................................................ 76

9.5     Notice of Default ................................................................................... 76

9.6     Non-Reliance on Agents and Other Lenders ....................................... 76

9.7     Indemnification .................................................................................... 77

9.8     Agent in Its Individual Capacity ......................................................... 77

9.9     Successor Administrative Agent ........................................................... 77

9.10    Banking Law ......................................................................................... 78

9.11    Limitations on Liability ....................................................................... 78

SECTION 10.    MISCELLANEOUS ........................................................................ 79

10.1    Amendments and Waivers .................................................................... 79

10.2    Notices .................................................................................................. 81

10.3    No Waiver; Cumulative Remedies ....................................................... 82

10.4    Survival of Representations and Warranties ....................................... 82

10.5    Payment of Expenses and Taxes .......................................................... 82

10.6    Successors and Assigns; Participations and Assignments ................... 84

10.7    Adjustments; Set-off ............................................................................ 87

10.8    Counterparts ........................................................................................ 88

10.9    Severability .......................................................................................... 88

10.10   Integration ........................................................................................... 88

10.11   **GOVERNING LAW** ......................................................................... 88

10.12   Submission to Jurisdiction; Waivers ................................................... 88

10.13   Acknowledgements .............................................................................. 89

10.14   Releases of Guarantees and Liens ....................................................... 90

10.15   Confidentiality ..................................................................................... 90

10.16   **WAIVERS OF JURY TRIAL** ......................................................... 91

10.17   USA Patriot Act ................................................................................... 91

10.18   Electronic Systems .............................................................................. 91

SECTION 11.    PRIORITY AND LIENS/RANKING/COLLATERAL/RELEASE ................... 92

11.1    Collateral; Grant of Lien and Security Interest .................................. 92

11.2    Administrative Priority ........................................................................ 94

11.3    Grants, Rights and Remedies ............................................................... 94

11.4    Prepetition Senior Secured Note Trustee ............................................ 94

11.5    Plan Term Sheet ................................................................................... 94

iv

11.6    Conflicts ................................................................................................................ 95

SCHEDULES:

| | |
|---|---|
| 1.1A | Commitments |
| 1.1B | Mortgaged Property |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.15 | Subsidiaries |
| 6.16(c) | Minimum Production |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 8 | Milestones |
| 9 | Borrower Account |

EXHIBITS:

| | |
|---|---|
| A | Plan Term Sheet |
| B | Form of Compliance Certificate |
| C | Form of Closing Certificate |
| D | Form of Assignment and Assumption |
| E-1 | Form of U.S. Tax Compliance Certificate for Non-U.S. Lenders That Are Not Partnerships |
| E-2 | Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Not Partnerships |
| E-3 | Form of U.S. Tax Compliance Certificate for Foreign Participants That Are Partnerships |
| E-4 | Form of U.S. Tax Compliance Certificate for Non-U.S. Lenders That Are Partnerships |
| F | Form of Initial Budget |
| G | Interim Order |
| H | Withdrawal Request |

DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of May [__], 2015, among Magnetation LLC, a Delaware limited liability company and a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), the several financial institutions or entities from time to time parties to this Agreement as lenders (the "Lenders") and Wilmington Trust, National Association, as administrative agent.

RECITALS

Capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1.

On May [__], 2015 (the "Petition Date"), the Borrower and certain of its Subsidiaries (together with the Borrower, the "Debtors") commenced voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Borrower has requested and the Lenders have agreed to provide a secured super-priority debtor-in-possession term loan facility to the Borrower, in an aggregate original principal amount not to exceed $135,000,000 (plus capitalized fees and interest), consisting of loans rolled up from Prepetition Term Loans held by the Lenders, loans rolled up from Prepetition Senior Secured Notes held by the Lenders and new term loans made by the Lenders, the proceeds of which will be used in accordance with the Budget and the terms of this Agreement.

The Guarantors have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to the Administrative Agent, for the benefit of the Secured Parties, a lien on substantially all of their respective assets, in accordance with the priorities provided in the DIP Order.

Accordingly, the parties hereto hereby agree as follows:

SECTION 1.  DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Ad Hoc Senior Secured Note Holder Committee":  AllianceBernstein L.P., Apollo Global Management, LLC, Archview Investment Group L.P., Davidson Kempner Capital Management L.P. and/or funds managed by the foregoing entities.

"Adequate Protection Liens":  the replacement security interests in and liens upon the Collateral granted to the Prepetition Secured Parties pursuant to the DIP Order.

"Administrative Agent":  Wilmington Trust, National Association, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 25% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agent Parties":  as defined in Section 10.18(b).

"Agents":  the collective reference to the Administrative Agent and any other agent identified on the cover page of this Agreement.

"Agreement":  as defined in the preamble hereto.

"AHMSA Agreement":  the Amended Concentrate Supply Agreement, dated as of October 18, 2010, by and among the Borrower, Magnetation, Inc. and Altos Hornos de México, S.A.B. de C.V., as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"AK Steel Pellet Purchase Agreement":  the First Amended and Restated Pellet Purchase Agreement, dated as of April 30, 2013, by and between AK Steel Corporation and Mag Pellet LLC, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Anti-Corruption Laws": all laws, rules and regulations of any jurisdiction applicable to the Borrower or its Affiliates from time to time concerning or relating to bribery or corruption.

"Applicable Commitment Percentage":  as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the aggregate Commitments then in effect.

"Applicable Note Roll-Up Amount":  as to any Lender, such Lender's Applicable Percentage of the Note Roll-Up Aggregate Maximum Amount as of the applicable record date set forth in the Solicitation Procedures.

"Applicable Percentage":  as to any Lender at any time, the percentage which such Lender's Commitment and outstanding Loans then constitutes of the aggregate Commitments then in effect and Loans then outstanding.

"Approved Fund":  as defined in Section 10.6(b)(ii)(B).

"Assignee":  as defined in Section 10.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit D, or such other form as shall be approved by the Administrative Agent.

"Avoidance Actions":  as defined in Section 11.1(a).

"Avoidance Proceeds":  as defined in Section 11.1(a).

"Backstop Fee":  as defined in Section 2.5(a).

"Bankruptcy Code":  Title 11 of the United States Code, as applicable to the Chapter 11 Cases, now and hereafter in effect, or any applicable successor statute.

"Bankruptcy Court":  as defined in the recitals hereto; provided that "Bankruptcy Court" shall also mean any other court having competent jurisdiction over the Chapter 11 Cases.

"Bankruptcy Event":  with respect to any Person, such Person becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benefitted Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower":  as defined in the preamble hereto.

"Borrower Account":  the bank account described on Schedule 9 or such other bank account of the Borrower as may be designated in writing to the Administrative Agent by the Borrower from time to time.

"Borrower Materials":  as defined in Section 10.18(c).

"Borrowing Date":  any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Bridge Roll-Up":  the roll-up of Prepetition Term Loans into Bridge Roll-Up Loans on the Closing Date pursuant to Section 2.1(b).

"Bridge Roll-Up Commitment": as to any Lender that holds Prepetition Term Loans, the obligation of such Lender to roll up its Prepetition Term Loans into Bridge Roll-Up Loans, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Bridge Roll-Up Commitment" opposite such Lender's name on Schedule 1.1A hereto (which Schedule shall be held by the Administrative Agent on the same basis as the Register under Section 10.6(b)) or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate principal amount of the Bridge Roll-Up Commitments is $3,841,747.55[1].

"Bridge Roll-Up Loans": as defined in Section 2.1(b).

"Budget": the Initial Budget, as modified pursuant to the definition thereof, and after the Closing Date, the meaning specified in Section 6.14.

"Budget Renewal Date": as defined in Section 6.14.

"Business Day": a day other than a Saturday, Sunday or other day on which commercial banks in New York City or Minneapolis, Minnesota are authorized or required by law to close.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"Carve-Out": (i) all fees required to be paid pursuant to 28 U.S.C. § 1930 and 31 U.S.C. § 3717, whether arising prior to or after the delivery of the Carve-Out Trigger Notice, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed by the Bankruptcy Court at any time, whether by interim order, procedural order or otherwise, and whether before or after delivery of a Carve-Out Trigger Notice, all unpaid fees, costs, disbursements and expenses of professionals retained by the Debtors or any Committee (but excluding fees and expenses of any professionals employed individually by members of any Committee) pursuant to sections 327 and 1103 of the Bankruptcy Code, respectively (collectively, the "Professionals") incurred at any time on or prior to the first Business Day following the delivery by the Administrative Agent of a Carve-Out Trigger Notice and (iv) to the extent allowed at any time by the Bankruptcy Court,

---

[1]       Amount is based on a Closing Date of May 7, 2015. If the Closing Date does not occur on such date, the amount will be updated to reflect the principal amount of Prepetition Term Loans (including accrued and unpaid interest) on the Closing Date, with an interest per diem of $1,492.27.

whether by interim order, procedural order or otherwise, the unpaid fees, costs, disbursements and expenses incurred by Professionals after the first Business Day following the delivery by the Administrative Agent of the Carve-Out Trigger Notice not to exceed the Carve-Out Cap.

"Carve-Out Account":  as defined in Section 6.17.

"Carve-Out Cap": $3,500,000.

"Carve-Out Claim":  as defined in Section 6.17.

"Carve-Out Trigger Notice":  a written notice delivered by the Administrative Agent on behalf of the Lenders or, in the case of a material violation of paragraph 11 or 16 of the Interim Order, by the Prepetition Revolving Agent on behalf of the Prepetition Revolving Lenders (with a copy to the Administrative Agent), in each case to the Debtors' lead counsel, the U.S. Trustee, the lead counsel to any Committee, and the Prepetition Revolving Agent's lead counsel, following the occurrence and continuation of an Event of Default, describing the Event of Default that is alleged to have occurred and be continuing and expressly stating that the Carve-Out Cap has been invoked.

"Cash Equivalents":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Ratings Services ("S&P") or P-1 by Moody's Investors Service, Inc. ("Moody's"), or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Order":  that certain Order (I) Granting an Expedited Hearing, (II) Authorizing Maintenance of the Debtors' Existing Cash Management System,

Purchase Card Program and Existing Bank Accounts and Business Forms and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers.

"Casualty Event": any event that gives rise to the receipt by the Borrower or any Subsidiary of any casualty insurance proceeds or amounts in respect of any condemnation, eminent domain or similar proceeding relating to any asset of the Borrower or any of its Subsidiaries.

"Chapter 11 Cases":  as defined in the recitals hereto.

"Chapter 11 Orders":  any order entered in the Chapter 11 Cases.

"Claim":  as defined in section 101(5) of the Bankruptcy Code.

"Closing Date":  the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied.

"Closing Date Committed Amount":  Commitments in an aggregate amount equal to $55,000,000.

"Code":  the Internal Revenue Code of 1986, as amended.

"Collateral":  all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commitment":  as to any Lender, such Lender's NM Commitment, Bridge Roll-Up Commitment and Note Roll-Up Commitment, collectively, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.1A hereto (which Schedule shall be held by the Administrative Agent on the same basis as the Register under Section 10.6(b)) or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate principal amount of the Commitments is $135,000,0000.

"Commitment Fee":  as defined in Section 2.5(b).

"Committee":  any official committee appointed in the Chapter 11 Cases.

"Compliance Certificate":  a certificate duly executed by a Responsible Officer of the Borrower substantially in the form of Exhibit B.

"Connection Income Taxes": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Liquidity":  on any date, the fair market value on such date of cash and Cash Equivalents held in securities accounts or deposit accounts of the Loan Parties (including, but only so long as no Event of Default shall have occurred and be continuing at such

time, the Funding Account), but only if and to the extent constituting Collateral and in any event excluding Restricted Cash.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Credit Party":  the Administrative Agent or any Lender and, for the purposes of Section 10.13 only, any other Agent.

"Critical Vendor Disbursements":  disbursements in respect of prepetition claims to Critical Vendors set forth in the Budget.

"Critical Vendor/Shippers Withdrawals":  Withdrawals for the purpose of making Critical Vendor Disbursements and/or Shippers Disbursements.

"Critical Vendors":  as defined in the Critical Vendors Orders.

"Critical Vendors Order":  that certain Order (I) Granting an Expedited Hearing, (II) Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Vendors and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers.

"Debtors":  as defined in the recitals hereto.

"Default":  any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender":  any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans or (ii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower and each applicable Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Borrower or any Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Borrower's or such Credit Party's receipt of such certification in form and substance satisfactory to it, or (d) has become the subject of a Bankruptcy Event.

"DIP Liens":  as defined in Section 4.24(b).

"DIP Order":  as the context may require, the Interim Order and the Final Order collectively, or the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be.

"DIP Superpriority Claims":  as defined in Section 11.2.

"Discharge of Prepetition Revolving Obligations":  as defined in the Interim Order.

"Discharge of Secured Obligations":  the indefeasible payment in full in cash of all Secured Obligations (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid) and the termination of all Commitments.

"Disposition":  with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Domestic Subsidiary":  any Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirement (including common law) of any Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning protection of human health, or employee health and safety, or the environment, as has been, is now or may at any time hereafter be in effect.

"Environmental Permits": any and all permits, licenses, approvals, registrations, notifications, exemptions and any other authorization issued or required under any Environmental Law.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate":  any trade or business (whether or not incorporated) that, together with any Group Member, is treated as a single employer under Section 414 of the Code.

"ERISA Event":  (a) the failure of any Plan to comply with any material provisions of ERISA and/or the Code (and applicable regulations under either) or with the material terms of such Plan; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any Reportable Event; (d) the failure of any Group Member or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (e) a determination that any Pension

Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (f) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (g) the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or the incurrence by any Group Member or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (h) the receipt by any Group Member or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (i) the failure by any Group Member or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan pursuant to Sections 431 or 432 of the Code; (j) the incurrence by any Group Member or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (k) the receipt by any Group Member or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Group Member or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA); or (l) the failure by any Group Member or any of its ERISA Affiliates to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA.

"Event of Default":  any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Consolidated Liquidity": at any time, the amount, if any, by which Consolidated Liquidity (excluding any amounts held in the Funding Account) exceeds $2,500,000 at such time.

"Excluded Assets": as defined in the Guarantee and Collateral Agreement.

"Excluded Taxes": any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in a Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.18) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending office, (c)

Taxes attributable to such Credit Party's failure to comply with Section 2.15(f), and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Final Maturity Date":  the date which is the earliest of (i) the date that is 45 days after the date of entry of the Interim Order, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (ii) the date which is seven (7) months following the date of the entry of the Interim Order, if the Final Order has been entered by the Bankruptcy Court on or prior to 45 days after the date of entry of the Interim Order, provided that the date set forth in this clause (ii) may, at the request of the Borrower and with the written consent of the Administrative Agent acting at the direction of the Required Lenders, be extended by three months, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code), in each case, of (if any) a plan of reorganization or a plan of liquidation, (iv) the consummation of a sale of all or substantially all of the Loan Parties' assets, and (v) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"Final Order":  an order (in substantially the form of the Interim Order with only such modifications as are satisfactory in form and substance to the Administrative Agent, the Required Lenders (in their sole discretion), the Prepetition Revolving Agent, the Prepetition Revolving Required Lenders and the Borrower) of the Bankruptcy Court pursuant to section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents, including the granting of the super-priority claims and Lien status in accordance with priorities specified in the Interim Order, the waiver of rights under section 506(c) of the Bankruptcy Code, the waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code and the payment of all fees constituting Secured Obligations and modifying the automatic stay to permit the Loan Parties to perform their obligations hereunder and under the other Loan Documents and the Lenders and the Administrative Agent to exercise their rights and remedies in accordance with Section 8 of this Agreement, authorizing the incurrence by the Loan Parties of permanent post-petition secured and super-priority Indebtedness in accordance with this Agreement and each other Loan Document, as to which no stay has been entered and which has not been reversed, vacated or overturned, and which has not been amended, supplemented or otherwise

modified in any respect adverse to (x) the Lenders without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders, (y) the Administrative Agent without the prior written consent of the Administrative Agent or (z) the Prepetition Revolving Secured Parties without the prior written consent of the Prepetition Revolving Agent, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Required Lenders waive such requirement in writing.

"Final Order Entry Date":  the date on which the Final Order is entered by the Bankruptcy Court on the dockets of the Chapter 11 Cases.

"First Day Orders" shall mean all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date or within five (5) Business Days of the Petition Date or based on motions filed on or about the Petition Date (including, for the avoidance of doubt, the Cash Management Order).

"First Supplemental Indenture":  the First Supplemental Indenture, dated as of July 7, 2014, entered into by the Borrower and certain of its Subsidiaries, together with all instruments and other agreements entered into by the Borrower or such Subsidiaries in connection therewith.

"Foreign Benefit Arrangement":  any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by any Group Member or any ERISA Affiliate.

"Foreign Plan":  each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained or contributed to by any Group Member or any ERISA Affiliate.

"Foreign Plan Event":  with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"Foreign Subsidiary":  any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Funding Account":  the blocked deposit account established by the Borrower with the Funding Account Bank and which is subject to the Funding Account Control Agreement.

"Funding Account Bank":  Wilmington Trust, National Association and any permitted successors in such capacity in accordance with the Loan Documents.

"Funding Account Control Agreement":  the deposit account control agreement dated on or about the date of this Agreement among the Borrower, the Administrative Agent and the Funding Account Bank, as depository bank, which deposit account control agreement shall (i) grant the Administrative Agent control over the Funding Account and (ii) limit the Borrower's access to the Funding Account in accordance with the terms and conditions of this Agreement.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  "Accounting Change" refers to a change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members":  the collective reference to the Borrower and its Subsidiaries.

"Guarantee and Collateral Agreement":  the Guarantee and Collateral Agreement to be executed and delivered by the Borrower and each Guarantor, in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the

purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantors": each Subsidiary of the Borrower.

"Highest Marginal Income Tax Rate": 45% (or such other rate as determined by the board of directors of the Borrower in good faith to be the highest combined federal, state and local marginal income tax rate applicable to an individual resident of Minnesota).

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (j) for the purposes of Section 8(e) only, all obligations of such Person in respect of Swap Agreements.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Taxes":  (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Initial Budget":  the 13 week cash flow forecast for the 13 week period beginning on the Petition Date substantially in the form of Exhibit F, which budget shall be deemed modified to provide for the Permitted Adequate Protection Payments specified in the DIP Order; provided that the Initial Budget shall not be amended to delete, modify or cap the Permitted Adequate Protection Payments without the consent of the recipient thereof, unless such payments are no longer payable in accordance with the terms of the DIP Order.

"Initial NM Loans":  the Loans made pursuant to Section 2.1(a)(i).

"Insolvent":  with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date":  the date that falls on each three month anniversary of the Closing Date to occur while the Loans are outstanding and the final maturity date of such Loans.

"Interest Rate":  12.00% *per annum*.

"Interim Order":  as defined in Section 5.1(o).

"Interim Order Entry Date":  the date on which the Interim Order is entered by the Bankruptcy Court on the dockets of the Chapter 11 Cases.

"Investments":  as defined in Section 7.7.

"IRS":  the United States Internal Revenue Service.

"Lenders":  as defined in the preamble hereto.

"Lien":  any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loans":  the NM Loans and the Roll-Up Loans.

"Loan Documents":  this Agreement, the Security Documents, the Negative Pledge Agreement, the Notes and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties":  each Group Member that is a party to a Loan Document.

"Management Services Agreement":  the Management Services Agreement, dated as of October 4, 2011, by and between the Borrower and Magnetation, Inc., as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Material Adverse Effect":  a material adverse effect on (a) the business, property, operations or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole (other than as customarily occurs as a result of the circumstances and events leading up to and following the commencement of the Chapter 11 Cases, including the filing of the Chapter 11 Cases) or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Material Contracts":  the Prepetition Secured Debt Documents, the Operating Agreement, the Technology License Agreement, the AHMSA Agreement, the Management Services Agreement, the AK Steel Pellet Purchase Agreement, the Resource Agency Agreement, the Sales and Marketing Agreement, any material lease agreement to which the Borrower is a party or any permit that is material to the Borrower's business.

"Material Indebtedness":  Indebtedness (other than Indebtedness in respect of Specified Capital Leases and Indebtedness constituting Obligations) in an aggregate principal amount exceeding $10,000,000 or outstanding under the Prepetition Revolving Credit Agreement or the Prepetition Senior Secured Note Indenture.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, asbestos, polychlorinated biphenyls, urea-formaldehyde insulation, molds, pollutants, contaminants, radioactivity, and any other substance that is regulated pursuant to or could give rise to liability under any Environmental Law.

"Mortgaged Properties":  (i) the owned real property listed on Schedule 1.1B and (ii) any other owned real property as to which the Administrative Agent for the benefit of the Lenders is granted a Lien pursuant to the Mortgages.  For the avoidance of doubt, Mortgaged Properties shall not include any Excluded Assets.

"Mortgages":  each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Lenders.

"Multiemployer Plan":  a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Negative Pledge Agreement": the Negative Pledge Agreement, dated as of the date hereof, executed and delivered by Magnetation, Inc. and AK Steel Corporation, in favor of

the Administrative Agent for the benefit of the Lenders, substantially in the form of the Negative Pledge Agreement (as defined in the Prepetition Revolving Credit Agreement).

"Net Cash Proceeds":

(a)      with respect to any Disposition subject to Section 2.7(b), an amount equal to:  (i) cash payments (including any cash received by way of release from escrow or deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Borrower or any of its Subsidiaries from such Disposition, minus (ii) any bona fide direct costs incurred in connection with such Disposition, including (A) income or gains taxes payable by the seller as a result of any gain recognized in connection with such Disposition, (B) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Disposition, (C) a reasonable reserve for any purchase price adjustment or indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Disposition undertaken by the Borrower or any of its Subsidiaries in connection with such Disposition; provided that upon release of any such reserve, the amount released shall be considered Net Cash Proceeds to the extent such reserved amount was not paid in cash to a third party and (D) the out-of-pocket expenses, costs and fees incurred with respect to legal, investment banking, brokerage, advisor and accounting and other professional fees, sales commissions and disbursements, in each case actually incurred in connection with such sale or disposition and payable to a Person that is not an Affiliate of the Borrower; and

(b)      with respect to any Casualty Event, an amount equal to:  (i) any cash payments or proceeds received by the Borrower or any of its Subsidiaries (A) under any casualty insurance policy in respect of a covered loss thereunder or (B) as a result of the taking of any assets of the Borrower or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (ii) (A) any actual and reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with the adjustment or settlement of any claims of the Borrower or such Subsidiary in respect thereof, and (B) any bona fide direct costs incurred in connection with any taking of such assets as referred to in clause (i)(B) of this definition, including income taxes payable as a result of any gain recognized in connection therewith.

"NM Commitment":  as to any Lender, the obligation of such Lender, if any, to make NM Loans, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "NM Commitment" opposite such Lender's name on Schedule 1.1A hereto (which Schedule shall be held by the Administrative Agent on the same basis as the Register under Section 10.6(b)) or in the Assignment and Assumption pursuant to which such Lender

became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate principal amount of the NM Commitments is $63,658,252.45[2].

"NM Loans":  the Initial NM Loans and the Second NM Loans.

"Non-Critical Vendor/Shipper Disbursements":  disbursements set forth in the Budget other than Critical Vendor Disbursements and Shipper Disbursements.

"Non-Critical Vendor/Shipper Withdrawals":  Withdrawals other than Critical Vendor/Shipper Withdrawals.

"Non-U.S. Lender":  any Lender that is not a U.S. Person.

"Note Roll-Up":  the roll-up of Prepetition Senior Secured Notes into Note Roll-Up Loans on the Note Roll-Up Date pursuant to Section 2.1(c).

"Note Roll-Up Aggregate Maximum Amount":  $67,500,000.

"Note Roll-Up Aggregate Actual Amount":  the Note Roll-Up Aggregate Maximum Amount less the aggregate amount of the Note Roll-Up Commitment of any Note Roll-Up Non-Electing Lender.

"Note Roll-Up Commitment":  as to any Lender, the obligation of such Lender, if any, to roll up a principal amount of its Prepetition Senior Secured Notes equal to its Applicable Note Roll-Up Amount into Note Roll-Up Loans, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Note Roll-Up Commitment" opposite such Lender's name on Schedule 1.1A hereto (which Schedule shall be held by the Administrative Agent on the same basis as the Register under Section 10.6(b)) or in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate principal amount of the Note Roll-Up Commitments is $67,500,000.

"Note Roll-Up Date":  the date designated in writing (at least five Business Days in advance of such date) to the Administrative Agent by the Required Lenders, in consultation with the Borrower, as the date on which the Note Roll-Up shall occur, which date shall be in accordance with the Solicitation Procedures and shall be no earlier than the Second Funding Date and no later than 10 Business Days following the Second Funding Date (unless otherwise agreed by the Administrative Agent, the Required Lenders and the Borrower).

"Note Roll-Up Electing Lender":  each Lender that elects, pursuant to and in accordance with the Solicitation Procedures, to roll-up its Applicable Note Roll-Up Amount of Prepetition Senior Secured Notes into Note Roll-Up Loans hereunder.

"Note Roll-Up Loans":  as defined in Section 2.1(c).

---

[2]    Amount is based on a Closing Date of May 7, 2015.  If the Closing Date does not occur on such date, the amount will be updated to reflect the principal amount of Prepetition Term Loans (including accrued and unpaid interest) on the Closing Date, with an interest per diem of $1,492.27.

"Note Roll-Up Non-Electing Lender":  each Lender that does not elect, pursuant to and in accordance with the Solicitation Procedures, to roll-up its Applicable Note Roll-Up Amount of Prepetition Senior Secured Notes into Note Roll-Up Loans hereunder.

"Notes":  the collective reference to any promissory note evidencing Loans.

"Notice of Borrowing":  as defined in Section 2.2.

"Obligations":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"Official Committee":  the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

"Operating Agreement":  the Amended and Restated Operating Agreement, dated as of October 4, 2011, by and between AK Iron Resources, LLC, Magnetation, Inc. and the Borrower (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof).

"Other Connection Taxes":  with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes":  all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.18).

"Participant":  as defined in Section 10.6(c).

"Participant Register":  as defined in Section 10.6(c).

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to ERISA and any successor entity performing similar functions.

"Pension Plan":  any Plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA.

"Permitted Adequate Protection Payments":  the adequate protection payments to the Prepetition Secured Parties pursuant to the terms of the DIP Order.

"Permitted Investors":  the collective reference to (a) AK Steel Corporation (and any Wholly Owned Subsidiary thereof that is a U.S. Subsidiary), (b) Magnetation, Inc. and (c) Larry Lehtinen, Matt Lehtinen and their respective spouses, lineal descendants and heirs and executors of the estates of the foregoing (including adopted children and their lineal descendants) or any trust or similar estate planning vehicle having as its 100% beneficiaries one or more of such Persons.

"Permitted Senior Liens":  as defined in Section 7.19.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date":  as defined in the recitals hereto.

"PIK Interest":  as defined in Section 2.10(c).

"Plan":  any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Group Member or any ERISA Affiliate is (or, if such Plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in section 3(5) of ERISA.

"Plan Term Sheet":  the term sheet for a plan of reorganization attached hereto as Exhibit A.

"Prepetition Indebtedness":  any or all Indebtedness of the Borrower and any of its Subsidiaries incurred prior to the Petition Date and outstanding on the Petition Date.

"Prepetition Revolving Agent":  JPMorgan Chase Bank, N.A., as administrative agent for the Prepetition Revolving Lenders.

"Prepetition Revolving Credit Agreement":  that certain Credit Agreement, dated as of May 20, 2013, among the Borrower, the Prepetition Revolving Agent and the other parties thereto, as amended on each of July 11, 2014, December 15, 2014 and April 17, 2015 and as may hereafter be amended, restated, modified, renewed, refunded, replaced in any manner (whether

upon or after termination or otherwise), extended or refinanced in whole or in part from time to time in accordance with this Agreement.

"Prepetition Revolving Facility Adequate Protection Liens":  the Adequate Protection Liens granted to the Prepetition Revolving Secured Parties pursuant to the DIP Order.

"Prepetition Revolving Facility Liens":  the liens and security interests granted to the Prepetition Revolving Secured Parties to secure the Prepetition Revolving Obligations.

"Prepetition Revolving Facility Section 507(b) Claim":  as defined in the Interim Order.

"Prepetition Revolving Lenders":  the Lenders party to the Prepetition Revolving Credit Agreement, from time to time, under and as defined in the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Loan Documents":  the Prepetition Revolving Credit Agreement and all instruments and documents executed at any time in connection therewith (and including, without limitation, any "Loan Documents" as defined in the Prepetition Revolving Credit Agreement).

"Prepetition Revolving Loans":  the loans provided to the Borrower under the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Obligations":  all indebtedness, obligations and liabilities of the Borrower and its Subsidiaries to the Prepetition Revolving Agent and the Prepetition Revolving Secured Parties incurred prior to the Petition Date arising from or related to the Prepetition Revolving Loan Documents and the other agreements, instruments and other documents related thereto including principal, fees, premiums, costs, expenses, indemnities, reimbursement obligations and guarantee obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition Revolving Required Lenders": the "Required Lenders" under and as defined in the Prepetition Revolving Credit Agreement.

"Prepetition Revolving Secured Parties":  the Prepetition Revolving Agent, the Prepetition Revolving Lenders and any other "Secured Parties" as defined in any Prepetition Revolving Loan Documents.

"Prepetition Secured Debt Documents":  the Prepetition Revolving Loan Documents, the Prepetition Term Loan Documents and the Prepetition Senior Secured Note Documents.

"Prepetition Secured Obligations":  the Prepetition Revolving Obligations, the Prepetition Term Obligations and the Prepetition Senior Secured Note Obligations.

"Prepetition Secured Parties":  the Prepetition Revolving Secured Parties, the Prepetition Term Secured Parties and the Prepetition Senior Secured Note Secured Parties.

"Prepetition Senior Secured Note Documents":  the Prepetition Senior Secured Note Indenture and all instruments and documents executed at any time in connection therewith.

"Prepetition Senior Secured Note Holders":  the Holders of the Prepetition Senior Secured Notes, from time to time, under and as defined in the Prepetition Senior Secured Note Indenture.

"Prepetition Senior Secured Note Indenture": the Indenture, dated as of May 20, 2013, entered into by the Borrower and certain of its Subsidiaries in connection with the issuance of the Prepetition Senior Secured Notes, together with all instruments and other agreements entered into by the Borrower or such Subsidiaries in connection therewith.

"Prepetition Senior Secured Note Obligations":  all indebtedness, obligations and liabilities of the Borrower and its Subsidiaries to the Prepetition Senior Secured Note Trustee and the Prepetition Senior Secured Note Secured Parties incurred prior to the Petition Date arising from or related to the Prepetition Senior Secured Note Documents and the other agreements, instruments and other documents related thereto including principal, fees, premiums, costs, expenses, indemnities, reimbursement obligations and guarantee obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition Senior Secured Note Secured Parties":  the Prepetition Senior Secured Note Trustee, the Prepetition Senior Secured Note Holders and any other "Secured Parties" as defined in any Prepetition Senior Secured Note Documents.

"Prepetition Senior Secured Note Trustee":  Wilmington Trust, National Association, as successor in interest to Wells Fargo Bank, National Association, as trustee and collateral agent for the Prepetition Senior Secured Note Holders.

"Prepetition Secured Note Trustee Escrow Account":  As defined in Section 4.16.

"Prepetition Senior Secured Notes":  (i) the secured notes of the Borrower issued on May 20, 2013 pursuant to the Prepetition Senior Secured Note Indenture and (ii) additional secured notes of the Borrower issued on July 11, 2014 pursuant to the Prepetition Senior Secured Note Indenture (as supplemented by the First Supplemental Indenture, the Second Supplemental Indenture and the Third Supplemental Indenture).

"Prepetition Term Agent":  Wilmington Trust, National Association, as administrative agent for the Prepetition Term Lenders.

"Prepetition Term Credit Agreement": that certain Credit Agreement, dated as of April 17, 2015, among the Borrower, the Prepetition Term Agent and the other parties thereto.

"Prepetition Term Lenders":  the Lenders party to the Prepetition Term Credit Agreement, from time to time, under and as defined in the Prepetition Term Credit Agreement.

"Prepetition Term Loan Documents":  the Prepetition Term Credit Agreement and all instruments and documents executed at any time in connection therewith (and including, without limitation, any "Loan Documents" as defined in the Prepetition Term Credit Agreement).

"Prepetition Term Loans": the loans provided to the Borrower under the Prepetition Term Credit Agreement.

"Prepetition Term Obligations":  all indebtedness, obligations and liabilities of the Borrower and its Subsidiaries to the Prepetition Term Agent and the Prepetition Term Secured Parties incurred prior to the Petition Date arising from or related to the Prepetition Term Loan Documents and the other agreements, instruments and other documents related thereto including principal, fees, premiums, costs, expenses, indemnities, reimbursement obligations and guarantee obligations due thereunder and interest thereon accruing both before and after the Petition Date, whether such indebtedness, obligations or liabilities are direct or indirect, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising.

"Prepetition Term Secured Parties":  the Prepetition Term Agent, the Prepetition Term Lenders and any other "Secured Parties" as defined in any Prepetition Term Loan Documents.

"Prohibited Transaction":  as defined in Section 406 of ERISA and Section 4975(c) of the Code.

"Public-Sider":  as defined in Section 10.18(c).

"Register":  as defined in Section 10.6(b)(iv).

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Relevant Transaction":  any conveyance, sale, assignment, transfer or other disposition of all or any substantial part of the assets of the Borrower and its Subsidiaries (whether pursuant to section 363 of the Bankruptcy Code or otherwise), the sale or other disposition or issuance of any Capital Stock of the Borrower or any transaction for the incurrence or refinancing of Material Indebtedness.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to DOL Reg. Section 4043 as in effect on the date hereof  (no matter how such notice requirement may be changed in the future).

"Required Lenders":  at any time, Lenders holding a principal amount of Loans and Commitments constituting more than 50% of the outstanding principal amount of all Loans and Commitments.

"Requirement of Law":  as to any Person, any requirement of the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resource Agency Agreement":  the Resource Agency Agreement, dated as of October 4, 2011, by and between the Borrower and Magnetation, Inc., as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Responsible Officer":  with respect to the Borrower, the chief executive officer, president or chief financial officer of the Borrower, but in any event, with respect to financial matters, the chief financial officer of the Borrower and with respect to the Administrative Agent, any officer assigned to the corporate trust office of such Person, including any managing director, principal, vice president, assistant vice president, assistant treasurer, assistant secretary, or any other officer of such Person customarily performing functions similar to those performed by any of the above designated officers and having direct responsibility for the administration of this Agreement, and also, with respect to a particular matter, any other officer, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Restricted Cash":  any cash or Cash Equivalents (x) subject to any Lien (other than a Lien permitted under Section 7.3(h), (j), (k) or (l)), (y) classified as "restricted cash" or the equivalent thereof in accordance with GAAP on the consolidated balance sheet of the Borrower or (z) held in the Interest Escrow Account (as defined in the Prepetition Senior Secured Note Documents).

"Restricted Payments":  as defined in Section 7.6.

"Roll-Up Loans":  the Bridge Roll-Up Loans and the Note Roll-Up Loans.

"Sales and Marketing Agreement":  the Sales and Marketing Agreement, dated as of October 4, 2011, by and between the Borrower and Magnetation, Inc., as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Sanctioned Country":  at any time, a country or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person":  at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating,

organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons.

"Sanctions": economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Second Funding Date":  the date on which the Second NM Loans are made in accordance with Section 5.2.

"Second Funding Date Committed Amount":  Commitments in an aggregate amount equal to $12,500,000.

"Second NM Loans":  the Loans made pursuant to Section 2.1(a)(ii).

"Second Supplemental Indenture":  the Second Supplemental Indenture, dated as of July 11, 2014, entered into by the Borrower and certain of its Subsidiaries in connection with the issuance of additional Prepetition Senior Secured Notes, together with all instruments and other agreements entered into by the Borrower or such Subsidiaries in connection therewith.

"Secured Obligations":  the Obligations and the "Guarantor Obligations" (as defined in the Guarantee and Collateral Agreement).

"Secured Parties":  the Administrative Agent and the Lenders.

"Security Documents":  the collective reference to the Guarantee and Collateral Agreement, Section 11 of this Agreement, the Funding Account Control Agreement and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Shippers": Shippers, Warehousemen and Service Providers, as each such term is defined in the Shippers Order.

"Shippers Disbursements":  disbursements to Shippers, Warehousemen and Service Providers set forth in the Budget.

"Shippers Order":  that certain Order (I) Granting an Expedited Hearing, (II) Authorizing Debtors to Pay the Prepetition Claims of Shippers, Warehousemen and Service Providers and (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers.

"Solicitation Procedures":  the procedures for the solicitation of Prepetition Senior Secured Note Holders that are not Lenders on the date of this Agreement to ratably purchase Loans and Commitments hereunder by assignment and the solicitation of the Lenders after giving effect to such assignments to participate in the Note Roll-Up, as set forth in the relevant Exhibit to the motion seeking approval of the Loan Documents and the DIP Order, as such procedures may be modified from time to time with the consent of the Borrower, the Administrative Agent and the Required Lenders.

"Specified Capital Leases":  (a) the capital lease arrangements between the Borrower and JPMorgan Chase Bank, N.A. evidenced by the Business Purpose Promissory Note dated February 29, 2012 for Loan No. 1000136037 and the Business Purpose Promissory Note dated June 22, 2012 for Loan No. 1000136461, (b) the Finance Lease Transaction No. 1946515 between the Borrower and Caterpillar Financial Services Corporation with respect to One (1) Caterpillar 730 Articulated Truck, One (1) Klein 6,500 Gallon Water Tank, One (1) Klein 6,500 Gallon Water Tank, One (1) Caterpillar D8T Track-Type Tractor and One (1) Caterpillar 257B3 Multi Terrain Loader, (c) the Finance Lease Transaction No. 2058017 between the Borrower and Caterpillar Financial Services Corporation with respect to One (1) Caterpillar 740B Articulated Truck, One (1) Caterpillar 740 Articulated Truck, One (1) Caterpillar 966K Medium Wheel Loader, One (1) Caterpillar D6TLGP Track Type Tractor, One (1) 3043 Light Plants, One (1) Caterpillar 246C Skid Steer Loader, One (1) Caterpillar 302.5C Mini Hydraulic Excav and One (1) Water Tank and (d) any capital lease agreement with respect to any equipment that replaces or is in substitution of any of the equipment subject to any of the Specified Capital Leases.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"Taxes": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Technology License Agreement":  as defined in Section 5.1(l).

"Test Period":  as defined in Section 6.16(a)(i).

"Third Supplemental Indenture":  the Third Supplemental Indenture, dated as of April 17, 2015, entered into by the Borrower and certain of its Subsidiaries, together with all instruments and other agreements entered into by the Borrower or such Subsidiaries in connection therewith.

"Total Assets":  at any time, all assets that would, in accordance with GAAP, be set forth under the caption "total assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries on such date.

"Transferee":  any Assignee or Participant.

"Unencumbered Property":  as defined in Section 11.1(a).

"United States":  the United States of America.

"U.S. Person":  a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate":  as defined in Section 2.15(f)(ii)(B)(3).

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wholly Owned Subsidiary Guarantor":  any Guarantor that is a Wholly Owned Subsidiary of the Borrower.

"Withdrawal":  a withdrawal of funds from the Funding Account.

"Withdrawal Liability":  any liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"Withdrawal Request":  a request by the Borrower for a Withdrawal, substantially in the form of Exhibit H.

1.2    Other Definitional Provisions.  (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP  (provided that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to (A)

any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein and (B) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof), (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)      The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)      The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

## SECTION 2.  AMOUNT AND TERMS OF COMMITMENTS

2.1    <u>Loans</u>.

(a)      <u>NM Loans</u>.  Subject to the terms and conditions hereof, each Lender severally agrees to make:

(i)      an Initial NM Loan to the Borrower on the Closing Date in a principal amount not exceeding (x) its Applicable Commitment Percentage of the Closing Date Committed Amount <u>minus</u> (y) the principal amount (including all accrued and unpaid interest, which shall be capitalized and included in each Prepetition Term Loan as principal) of its Prepetition Term Loans rolled up into Bridge Roll-Up Loans on the Closing Date pursuant to Section 2.1(b), if any; and

(ii)      a Second NM Loan to the Borrower on the Second Funding Date in a principal amount not exceeding its Applicable Commitment Percentage of the Second Funding Date Committed Amount and in any event not exceeding its Commitment.

Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.

        (b)      <u>Bridge Roll-Up Loans</u>.  Subject to the terms and conditions set forth herein and in the DIP Order, the Prepetition Term Loans held by the Lenders shall be substituted and exchanged for (and deemed prepaid by) Bridge Roll-Up Loans as follows:  on the Closing Date, upon the satisfaction or waiver of the conditions precedent set forth in Section 5.1 and the making of the Initial NM Loans on the Closing Date, the Prepetition Term Loans held by each Lender shall be automatically, without notice or any action whatsoever, rolled up into, substituted and exchanged for (and deemed prepaid by) and deemed to be, roll-up loans of such Lender hereunder (the "<u>Bridge Roll-Up Loans</u>"), without any further action by any party to this Agreement, equal to the aggregate principal amount of the Prepetition Term Loans (including all accrued and unpaid interest, which shall be capitalized and included in each Prepetition Term Loan as principal) held by the Lenders as of the Closing Date on a dollar-for-dollar basis, which Bridge Roll-Up Loans shall from and after the Closing Date constitute Loans hereunder continuing to be outstanding and administered under this Agreement.  The Bridge Roll-Up Loans shall constitute the same tranche as, and have terms and provisions identical to those applicable to, the NM Loans and the Note Roll-Up Loans.  In connection with the foregoing, the parties hereto that are parties to the Prepetition Term Loan Documents hereby agree that, subject to the terms and conditions set forth in the DIP Order, the Prepetition Term Loans shall automatically be deemed paid in full, all guarantees and security interests granted pursuant to the  Prepetition Term Loan Documents shall automatically be released and all Prepetition Term Loan Documents shall automatically terminate and have no further force or effect (except only those provisions that are expressly specified in the Prepetition Term Loan Document as surviving that respective agreement's termination or the repayment of the Prepetition Term Loans and all other amounts payable under any other Prepetition Term Loan Document) upon such Prepetition Term Loans becoming Bridge Roll-Up Loans hereunder, without any further action on the part of any party to such Prepetition Term Loan Documents.  The Administrative Agent is hereby authorized to modify the Register to give effect to the Bridge Roll-Up, and such modifications shall be conclusive absent manifest error.

        (c)      <u>Note Roll-Up Loans</u>.  Subject to the terms and conditions set forth herein and in the DIP Order, Prepetition Senior Secured Notes held by the Lenders in an aggregate principal amount equal to the Note Roll-Up Aggregate Actual Amount shall be validly tendered and accepted for purchase by the Borrower.  As consideration, holders of validly tendered Prepetition Senior Secured Notes accepted for purchase will receive holdings of Note Roll-Up Loans as follows:  on the Note Roll-Up Date, a portion of the Prepetition Senior Secured Notes held by each Note Roll-Up Electing Lender in a principal amount equal to such Lender's Applicable Note Roll-Up Amount shall be, upon consummation of the Tender Offer pursuant to (and as such term is defined in) the procedures described in the Offer to Purchase and the motion seeking approval of the DIP Order, rolled up into, substituted and exchanged for and deemed to be, roll-up loans of such Lender hereunder (the "<u>Note Roll-Up Loans</u>"), without any further action by any party to this Agreement, in a principal amount equal to such Lender's Applicable Note Roll-Up Amount on a dollar-for-dollar basis, which Note Roll-Up Loans shall from and after the Note Roll-Up Date constitute Loans hereunder continuing to be outstanding and administered under this Agreement.  The Borrower shall assist with the coordination of all necessary DTC procedures, if any, in connection with the roll-up of Prepetition Senior Secured Notes into Note Roll-Up Loans.  The Note Roll-Up Loans shall constitute the same tranche as, and have terms and provisions identical to those applicable to, the NM Loans and the Bridge Roll-Up Loans.  The Administrative Agent is hereby authorized to modify the Register to give

effect to the Note Roll-Up, and such modifications shall be conclusive absent manifest error.  At least five Business Days prior to the Note Roll-Up Date, the Borrower shall deliver to the Administrative Agent a written certification by the information agent appointed pursuant to the Solicitation Procedures and by a Responsible Officer of the Borrower setting forth and certifying as to (w) the identity of the Note Roll-Up Electing Lenders and the Note Roll-Up Non-Electing Lenders, (x) the Note Roll-Up Aggregate Actual Amount, (y) each Lender's Applicable Note Roll-Up Amount and (z) the Note Roll-Up Commitments of each Lender and the aggregate Note Roll-Up Commitments.  The Administrative Agent shall be entitled to rely conclusively on such certification.

(d)     Principal Amount.  The parties hereto hereby acknowledge that:

(i) on the Closing Date, immediately following the making of the Initial NM Loans, the occurrence of the Bridge Roll-Up and the addition of the Commitment Fee to the principal amount of the Loans pursuant to Section 2.5(b), the aggregate outstanding principal amount of the Loans shall be $57,025,000;

(ii) on the Second Funding Date, immediately following the making of the Second NM Loans, the aggregate outstanding principal amount of the Loans shall be $69,525,000 (assuming that no amount of Loans shall have been prepaid on or prior to the Second Funding Date); and

(iii) on the Note Roll-Up Date, immediately following the occurrence of the Note Roll-Up, the aggregate outstanding principal amount of the Loans shall be $137,025,000 (assuming that no amount of Loans shall have been prepaid on or prior to the Note Roll-Up Date and each Lender shall be a Note Roll-Up Electing Lender).

(e)     Maturity.  The Borrower shall repay all outstanding Loans on the Final Maturity Date.

2.2     Procedure for NM Loan Borrowing.  The Borrower may borrow NM Loans on the Closing Date and the Second Funding Date, respectively, in accordance with Section 2.1(a) and Section 5, provided that the Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 11:00 A.M., New York City time, (x) one Business Day prior to the requested Borrowing Date, in the case of the Initial NM Loans, or (y) three Business Days prior to the requested Borrowing Date, in the case of the Second NM Loans (or, in each case, by such later time as the Administrative Agent and the Lenders shall otherwise accept in their sole discretion)), specifying (i) the amount of NM Loans to be borrowed and (ii) the requested Borrowing Date (a "Notice of Borrowing").  Each borrowing of NM Loans shall be in an amount equal to $1,000,000 or a whole multiple thereof (or, if the then aggregate NM Commitments are less than $1,000,000, such lesser amount).  Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Lender thereof.  Each Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 Noon, New York City time (or by such later time as the Administrative Agent and the Borrower shall otherwise accept), on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent.  Such

borrowing will then be applied by the Administrative Agent to pay all fees and expenses then due under Section 2.5 and Section 10.5 and for the purpose set forth in Section 4.16(c) (in each case pursuant to a written direction delivered by the Borrower which shall contain the amounts due to, and wire instructions for, each recipient of any such amounts) and the amount net of such payments shall be remitted by the Administrative Agent to the Funding Account.

      2.3     <u>Funding Account</u>.  Subject to Section 5.3, Section 5.4 and the other terms and conditions set forth herein, the Borrower may withdraw amounts from the Funding Account by delivering to the Administrative Agent (with a copy to the primary counsel and financial advisor for the Ad Hoc Senior Secured Note Holder Committee) a Withdrawal Request (including all applicable information and materials required under Section 5.3) not later than 9:00 A.M., New York City time, one Business Day before the proposed date of the applicable Withdrawal.  Upon receipt of any such timely delivered Withdrawal Request from the Borrower, the Administrative Agent shall promptly (and in any event, no later than 1:00 P.M., New York City time, one Business Day before the proposed date of the applicable Withdrawal) notify each Lender thereof.  Upon the satisfaction of the conditions set forth in Sections 5.3 and 5.4, the Administrative Agent shall promptly (and in any event no later than the close of business on the proposed date of the applicable Withdrawal) instruct the Funding Account Bank to transfer funds from the Funding Account in an aggregate principal amount equal to the amount specified in such Withdrawal Request (to the extent there are sufficient funds in the Funding Account to make such withdrawal) to the Borrower Account or such other bank account of the Borrower as is specified in such Withdrawal Request.  All proceeds of the NM Loans shall be held in the Funding Account at all times until such proceeds are applied in accordance with this Section 2.3 for purposes permitted under Sections 4.16 and 7.18.  The Borrower shall not have (and the Borrower hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in the Funding Account upon the occurrence and continuance of any Event of Default; <u>provided</u>, <u>however</u>, that, notwithstanding the existence of an Event of Default or the failure to satisfy the conditions set forth in Sections 5.3 and 5.4, upon the receipt of a Carve-Out Trigger Notice, the Borrower shall, no later than the first Business Day following receipt of such Carve-Out Trigger Notice, direct the Administrative Agent to apply from the Funding Account (in each case, which it hereby irrevocably authorizes and directs the Administrative Agent to do and a Withdrawal Request is hereby deemed delivered in respect thereof by the close of business on the first Business Day following delivery of such Carve-Out Trigger Notice if not otherwise delivered by such time, and, in the case of such a deemed delivery, the proposed date of Withdrawal shall be deemed to be the date that is two Business Days following the date such Withdrawal Request is deemed to be delivered) (i) an amount equal to the Carve-Out Cap (or such amount as is then available in the Funding Account if the amount in the Funding Account is less than the Carve-Out Cap) solely to fund the Carve-Out Account and (ii) all funds in the Funding Account in excess of the Carve-Out Cap solely to prepay the Loans (after first being applied to pay then accrued and unpaid fees, expenses and indemnities of the Administrative Agent under the Loan Documents), in each case, by delivering a Withdrawal Request in accordance with this Section 2.3 (which Withdrawal Request shall specify that the Withdrawal is to be used to fund the Carve-Out Account and to prepay the Loans).  The Administrative Agent shall promptly (and in any event, no later than 1:00 P.M., New York City time, one Business Day before the proposed date of the applicable Withdrawal so long as the Withdrawal Request was delivered not later than 9:00 A.M., New York City time, on such day, or in the event that such Withdrawal Request is deemed to be delivered, no later than 10:00

A.M., New York City time on the Business Day following the date that such Withdrawal Request is deemed to be delivered) notify each Lender thereof and promptly (and in any event no later than the close of business on the proposed date of the Withdrawal) instruct the Funding Account Bank to (x) in the case of clause (i) above, transfer funds in such amount to the Carve-Out Account specified in such Withdrawal Request (or, if no such Carve-Out Account is specified (including in the case of a deemed Withdrawal Request), to the Borrower Account, in which case such funds will then be promptly transferred by the Borrower from the Borrower Account to the Carve-Out Account) and (y) in the case of clause (ii) above, unless such prepayment is waived by the Required Lenders by written direction delivered to the Administration Agent by 1:00 P.M., New York City time, on the proposed date of the Withdrawal, transfer such funds in such amount to the Administrative Agent for prepayment of the Loans (and payment of any such fees, expenses and indemnities of the Administrative Agent).

2.4    Intentionally Omitted.

2.5    Fees.

(a)    Backstop Fee.  The Borrower agrees to pay on the Closing Date to each Lender party to this Agreement as of the date hereof, as fee compensation for the NM Commitment provided by such Lender on the date hereof, a cash fee in an amount equal to 4.00% of the amount of such Lender's NM Commitment as of the date hereof (the "Backstop Fee").  Such fee will be in all respects fully earned on the date hereof and due and payable on the Closing Date and non-refundable and non-creditable thereafter.  Such Lenders may, in their sole discretion, share all or a portion of any of such fees with any of the other Lenders.

(b)    Commitment Fee.  The Borrower agrees to pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for such Lender's NM Commitment and Bridge Roll-Up Commitment, a fee in an amount equal to 3.00% of such Lender's NM Commitment and Bridge Roll-Up Commitment immediately before giving effect to the funding of Initial NM Loans and the occurrence of the Bridge Roll-Up on the Closing Date (the "Commitment Fee").  Such fee will be in all respects fully earned on the Closing Date and non-refundable and non-creditable thereafter, and shall be payable in kind by adding such fee to the principal amount of the Loans on the Closing Date immediately following the funding of NM Loans and the occurrence of the Bridge Roll-Up on the Closing Date (whereupon from and after any such date such additional amounts shall also accrue interest pursuant to Section 2.10).  Such fee shall be treated as principal of the Loans for all purposes of this Agreement.  The obligation of the Borrower to pay such fee so added shall be automatically evidenced by this Agreement.

(c)    Agency Fee.  The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent and to perform any other obligations contained therein.

2.6    Termination or Reduction of Commitments.

(a)     The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the NM Commitments or, from time to time, to reduce the amount of the NM Commitments.  Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Commitments then in effect.

(b)     A notice of termination of the NM Commitments delivered by the Borrower under this Section 2.6 may state that such notice is conditioned upon the effectiveness of other credit facilities or other transactions, in which case such notice may, with the approval of the Administrative Agent (acting pursuant to the written direction of the Required Lenders), be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(c)     (i) The NM Commitments (to the extent not reduced pursuant to clause (a) above prior to the Closing Date) shall be automatically and permanently reduced by an amount equal to (x) the Closing Date Committed Amount minus (y) the aggregate Bridge Roll-Up Commitments upon the making of the Initial NM Loans on the Closing Date, (ii) the Bridge Roll-Up Commitments shall be automatically and permanently terminated upon the occurrence of the Bridge Roll-Up on the Closing Date, (iii) the NM Commitments (to the extent not terminated pursuant to clause (a) above prior to the Second Funding Date) shall be automatically and permanently terminated upon the making of the Second NM Loans on the Second Funding Date, (iv) the Note Roll-Up Commitment of each Note Roll-Up Non-Electing Lender shall be automatically and permanently terminated immediately prior to the occurrence of the Note Roll-Up on the Note Roll-Up Date and (v) the Note Roll-Up Commitment of each Note Roll-Up Electing Lender shall be automatically and permanently terminated upon the occurrence of the Note Roll-Up on the Note Roll-Up Date.

2.7     Prepayments.

(a)     Optional Prepayments.  Provided that the Discharge of Prepetition Revolving Obligations shall have occurred, the Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, one Business Day prior thereto which notice shall specify the date and amount of prepayment; provided that such notice shall be irrevocable except to the extent conditioned on a refinancing of all or any portion of the Loans.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.  Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof.

(b)     Mandatory Prepayments.

(i)     Issuance of Debt.  Provided that the Discharge of Prepetition Revolving Obligations shall have occurred, no later than the first Business Day following receipt by the Borrower or any of its Subsidiaries of any cash proceeds from the incurrence of any Indebtedness by the Borrower or any of its Subsidiaries (other than with respect to any

Indebtedness permitted to be incurred pursuant to Section 7.2), the Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(ii)    Issuance of Equity.  Provided that the Discharge of Prepetition Revolving Obligations shall have occurred, no later than the first Business Day following receipt by the Borrower or any of its Subsidiaries of any cash proceeds from the issuance of any Capital Stock of the Borrower or any of its Subsidiaries, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of such proceeds, net of underwriting discounts and commissions and other reasonable costs and expenses associated therewith, including reasonable legal fees and expenses.

(iii)    Casualty Events.  Provided that the Discharge of Prepetition Revolving Obligations shall have occurred, no later than the third Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any Net Cash Proceeds from a Casualty Event in excess of $100,000, the Borrower shall prepay, or cause to be prepaid, the Loans in an aggregate amount equal to 100% of such Net Cash Proceeds.

(iv)    Asset Dispositions.  Provided that the Discharge of Prepetition Revolving Obligations shall have occurred, no later than the third Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any Net Cash Proceeds from Dispositions of property in excess of $100,000 and not permitted under Section 7.5, the Borrower shall prepay, or cause to be prepaid, the Loans in an aggregate amount equal to 100% of such Net Cash Proceeds.

2.8    Intentionally Omitted.

2.9    Intentionally Omitted.

2.10    Interest Rates and Payment Dates.  (a)  Each Loan shall bear interest for each day at a rate per annum equal to the Interest Rate.

(b)    Upon the occurrence and continuance of an Event of Default, and for so long as such Event of Default is continuing, all amounts outstanding hereunder shall bear interest (after as well as before judgment) at a rate per annum equal to the Interest Rate plus 2%.

(c)    Interest shall be payable, and shall be paid, in kind (the "PIK Interest"), in arrears on each Interest Payment Date by adding such accrued and unpaid interest to the unpaid principal amount of the Loans on such Interest Payment Date and on the date of any repayment or prepayment of any Loan (whereupon from and after any such date such additional amounts shall also accrue interest pursuant to this Section 2.10).  All such PIK Interest added shall be treated as principal of the Loans for all purposes of this Agreement.  The obligation of the Borrower to pay all such PIK Interest so added shall be automatically evidenced by this Agreement.

2.11    Computation of Interest and Fees.  Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed.

2.12    Intentionally Omitted.

2.13    Pro Rata Treatment and Payments.  (a)  Each borrowing by the Borrower from the Lenders hereunder shall be made pro rata according to the respective Applicable Commitment Percentages of the Lenders.

(b)    Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made pro rata according to the respective outstanding principal amounts of the Loans then held by the Lenders.

(c)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 1:00 P.M., New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to each relevant Lender promptly upon receipt in like funds as received, net of any amounts owing by such Lender pursuant to Section 9.7.  If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

(d)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the Interest Rate, on demand, from the Borrower.

(e)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any

amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)    If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.13(d), 2.13(e), 2.15(e) or 9.7, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent to satisfy such Lender's obligations to the Administrative Agent under such Sections until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

(g)    Notwithstanding anything in this Agreement to the contrary, the Administrative Agent shall have no obligation to advance any amount owed to or from the Lenders.

2.14    <u>Requirements of Law</u>.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender or other Credit Party with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    shall subject any Credit Party to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit (or participations therein) by, or any other acquisition of funds by, any office of such Lender; or

(iii)    shall impose on such Lender any other condition (other than Taxes);

and the result of any of the foregoing is to increase the cost to such Lender or such other Credit Party, by an amount that such Lender or other Credit Party deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Credit Party, upon its demand, any additional amounts necessary to compensate such Lender or such other Credit Party for such increased cost or reduced amount receivable. If any Lender or such other Credit Party becomes entitled to claim any additional amounts pursuant to

this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital or liquidity requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented.

(d)    A certificate as to any additional amounts payable pursuant to this Section 2.14 submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Section 2.14, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.14 for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrower pursuant to this Section 2.14 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.15    Taxes. (a) Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15),

the amounts received with respect to this Agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)      The Loan Parties shall timely (i) pay to the relevant Governmental Authority in accordance with applicable law all Other Taxes and (ii) to the extent the Administrative Agent, in its sole discretion, has paid any Other Taxes, reimburse the Administrative Agent therefor.

(c)      On a quarterly basis, after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)      The Loan Parties shall jointly and severally indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set-off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)      (a)  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other

documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding Tax;

(B)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(1)      in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed originals of IRS Form W-8ECI;

(3)      in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or

(4)      to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)      any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, if any, and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)      If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect to the Taxes giving rise to such

refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph (g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)      Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any of the Loan Documents.

(i)      For purposes of this Section 2.15, the term "applicable law" includes FATCA.

(j)      For purposes of determining withholding Taxes imposed under FATCA, from and after the date hereof, the Borrower and the Administrative Agent shall treat (and the Lenders hereby authorize the Administrative Agent to treat) this Agreement (together with any loans or other extensions of credit pursuant hereto) as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

2.16    Intentionally Omitted.

2.17    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.14 or 2.15(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending offices to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.14 or 2.15(a).

2.18    Replacement of Lenders.  The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.14 or 2.15(a), (b) becomes a Defaulting Lender, or (c) does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of each of the Lenders or each of the Lenders affected

thereby (so long as the consent of the Administrative Agent acting at the direction of the Required Lenders has been obtained), with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.17 so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.14 or 2.15(a), (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (vi) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay any registration and processing fee in connection therewith), (vii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.14 or 2.15(a), as the case may be, and (viii) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.  Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee, and that the Lender required to make such assignment need not be a party thereto in order for such assignment to be effective.

2.19   Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then for so long as such Lender is a Defaulting Lender the Commitment and Loans of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 10.1); provided, that this Section 2.19 shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender affected thereby.

SECTION 3.  INTENTIONALLY OMITTED

SECTION 4.  REPRESENTATIONS AND WARRANTIES

To induce the Lenders to make the Loans and each of the Administrative Agent and the Lenders to enter into this Agreement, the Borrower hereby represents and warrants to the Administrative Agent and each Lender that:

4.1   Financial Condition.  (a)  All pro forma financial statements (if any) heretofore furnished to the Lenders have been prepared based on the best information available to the Borrower as of the date of delivery thereof, and present fairly on a pro forma basis the estimated financial position of the Borrower and its consolidated Subsidiaries as at the date of such pro forma financial statements and for the fiscal quarter then ending, assuming that the events contemplated thereby had actually occurred at such date.

(b)     The audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as at December 31, 2013 and December 31, 2014, and the related consolidated statements of income and of cash flows for the fiscal years ended on such dates,

reported on by and accompanied by an unqualified report from McGladrey LLP, present fairly the consolidated financial condition of the Borrower and its consolidated Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein). As of the Closing Date, no Group Member has any material Guarantee Obligations, contingent liabilities or liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph. During the period from December 31, 2014 to and including the date hereof there has been no Disposition by any Group Member of any material part of its business or property.

4.2    No Change. Since December 31, 2014, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

4.3    Existence; Compliance with Law. Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4    Power; Authorization; Enforceable Obligations. Subject to the entry by the Bankruptcy Court of the DIP Order, each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder. Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement. Subject to the entry by the Bankruptcy Court of the DIP Order, no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except consents, authorizations, filings and notices described on Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect. Each Loan Document has been duly executed and delivered on behalf of each Loan Party which is party thereto. Subject to the entry by the Bankruptcy Court of the DIP Order, this Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party which is party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights

generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4.5     No Legal Bar.  The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Group Member entered into after the Petition Date and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents).  No Requirement of Law or Contractual Obligation entered into after the Petition Date applicable to the Borrower or any of its Subsidiaries could reasonably be expected to have a Material Adverse Effect.

4.6     Litigation.  Other than the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

4.7     No Default.  No Group Member is in default under or with respect to any of its Contractual Obligations entered into after the Petition Date in any respect that could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

4.8     Ownership of Property; Liens.  Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold or license interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 7.3.

4.9     Intellectual Property.  Each Group Member owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted.  No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does the Borrower know of any valid basis for any such claim.  The use of Intellectual Property by each Group Member does not infringe on the rights of any Person in any material respect.

4.10     Taxes.  Each Group Member has filed or caused to be filed all Federal, state and other material Tax returns that are required to be filed and has paid all Taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any Tax, fee or other charge the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); no Tax Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such Tax, fee or other charge.

4.11    Federal Regulations.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board.  No more than 25% of the assets of the Group Members consist of "margin stock" as so defined.  If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.12    Labor Matters.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

4.13    ERISA.  (a) Each Group Member and each of their respective ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; (b) no ERISA Event or Foreign Plan Event has occurred or is reasonably expected to occur; and (c) all amounts required by applicable law with respect to, or by the terms of, any retiree welfare benefit arrangement maintained by any Group Member or any ERISA Affiliate or to which any Group Member or any ERISA Affiliate has an obligation to contribute have been accrued in accordance with Statement of Financial Accounting Standards No. 106.  The present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation-Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than an immaterial amount the fair market value of the assets of such Pension Plan allocable to such accrued benefits, and the present value of all accumulated benefit obligations of all underfunded Pension Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715: Compensation-Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than an immaterial amount the fair market value of the assets of all such underfunded Pension Plans.

4.14    Investment Company Act; Other Regulations.  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board and the DIP Order) that limits its ability to incur Indebtedness.

4.15    Subsidiaries.  Except as disclosed to the Administrative Agent and the Lenders by the Borrower in writing from time to time after the Closing Date, (a) Schedule 4.15 sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and (b) there

are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary, except as created by the Loan Documents.

4.16    Use of Proceeds.  The proceeds of the Loans shall be used to (a) provide working capital to the Debtors (but not, for the avoidance of doubt, any equityholder or other Affiliate of the Debtors), (b) pay (i) all amounts payable to the Administrative Agent and the Lenders, including, without limitation, the Backstop Fee, in accordance with the DIP Order, and (ii) reasonable and documented pre- and post-petition professional fees and expenses in accordance with the terms hereof and the DIP Order, (c) fund an indemnity escrow account (the "Prepetition Secured Note Trustee Escrow Account") for the benefit of Wilmington Trust, National Association in its capacity as successor Prepetition Senior Secured Note Trustee, which amount shall not exceed $1,298,551.69, and (d) make Permitted Adequate Protection Payments, in each case, subject to compliance with Sections 6.16(a) and 7.18.

4.17    Environmental Matters.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)    each Group Member:  (i) is, and within the period of all applicable statutes of limitation has been, in compliance with all applicable Environmental Laws; (ii) holds all Environmental Permits (each of which is in full force and effect) required for any of its current or intended operations or for any property owned, leased, or otherwise operated by it; (iii) is, and within the period of all applicable statutes of limitation has been, in compliance with all of its Environmental Permits; and (iv) reasonably believes that:  each of its Environmental Permits will be timely renewed and complied with, without expense; any additional Environmental Permits that may be required of it will be timely obtained and complied with, without expense; and compliance with any Environmental Law that is or is expected to become applicable to it will be timely attained and maintained, without expense;

(b)    Materials of Environmental Concern are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by any Group Member or at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of any Group Member under any applicable Environmental Law or otherwise result in costs to any Group Member, or (ii) interfere with any Group Member's continued operations, or (iii) impair the fair saleable value of any real property owned or leased by any Group Member;

(c)    there is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which any Group Member is, or to the knowledge of the Borrower will be, named as a party that is pending or, to the knowledge of the Borrower, threatened;

(d)    no Group Member has received any request for information under, or been notified that it is a potentially responsible party under or relating to, the federal Comprehensive

Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Materials of Environmental Concern;

(e) no Group Member has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum, relating to compliance with or liability under any Environmental Law; and

(f) no Group Member has assumed or retained, by contract or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Material of Environmental Concern.

4.18    Accuracy of Information, etc.  No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.  The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.  There is no fact known to any Loan Party that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Administrative Agent and the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

4.19    Intentionally Omitted.

4.20    Intentionally Omitted.

4.21    Intentionally Omitted.

4.22    Certain Documents.  The Borrower has delivered to the Ad Hoc Senior Secured Note Holder Committee or its professionals a complete and correct copy of the Material Contracts, including any amendments, supplements or modifications with respect to any of the foregoing.

4.23    Anti-Corruption Laws and Sanctions.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees, and to the knowledge of the Borrower its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Borrower

being designated as a Sanctioned Person.  None of (a) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Loan, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

4.24    Secured, Super-Priority Obligations.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice of (x) the motions seeking approval of the Loan Documents and the DIP Order and (y) the hearings for the approval of the DIP Order was given in each case.  The Borrower shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(b)    The provisions of the Loan Documents and the DIP Order are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (the "DIP Liens"), having the priority provided for in Section 11.1 and in the DIP Order, and enforceable against the Loan Parties.

(c)    Subject to the terms of the DIP Order, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Secured Obligations shall constitute allowed claims against the Debtors having the priority provided for in Section 11.2 and in the DIP Order.

4.25    DIP Order.  The DIP Order and the transactions contemplated hereby and thereby are in full force and effect, are not subject to a stay and have not been vacated, reversed, modified or amended in any respect adverse to (x) the Lenders without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders, (y) the Administrative Agent without the prior written consent of the Administrative Agent or (z) the Prepetition Revolving Secured Parties without the prior written consent of the Prepetition Revolving Agent.

4.26    Budget.  The Budget was prepared in good faith by the management of the Loan Parties, based on assumptions believed by the management of the Loan Parties to be reasonable at the time made and upon information believed by the management of the Loan Parties to have been accurate based upon the information available to the management of the Loan Parties at the time such Budget was furnished.

SECTION 5.  CONDITIONS PRECEDENT

5.1     Conditions to Closing Date and Funding of Initial NM Loans.  The agreement of each Lender to make its Initial NM Loan on the Closing Date is subject to the satisfaction, prior to or concurrently with the making of such Initial NM Loan on the Closing Date, of the following conditions precedent:

(a)     Credit Agreement; Other Documents.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, the Borrower and each initial Lender, (ii) the Guarantee and Collateral Agreement, executed and delivered by the Borrower and each Guarantor, (iii) the Funding Account Control Agreement, executed and delivered by the Administrative Agent, the Funding Account Bank and the Borrower and (iv) the Negative Pledge Agreement, executed and delivered by Magnetation, Inc. and AK Steel Corporation.

(b)     Funding Account.  The Administrative Agent shall have received evidence satisfactory to it that the Funding Account shall have been established.

(c)     Approvals.  All governmental and third party approvals (including landlords' and other consents) necessary in connection with the continuing operations of the Group Members and the transactions contemplated hereby shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the financing contemplated hereby.

(d)     Lien Searches.  The Lenders shall have received from the Borrower the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 7.3 or discharged on or prior to the Closing Date pursuant to documentation satisfactory to Required Lenders.

(e)     Indebtedness.  Neither the Borrower nor any of its Subsidiaries shall have any Indebtedness outstanding (other than Indebtedness in respect of Specified Capital Leases, Indebtedness under the Prepetition Revolving Loan Documents, Indebtedness under this Agreement, Indebtedness in respect of the Prepetition Senior Secured Notes, Indebtedness under the Prepetition Term Credit Agreement, Indebtedness of the Loan Parties pursuant to the Specified Cash Management Agreements (as defined in the Prepetition Revolving Credit Agreement) and any other Indebtedness outstanding on the date hereof and listed on Schedule 7.2(d)) in an aggregate amount in excess of $1,000,000.

(f)     Fees.  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date.  All such amounts will be paid with proceeds of Loans made on the Closing Date

and will be reflected in the funding instructions given by the Borrower to the Administrative Agent on or before the Closing Date.

(g)    Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party, and (ii) a good standing certificate for each Loan Party from its jurisdiction of organization.

(h)    Legal Opinions.  The Administrative Agent shall have received the following executed legal opinions:

(i)    the legal opinions of Fredrickson & Byron, P.A. and Davis Polk & Wardwell LLP, in each case, special counsel to the Borrower and its Subsidiaries, covering such matters as reasonably required by and otherwise reasonably satisfactory in form and substance to the Required Lenders; and

(ii)    the legal opinion of local counsel in Indiana and of such other special and local counsel as may be required by the Administrative Agent or the Lenders.

Each such legal opinion shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent or the Lenders may reasonably require.

(i)    Filings, Registrations and Recordings.  Each Uniform Commercial Code financing statement required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create, or evidence, in favor of the Administrative Agent, for the benefit of the Lenders, a perfected Lien on the Collateral described therein with the priority set forth in the DIP Order, shall be in proper form for filing, registration or recordation.

(j)    Intentionally Omitted.

(k)    Insurance.  The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 5.2(b) of the Guarantee and Collateral Agreement.

(l)    Technology License Agreement.  The Administrative Agent shall have received a consent and waiver with respect to the Technology License Agreement, dated as of October 4, 2011, by and between the Borrower and Magnetation, Inc. and as amended on May 16, 2013 (as may hereafter be amended, restated or modified in any manner in accordance with the terms thereof, the "Technology License Agreement"), duly executed and delivered by the Borrower and Magnetation, Inc., substantially in the form of the Technology License Agreement (as defined in the Prepetition Revolving

Credit Agreement), permitting assignments of the Borrower's interest in the Technology License Agreement to the Administrative Agent, on behalf of the Lenders, or to any other party in connection with enforcement of the security interest in the Technology License Agreement granted to the Administrative Agent, for the benefit of the Lenders, pursuant to the Loan Documents.

(m)      USA Patriot Act.  The Administrative Agent shall have received, at least five days prior to the Closing Date, from each of the Loan Parties, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act.

(n)      Commencement of Chapter 11 Cases.  The Debtors shall have commenced the Chapter 11 Cases and all of the First Day Orders and all related pleadings shall be in form and substance acceptable (in the case of the DIP Order and the Cash Management Order) or reasonably acceptable (in the case of all other First Day Orders) to the Administrative Agent and the Required Lenders (and, in the case of the DIP Order, the Prepetition Revolving Agent and the Prepetition Revolving Required Lenders).

(o)      Interim Order.  The Bankruptcy Court shall have entered an order in substantially the form attached hereto as Exhibit G (the "Interim Order") no later than five (5) Business Days after the date hereof, with such changes as are acceptable to the Administrative Agent, the Required Lenders and the Prepetition Revolving Agent, and the Interim Order shall be in full force and effect, shall not be subject to a stay and shall not have been vacated, reversed, modified or amended without the written consent of the Prepetition Revolving Agent and of the Administrative Agent acting at the direction of the Required Lenders and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by the Loan Parties of their respective obligations under the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Loan Parties shall be in compliance in all respects with the Interim Order.

(p)      No Trustee; Control over Collateral.  (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral; provided that this clause (ii) shall not apply to any motion that is being contested in good faith by the Debtors and which contest the Debtors reasonably believe will be successful.

(q)      Prepetition Obligations.  The Prepetition Senior Secured Note Secured Parties and the Prepetition Revolving Secured Parties shall have received adequate protection in respect of the Liens securing the Prepetition Senior Secured Note Secured Obligations or the Prepetition Revolving Obligations, as applicable, in the form set forth in the DIP Order.

(r)    Initial Budget; Information.  The Administrative Agent and the Lenders shall have received the Initial Budget, which shall be in form and substance reasonably acceptable to the Required Lenders, and such other information (financial or otherwise) as the Required Lenders or the Administrative Agent may reasonably request.

For the purpose of determining compliance with the applicable conditions specified in this Section 5.1 and Section 5.4 on the Closing Date, each Lender shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 5.1 and Section 5.4, unless the Administrative Agent shall have received written notice from such Lender prior to the Closing Date specifying its objection thereto (which notice shall be forwarded by the Administrative Agent to the Lenders and the Borrower promptly upon receipt thereof).

5.2    Conditions to Second Funding Date.  The agreement of each Lender to make its Second NM Loan on the Second Funding Date is subject to the satisfaction, prior to or concurrently with the making of such Second NM Loan on the Second Funding Date, of the following conditions precedent:

(a)    Closing Date.  The Closing Date shall have occurred.

(b)    Final Order.  The Final Order Entry Date shall have occurred no later than 45 days after the Interim Order Entry Date, and the Administrative Agent shall have received a true and complete copy of the Final Order.

(c)    Timing.  The borrowing of the Second NM Loans shall have occurred on the day that is 45 days following the Interim Order Entry Date (or, if such day is not a Business Day, the Business Day immediately following such day).

For the purpose of determining compliance with the applicable conditions specified in this Section 5.2 and Section 5.4 on the Second Funding Date, each Person who is a Lender at the time of the Second Funding Date shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 5.2 and Section 5.4, unless the Administrative Agent shall have received written notice from such Lender prior to the Second Funding Date specifying its objection thereto (which notice shall be forwarded by the Administrative Agent to the Lenders and the Borrower promptly upon receipt thereof).

5.3    Conditions to Withdrawal.  The Borrower may make a Withdrawal subject to the satisfaction or waiver of the following conditions precedent:

(a)    Non-Critical Vendor/Shippers Withdrawals.  In the case of Non-Critical Vendor/Shipper Withdrawals, (i) there shall be no more than one Non-Critical Vendor/Shipper Withdrawal in any period of 14 consecutive days and (ii) the proposed Withdrawal shall be in an amount not to exceed (x) the greater of (A) the amount necessary to finance the Loan Parties' total Non-Critical Vendor/Shipper Disbursements for the following two weeks in accordance with the Budget and (B) (1) if such Non-Critical Vendor/Shippers Withdrawal is made at any time on or prior to the Friday of the seventh full week occurring after the Petition Date, $13,000,000 or (2) if such Non-Critical Vendor/Shipper Request is made at any time after the Friday of the seventh full

week occurring after the Petition Date $10,000,000 <u>minus</u> (y) Excess Consolidated Liquidity at such time; <u>provided</u> that any of the foregoing requirements for any Withdrawal Request may be waived in writing by the Required Lenders.

(b)     <u>Critical Vendor/Shipper Withdrawals</u>.  In the case of Critical Vendor/Shipper Withdrawals, the proposed Withdrawal shall be in the amount sought to be paid to any such Critical Vendor(s) or Shipper(s), and the Withdrawal Request shall include (i) the name of such Critical Vendor(s) or Shipper(s), (ii) a copy of the applicable agreement (substantially in the form attached to the Critical Vendors Order or Shippers Order, as applicable) proposed to be entered into with such Critical Vendor(s) or Shipper(s), if any, or, if no such agreement is proposed, a description of the terms proposed to be agreed to with such Critical Vendor(s) or Shipper(s) in exchange for such payment, if any, and (iii) the payments projected to be made to such Critical Vendor(s) or Shipper(s) for the following two weeks; <u>provided</u> that any of the foregoing requirements for any Withdrawal Request may be waived in writing by the Required Lenders.

(c)     <u>Remaining Amount</u>.  The amount of funds on deposit in the Funding Account, after giving effect to such Withdrawal, shall not be less than the Carve-Out Cap (other than in the case of a Withdrawal made pursuant to the proviso to the last sentence of Section 2.3).

For the purpose of determining compliance with the applicable conditions specified in clauses (a) and (b) above, each Lender shall be deemed to have accepted, and to be satisfied with, each matter required under clause (a) or (b) above, as applicable, for any Withdrawal for which they are given notice by 1:00 P.M., New York City time, one Business Day before the proposed date of the applicable Withdrawal, and the Administrative Agent shall be deemed authorized to instruct, and shall instruct, the Funding Account Bank to transfer the applicable funds for such Withdrawal from the Funding Account to the Borrower in accordance with Section 2.3, unless the Administrative Agent shall have received written notice from or on behalf of any Lender by 1:00 P.M., New York City time, on the proposed date of the applicable Withdrawal specifying its objection thereto (which notice shall be forwarded by the Administrative Agent to the Lenders and the Borrower promptly upon receipt thereof); <u>provided</u> that, in the event of any such objection, the applicable conditions specified in clauses (a) and (b) above shall nevertheless be deemed satisfied and the Administrative Agent shall nevertheless be deemed authorized to instruct, and shall instruct, the Funding Account Bank to transfer the applicable funds from the Funding Account to the Borrower in accordance with Section 2.3 if the Required Lenders provide written confirmation to the Administrative Agent that they accept and are satisfied with each matter required under clause (a) or (b) above, as applicable, with respect to such Withdrawal and direct the Administrative Agent to instruct the Funding Account Bank to transfer the applicable funds for such Withdrawal.

5.4     <u>Additional Conditions to Each Loan and Withdrawal</u>.  The agreement of each Lender to make any NM Loan requested to be made by it on any date and, unless waived in writing by the Required Lenders, the ability of the Borrower to make a Withdrawal pursuant to 5.3 are subject to the satisfaction of the following conditions precedent:

(a)      Notice of Borrowing or Withdrawal.  The Borrower shall have delivered to the Administrative Agent (i) in the case of a borrowing of NM Loans, a Notice of Borrowing, duly executed and completed, by the time specified in, and otherwise in accordance with, Sections 2.2, 5.1 and 5.2, and (ii) in the case of a Withdrawal, a Withdrawal Request, duly executed and completed, by the time specified in, and otherwise in accordance with, Sections 2.3 and 5.3.

(b)      Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (provided that if any representation or warranty is by its terms qualified by materiality, such representation shall be true and correct in all respects) on and as of such date as if made on and as of such date.

(c)      No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(d)      DIP Order.  The DIP Order shall be in full force and effect, shall not be subject to a stay and shall not have been vacated, reversed, modified or amended in any respect adverse to (x) the Lenders without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders or (y) the Administrative Agent without the prior written consent of the Administrative Agent.

(e)      Chapter 11 Orders.  The Loan Parties shall be in compliance with the DIP Order in all respects and each other Chapter 11 Order in all material respects.

(f)      Budget.  The Administrative Agent and the Lenders shall have received all periodic updates required under the Budget including, in the case of the Second Funding Date, updates such that the Budget covers the 13 week period immediately following such borrowing, and all other reports then required under Section 6.14 and Section 6.15, each in form and substance reasonably satisfactory to the Required Lenders, and the Loan Parties shall be in compliance with the Budget in accordance with Section 6.16(a).

Notwithstanding the foregoing, the conditions specified in Sections 5.3 and 5.4 shall not be required to be satisfied in the case of any Withdrawal Request submitted pursuant to the proviso to the last sentence of Section 2.3, and each Lender acknowledges and agrees that, other than the Borrower's delivery (or deemed delivery) of a Withdrawal Request and the Borrower's receipt of a Carve-Out Trigger Notice, there shall be no conditions precedent to any Withdrawal pursuant to the proviso to the last sentence of Section 2.3.

5.5      Determination of Compliance with Conditions.  Each borrowing and Withdrawal by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such borrowing or Withdrawal that the conditions contained in Sections 5.1, 5.2, 5.3 and/or 5.4, as applicable, have been satisfied.

## SECTION 6.  AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall and shall cause each of its Subsidiaries to:

6.1     <u>Financial Statements</u>.  Furnish to the Administrative Agent, each Lender and the Prepetition Revolving Agent:

(a)     as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a qualification arising out of the scope of the audit, by McGladrey LLP or other independent certified public accountants of nationally recognized standing; and

(b)     as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by a Responsible Officer of the Borrower as being fairly stated in all material respects (subject to normal year-end audit adjustments).

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

6.2     <u>Certificates; Other Information</u>.  Furnish to the Administrative Agent, each Lender (or, in the case of clause (j), to the relevant Lender) and the Prepetition Revolving Agent:

(a)     concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate;

(b)     concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer of the Borrower stating that, to the best of such Responsible Officer's knowledge, each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has

obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) (x) a Compliance Certificate containing all information and calculations necessary for determining compliance by each Group Member with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be, and (y) to the extent not previously disclosed to the Administrative Agent, (1) a description of any change in the jurisdiction of organization of any Loan Party, (2) a list of any Intellectual Property acquired by any Loan Party and (3) a description of any Person that has become a Group Member, in each case since the date of the most recent report delivered pursuant to this clause (y) (or, in the case of the first such report so delivered, since the Closing Date);

(c)     [Intentionally Omitted];

(d)     within 45 days after the end of each fiscal quarter of the Borrower (or 90 days, in the case of the fourth fiscal quarter of each fiscal year), a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the comparable periods of the previous year;

(e)     no later than 10 Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed amendment, supplement, waiver or other modification with respect to any Prepetition Secured Debt Document;

(f)     within five days after the same are sent, copies of all financial statements and reports that the Borrower sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(g)     promptly following receipt thereof, copies of any documents described in (i) Section 101(f) or 101(j) of ERISA that any Group Member or any ERISA Affiliate may receive with respect to a Pension Plan and/or (ii) Section 101(f), 101(k) or 101(l) of ERISA with respect to any Multiemployer Plan; provided, that if the relevant Group Members or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such Group Member or the ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(h)     promptly following the effectiveness thereof, any amendments, modifications, consents or waivers relating to any of the Material Contracts or any agreement, indenture or other documentation governing or evidencing any Material Indebtedness;

(i)     concurrently with delivery of any information, documents or certificates to any Prepetition Secured Party, complete copies of all such information, documents and certificates; and

(j)     promptly, such additional financial and other information as any Lender may from time to time reasonably request.

6.3     <u>Payment of Obligations</u>.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature arising after the Petition Date, except where (i) the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Group Member or (ii) non-payment and discharge thereof is permitted or required under the Bankruptcy Code or order of the Bankruptcy Court.

6.4     <u>Maintenance of Existence; Compliance</u>.  (a)  Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of this clause (ii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect; and (c) maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

6.5     <u>Maintenance of Property; Insurance</u>.  (a)  Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted and (b) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business.

6.6     <u>Inspection of Property; Books and Records; Discussions</u>.  (a)  Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants.

6.7     <u>Notices</u>.  Promptly give notice to the Administrative Agent, each Lender and the Prepetition Revolving Agent of:

(a)     the occurrence of any Default or Event of Default;

(b)      any (i) default or event of default under any Contractual Obligation entered into after the Petition Date of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)      any litigation or proceeding affecting any Group Member (i) in which the amount involved is $5,000,000 or more and not covered by insurance, (ii) in which injunctive or similar relief is sought or (iii) which relates to any Loan Document;

(d)      the occurrence of any ERISA Event or Foreign Plan Event that, alone or together with any other ERISA Events and/or Foreign Plan Events that have occurred, could reasonably be expected to result in liability of any Group Member or any ERISA Affiliate in an aggregate amount exceeding $5,000,000, as soon as possible and in any event within 10 days after the Borrower knows or has reason to know thereof; and

(e)      any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

6.8      Environmental Laws.  (a)  (i) Comply with all Environmental Laws applicable to it, and obtain, comply with and maintain any and all Environmental Permits necessary for its operations as conducted and as planned; and (ii) take all reasonable efforts to ensure that all of its tenants, subtenants, contractors, subcontractors, and invitees comply with all Environmental Laws, and obtain, comply with and maintain any and all Environmental Permits, applicable to any of them insofar as any failure to so comply, obtain or maintain reasonably could be expected to adversely affect the Borrower.  For purposes of this Section 6.8(a), noncompliance by the Borrower with any applicable Environmental Law or Environmental Permit shall be deemed not to constitute a breach of this covenant; provided that, upon learning of any actual or suspected noncompliance, the Borrower shall promptly undertake all reasonable efforts to achieve compliance, and provided further that, in any case, such non-compliance, and any other noncompliance with Environmental Law, individually or in the aggregate, could not reasonably be expected to give rise to a Material Adverse Effect or materially and adversely affect the value of any Mortgaged Property.

(b)      Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all orders and directives of all Governmental Authorities regarding Environmental Laws, other than such orders and directives as to which an appeal has been timely and properly taken in good faith, and provided that the pendency of any and all such appeals could not reasonably be expected to give rise to a Material Adverse Effect and does not materially and adversely affect the value of any Mortgaged Property.

6.9   <u>Additional Collateral, etc</u>.  (a)  With respect to any property acquired after the Closing Date by any Group Member (other than (x) any property described in paragraph (b) below and any fee interest in real property and (y) any property subject to a Lien expressly permitted by Section 7.3(g)) as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien pursuant to the DIP Order, promptly (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as may be necessary or advisable, or as the Administrative Agent may reasonably request, to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions necessary or advisable or as the Administrative Agent may request to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Required Lenders.

(b)   With respect to any new Subsidiary created or acquired after the Closing Date by any Group Member, (i) promptly cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement, (B) to take such actions necessary or advisable to grant to the Administrative Agent for the benefit of the Lenders a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Subsidiary, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent or the Required Lenders and (C) to deliver to the Administrative Agent a certificate of such Subsidiary, substantially in the form of Exhibit C, with appropriate insertions and attachments, and (ii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Required Lenders.

6.10   <u>Chapter 11 Cases Filings</u>.  Furnish to the Administrative Agent and the Prepetition Revolving Agent:

(a)   at least two Business Days in advance of filing (or, if impracticable, then as promptly as practicable in advance of filing) with the Bankruptcy Court, copies of all pleadings, motions, applications, judicial information, financial information and other documents, in each case, filed by or on behalf of the Borrower or any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, or any pleadings distributed by or on behalf of the Borrower or any other Loan Party to the Ad Hoc Senior Secured Note Holder Committee or the Official Committee, in each case directly related to the Loans or this Agreement; <u>provided</u>, <u>however</u> that this clause (a) shall not require delivery of any sealed documents or unredacted versions of documents for which the Borrower or any other Loan Party is seeking or intends to seek sealed treatment, but shall instead require delivery of reasonably complete summaries of the content of any such sealed documents and redacted versions of any such documents for which sealed treatment is sought or intended to be sought (excluding any content sought or intended to be sought to be sealed or redacted); and

(b)   promptly after the same is available and to the extent reasonably practicable, copies of all other pleadings, motions, applications, judicial information, financial

information and other documents, in each case, filed by or on behalf of the Borrower or any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, or any other pleadings distributed by or on behalf of the Borrower or any other Loan Party to the Ad Hoc Senior Secured Note Holder Committee or the Official Committee; provided that, in the case of this clause (b), the Borrower shall not be required to deliver any such pleading, motion, application, judicial or financial information or document to the extent it is accessible to the Administrative Agent or its counsel on the electronic docket maintained for the Chapter 11 Cases; provided, further that this clause (b) shall not require delivery of any sealed documents or unredacted versions of documents for which the Borrower or any other Loan Party is seeking or intends to seek sealed treatment.

6.11     Chapter 11 Cases.

(a)     File a substantive pleading in form and substance acceptable to the Required Lenders with respect to the AK Steel Pellet Purchase Agreement on or before the date that is 40 days after the Petition Date.

(b)     Promptly provide to and discuss with the Administrative Agent and each Lender any and all information and developments in connection with any proposed Relevant Transaction, event of the type described in paragraph (k) of Section 8 or modification to a Material Contract, including, without limitation, any letters of intent, commitment letters or engagement letters received by the Loan Parties, and any other event or condition which is reasonably likely to have a material effect on the Loan Parties, the Loans or the Chapter 11 Cases, including, without limitation, the progress of any proposed or confirmed Chapter 11 plan of reorganization.

(c)     Comply with each Chapter 11 Order in all material respects.

6.12     Cash Management.  Maintain cash management systems reasonably acceptable to the Required Lenders and in accordance with the applicable Chapter 11 Orders, it being understood that the cash management arrangements of the Borrower, approved pursuant to a First Day Order, are reasonably satisfactory to the Required Lenders.

6.13     Funding Account.  Cause the Funding Account to be subject at all times to the Funding Account Control Agreement.  The Borrower shall maintain the Funding Account as a segregated deposit account and shall not deposit, nor permit to be deposited, any funds into the Funding Account other than (w) the proceeds of the Initial NM Loans on the Closing Date, (x) the proceeds of the Second NM Loans on the Second Funding Date, (y) any amounts remaining in the Carve-Out Account upon payment in full of the Carve-Out and (z) any amounts released from the Prepetition Secured Note Trustee Escrow Account.  The Borrower shall direct the escrow agent for the Prepetition Secured Note Trustee Escrow Account to remit all amounts released from the Prepetition Secured Note Trustee Escrow Account directly to the Funding Account (and if such amounts are nevertheless received by the Borrower or any other Loan Party, the Borrower or such other Loan Party shall hold such amounts in trust for the Secured Parties and promptly cause such amounts to be deposited in the Funding Account); provided, however, that in the case of clauses (y) and (z) above, the Borrower shall give prior notice to the Funding Account Bank of such deposit of funds in the Funding Account.

6.14    Rolling 13 Week Cash Flow Reports.  By 5:00 P.M., New York City time, on the first Friday of each month (each, a "Budget Renewal Date"), deliver to the Administrative Agent and the Lenders a report (each, a "Budget"), in form and substance reasonably satisfactory to the Required Lenders, setting forth for the 13 week period beginning on the immediately preceding Monday, the projected weekly results by line item in the Budget (including, without limitation, updates as a result of actual or projected Permitted Adequate Protection Payments exceeding the amounts previously projected), together with a reasonably detailed written explanation of all projected material variances as compared to the immediately preceding rolling 13 week forecast delivered by the Borrower.

6.15    Reporting of Budget Variance, Consolidated Liquidity and Production. By 5:00 P.M., New York City time, on each Friday after the Petition Date, (i) for the immediately preceding week (ending on the Sunday immediately preceding the applicable Friday reporting deadline) and for the cumulative period from the Petition Date through the immediately preceding Sunday, the actual and budgeted results for such week and cumulative post-Petition Date time period by line item in the Budget, together with a reasonably detailed written explanation of all material variances, (ii) for the immediately preceding week (ending on the Sunday immediately preceding the applicable Friday reporting deadline), the Consolidated Liquidity on each day of such week, and (iii) in the case of the second Friday of each month, for the immediately preceding month, the Loan Parties' total production of iron ore flux pellets for such month.

6.16    Financial Condition Covenants.

(a)    Budget Compliance.  The proceeds of Loans made under this Agreement and all proceeds of Collateral shall be used by the Loan Parties solely for the purposes and, subject to the variances provided for in clause (i) below, up to the amounts set forth in the Budget for the applicable line item during the applicable Test Period or as may be required pursuant to any Permitted Adequate Protection Payments (it being understood that any line item for Permitted Adequate Protection Payments shall not cap the amount that is required to be paid by the Borrower from time to time as Permitted Adequate Protection Payments), and:

(i)    for each week occurring after the Petition Date, beginning on the first Monday after the Petition Date (each such week, a "Test Period"), (1) the aggregate amount of actual total receipts of the type set forth in the Budget line item "Total Receipts" of the Borrower and its Subsidiaries for such Test Period, as compared to "Total Receipts" for such Test Period set forth in the Budget, shall not be less than (x) 80% of the amount set forth in the Budget for the first Test Period, (y) 85% of the amount set forth in the Budget for the second Test Period and (z) 90% of the amount set forth in the Budget for each Test Period after the second Test Period; provided, however, that, in any week that the amount of the actual total receipts of the type set forth in the Budget line item "Total Receipts" of the Borrower and its Subsidiaries is more than the budgeted amount for such week, the amount by which the actual receipts is more may be carried forward and added to the actual amount for the immediately subsequent weekly period; provided, further, that any such amounts carried forward shall not be taken into account in determining whether there is to be any amount carried forward beyond such

immediately subsequent weekly period; and (2) the aggregate amount of actual operating disbursements of the type set forth in the Budget line item "Total Operating Disbursements" of the Borrower and its Subsidiaries for such Test Period, as compared to "Total Operating Disbursements" for such Test Period set forth in the Budget (which, for the avoidance of doubt, shall exclude Critical Vendor Disbursements, Shipper Disbursements, fees, costs and expenses of professionals retained by the Loan Parties, the Administrative Agent, the Ad Hoc Senior Secured Note Holder Committee, the Prepetition Secured Parties and the Official Committee and Permitted Adequate Protection Payments), shall not be in excess of (x) 120% of the amount set forth in the Budget for the first Test Period, (y) 115% of the amount set forth in the Budget for the second Test Period and (z) 110% of the amount set forth in the Budget for each Test Period after the second Test Period; provided, however, that, in any week that the amount of the actual operating disbursements of the type set forth in the Budget line item "Total Operating Disbursements" of the Borrower and its Subsidiaries is less than the budgeted amount for such week, the amount by which the actual disbursements is less may be carried forward and added to the budgeted amount for the immediately subsequent weekly period; provided, further, that any such amounts carried forward shall not be taken into account in determining whether there is to be any amount carried forward beyond such immediately subsequent weekly period; and

(ii)      for each Test Period, the aggregate amount of actual capital expenditure payments of the type set forth in the Budget line item "Capex Payments" of the Borrower and its Subsidiaries for such Test Period, as compared to "Capex Payments" for such Test Period set forth in the Budget, shall not be in excess of (x) 120% of the amount set forth in the Budget for the first Test Period, (y) 115% of the amount set forth in the Budget for the second Test Period and (z) 110% of the amount set forth in the Budget for each Test Period after the second Test Period; provided, however, that, in any week that the amount of the actual capital expenditure payments of the type set forth in the Budget line item "Capex Payments" is less than the budgeted amount for such week, the amount by which the actual payments is less may be carried forward and added to the budgeted amount for any subsequent weekly period ending prior to the next Budget Renewal Date; provided, further, that any such amounts carried forward and applied in a subsequent weekly period shall not be taken into account in determining whether there is to be any amount for such weekly period carried forward beyond such weekly period.

(b)      Minimum Liquidity.  Consolidated Liquidity, as determined on a daily basis and reported on a weekly basis for the preceding week pursuant to clause (ii) of Section 6.15, shall at all times be no less than $2,500,000.

(c)      Minimum Production.  For each month beginning with May 2015, total monthly production of iron ore flux pellets for such month, as compared to the projected total monthly production of iron ore flux pellets for such month set forth on Schedule 6.16(c), shall not be less than 90% of the projected amount set forth on Schedule 6.16(c) for such month.

(d)      Critical Vendor and Shipper Payments.  The Loan Parties shall not make or commit to make payments pursuant to the Critical Vendors Order and the Shippers Order in excess of $32,000,000 in the aggregate during the Chapter 11 Cases.

6.17    <u>Carve-Out Account</u>.  Upon the receipt of a Carve-Out Trigger Notice, the Borrower shall (i) submit a Withdrawal Request for up to the amount of the Carve-Out Cap (or such amount as is then available in the Funding Account if the amount in the Funding Account is less than the Carve-Out Cap) and (ii) direct the Administrative Agent to prepay Loans (after first paying then accrued and unpaid fees, expenses and indemnities of the Administrative Agent under the Loan Documents) in an aggregate amount equal to the amount of any funds in the Funding Account in excess of the Carve-Out Cap, in each case in accordance with Section 2.3. Upon receipt of such amount described in clause (i) above, the Borrower shall transfer such amount to a segregated account not subject to the control of the Administrative Agent (the "<u>Carve-Out Account</u>").  Proceeds on deposit in the Carve-Out Account shall be available only to pay the Carve-Out as set forth in the DIP Order.  It is understood and agreed that (x) the Secured Parties shall not sweep or foreclose on cash in the Funding Account to the extent the amount remaining therein thereafter would be less than the Carve-Out Cap (less any amounts already funded to the Carve-Out Account), (y) the Secured Parties shall have a security interest in the Carve-Out Account and all funds therein until such time as they are applied to pay the Carve-Out as set forth in the DIP Order and (z) an amount of the DIP Superpriority Claims equal to the amount of all funds that shall have been funded to the Carve-Out Account from proceeds of the NM Loans or the Funding Account and then actually applied to pay the Carve-Out (which amount shall not in any event exceed the Carve-Out Cap) shall constitute a superpriority claim having the priority set forth in Section 11.2 and in the DIP Order (the "<u>Carve-Out Claim</u>"). Upon payment in full of the amounts set forth in clause (iv) of the definition of "Carve-Out", the Borrower shall promptly remit all amounts remaining in the Carve-Out Account, if any, to the Funding Account.

## SECTION 7.  NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

7.1    <u>Intentionally Omitted</u>.

7.2    <u>Indebtedness</u>.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document;

(b)    Indebtedness of the Borrower to any Subsidiary and of any Wholly Owned Subsidiary Guarantor to the Borrower or any other Subsidiary;

(c)    Guarantee Obligations incurred in the ordinary course of business by the Borrower or any of its Subsidiaries of obligations of the Borrower or any Wholly Owned Subsidiary Guarantor;

(d)    Indebtedness outstanding on the date hereof and listed on Schedule 7.2(d) and any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity of, the principal amount thereof);

(e)      Indebtedness in the form of a tax increment financing on terms and in amounts reasonably acceptable to the Administrative Agent;

(f)      Indebtedness of the Borrower or any of its Subsidiaries (including, without limitation, Capital Lease Obligations) incurred to finance the purchase, lease, construction or improvement of any property, plant or equipment used or to be used in the business of the Borrower or such Subsidiary through the direct purchase of such property, plant or equipment, and any Indebtedness of the Borrower or any of its Subsidiaries incurred solely to refinance such Indebtedness, in an aggregate principal amount for all such Indebtedness incurred pursuant to this clause (f) not to exceed $20,000,000 at any one time outstanding;

(g)      (i) Indebtedness of the Borrower incurred prior to the date hereof in respect of the Prepetition Senior Secured Notes in an aggregate principal amount not to exceed $425,000,000 and (ii) Guarantee Obligations of any Guarantor in respect of such Indebtedness;

(h)      unsecured Indebtedness of the Borrower or any of its Subsidiaries incurred prior to the date hereof and owing to and held by Magnetation, Inc. or AK Iron Resources, LLC and subordinated or junior in right of payment to the Obligations, in an aggregate principal amount not to exceed $50,000,000;

(i)      unsecured Indebtedness of the Borrower or any Subsidiary incurred prior to the date hereof and maturing at least 91 days after the Final Maturity Date (and not requiring any payment of principal prior to such date) in an aggregate principal amount not to exceed $25,000,000; and

(j)      (i) Indebtedness of the Borrower incurred prior to the date hereof pursuant to the Prepetition Revolving Loan Documents in an aggregate principal amount not in excess of $65,000,000 and Indebtedness of the Loan Parties pursuant to the Specified Cash Management Agreements (as defined in the Prepetition Revolving Credit Agreement) and (ii) Guarantee Obligations of any Guarantor in respect of such Indebtedness.

7.3      Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)      Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(c)      pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)      deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)      easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)      Liens in existence on the date hereof listed on Schedule 7.3(f), securing Indebtedness permitted by Section 7.2(d), provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)      Liens securing Indebtedness of the Borrower or any Subsidiary incurred pursuant to Section 7.2(f) to finance the acquisition of fixed or capital assets, provided that (i) such Liens shall be created substantially simultaneously with the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (iii) the amount of Indebtedness secured thereby is not increased (or with respect to any Indebtedness that is revolving in nature, the maximum amount of such Indebtedness is not increased);

(h)      Liens created pursuant to the Security Documents;

(i)      any interest or title of a lessor under any lease entered into by the Borrower or any Subsidiary in the ordinary course of its business and covering only the assets so leased;

(j)      Liens in existence prior to the date hereof securing Indebtedness permitted by Section 7.2(g);

(k)      Liens in existence prior to the date hereof securing Indebtedness permitted by Section 7.2(j);

(l)      Liens in favor of the Prepetition Secured Parties as adequate protection granted pursuant to the DIP Order; provided that such Liens (other than any such Liens granted in favor of the Prepetition Revolving Secured Parties) shall be junior to the Liens created pursuant to the Security Documents and the DIP Order in favor of the Secured Parties; and

(m)      Liens on cash and/or deposit accounts in favor of any issuer of a Letter of Credit (as defined in the Prepetition Revolving Credit Agreement) to the extent needed to provide cash collateral in an amount equal to 103% of the undrawn principal amount of any such

Letter of Credit in accordance with the terms of the Prepetition Revolving Loan Documents and the DIP Order.

7.4    <u>Fundamental Changes</u>.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)    any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (<u>provided</u> that the Borrower shall be the continuing or surviving corporation) or with or into any Wholly Owned Subsidiary Guarantor (<u>provided</u> that the Wholly Owned Subsidiary Guarantor shall be the continuing or surviving corporation);

(b)    any Subsidiary of the Borrower may Dispose of any or all of its assets (i) to the Borrower or any Wholly Owned Subsidiary Guarantor (upon voluntary liquidation or otherwise) or (ii) pursuant to a Disposition permitted by Section 7.5; and

(c)    any Investment expressly permitted by Section 7.7 may be structured as a merger, consolidation or amalgamation.

7.5    <u>Disposition of Property</u>.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person, except:

(a)    the Disposition of obsolete or worn out property in the ordinary course of business;

(b)    the sale of inventory in the ordinary course of business;

(c)    Dispositions permitted by clause (i) of Section 7.4(b); and

(d)    the sale or issuance of any Subsidiary's Capital Stock to the Borrower or any Wholly Owned Subsidiary Guarantor.

7.6    <u>Restricted Payments</u>.  Declare or pay any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member (collectively, "<u>Restricted Payments</u>"), except that:

(a)    any Subsidiary may make Restricted Payments to the Borrower or any Wholly Owned Subsidiary Guarantor; and

(b)    with respect to periods during which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes, distributions for each quarter in an amount equal to the product of (x) the taxable income of the Borrower determined for

U.S. federal income tax purposes for such quarter, multiplied by (y) the Highest Marginal Income Tax Rate.

7.7     Investments.  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "Investments"), except:

(a)     extensions of trade credit in the ordinary course of business;

(b)     investments in Cash Equivalents;

(c)     Guarantee Obligations permitted by Section 7.2;

(d)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(e)     loans and advances to employees, officers or directors of any Group Member in the ordinary course of business consistent with past practices (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $1,000,000 at any one time outstanding (without giving effect to the forgiveness of any such loan);

(f)     intercompany Investments by any Group Member in the Borrower or any Person that, prior to such investment, is a Wholly Owned Subsidiary Guarantor; and

(g)     industrial revenue, municipal or similar bonds acquired from one or more tax exempt issuers thereof in connection with tax increment and/or municipal bond financings on terms and in amounts reasonably acceptable to the Administrative Agent.

7.8     Optional Payments and Modifications of Certain Debt Instruments.  (a)  Make or offer to make any optional or voluntary payment, prepayment, repurchase or redemption of or otherwise optionally or voluntarily defease or segregate funds with respect to the Prepetition Senior Secured Notes, any other Prepetition Indebtedness (other than the Prepetition Revolving Obligations) or any subordinated or junior lien Indebtedness; provided that the restrictions in this Section 7.8 shall not prohibit the substitution and exchange (and deemed prepayment) of the Roll-Up Loans; (b) amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of (or any documentation relating to) the Prepetition Revolving Loans, the Prepetition Senior Secured Notes, any other Prepetition Indebtedness or any subordinated Indebtedness or any Material Indebtedness; (c) amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any preferred stock issued by a Group Member to a Person other than a Group Member; or (d) designate any Indebtedness (other than obligations of the Loan Parties pursuant to the Loan Documents, the Prepetition Revolving Loan Documents and the Prepetition Senior Secured Note Indenture) as "Designated Senior Indebtedness" (or any other defined term having a similar purpose) for the purposes of the Prepetition Senior Secured Note Indenture.

7.9    <u>Transactions with Affiliates</u>.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower or any Wholly Owned Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the relevant Group Member (<u>provided</u> that this clause (b) shall not apply to any such transaction with any Wholly Owned Subsidiary of the Borrower), and (c) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.

7.10    <u>Sales and Leasebacks</u>.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member.

7.11    <u>Swap Agreements</u>.  Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Capital Stock or the Prepetition Senior Secured Notes) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

7.12    <u>Changes in Fiscal Periods</u>.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

7.13    <u>Negative Pledge Clauses</u>.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party, other than (a) this Agreement and the other Loan Documents, (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby) and (c) the Prepetition Secured Debt Documents.

7.14    <u>Clauses Restricting Subsidiary Distributions</u>.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in

connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary and (iii) any restrictions existing under the Prepetition Secured Debt Documents.

7.15    Lines of Business.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related thereto.

7.16    Modifications to Certain Documents.  Amend, modify, waive or otherwise change or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any of the Material Contracts, in each case, without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders.

7.17    Intentionally Omitted.

7.18    Use of Proceeds.  Request any Loan or use, or permit its Subsidiaries or its or their respective directors, officers, employees and agents to use, the proceeds of any Loan:

(a)    (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto;

(b)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Order;

(c)    for the payment of fees, expenses, interest or principal with respect to any Prepetition Indebtedness (other than payments made pursuant to Section 4.16, Permitted Adequate Protection Payments or as otherwise permitted pursuant to a First Day Order);

(d)    to make any distribution under a plan of reorganization in the Chapter 11 Cases; or

(e)    to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under section 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

7.19    Chapter 11 Claims; Adequate Protection.  Incur, create, assume, suffer to exist or permit (i) any administrative expense, unsecured claim, or other super-priority claim or Lien that is pari passu with or senior to the claims of the Secured Parties against the Loan Parties

hereunder, or apply to the Bankruptcy Court for authority to do so, except for certain valid, perfected and unavoidable liens permitted under the Prepetition Revolving Credit Documents as senior to the Prepetition Revolving Facility Liens (the "Permitted Senior Liens"), the Prepetition Revolving Obligations, any adequate protection in respect of the Prepetition Revolving Obligations and the Carve-Out or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection, other than Permitted Adequate Protection Payments.

### SECTION 8.  EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within three days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)    any Loan Party shall default in the observance or performance of any agreement contained in clause (i) or (ii) of Section 6.4(a) (with respect to the Borrower only), Section 6.7(a), Section 6.11(a), Section 6.13, Section 6.16 or Section 7 of this Agreement or Sections 5.5 and 5.7(b) of the Guarantee and Collateral Agreement; or

(d)    any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days (or, in the case of Section 6.10, Section 6.11(b), Section 6.12, Section 6.14 or Section 6.15, 5 days) after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(e)    any Group Member shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans and Prepetition Indebtedness) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such

Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Material Indebtedness; or

(f)       [Intentionally Omitted]; or

(g)       (i)  an ERISA Event and or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; (iv) any Group Member or any of their respective ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; (v) any Loan Party shall hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code); or (vi) any other event or condition shall occur or exist with respect to a Plan, a Foreign Benefit Arrangement, or a Foreign Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to result in a Material Adverse Effect; or

(h)       one or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $10,000,000 or more as to any post-petition obligation, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

(i)       any of the Security Documents shall cease, for any reason, other than as expressly permitted hereunder or thereunder, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents or pursuant to the DIP Order shall cease to be enforceable and of the same effect and priority purported to be created thereby (other than pursuant to the express terms hereof or thereof); or

(j)       the guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, other than as expressly permitted hereunder or thereunder, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)       (i)  the Permitted Investors shall cease to have the power to vote or direct the voting, directly or indirectly, of securities having a majority of the ordinary voting power for the election of directors of the Borrower (determined on a fully diluted basis); (ii) the Permitted Investors shall cease to own of record and beneficially, directly or

indirectly, an amount of common stock of the Borrower equal to at least 65% of the amount of common stock of the Borrower owned by the Permitted Investors of record and beneficially as of the Closing Date; (iii) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), excluding the Permitted Investors, shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than 35% of the outstanding common stock of the Borrower or more than a majority of the outstanding common stock of Magnetation, Inc.; or (iv) the sale, assignment, conveyance, transfer, lease or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Magnetation, Inc. or the Borrower and its Subsidiaries taken as a whole to any Person, other than transactions with a Permitted Investor; or

(l)    (i) a Group Member shall be enjoined, restrained or in any way prevented by any Governmental Authority from conducting any part of its business; (ii) a Group Member shall suffer the loss, revocation or termination of, or there shall exist a default by any Group Member under, any license, permit, lease or agreement material to its business (including, without limitation, any Material Contract); (iii) there shall be a cessation of any part of a Group Member's business for a period of time; or (iv) any Collateral or property of a Group Member shall be taken or impaired through condemnation; except, in each case pursuant to this clause (l), to the extent that a Material Adverse Effect could not reasonably be expected to result; or

(m)    AK Iron Resources, LLC (or any Affiliate thereof from time to time party to the Operating Agreement) shall fail to make any Capital Contribution (as defined in the Operating Agreement) to the Borrower that is required to be made by it pursuant to and in accordance with the terms of the Operating Agreement at the time or times specified in the Operating Agreement; or

(n)    a Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 45 days after the entry of the Interim Order, or such Final Order shall not be in full force and effect or shall have been vacated, reversed, modified or amended in any respect adverse to (x) the Lenders without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders, (y) the Administrative Agent without the prior written consent of the Administrative Agent or (z) the Prepetition Revolving Secured Parties without the prior written consent of the Prepetition Revolving Agent; or

(o)    any Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of any Chapter 11 Case), suspended or converted to a case under Chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or a motion shall be filed by any Loan Party for the approval of, or there shall arise, (i) any other Claim having priority senior to or pari passu with the claims of the Administrative Agent and Lenders under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of section 507 of the Bankruptcy Code (other than

the claims of the Prepetition Revolving Secured Parties in respect of the Prepetition Revolving Obligations and the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein and in the DIP Order; or

(p)     any Loan Party files a motion in the Chapter 11 Cases without the express written consent of the Administrative Agent acting at the direction of the Required Lenders to obtain additional financing from a party other than the Lenders under section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under section 363(c) of the Bankruptcy Code; or

(q)     any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any pre-petition Claim other than (x) as provided for in a First Day Order or (y) as otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $1,000,000 in the aggregate or to permit other actions that would have a material adverse effect on the Loan Parties or their estates, or (iii) approving any settlement or other stipulation not approved by the Required Lenders and not included in the Budget (together with such variances thereto as are permitted pursuant to Section 6.16(a)) with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or

(r)     (i) the DIP Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified in any respect adverse to (x) the Lenders (or any Loan Party shall apply for authority to do so) without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders, (y) the Administrative Agent without the prior written consent of the Administrative Agent or (z) the Prepetition Revolving Secured Parties without the prior written consent of the Prepetition Revolving Agent (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this paragraph) or (ii) the DIP Order shall cease to be in full force and effect; or

(s)     any of the Loan Parties shall fail to comply with the terms and conditions of any Chapter 11 Order in any material respect; or

(t)     the Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of section 1106 of the Bankruptcy Code) under clause (b) of section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this paragraph); or

(u)     entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a Chapter 11 plan pursuant to section 1121 of the

Bankruptcy Code, without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders; or

(v)      the Loan Parties or any of their Affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's opposition to any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Administrative Agent (for the benefit of the Secured Parties); or

(w)      (i) the Loan Parties or any of their Affiliates shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the Administrative Agent (for the benefit of the Secured Parties) or contest any material provision of any Loan Document, (ii) such Liens and/or super-priority claims shall otherwise cease to be valid, perfected and enforceable in all respects or (iii) any material provision of any Loan Document shall cease to be effective; or

(x)      (i) the Loan Parties or any of their Affiliates shall file any pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or the Administrative Agent or (ii) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders or the Administrative Agent; or

(y)      any Loan Party shall fail to execute and deliver to the Administrative Agent any agreement, financing statement, trademark filing, copyright filing, mortgages, notice of lien or similar instrument or other document that is necessary, or that the Administrative Agent may reasonably request from time to time, to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the Administrative Agent (for the benefit of the Secured Parties) under the DIP Order; or

(z)      the Loan Parties shall fail to meet any of the milestones set forth on Schedule 8 unless satisfaction of such milestone is waived by the Administrative Agent (acting at the direction of the Required Lenders); or

(aa)      a plan shall be confirmed in the Chapter 11 Cases that does not provide for the Discharge of Secured Obligations on the effective date of such plan; or

(bb)      15 days shall have elapsed since any Loan Party shall have filed a plan in the Chapter 11 Cases that contains terms and conditions that are inconsistent in any material respect with the Plan Term Sheet, or, if the RSA (as defined in the DIP Order)

has been executed, the RSA, without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders; or

(cc)     the Note Roll-Up shall not occur on or prior to the Note Roll-Up Date or shall not result in Prepetition Senior Secured Notes of each Note Roll-Up Electing Lender being rolled up into Note Roll-Up Loans in a principal amount of at least such Lender's Applicable Note Roll-Up Amount, the DIP Order shall cease to authorize the Note Roll-Up resulting in at least such amount of Note Roll-Up Loans for each Note Roll-Up Electing Lender, or the Note Roll-Up Commitment of any Note Roll-Up Electing Lender shall be reduced or terminated prior to the occurrence of the Note Roll-Up;

then, and in any such event, either or both of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the NM Commitments or all the Commitments to be terminated forthwith, whereupon the NM Commitments or all the Commitments, as the case may be, shall immediately terminate and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower. In addition, subject solely to the giving of prior written notice as set forth below, the automatic stay provided in section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents, including all rights and remedies with respect to the Collateral and the Guarantors (provided that any proceeds of Collateral shall be subject to the distribution of proceeds set forth in the DIP order).  In addition to the remedies set forth above, the Administrative Agent may exercise any other remedies provided for by this Agreement and the Security Documents in accordance with the terms hereof and thereof or any other remedies provided by applicable law. Notwithstanding the foregoing, any exercise of remedies is subject to the requirement of the giving of two (2) Business Day's prior written notice, in the case of remedies other than remedies against the Collateral, or five (5) Business Days' prior written notice, in the case of remedies against the Collateral, to counsel for the Loan Parties, the Office of the U.S. Trustee and counsel for the Official Committee in accordance with the terms of the DIP Order.

## SECTION 9.  THE AGENTS

9.1     Appointment.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding anything

herein or in any other Loan Document to the contrary, each party hereto agrees that the Administrative Agent shall not take any discretionary action (other than any such actions of an administrative or ministerial nature, including, without limitation, any consent to an assignment pursuant to Section 10.6(b)) or exercise any discretionary powers, including in each case, without limitation, any expressions of approval or satisfaction or any delivery of a Carve-Out Trigger Notice pursuant to the DIP Order, except such discretionary actions and powers exercised in the manner directed by, or with the consent of, the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under Section 10.1), and in the absence of any such direction or consent shall refrain from taking any such discretionary actions or exercising any such discretionary powers.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have (a) any duties or responsibilities, except those expressly set forth herein, or (b) any fiduciary relationship with any Lender.  No implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

9.2     Delegation of Duties and Consultation with Counsel.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact.  The Administrative Agent shall not be responsible for the negligence or misconduct of or for the supervision of, any agents or attorneys-in-fact selected by it with reasonable care.  The Administrative Agent may consult with counsel of its selection, and the advice or opinion of counsel with respect to legal matters relating to this Agreement or any related document shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder or under any related document in good faith and in accordance with the advice or opinion of such counsel.

9.3     Exculpatory Provisions.  Neither any Agent nor any of their respective officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.  No Agent shall be deemed to have knowledge or notice of the designation of any Lender as a "Defaulting Lender" hereunder unless such Agent has received written notice from the Borrower referring to this Agreement and notifying such Agent of the identity and designation of such Lender as a "Defaulting Lender", which such Agent may conclusively rely upon without incurring liability therefor, and absent

receipt of such notice from the Borrower, each Agent may conclusively assume that no Lender under this Agreement has been designated as a "Defaulting Lender".

9.4     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate and unless it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5     Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless a Responsible Officer of the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6     Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of an investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance

upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates.

9.7    Indemnification.  The Lenders agree to indemnify each Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "Agent Indemnitee") (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably in accordance with their respective Applicable Percentages in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Applicable Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder or earlier resignation of removal of the Administrative Agent.

9.8    Agent in Its Individual Capacity.  Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9    Successor Administrative Agent.  The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Borrower.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8(a)

with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans provided, however, that the retiring Administrative Agent's rights to indemnification under this Agreement shall survive along with any other rights that by the express terms hereof shall so survive.  If no successor agent has accepted appointment as Administrative Agent by the date that is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 9 and of Section 10.5 shall continue to inure to its benefit.

9.10    Banking Law.  In order to comply with laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including those relating to the funding of terrorist activities and money laundering ("Banking Law"), the Administrative Agent is required to obtain, verify and record certain information relating to individuals and entities which maintain a business relationship with the Administrative Agent. Accordingly, each of the parties hereto agrees to provide to the Administrative Agent upon its request from time to time such identifying information and documentation as may be available for such party in order to enable the Administrative Agent to comply with Banking Law.

9.11    Limitations on Liability.

(a)    No provision of this Agreement or any related document shall require the Administrative Agent to expend or risk its own funds or otherwise incur any liability, financial or otherwise, in the performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers, if it shall have grounds to believe that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(b)    The Administrative Agent shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers.

(c)    In no event shall the Administrative Agent be responsible or liable for special, indirect, exemplary, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(d)    The Administrative Agent shall not be liable for failing to comply with its obligations under this Agreement in so far as the performance of such obligations is dependent upon the timely receipt of instructions and/or other information from any other person which are not received or not received by the time required.

(e)      The Administrative Agent shall not be required to take any action under this Agreement or any related document if taking such action (i) would subject the Administrative Agent to a tax in any jurisdiction where it is not then subject to a tax, or (ii) would require the Administrative Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(f)      The Administrative Agent shall not have any duty or responsibility in respect of (i) any recording, filing, or depositing of this Agreement or any other agreement or instrument, monitoring or filing any financing statement or continuation statement evidencing a security interest, the maintenance of any such recording, filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, or otherwise monitoring or maintaining the perfection, continuation of perfection or the sufficiency or validity of any security interest in or related to the Collateral, (ii) the acquisition or maintenance of any insurance or (iii) the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Collateral.  The Administrative Agent shall be authorized to, but shall in no event have any duty or responsibility to, file any financing or continuation statements or record any documents or instruments in any public office at any time or times or otherwise perfect or monitor or maintain any security interest in the Collateral.

(g)      In no event shall the Administrative Agent be liable for any failure or delay in the performance of its obligations under this Agreement or any related documents because of circumstances beyond the Administrative Agent's control, including, but not limited to, a failure, termination, or suspension of a clearing house, securities depositary, settlement system or central payment system in any applicable part of the world or acts of God, flood, war (whether declared or undeclared), civil or military disturbances or hostilities, nuclear or natural catastrophes, political unrest, explosion, severe weather or accident, earthquake, terrorism, fire, riot, labor disturbances, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like (whether domestic, federal, state, county or municipal or foreign) which delay, restrict or prohibit the providing of the services contemplated by this Agreement or any related documents, or the unavailability of communications or computer facilities, the failure of equipment or interruption of communications or computer facilities, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility, or any other causes beyond the Administrative Agent's control whether or not of the same class or kind as specified above.

(h)      For the avoidance of doubt, the Administrative Agent's rights, protections, indemnities and immunities provided herein shall apply to Administrative Agent for any actions taken or omitted to be taken under any Loan Document and any other related agreements in any of its capacities.

## SECTION 10.  MISCELLANEOUS

10.1    <u>Amendments and Waivers</u>.  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1.  The Required Lenders and each Loan Party which is party to the relevant Loan Document may, or, with the written consent of the

Required Lenders, the Administrative Agent and each Loan Party which is party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall: (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; (ii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent of such Lender; (iii) reduce any percentage specified in the definition of "Required Lenders", consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders; (iv) amend, modify or waive any provision of Section 2.13 without the written consent of each Lender adversely affected thereby; (v) amend, modify or waive any provision of Section 9 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent; or (vi) amend, modify or waive the condition to Withdrawals set forth in Section 5.3(c) without the written consent of the Prepetition Revolving Agent.  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

Notwithstanding the foregoing, the Administrative Agent may, without the consent of the Borrower or the Lenders, amend the amounts set forth in the definition of "Bridge Roll-Up Commitment" and in the definition of "Note Roll-Up Commitment" to reflect the aggregate principal amount of the Prepetition Term Loans on the Closing Date (including all accrued and unpaid interest).

10.2    <u>Notices</u>.  All notices, requests instructions, directions and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received (provided that if such receipt occurs after business hours of the recipient, then on the next Business Day following such receipt), addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Borrower:                    Magnetation LLC
                             102 NE 3rd Street, Suite 120
                             Northbank Building
                             Grand Rapids, MN 55744
                             Attention:  Joseph A. Broking
                             Fax: 218-999-5827
                             Telephone: 219-999-5165

                             With a copy to:

                             Davis Polk & Wardwell
                             450 Lexington Avenue
                             New York, NY 10017
                             Attention: Jinsoo H. Kim
                                         Marshall S. Huebner
                             Fax: 212-701-5800

Administrative Agent:        Wilmington Trust, National Association
                             Attn: Josh James
                             50 South Sixth Street, Suite 1290
                             Minneapolis, MN 55402
                             Fax: 612-217-5651

                             With a copy to:

                             Seward & Kissel LLP
                             One Battery Park Plaza
                             New York, NY 10005
                             Attn: Kalyan Das
                             Fax: 212-480-8421

<u>provided</u> that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

       Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative

Agent; _provided_ that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; _provided_ that approval of such procedures may be limited to particular notices or communications.

      10.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

      10.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

      10.5    Payment of Expenses and Taxes.  The Borrower agrees (a) to pay or reimburse each of the Administrative Agent and the Lenders that are members of the Ad Hoc Senior Secured Note Holder Committee for all their reasonable and documented fees, costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented pre-Petition Date and post-Petition Date fees, expenses and disbursements of one primary counsel, one local counsel and one financial advisor for each of the Administrative Agent and the Ad Hoc Senior Secured Note Holder Committee and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on such periodic basis as the Administrative Agent and the Lenders that are members of Ad Hoc Senior Secured Note Holder Committee shall deem appropriate, (b) to pay or reimburse each of the Administrative Agent and each Lender that is a member of the Ad Hoc Senior Secured Note Holder Committee for (i) all their respective reasonable and documented fees, costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement and the other Loan Documents and (ii) all their respective reasonable and documented out-of-pocket costs and expenses incurred in connection with the commencement, defense, conduct of, intervention in, or the taking of any other action (including, without limitation, preparation for and/or response to any subpoena or request for document production relating thereto) with respect to any proceeding (including the Chapter 11 Cases or any other bankruptcy or insolvency proceeding) related to any Loan Party, any Subsidiary of a Loan Party, any Loan Document or any Obligation, including, in each case, the fees, expenses and disbursements of one primary counsel, one local counsel and one financial advisor for each of the Administrative Agent and the Ad Hoc Senior Secured Note Holder Committee, (c) to pay, indemnify, and hold each Lender, the Administrative Agent, the Agent Parties and the Ad Hoc Senior Secured Note Holder Committee harmless from, any and all recording and filing fees and

any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other Taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender, the Administrative Agent, the Ad Hoc Senior Secured Note Holder Committee, each Prepetition Revolving Lender, the Prepetition Revolving Agent, their respective affiliates, officers, directors, employees, agents, advisors, controlling persons, equityholders, partners, managers, investors, fiduciaries, attorneys and representatives (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, claims, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents, the Prepetition Revolving Loan Documents and any such other documents, including any claim, litigation, investigation or proceeding or the preparation of any defense with respect thereto regardless of whether any Indemnitee is a party thereto and whether or not the same are brought by the Borrower, its equity holders, affiliates or creditors or any other Person, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to any Group Member or any property at any time owned, leased, or used by any Group Member and the reasonable and documented fees and expenses of one primary counsel, one local counsel and one financial advisor in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document or any Prepetition Revolving Loan Document or otherwise arising out of or relating to the foregoing or the transactions contemplated thereby (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities") (it being understood and agreed that the Administrative Agent shall not have this same right to retain such financial advisor unless the Administrative Agent shall jointly retain the financial advisor retained by the Lenders pursuant to this proviso; provided, however, that if there is a conflict, as determined by the Administrative Agent in its sole discretion, between the Lenders and the Administrative Agent, then the Administrative Agent shall be entitled to retain its own financial advisor), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities (x) arise from any dispute solely among Indemnitees which does not arise out of any act or omission of the Loan Parties or their Affiliates (other than any proceeding against or by any Indemnitee solely in its capacity or in fulfilling its role as Agent or similar role under the Loan Documents or the Prepetition Revolving Loan Documents) or (y) are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee, and provided, further, that this Section 10.5(d) shall not apply with respect to Taxes other than any Indemnified Taxes. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. No Indemnitee shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such

damages are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee.  No Indemnitee shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.  All amounts due under this Section 10.5 shall be payable not later than 10 days after written demand therefor.  Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the Chief Financial Officer of the Borrower, at the address of the Borrower set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent.  The agreements in this Section 10.5 shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder or the earlier resignation of removal of the Administrative Agent.

10.6    <u>Successors and Assigns; Participations and Assignments</u>.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and the Administrative Agent and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b)    (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (each, an "<u>Assignee</u>"), other than a natural person, a Loan Party or an Affiliate of a Loan Party, all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it, provided that each partial assignment shall be made as a ratable assignment of such Lender's NM Commitments, Bridge Roll-Up Commitments, Note Roll-Up Commitments and Loans) with the prior written consent of:

(A)    at any time prior to the Second Funding Date, the Borrower (such consent not to be unreasonably withheld, conditioned or delayed), <u>provided</u> that no consent of the Borrower shall be required for an assignment to a Lender, a Prepetition Senior Secured Note Holder, an affiliate of a Lender, a Prepetition Senior Secured Note Holder, an Approved Fund (as defined below) or, if an Event of Default has occurred and is continuing, any other Person; and <u>provided</u>, <u>further</u>, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof; and

(B)    the Administrative Agent.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the

assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $100,000, unless each of the Borrower and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

(B)  (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; and

(C)  the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (1) a Lender, (2) an Affiliate of a Lender or (3) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)  Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.15 and 10.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)  The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The Register shall be available for inspection by (x) the Borrower or (y) any Lender (solely with respect to (i) any entry relating to any information about such Lender or its Commitments or Loans or (ii) the identity of the other Lenders (but not any information with respect to any such other Lender's Commitments or Loans)), in each case at any reasonable time on a Business Day during the Administrative Agent's business hours and from time to time upon reasonable prior notice. The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders

shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), a $3,500 processing and recording fee and any written consent to such assignment required by paragraph (b)(i) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (i) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (ii) directly affects such Participant.  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.18 with respect to any Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(f) (it being understood that the documentation required under Section 2.15(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (i) agrees to be subject to the provisions of Sections 2.14 and 2.15 as if it were an assignee under paragraph (b) of this Section and (ii) shall not be entitled to receive any greater payment under Section 2.14 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided such Participant shall be subject to Section 10.7(a) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address

of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.6 shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto. The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in this paragraph (d).

(e)    Each Lender hereby acknowledges and agrees that it will assign such ratable portion of its Loans and Commitments as is required by, and in accordance with, the Solicitation Procedures.

10.7    <u>Adjustments; Set-off</u>. (a) Except to the extent that this Agreement or a court order expressly provides for payments to be allocated to a particular Lender, if any Lender (a "<u>Benefitted Lender</u>") shall receive any payment of all or part of the Obligations owing to it (other than in connection with an assignment made pursuant to Section 10.6), or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to the Chapter 11 Cases, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; <u>provided</u>, <u>however</u>, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right (notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application or motion to, hearing before, or order from, the Bankruptcy Court, but subject in all cases to the provisions of the DIP Order), without notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrower (whether at the

stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by set-off or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Borrower; provided that if any Defaulting Lender shall exercise any such right of set-off, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such application made by such Lender, provided that the failure to give such notice shall not affect the validity of such application.

10.8    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9    Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10    Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

**10.11    GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCES TO CONFLICT OF LAWS PRINCIPLES, EXCEPT TO THE EXTENT THE LAW OF THE STATE OF NEW YORK IS SUPERSEDED BY THE BANKRUPTCY CODE.**

10.12    Submission to Jurisdiction; Waivers.  The Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition

and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Bankruptcy Court and, to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York and the courts of the United States for the Southern District of New York, in each case sitting in the City and County of New York, and appellate courts from any thereof; <u>provided</u>, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower, as the case may be at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any indirect, special, exemplary, punitive or consequential damages.

10.13   <u>Acknowledgements</u>.  The Borrower hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Credit Party has been, is, and will be acting solely as a principal (except that the Administrative Agent is acting as an agent on behalf of the Lenders)

and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

10.14    <u>Releases of Guarantees and Liens</u>.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in Section 11.1.  Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, in no event shall the Administrative Agent be obligated to execute or deliver any document evidencing any release or re-conveyance of Collateral without receipt of a certificate executed by the Chief Financial Officer or Controller of the Borrower certifying that such release complies with this Agreement and the other Loan Documents, and that all conditions precedent to such release or re-conveyance have been complied with.

10.15    <u>Confidentiality</u>.  The Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is clearly designated by the provider thereof in writing on any such materials as confidential; <u>provided</u> that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof (subject to the limitations set forth in the second sentence of Section 10.6(b)(iv) with respect to the Register), (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) on a need-to-know basis, to its employees, directors, agents, attorneys, accountants, auditors, and other professional advisors or those of any of its affiliates (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential pursuant to the terms hereof), (d) in response to any order of any court or other Governmental Authority or as may otherwise be requested or demanded by any Governmental Authority or required pursuant to any Requirement of Law, (e) if required to do so in connection with any litigation or similar proceeding; provided that the Administrative Agent and each Lender, as applicable, shall cooperate with the Borrower in any attempt by the Borrower to seek a protective order, (f) that has been publicly disclosed or is or becomes publicly known or is information obtained by the Administrative Agent or any Lender from sources other than a Loan Party; provided that such source is not, to the knowledge of the Administrative Agent or such Lender, bound by an obligation of confidentiality, (g) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that

requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (h) in connection with the exercise of any right or remedy hereunder or under any other Loan Document or (i) if agreed by the Borrower in its sole discretion, to any other Person; provided further that any materials created by the Administrative Agent without reliance on non-public information provided by and designated confidential by a Loan Party (as set forth above) shall not be considered confidential.

10.16  **WAIVERS OF JURY TRIAL.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

10.17  USA Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

10.18  Electronic Systems.

(a)  Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak, ClearPar or a substantially similar Electronic System (as defined below).

(b)  Any Electronic System used by the Administrative Agent is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of such Electronic Systems and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or any Electronic System. In no event shall the Administrative Agent or any of its employees, agents, officers and other representatives (collectively, the "Agent Parties") have any liability to the Borrower or the other Loan Parties, any Lender any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrowers', any Loan Party's or the Administrative Agent's transmission of communications through an Electronic System.

(c)  The Borrower acknowledges (i) that (to the extent applicable) the Administrative Agent may make available to the Lenders materials or information provided by or on behalf of any Borrower hereunder (the "Borrower Materials") by posting Borrower Materials on Intralinks, SyndTrak Online or another Electronic System and (ii) that certain of the Lenders may be "public-side" Lenders (i.e., Lenders, or representatives thereof, that do not wish to receive material non-public information with respect to the Loan Parties or their securities)

(each, a "Public-Sider").  The Borrower hereby agrees that it will identify that portion of the Borrower Materials (including, without limitation, the Borrower Materials delivered pursuant to Sections 2.3, 5.3, 6.10, 6.11(b), 6.14 and 6.15) that may be distributed to the Public-Siders and that (v) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (w) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its Affiliates or any of their respective securities for purposes of United States Federal and state securities laws; (x) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Electronic System designated "Public Side Information"; (y) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Electronic System not designated "Public Side Information"; and (z) to the extent any Borrower Materials delivered pursuant to Sections 2.3 and 5.3 (or, to the extent reasonably requested by the Administrative Agent or the Required Lenders, any other Borrower Materials) are not marked "PUBLIC", the Borrower shall have prepared an additional version thereof suitable for Public-Siders (including any necessary redactions) that is marked "PUBLIC", and shall deliver both versions thereof.

(d)     For purposes of this Section 10.18, (i) "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to this Agreement, any other Loan Document or the transactions contemplated hereby or therein which is distributed by the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through an Electronic System; and (ii) "Electronic System" means any electronic system, including e-mail, e-fax, Intralinks®, ClearPar® and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Administrative Agent, any Agent Parties or any other Person, providing for access to data protected by passcodes or other security system.

SECTION 11.  PRIORITY AND LIENS/RANKING/COLLATERAL/RELEASE

11.1    Collateral; Grant of Lien and Security Interest.  Pursuant to the DIP Order and in accordance with the terms thereof, as security for the Secured Obligations, the Administrative Agent, for its own benefit and for the benefit of the Lenders, is hereby granted, effective and perfected upon the entry of the Interim Order and (when applicable) the Final Order (without the necessity for the execution, recordation or filing of any mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral), the following security interests in and liens on all of the property identified in clauses (a), (b) and (c) below, which security interests and liens shall be (i) junior in lien and payment priority to the Prepetition Revolving Facility Liens and the Prepetition Revolving Facility Adequate Protection Liens, except for such liens on and security interests in the Funding Account and the Carve-Out Account, which at all times shall be subject to a first priority security interest and lien in favor of the Secured Parties, and (ii) subject to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out as described in the DIP Order:

(a)     First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien on all pre- and post-petition property of the Borrower, including without limitation the Funding Account and the Carve-Out Account, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), and the proceeds of all the foregoing, other than the proceeds of the Funding Account and the Carve-Out Account, which are subject to the provisions of paragraph 11(a) of the Interim Order.  For purposes of the DIP Order and the Loan Documents, Unencumbered Property does not include the Borrower's claims and causes of action (or any proceeds therefrom) under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or otherwise (collectively, the "Avoidance Actions"), but, subject to and effective upon entry of the Final Order, Unencumbered Property shall include all proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise (the "Avoidance Proceeds").

(b)     Liens Priming Certain Prepetition Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon all pre- and post-petition property of the Borrower and its estate, whether now existing or hereafter acquired, that is subject to any liens in existence as of the Petition Date, except for (i) the Prepetition Revolving Facility Liens and the Prepetition Revolving Facility Adequate Protection Liens (other than with respect to the Funding Account and the Carve-Out Account) and (ii) the Permitted Senior Liens.

(c)     Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Borrower (other than the property described in clauses (a) and (b) of this Section 11.1, as to which the liens and security interests in favor of the Administrative Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence on the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interest and lien is immediately junior to such valid, perfected and unavoidable liens.

(d)     Survival.  Except as expressly provided in the DIP Order or in this Agreement, the DIP Liens, the DIP Superpriority Claims and all other rights and remedies of the Administrative Agent and the Lenders granted by the DIP Order and the Loan Documents shall continue in full force and effect until the Discharge of Secured Obligations has occurred, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or appointing a trustee or examiner with expanded powers in any of the Chapter 11 Cases, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent

permitted by the Loan Documents) or (iii) the entry of an order confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases.  The terms and provisions of the DIP Order and the Loan Documents shall continue in the Chapter 11 Cases, and in any successor or superseding cases.

11.2   <u>Administrative Priority</u>.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Secured Obligations shall constitute allowed claims against the Debtors with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under section 105, 326, 328, 330, 331, 503(b), 506(c) (subject to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims are secured by a judgment lien or other non-consensual lien, levy or attachment, which claims (the "<u>DIP Superpriority Claims</u>") shall be payable from and have recourse to all pre-and post-petition property of the Debtors and the Debtors' estates and all proceeds thereof, including, effective upon entry of the Final Order, any Avoidance Proceeds (but excluding Avoidance Actions), subject, solely to (i) the Prepetition Revolving Facility Section 507(b) Claim; (ii) the provisions of paragraph 16 of the Interim Order, and (iii) in the event of the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out; <u>provided</u>, <u>however</u>, that the Carve-Out Claim shall constitute a superpriority claim of the Secured Parties against the Debtors that is senior in priority to the Prepetition Revolving Facility Section 507(b) Claim.

11.3   <u>Grants, Rights and Remedies</u>.  The Liens and security interests granted pursuant to Section 11.1 and the administrative priority granted pursuant to Section 11.2 may be independently granted by the Guarantee and Collateral Agreement and by other Loan Documents hereafter entered into.  This Agreement, the DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.  In connection with paragraph 13 of the Interim Order (and any analogous provision contained in the Final Order), each Lender hereby acknowledges that the Administrative Agent is not required (but is authorized) to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over any of the Collateral, or take any other action in order to validate and perfect, the liens and security interests granted to the Administrative Agent, for the benefit of the Administrative Agent and the Lenders, under the Loan Documents or the Interim Order.

11.4   <u>Prepetition Senior Secured Note Trustee</u>.  Each Lender who is also a Prepetition Senior Secured Note Holder hereby waives (solely in such party's capacity as a Prepetition Senior Secured Note Holder) any and all claims, actions or suits against the Prepetition Senior Secured Note Trustee in connection with or arising out of any actions taken by the Prepetition Senior Secured Note Trustee pursuant to the Prepetition Senior Secured Note Documents on or prior to the Closing Date.  The Prepetition Senior Secured Note Trustee shall be a third party beneficiary of this provision.

11.5   <u>Plan Term Sheet</u>.  The Borrower and the Lenders party hereto on the date of this Agreement hereby acknowledge that the terms set forth in the Plan Term Sheet have been agreed to by the Borrower and such Lenders.

11.6    <u>Conflicts</u>.  In the event of any inconsistency between the provisions of the DIP Order and any of the Loan Documents, the provisions of the DIP Order shall govern.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

MAGNETATION LLC

By:_____
        Name:
        Title:

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Administrative Agent


By:_____
     Name:
     Title:

_____, as a Lender


By:_____
    Name:
    Title:

Exhibit B

Collateral and Guarantee Agreement

GUARANTEE AND COLLATERAL AGREEMENT


made by


MAGNETATION LLC


and certain of its Subsidiaries


in favor of


WILMINGTON TRUST, NATIONAL ASSOCIATION,

as Administrative Agent


Dated as of May [__], 2015

# TABLE OF CONTENTS

Page

SECTION 1.    DEFINED TERMS ............................................................................................... 2
    1.1    Definitions ...................................................................................................... 2
    1.2    Other Definitional Provisions ....................................................................... 4

SECTION 2.    GUARANTEE ..................................................................................................... 5
    2.1    Guarantee ....................................................................................................... 5
    2.2    Right of Contribution ..................................................................................... 5
    2.3    No Subrogation .............................................................................................. 5
    2.4    Amendments, etc. with respect to the Borrower Obligations ........................ 6
    2.5    Guarantee Absolute and Unconditional ......................................................... 6
    2.6    Reinstatement ................................................................................................. 7
    2.7    Payments ........................................................................................................ 7

SECTION 3.    GRANT OF SECURITY INTEREST ................................................................. 7
    3.1    Collateral; Grant of Lien and Security Interest. ............................................ 7

SECTION 4.    REPRESENTATIONS AND WARRANTIES ..................................................... 9
    4.1    Title; No Other Liens ..................................................................................... 9
    4.2    Intentionally Omitted ..................................................................................... 9
    4.3    Jurisdiction of Organization; Chief Executive Office .................................... 9
    4.4    Inventory and Equipment ............................................................................. 10
    4.5    Farm Products .............................................................................................. 10
    4.6    Investment Property ..................................................................................... 10
    4.7    Receivables .................................................................................................. 10
    4.8    Contracts ...................................................................................................... 10
    4.9    Intellectual Property .................................................................................... 11
    4.10    Commercial Tort Claims ............................................................................. 11

SECTION 5.    COVENANTS .................................................................................................. 11
    5.1    Delivery of Instruments, Certificated Securities and Chattel Paper ............ 12
    5.2    Maintenance of Insurance ............................................................................ 12
    5.3    Payment of Obligations ............................................................................... 12
    5.4    Maintenance of Perfected Security Interest; Further Documentation ........... 12
    5.5    Changes in Name, etc .................................................................................. 13
    5.6    Notices ......................................................................................................... 13
    5.7    Investment Property ..................................................................................... 13
    5.8    Receivables .................................................................................................. 14
    5.9    Contracts ...................................................................................................... 14
    5.10    Intellectual Property .................................................................................... 14
    5.11    Commercial Tort Claims ............................................................................. 16

SECTION 6.    REMEDIAL PROVISIONS .............................................................................. 16
    6.1    Certain Matters Relating to Receivables...................................................... 16
    6.2    Communications with Obligors; Grantors Remain Liable ........................... 16
    6.3    Pledged Stock .............................................................................................. 17
    6.4    Proceeds to be Turned Over To Administrative Agent.................................. 18

i

| | 6.5 | Application of Proceeds | 18 |
| | 6.6 | Code and Other Remedies | 18 |
| | 6.7 | Registration Rights | 19 |
| | 6.8 | Subordination | 20 |
| | 6.9 | Deficiency | 20 |
| SECTION 7. | | THE ADMINISTRATIVE AGENT | 20 |
| | 7.1 | Administrative Agent's Appointment as Attorney-in-Fact, etc | 20 |
| | 7.2 | Duty of Administrative Agent | 21 |
| | 7.3 | Execution of Financing Statements | 22 |
| | 7.4 | Authority of Administrative Agent | 23 |
| SECTION 8. | | MISCELLANEOUS | 23 |
| | 8.1 | Amendments in Writing | 23 |
| | 8.2 | Notices | 23 |
| | 8.3 | No Waiver by Course of Conduct; Cumulative Remedies | 23 |
| | 8.4 | Enforcement Expenses; Indemnification | 23 |
| | 8.5 | Successors and Assigns | 24 |
| | 8.6 | Set-Off | 24 |
| | 8.7 | Counterparts | 24 |
| | 8.8 | Severability | 24 |
| | 8.9 | Section Headings | 24 |
| | 8.10 | Integration | 24 |
| | 8.11 | **GOVERNING LAW** | 24 |
| | 8.12 | Submission To Jurisdiction; Waivers | 25 |
| | 8.13 | Acknowledgements | 25 |
| | 8.14 | Additional Grantors | 25 |
| | 8.15 | Release | 26 |
| | 8.16 | **WAIVER OF JURY TRIAL** | 26 |
| | 8.17 | Conflicts | 26 |

<u>SCHEDULES</u>

Schedule 1    Notice Addresses
Schedule 2    Investment Property
Schedule 3    [RESERVED]
Schedule 4    Jurisdictions of Organization and Chief Executive Offices
Schedule 5    Inventory and Equipment Locations
Schedule 6    Intellectual Property
Schedule 7    Contracts

## GUARANTEE AND COLLATERAL AGREEMENT

GUARANTEE AND COLLATERAL AGREEMENT, dated as of May [__], 2015, made by each of the signatories hereto (together with any other entity that may become a party hereto as provided herein, the "Grantors"), each a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, in favor of Wilmington Trust, National Association, as Administrative Agent (in such capacity, the "Administrative Agent") for the banks and other financial institutions or entities (the "Lenders") from time to time parties to the Debtor-in-Possession Credit Agreement, dated as of May [__], 2015 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), among Magnetation LLC (the "Borrower"), the Lenders and the Administrative Agent.

W I T N E S S E T H:

WHEREAS, pursuant to the DIP Credit Agreement, the Lenders have severally agreed to make extensions of credit to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, the Borrower is a member of an affiliated group of companies that includes each other Grantor;

WHEREAS, the proceeds of the extensions of credit under the DIP Credit Agreement will be used in part to enable the Borrower to make valuable transfers to one or more of the other Grantors in connection with the operation of their respective businesses;

WHEREAS, the Borrower and the other Grantors are engaged in related businesses, and each Grantor will derive substantial direct and indirect benefit from the making of the extensions of credit under the DIP Credit Agreement;

WHEREAS, it is a condition precedent to the obligation of the Lenders to make their respective extensions of credit to the Borrower under the DIP Credit Agreement that the Grantors shall have executed and delivered this Agreement to the Administrative Agent for the ratable benefit of the Secured Parties and granted a security interest, pledge and Lien on the Collateral (as defined below) as more fully set forth in the DIP Order;

WHEREAS, the grant of such security interest, pledge and Lien has been authorized pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code by the DIP Order;

WHEREAS, to supplement the DIP Order without in any way diminishing or limiting the effect of the DIP Order or the security interest, pledge and Lien granted thereunder, the parties hereto desire to more fully set forth their respective rights in connection with such security interest, pledge and Lien;

WHEREAS, this Agreement has been approved by the DIP Order; and

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent and the Lenders to enter into the DIP Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Administrative Agent, for the ratable benefit of the Secured Parties, as follows:

SECTION 1.    DEFINED TERMS

1.1    <u>Definitions</u>. (a)  Unless otherwise defined herein, terms defined in the DIP Credit Agreement and used herein shall have the meanings given to them in the DIP Credit Agreement, and the following terms are used herein as defined in the New York UCC:  Accounts, As-Extracted Collateral, Certificated Security, Chattel Paper, Commercial Tort Claims, Documents, Equipment, Farm Products, Fixtures, General Intangibles, Instruments, Inventory, Letter-of-Credit Rights and Supporting Obligations.

(b)    The following terms shall have the following meanings:

"<u>Agreement</u>":  this Guarantee and Collateral Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"<u>Borrower Obligations</u>":  the collective reference to the unpaid principal of and interest on the Loans and all other obligations and liabilities of the Borrower (including, without limitation, interest accruing at the then applicable rate provided in the DIP Credit Agreement after the maturity of the Loans and interest accruing at the then applicable rate provided in the DIP Credit Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) to the Administrative Agent or any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, the DIP Credit Agreement, this Agreement, the other Loan Documents, or any other document made, delivered or given in connection with any of the foregoing, in each case whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to the Lenders that are required to be paid by the Borrower pursuant to the terms of any of the foregoing agreements).

"<u>Collateral</u>":  as defined in the DIP Credit Agreement.

"<u>Collateral Account</u>":  any collateral account established by the Administrative Agent as provided in Section 6.1 or 6.4.

"<u>Contracts</u>":  the contracts and agreements listed in Schedule 7, as the same may be amended, supplemented or otherwise modified from time to time, including, without limitation, (i) all rights of any Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of any Grantor to damages arising thereunder and (iii) all rights of any Grantor to perform and to exercise all remedies thereunder.

"<u>Copyrights</u>":  (i) all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished (including, without limitation, those listed in Schedule 6), all registrations and recordings thereof, and all applications in connection therewith, including, without limitation, all registrations, recordings and applications in the United States Copyright Office, and (ii) the right to obtain all renewals thereof.

"<u>Copyright Licenses</u>":  any written agreement naming any Grantor as licensor or licensee (including, without limitation, those listed in Schedule 6), granting any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright.

"Deposit Account":  as defined in the Uniform Commercial Code of any applicable jurisdiction and, in any event, including, without limitation, any demand, time, savings, passbook or like account maintained with a depositary institution.

"Foreign Subsidiary":  any Subsidiary organized under the laws of any jurisdiction outside the United States of America.

"Foreign Subsidiary Voting Stock":  the voting Capital Stock of any Foreign Subsidiary.

"Guarantor Obligations":  with respect to any Guarantor, all obligations and liabilities of such Guarantor which may arise under or in connection with this Agreement (including, without limitation, Section 2) or any other Loan Document to which such Guarantor is a party, in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to the Lenders that are required to be paid by such Guarantor pursuant to the terms of this Agreement or any other Loan Document).

"Guarantors":  the collective reference to each Grantor other than the Borrower.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Note":  any promissory note evidencing loans made by any Grantor to the Borrower or any of its Subsidiaries.

"Investment Property":  the collective reference to (i) all "investment property" as such term is defined in Section 9-102(a)(49) of the New York UCC (other than any Foreign Subsidiary Voting Stock excluded from the definition of "Pledged Stock") and (ii) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Stock.

"Issuers":  the collective reference to each issuer of any Investment Property.

"Leased Real Property": any real property subject to Real Estate Leases.

"New York UCC":  the Uniform Commercial Code as from time to time in effect in the State of New York.

"Obligations":  (i) in the case of the Borrower, the Borrower Obligations, and (ii) in the case of each Guarantor, its Guarantor Obligations.

"Patents":  (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, including, without limitation, any of the foregoing referred to in Schedule 6, (ii) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, including, without limitation, any of the foregoing referred to in Schedule 6, and (iii) all rights to obtain any reissues or extensions of the foregoing.

"Patent License":  all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent, including, without limitation, any of the foregoing referred to in Schedule 6.

"Pledged Notes":  all promissory notes listed on Schedule 2, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor (other than promissory notes issued in connection with extensions of trade credit by any Grantor in the ordinary course of business).

"Pledged Stock":  the shares of Capital Stock listed on Schedule 2, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect; provided that in no event shall more than 66% of the total outstanding Foreign Subsidiary Voting Stock of any Foreign Subsidiary be required to be pledged hereunder.

"Proceeds":  all "proceeds" as such term is defined in Section 9-102(a)(64) of the New York UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Receivable":  any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including, without limitation, any Account).

"Secured Parties":  the collective reference to the Administrative Agent, the Lenders and any affiliate of any Lender to which Borrower Obligations or Guarantor Obligations, as applicable, are owed.

"Securities Act":  the Securities Act of 1933, as amended.

"Trademarks":  (i) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including, without limitation, any of the foregoing referred to in Schedule 6, and (ii) the right to obtain all renewals thereof.

"Trademark License":  any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including, without limitation, any of the foregoing referred to in Schedule 6.

1.2    Other Definitional Provisions.  (a)  The words "hereof," "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)     Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

## SECTION 2.    GUARANTEE

2.1     <u>Guarantee</u>.  (a)  Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Administrative Agent, for the ratable benefit of the Secured Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Borrower when due (whether at the stated maturity, by acceleration or otherwise) of the Borrower Obligations.

(b)     Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Loan Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in Section 2.2).

(c)     Each Guarantor agrees that the Borrower Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 2 or affecting the rights and remedies of the Administrative Agent or any Secured Party hereunder.

(d)     The guarantee contained in this Section 2 shall remain in full force and effect until all the Borrower Obligations and the obligations of each Guarantor under the guarantee contained in this Section 2 shall have been satisfied by payment in full and the Commitments shall be terminated, notwithstanding that from time to time during the term of the DIP Credit Agreement the Borrower may be free from any Borrower Obligations.

(e)     No payment made by the Borrower, any of the Guarantors, any other guarantor or any other Person or received or collected by the Administrative Agent or any Secured Party from the Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Borrower Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Borrower Obligations or any payment received or collected from such Guarantor in respect of the Borrower Obligations), remain liable for the Borrower Obligations up to the maximum liability of such Guarantor hereunder until the Borrower Obligations are paid in full and the Term Loan Commitments are terminated.

2.2     <u>Right of Contribution</u>.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 2.3.  The provisions of this Section 2.2 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Secured Parties, and each Guarantor shall remain liable to the Administrative Agent and the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

2.3     <u>No Subrogation</u>.  Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the Administrative Agent or any Lender, no Guarantor

shall be entitled to be subrogated to any of the rights of the Administrative Agent or any Lender against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by the Administrative Agent or any Lender for the payment of the Borrower Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to the Administrative Agent and the Lenders by the Borrower on account of the Borrower Obligations are paid in full and the Term Loan Commitments are terminated.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Borrower Obligations shall not have been paid in full, such amount shall be held by such Guarantor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Administrative Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Administrative Agent, if required), to be applied against the Borrower Obligations, whether matured or unmatured, pursuant to Section 6.5.

2.4    _Amendments, etc. with respect to the Borrower Obligations_.  Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Borrower Obligations made by the Administrative Agent or any Lender may be rescinded by the Administrative Agent or such Lender and any of the Borrower Obligations continued, and the Borrower Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Administrative Agent or any Lender, and the DIP Credit Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Administrative Agent or any Lender for the payment of the Borrower Obligations may be sold, exchanged, waived, surrendered or released.  Neither the Administrative Agent nor any Lender shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Borrower Obligations or for the guarantee contained in this Section 2 or any property subject thereto.

2.5    _Guarantee Absolute and Unconditional_.  Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Borrower Obligations and notice of or proof of reliance by the Administrative Agent or any Secured Party upon the guarantee contained in this Section 2 or acceptance of the guarantee contained in this Section 2; the Borrower Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Section 2; and all dealings between the Borrower and any of the Guarantors, on the one hand, and the Administrative Agent and the Secured Parties, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Section 2.  Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Guarantors with respect to the Borrower Obligations.  Each Guarantor understands and agrees that the guarantee contained in this Section 2 shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of the DIP Credit Agreement or any other Loan Document, any of the Borrower Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Administrative Agent or any Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against the Administrative Agent or any Lender, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or such Guarantor) which constitutes, or might

be construed to constitute, an equitable or legal discharge of the Borrower for the Borrower Obligations, or of such Guarantor under the guarantee contained in this Section 2, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Administrative Agent or any Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Borrower Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent or any Lender against any Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

2.6    <u>Reinstatement</u>. The guarantee contained in this Section 2 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Borrower Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

2.7    <u>Payments</u>. Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in Dollars at the Funding Office.

SECTION 3.    GRANT OF SECURITY INTEREST

3.1    <u>Collateral; Grant of Lien and Security Interest</u>.

(a)    <u>Grant of Lien and Security Interest</u>. Pursuant to the DIP Order and in accordance with the terms thereof, as security for the Secured Obligations, the Administrative Agent, for its own benefit and for the benefit of the Lenders, is hereby granted, effective and perfected upon the entry of the Interim Order and (when applicable) the Final Order (without the necessity for the execution, recordation or filing of any mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral), the following security interests in and liens on all of the property identified in clauses (i), (ii) and (iii) below, which security interests and liens shall be (x) junior in lien and payment priority to the Prepetition Revolving Facility Liens and the Prepetition Revolving Facility Adequate Protection Liens, except for such liens on and security interests in the Funding Account and the Carve-Out Account, which at all times shall be subject to a first priority security interest and lien in favor of the Secured Parties, and (y) subject to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out as described in the DIP Order:

(i)    <u>First Lien on Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien on all pre- and post-petition property of each Grantor, including without limitation the Funding Account and the Carve-Out Account, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens (collectively, "<u>Unencumbered Property</u>"), and the proceeds of all the

foregoing, other than the proceeds of the Funding Account and the Carve-Out Account, which are subject to the provisions of paragraph 11(a) of the Interim Order. For purposes of the DIP Order and the Loan Documents, Unencumbered Property does not include the Grantors' claims and causes of action (or any proceeds therefrom) under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or otherwise (collectively, the "Avoidance Actions"), but, subject to and effective upon entry of the Final Order, Unencumbered Property shall include all proceeds or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or otherwise (the "Avoidance Proceeds").

(ii)     Liens Priming Certain Prepetition Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and lien upon all pre- and post-petition property of each Grantor and its estate, whether now existing or hereafter acquired, that is subject to any liens in existence as of the Petition Date, except for (i) the Prepetition Revolving Facility Liens and the Prepetition Revolving Facility Adequate Protection Liens (other than with respect to the Funding Account and the Carve-Out Account) and (ii) the Permitted Senior Liens.

(iii)     Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of each Grantor (other than property described in clause (i) and (ii) of this Section 3.1(a), as to which the liens and security interests in favor of the Administrative Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence on the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interest and lien is immediately junior to such valid, perfected and unavoidable liens.

(iv)     Survival. Except as expressly provided in the DIP Order or in the DIP Credit Agreement, the DIP Liens, the DIP Superpriority Claims and all other rights and remedies of the Administrative Agent and the Lenders granted by the DIP Order and the Loan Documents shall continue in full force and effect until the Discharge of Secured Obligations has occurred, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases, terminating the joint administration of the Chapter 11 Cases or appointing a trustee or examiner with expanded powers in any of the Chapter 11 Cases, (ii) the entry of an order approving the sale of any Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the Loan Documents) or (iii) the entry of an order confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases. The terms and provisions of the DIP Order and the Loan Documents shall continue in the Chapter 11 Cases, and in any successor or superseding cases.

(b)     Administrative Priority. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Secured Obligations shall constitute allowed claims against the Grantors with priority over any and all claims against the Grantors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under section 105, 326, 328, 330, 331, 503(b), 506(c) (subject to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims are secured by a judgment lien or other non-consensual lien, levy or attachment, which claims (the "DIP Superpriority Claims") shall be payable from and have recourse to all pre-and post-petition property of the Grantors and the Grantors'

estates and all proceeds thereof, including, effective upon entry of the Final Order, any Avoidance Proceeds (but excluding Avoidance Actions), subject, solely to (i) the Prepetition Revolving Facility Section 507(b) Claim; (ii) the provisions of paragraph 16 of the Interim Order, and (iii) in the event of the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out; provided, however, that the Carve-Out Claim shall constitute a superpriority claim of the Secured Parties against the Debtors that is senior in priority to the Prepetition Revolving Facility Section 507(b) Claim.

(c)    Grants, Rights and Remedies.  The Liens and security interests granted pursuant to Section 3.1(a) and the administrative priority granted pursuant to Section 3.1(b) may be independently granted by the DIP Credit Agreement and by other Loan Documents hereafter entered into.  This Agreement, the DIP Credit Agreement, the DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative.  In connection with paragraph 13 of the Interim Order (and any analogous provision contained in the Final Order), each Lender hereby acknowledges that the Administrative Agent is not required (but is authorized) to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over any of the Collateral, or take any other action in order to validate and perfect, the liens and security interests granted to the Administrative Agent, for the benefit of the Administrative Agent and the Lenders, under the Loan Documents or the Interim Order.

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into the DIP Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby represents and warrants to the Administrative Agent and each Lender that:

4.1    Title; No Other Liens.  Except for the security interest granted to the Administrative Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and the other Liens permitted to exist on the Collateral by the DIP Credit Agreement, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as have been filed in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, pursuant to this Agreement or as are permitted by the DIP Credit Agreement.  For the avoidance of doubt, it is understood and agreed that any Grantor may, as part of its business, grant licenses to third parties to use Intellectual Property owned or developed by a Grantor.  For purposes of this Agreement and the other Loan Documents, such licensing activity shall not constitute a "Lien" on such Intellectual Property.  Each of the Administrative Agent and each Lender understands that any such licenses may be exclusive to the applicable licensees, and such exclusivity provisions may limit the ability of the Administrative Agent to utilize, sell, lease or transfer the related Intellectual Property or otherwise realize value from such Intellectual Property pursuant hereto.

4.2    Intentionally Omitted.

4.3    Jurisdiction of Organization; Chief Executive Office.  On the date hereof, such Grantor's jurisdiction of organization, identification number from the jurisdiction of organization (if any), and the location of such Grantor's chief executive office or sole place of business or principal residence, as the case may be, are specified on Schedule 4.  Such Grantor has furnished to the Administrative Agent a certified charter, certificate of incorporation or other organization document and good standing certificate as of a date which is recent to the date hereof.

4.4    <u>Inventory and Equipment</u>.  On the date hereof, the Inventory and the Equipment (other than mobile goods) are kept at the locations listed on Schedule 5.

4.5    <u>Farm Products</u>.  None of the Collateral constitutes, or is the Proceeds of, Farm Products.

4.6    <u>Investment Property</u>.  (a)  The shares of Pledged Stock pledged by such Grantor hereunder constitute all the issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor or, in the case of Foreign Subsidiary Voting Stock, if less, 66% of the outstanding Foreign Subsidiary Voting Stock of each relevant Issuer.

(b)    All the shares of the Pledged Stock have been duly and validly issued and are fully paid and nonassessable.

(c)    Each of the Pledged Notes constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(d)    Such Grantor is the record and beneficial owner of, and has good and marketable title to, the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except the security interests created by the DIP Order and the Liens permitted under the DIP Credit Agreement.

4.7    <u>Receivables</u>.  (a)  No amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Administrative Agent.

(b)    None of the obligors on any Receivables is a Governmental Authority.

(c)    The amounts represented by such Grantor to the Lenders from time to time as owing to such Grantor in respect of the Receivables will at such times be accurate.

4.8    <u>Contracts</u>.  (a)   No consent of any party (other than such Grantor) to any Contract is required, or purports to be required, in connection with the execution, delivery and performance of this Agreement, except as has been obtained.

(b)    Each Contract is in full force and effect and constitutes a valid and legally enforceable obligation of the parties thereto, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

(c)    No consent or authorization of, filing with or other act by or in respect of any Governmental Authority is required in connection with the execution, delivery, performance, validity or enforceability of any of the Contracts by any party thereto other than those which have been duly obtained, made or performed, are in full force and effect and do not subject the scope of any such Contract to any material adverse limitation, either specific or general in nature.

(d)      Neither such Grantor nor (to the best of such Grantor's knowledge) any of the other parties to the Contracts is in default in the performance or observance of any of the terms thereof in any manner that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(e)      The right, title and interest of such Grantor in, to and under the Contracts are not subject to any defenses, offsets, counterclaims or claims that, in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(f)      Such Grantor has delivered to the Ad Hoc Senior Secured Note Holder Committee or its professionals a complete and correct copy of the Material Contracts, including any amendments, supplements or modifications with respect to any of the foregoing.

(g)      No amount payable to such Grantor under or in connection with any Contract is evidenced by any Instrument or Chattel Paper which has not been delivered to the Administrative Agent.

(h)      None of the parties to any Contract is a Governmental Authority.

4.9      Intellectual Property.  (a)  Schedule 6 lists all Intellectual Property owned by or licensed to such Grantor in its own name on the date hereof.

(b)      On the date hereof, all material Intellectual Property listed on Schedule 6 is valid, subsisting, unexpired and enforceable, has not been abandoned and does not infringe the intellectual property rights of any other Person.

(c)      Except as set forth in Schedule 6, on the date hereof, none of the Intellectual Property is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

(d)      No holding, decision or judgment has been rendered by any Governmental Authority which would limit, cancel or question the validity of, or such Grantor's rights in, any Intellectual Property in any respect that could reasonably be expected to have a Material Adverse Effect.

(e)      No action or proceeding is pending, or, to the knowledge of such Grantor, threatened, on the date hereof (i) seeking to limit, cancel or question the validity of any Intellectual Property listed on Schedule 6 or such Grantor's ownership interest therein, or (ii) which, if adversely determined, would have a material adverse effect on the value of any Intellectual Property.

4.10     Commercial Tort Claims

(a)      On the date hereof, no Grantor has rights in any Commercial Tort Claim with potential value in excess of $100,000.

(b)      [Reserved.]


SECTION 5.    COVENANTS

Each Grantor covenants and agrees with the Administrative Agent and the Lenders that, from and after the date of this Agreement until the Obligations shall have been paid in full and the Commitments shall have terminated:

5.1     Delivery of Instruments, Certificated Securities and Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, such Instrument, Certificated Security or Chattel Paper shall be immediately delivered to the Administrative Agent, duly indorsed in a manner reasonably satisfactory to the Required Lenders, to be held as Collateral pursuant to this Agreement.

5.2     Maintenance of Insurance.  (a)  Such Grantor will maintain, with financially sound and reputable companies, insurance policies (i) insuring the Inventory and Equipment against loss by fire, explosion, theft and such other casualties as may be reasonably satisfactory to the Required Lenders and (ii) insuring such Grantor, the Administrative Agent and the Lenders against liability for personal injury and property damage relating to such Inventory and Equipment, such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Administrative Agent.

(b)     All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent as insured party or loss payee, (iii) if reasonably requested by the Required Lenders, include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Required Lenders.

(c)     The Borrower shall deliver to the Administrative Agent and the Lenders a report of a reputable insurance broker with respect to such insurance substantially concurrently with each delivery of the Borrower's audited annual financial statements and such supplemental reports with respect thereto as the Required Lenders may from time to time reasonably request.

5.3     Payment of Obligations.  Such Grantor will pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, arising after the Petition Date, imposed upon the Collateral or in respect of income or profits therefrom, as well as all claims of any kind (including, without limitation, claims for labor, materials and supplies) against or with respect to the Collateral, except where (i) the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Grantor, and such proceedings could not reasonably be expected to result in the sale, forfeiture or loss of any material portion of the Collateral or any interest therein, or (ii) non-payment and discharge thereof is permitted or required under the Bankruptcy Code or order of the Bankruptcy Court.

5.4     Maintenance of Perfected Security Interest; Further Documentation.  (a)  Such Grantor shall create and maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 3.1 and shall defend such security interest against the claims and demands of all Persons whomsoever, subject to the rights of such Grantor under the Loan Documents to dispose of the Collateral.

(b)     Such Grantor will furnish (without further order of the Bankruptcy Court) to the Administrative Agent and the Lenders from time to time statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as the Administrative Agent or the Required Lenders may reasonably request, all in reasonable detail.

(c)     At any time and from time to time, upon the written request of the Administrative Agent, and at the sole expense of such Grantor, such Grantor will promptly and duly execute and deliver, and record or authorize the Administrative Agent to record, such further instruments and documents and take such further actions as are necessary, or as the Administrative Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein

granted, including, without limitation, (i) filing any financing or continuation statements under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby and (ii) in the case of Investment Property, Deposit Accounts, Letter-of-Credit Rights and any other relevant Collateral, taking any actions necessary to enable the Administrative Agent to obtain "control" (within the meaning of the applicable Uniform Commercial Code) with respect thereto.

5.5    Changes in Name, etc.  Such Grantor will not, except upon 15 days' prior written notice to the Administrative Agent and delivery to the Administrative Agent of all additional executed financing statements and other documents reasonably requested by the Administrative Agent to maintain the validity, perfection and priority of the security interests provided for herein, (i) change its jurisdiction of organization or the location of its chief executive office or sole place of business or principal residence from that referred to in Section 4.3 or (ii) change its name.

5.6    Notices.  Such Grantor will advise the Administrative Agent and the Lenders promptly, in reasonable detail, of:

(a)    any Lien (other than security interests created hereby or Liens permitted under the DIP Credit Agreement or pursuant to the DIP Order) on any of the Collateral which would adversely affect the ability of the Administrative Agent to exercise any of its remedies hereunder; and

(b)    of the occurrence of any other event which could reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or on the security interests created hereby.

5.7    Investment Property.  (a) If such Grantor shall become entitled to receive or shall receive any certificate (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Capital Stock of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Stock, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Administrative Agent and the Lenders, hold the same in trust for the Administrative Agent and the Lenders and deliver the same forthwith to the Administrative Agent in the exact form received, duly indorsed by such Grantor to the Administrative Agent, if required, together with an undated stock power covering such certificate duly executed in blank by such Grantor and with, if the Administrative Agent so requests, signature guaranteed, to be held by the Administrative Agent, subject to the terms hereof, as additional collateral security for the Obligations.  Any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any Issuer shall be paid over to the Administrative Agent to be held by it hereunder as additional collateral security for the Obligations, and in case any distribution of capital shall be made on or in respect of the Investment Property or any property shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Administrative Agent, be delivered to the Administrative Agent to be held by it hereunder as additional collateral security for the Obligations.  If any sums of money or property so paid or distributed in respect of the Investment Property shall be received by such Grantor, such Grantor shall, until such money or property is paid or delivered to the Administrative Agent, hold such money or property in trust for the Administrative Agent and the Lenders, segregated from other funds of such Grantor, as additional collateral security for the Obligations.

(b)    Without the prior written consent of the Administrative Agent, such Grantor will not (i) vote to enable, or take any other action to permit, any Issuer to issue any Capital Stock of any

nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Capital Stock of any nature of any Issuer, (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property or Proceeds thereof (except pursuant to a transaction expressly permitted by the DIP Credit Agreement), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for (x) the security interests created by this Agreement, (y) Liens securing the Prepetition Revolving Obligations permitted by the DIP Credit Agreement and subject to the Intercreditor Agreement and the Superpriority Intercreditor Agreement and (z) Liens securing the Prepetition Senior Secured Notes permitted by the DIP Credit Agreement and subject to the Intercreditor Agreement or (iv) enter into any agreement or undertaking restricting the right or ability of such Grantor or the Administrative Agent to sell, assign or transfer any of the Investment Property or Proceeds thereof.

(c)     In the case of each Grantor which is an Issuer, such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify the Administrative Agent promptly in writing of the occurrence of any of the events described in Section 5.7(a) with respect to the Investment Property issued by it and (iii) the terms of Sections 6.3(c) and 6.7 shall apply to it, mutatis mutandis, with respect to all actions that may be required of it pursuant to Section 6.3(c) or 6.7 with respect to the Investment Property issued by it.

5.8     Receivables.  (a)  Other than in the ordinary course of business consistent with its past practices, such Grantor will not (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any Receivable, (iv) allow any credit or discount whatsoever on any Receivable or (v) amend, supplement or modify any Receivable in any manner that could adversely affect the value thereof.

(b)     Such Grantor will deliver to the Administrative Agent a copy of each material demand, notice or document received by it that questions or calls into doubt the validity or enforceability of more than 5% of the aggregate amount of the then outstanding Receivables.

5.9     Contracts.  (a)  Such Grantor will perform and comply in all material respects with all its obligations under the Contracts.

(b)     Such Grantor will not amend, modify, terminate or waive any provision of any Contract in any manner which could reasonably be expected to materially adversely affect the value of such Contract as Collateral.

(c)     Such Grantor will exercise promptly and diligently each and every material right which it may have under each Contract (other than any right of termination).

(d)     Such Grantor will deliver to the Administrative Agent a copy of each material demand, notice or document received by it relating in any way to any Contract that questions the validity or enforceability of such Contract.

5.10     Intellectual Property.  (a)  Such Grantor (either itself or through licensees) will (i) continue to use each material Trademark on each and every trademark class of goods applicable to its current line as reflected in its current catalogs, brochures and price lists in order to maintain such Trademark in full force free from any claim of abandonment for non-use, (ii) maintain as in the past the quality of products and services offered under such Trademark, (iii) use such Trademark with the

appropriate notice of registration and all other notices and legends required by applicable Requirements of Law, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless the Administrative Agent, for the ratable benefit of the Secured Parties, shall obtain a perfected security interest in such mark pursuant to this Agreement, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way if the consequence thereof would materially adversely affect the value of the Trademarks considered as a whole.

(b)     Such Grantor (either itself or through licensees) will not do any act, or omit to any act, whereby any material Patent may become forfeited, abandoned or dedicated to the public.

(c)     Such Grantor (either itself or through licensees) (i) will employ each material Copyright and (ii) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any material portion of the Copyrights may become invalidated or otherwise impaired.  Such Grantor will not (either itself or through licensees) do any act whereby any material portion of the Copyrights may fall into the public domain if the consequence thereof would materially adversely affect the value of the Copyrights considered as a whole.

(d)     Such Grantor (either itself or through licensees) will not do any act that knowingly uses any material Intellectual Property to infringe the intellectual property rights of any other Person.

(e)     Such Grantor will notify the Administrative Agent and the Lenders immediately if it knows, or has reason to know, that any application or registration relating to any material Intellectual Property may become forfeited, abandoned or dedicated to the public, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding such Grantor's ownership of, or the validity of, any material Intellectual Property or such Grantor's right to register the same or to own and maintain the same.

(f)     Whenever such Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall report such filing to the Administrative Agent within five Business Days after the last day of the fiscal quarter in which such filing occurs.  Such Grantor shall execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers as may be necessary, or as the Administrative Agent may request to evidence the Administrative Agent's and the Lenders' security interest in any Copyright, Patent or Trademark and the goodwill and general intangibles of such Grantor relating thereto or represented thereby.

(g)     Such Grantor will take all reasonable and necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the material Intellectual Property, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(h)     In the event that any material Intellectual Property is infringed, misappropriated or diluted by a third party, such Grantor shall (i) take such actions as such Grantor shall reasonably deem

appropriate under the circumstances to protect such Intellectual Property and (ii) if such Intellectual Property is of material economic value, promptly notify the Administrative Agent after it learns thereof and sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution.

     5.11   <u>Commercial Tort Claims</u>.  If such Grantor shall obtain an interest in any Commercial Tort Claim with a potential value in excess of $100,000, such Grantor shall within 30 days of obtaining such interest sign and deliver documentation acceptable to the Required Lenders granting a security interest under the terms and provisions of this Agreement in and to such Commercial Tort Claim.


SECTION 6.    REMEDIAL PROVISIONS

     6.1   <u>Certain Matters Relating to Receivables</u>.  (a)  From time to time but no more frequently than quarterly unless an Event of Default has occurred and is continuing, the Administrative Agent shall have the right to make test verifications of the Receivables in any manner and through any medium that it reasonably considers advisable, and each Grantor shall furnish all such assistance and information as the Administrative Agent may require in connection with such test verifications.  At any time and from time to time during the continuance of an Event of Default, upon the Administrative Agent's request and at the expense of the relevant Grantor, such Grantor shall cause independent public accountants or others satisfactory to the Required Lenders to furnish to the Administrative Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables.

     (b)    The Administrative Agent hereby authorizes each Grantor to collect such Grantor's Receivables, subject to the Administrative Agent's direction and control, and the Administrative Agent may curtail or terminate said authority at any time after the occurrence and during the continuance of an Event of Default.  If required by the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by any Grantor, (i) shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Administrative Agent if required, in a Collateral Account maintained under the sole dominion and control of the Administrative Agent, subject to withdrawal by the Administrative Agent for the account of the Lenders only as provided in Section 6.5, and (ii) until so turned over, shall be held by such Grantor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Grantor.  Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

     (c)    At the Administrative Agent's request, each Grantor shall deliver to the Administrative Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including, without limitation, all original orders, invoices and shipping receipts.

     6.2   <u>Communications with Obligors; Grantors Remain Liable</u>.  (a)  At any time after the occurrence and during the continuance of an Event of Default, the Administrative Agent in its own name or in the name of others may communicate with obligors under the Receivables and parties to the Contracts to verify with them the existence, amount and terms of any Receivables or Contracts.

     (b)    Upon the request of the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Receivables and parties to the Contracts that the Receivables and the Contracts have been assigned to the

Administrative Agent for the ratable benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Administrative Agent.

(c)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Receivables and Contracts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. Neither the Administrative Agent nor any Secured Party shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) or Contract by reason of or arising out of this Agreement or the receipt by the Administrative Agent or any Secured Party of any payment relating thereto, nor shall the Administrative Agent or any Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto) or Contract, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

6.3    <u>Pledged Stock</u>. (a) Unless an Event of Default shall have occurred and be continuing and the Administrative Agent shall have given notice to the relevant Grantor of the Administrative Agent's intent to exercise its corresponding rights pursuant to Section 6.3(b), each Grantor shall be permitted to receive all cash dividends paid in respect of the Pledged Stock and all payments made in respect of the Pledged Notes, in each case paid in the normal course of business of the relevant Issuer and consistent with past practice, to the extent permitted in the DIP Credit Agreement, and to exercise all voting and corporate or other organizational rights with respect to the Investment Property; provided, however, that no vote shall be cast or corporate or other organizational right exercised or other action taken which, in the Required Lenders' reasonable judgment, would impair the Collateral or which would be inconsistent with or result in any violation of any provision of the DIP Credit Agreement, this Agreement or any other Loan Document.

(b)    If an Event of Default shall occur and be continuing and the Administrative Agent shall give notice of its intent to exercise such rights to the relevant Grantor or Grantors, (i) the Administrative Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in pursuant to Section 6.5, and (ii) any or all of the Investment Property shall be registered in the name of the Administrative Agent or its nominee, and the Administrative Agent or its nominee may thereafter exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate or other organizational structure of any Issuer, or upon the exercise by any Grantor or the Administrative Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Administrative Agent or the Required Lenders may determine), all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)    Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to, (i) comply with any instruction received by it from the Administrative Agent in writing that (x) states that an Event of Default has occurred and is continuing and

(y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying, and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Investment Property directly to the Administrative Agent.

6.4     Proceeds to be Turned Over To Administrative Agent.  In addition to the rights of the Administrative Agent and the Lenders specified in Section 6.1 with respect to payments of Receivables, if an Event of Default shall occur and be continuing (and subject in any event to the terms and conditions of the DIP Order), all Proceeds received by any Grantor consisting of cash, checks and other near-cash items shall be held by such Grantor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Grantor and shall, forthwith upon receipt by such Grantor, be turned over to the Administrative Agent in the exact form received by such Grantor (duly indorsed by such Grantor to the Administrative Agent, if required).  All Proceeds received by the Administrative Agent hereunder shall be held by the Administrative Agent in a Collateral Account maintained under its sole dominion and control. All Proceeds while held by the Administrative Agent in a Collateral Account (or by such Grantor in trust for the Administrative Agent and the Lenders) shall continue to be held as collateral security for all the Obligations and shall not constitute payment thereof until applied as provided in Section 6.5.

6.5     Application of Proceeds.  Subject to the terms and conditions of the DIP Order, at such intervals as may be agreed upon by the Borrower and the Administrative Agent, or, if an Event of Default shall have occurred and be continuing, at any time at the Administrative Agent's election, the Administrative Agent may apply all or any part of Proceeds constituting Collateral, whether or not held in any Collateral Account, and any proceeds of the guarantee set forth in Section 2, in payment of the Obligations in the following order:

First, to pay incurred and unpaid fees, expenses and indemnities of the Administrative Agent under the Loan Documents;

Second, to the Administrative Agent, for application by it towards payment of amounts then due and owing and remaining unpaid in respect of the Obligations, pro rata among the Secured Parties according to the amounts of the Obligations then due and owing and remaining unpaid to the Secured Parties;

Third, to the Administrative Agent, for application by it towards prepayment of the Obligations, pro rata among the Secured Parties according to the amounts of the Obligations then held by the Secured Parties; and

Fourth, any balance remaining after the Obligations shall have been paid in full and the Term Loan Commitments shall have terminated shall be paid over to or at the direction of the Borrower.

6.6     Code and Other Remedies.  If an Event of Default shall occur and be continuing, the Administrative Agent, on behalf of the Lenders, may exercise (subject in any event to the terms and conditions of the DIP Order), in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the New York UCC or any other applicable law.  Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease,

assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any Lender or elsewhere upon any reasonable terms and conditions without assumption of any credit risk.  The Administrative Agent or any Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released.  Each Grantor further agrees (subject in any event to the terms and conditions of the DIP Order), at the Administrative Agent's request, to assemble the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Section 6.6, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Administrative Agent and the Lenders hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Obligations, pursuant to Section 6.5, and only after such application and after the payment by the Administrative Agent of any other amount required by any provision of law, including, without limitation, Section 9-615(a)(3) of the New York UCC, need the Administrative Agent account for the surplus, if any, to any Grantor.  To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Administrative Agent or any Lender arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

6.7     Registration Rights.  (a)  If the Administrative Agent shall determine to exercise its right to sell any or all of the Pledged Stock pursuant to Section 6.6, and if in the opinion of the Required Lenders it is necessary or advisable to have the Pledged Stock, or that portion thereof to be sold, registered under the provisions of the Securities Act, the relevant Grantor will cause the Issuer thereof to (i) execute and deliver, and cause the directors and officers of such Issuer to execute and deliver, all such instruments and documents, and do or cause to be done all such other acts as may be necessary or advisable or as the Required Lenders may reasonably request to register the Pledged Stock, or that portion thereof to be sold, under the provisions of the Securities Act, (ii) use its best efforts to cause the registration statement relating thereto to become effective and to remain effective for a period of one year from the date of the first public offering of the Pledged Stock, or that portion thereof to be sold, and (iii) make all amendments thereto and/or to the related prospectus which, in the opinion of the Administrative Agent, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto.  Each Grantor agrees to cause such Issuer to comply with the provisions of the securities or "Blue Sky" laws of any and all jurisdictions which the Required Lenders shall designate and to make available to its security holders, as soon as practicable, an earnings statement (which need not be audited) which will satisfy the provisions of Section 11(a) of the Securities Act.

(b)     Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Stock, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner.  The Administrative Agent shall be under no obligation to delay a sale

of any of the Pledged Stock for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

(c)     Each Grantor agrees to use its best efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Pledged Stock pursuant to this Section 6.7 valid and binding and in compliance with any and all other applicable Requirements of Law. Each Grantor further agrees that a breach of any of the covenants contained in this Section 6.7 will cause irreparable injury to the Administrative Agent and the Lenders, that the Administrative Agent and the Lenders have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 6.7 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the DIP Credit Agreement.

6.8     Subordination.  Each Grantor hereby agrees that, upon the occurrence and during the continuance of an Event of Default, unless otherwise agreed by the Required Lenders, all Indebtedness owing by it to any Subsidiary of the Borrower shall be fully subordinated to the indefeasible payment in full in cash of such Grantor's Obligations.

6.9     Deficiency.  Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Obligations and the fees and disbursements of any attorneys employed by the Administrative Agent or any Lender to collect such deficiency.


SECTION 7.    THE ADMINISTRATIVE AGENT

7.1     Administrative Agent's Appointment as Attorney-in-Fact, etc.  (a)  Each Grantor hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Administrative Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following:

(i)     in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or Contract or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Required Lenders for the purpose of collecting any and all such moneys due under any Receivable or Contract or with respect to any other Collateral whenever payable;

(ii)     in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers to evidence the Administrative Agent's and the Lenders' security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)    pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iv)    execute, in connection with any sale provided for in Section 6.6 or 6.7, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(v)    (1)  direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct;  (2)   ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral;  (3)   sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral;  (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Administrative Agent may deem appropriate; (7) assign any Copyright, Patent or Trademark (along with the goodwill of the business to which any such Copyright, Patent or Trademark pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Administrative Agent shall in its sole discretion determine; and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and do, at the Administrative Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Administrative Agent deems necessary to protect, preserve or realize upon the Collateral and the Administrative Agent's and the Lenders' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 7.1(a) to the contrary notwithstanding, the Administrative Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 7.1(a) (other than pursuant to clause (ii) thereof) unless an Event of Default shall have occurred and be continuing.

(b)    If any Grantor fails to perform or comply with any of its agreements contained herein, the Administrative Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)    The expenses of the Administrative Agent incurred in connection with actions undertaken as provided in this Section 7.1, together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due Loans under the DIP Credit Agreement, from the date of payment by the Administrative Agent to the date reimbursed by the relevant Grantor, shall be payable by such Grantor to the Administrative Agent on demand.

(d)    Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

7.2    <u>Duty of Administrative Agent</u>.  The Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of

the New York UCC or otherwise, shall be to deal with it in the same manner as the Administrative Agent deals with similar property for the benefit of third parties.  Neither the Administrative Agent, any Lender nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Administrative Agent and the Lenders hereunder are solely to protect the Administrative Agent's and the Lenders' interests in the Collateral and shall not impose any duty upon the Administrative Agent or any Lender to exercise any such powers.  The Administrative Agent and the Lenders shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct (as determined in a final non-appealable decision of a court of competent jurisdiction).

7.3     Execution of Financing Statements.  Pursuant to any applicable law, each Grantor authorizes the Administrative Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as the Administrative Agent determines appropriate to perfect the security interests of the Administrative Agent under this Agreement.  Each Grantor authorizes the Administrative Agent to use the collateral description "all personal property", "all assets" or a similar description in any such financing statements.  Each Grantor hereby ratifies and authorizes the filing by the Administrative Agent of any financing statement with respect to the Collateral made prior to the date hereof. Notwithstanding anything in this Agreement to the contrary:

(a)     no Grantor shall be obligated to make or permit any financing statement filings at the county or other local level solely with respect to Fixtures on real property in which such Grantor owns a fee interest except as part of the filing of a mortgage required to be filed under the DIP Credit Agreement;

(b)     each Grantor shall be required to make or permit financing statement filings at the county or other local level with respect to As-Extracted Collateral as soon as reasonably practicable, and in any event, (i) in the case of As-Extracted Collateral located on real property in which such Grantor owns a fee interest as of the date hereof, the date hereof and (ii) in the case of As-Extracted Collateral located on real property with a fair market value of at least $2,500,000 in which such Grantor acquires a fee interest after the date hereof, within 30 days after the date of the acquisition of such real property;

(c)     no Grantor shall be obligated to make or permit any financing statement filings at any county, real estate or other local filing office solely with respect to Fixtures or As-Extracted Collateral located on Leased Real Property until 30 days after the date hereof (or, with respect to future Leased Real Property, until 30 days after the date that a Grantor acquires rights to such Leased Real Property), or in any event if such a filing would be prohibited by, or constitute a breach or default under or result in the termination of or require any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to the Leased Real Property.

Notwithstanding anything contained herein to the contrary, in no event shall the Administrative Agent have any duty or responsibility in respect of any recording, filing, or depositing of this Agreement or any other agreement or instrument, monitoring or filing any financing statement or continuation statement evidencing a security interest, the maintenance of any such recording, filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, or otherwise monitoring the perfection, continuation or perfection of the sufficiency or validity of any security interest in or related to the Collateral.

7.4     <u>Authority of Administrative Agent</u>.  Each Grantor acknowledges that the rights and responsibilities of the Administrative Agent under this Agreement with respect to any action taken by the Administrative Agent or the exercise or non-exercise by the Administrative Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Administrative Agent and the Lenders, be governed by the DIP Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Administrative Agent and the Grantors, the Administrative Agent shall be conclusively presumed to be acting as agent for the Lenders with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.  The Administrative Agent shall be entitled to the same rights, protections, immunities and indemnities in this Agreement as are set forth in the Credit Agreement as if the provisions setting forth those rights, protections, immunities and indemnities were fully set forth herein.

SECTION 8.    MISCELLANEOUS

8.1     <u>Amendments in Writing</u>.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 10.1 of the DIP Credit Agreement.

8.2     <u>Notices</u>.  All notices, requests and demands to or upon the Administrative Agent or any Grantor hereunder shall be effected in the manner provided for in Section 10.2 of the DIP Credit Agreement; provided that any such notice, request or demand to or upon any Guarantor shall be addressed to such Guarantor at its notice address set forth on Schedule 1.

8.3     <u>No Waiver by Course of Conduct; Cumulative Remedies</u>.  Neither the Administrative Agent nor any Lender shall by any act (except by a written instrument pursuant to Section 8.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Administrative Agent or any Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Administrative Agent or any Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Administrative Agent or such Lender would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4     <u>Enforcement Expenses; Indemnification</u>.  (a)  Each Guarantor agrees to pay or reimburse each Lender and the Administrative Agent for all its reasonable costs and expenses incurred in collecting against such Guarantor under the guarantee contained in Section 2 or otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents to which such Guarantor is a party, including, without limitation, the reasonable fees and disbursements of counsel (including the allocated fees and expenses of in-house counsel) to each Lender and of counsel to the Administrative Agent.

(b)     Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)     Each Guarantor agrees to pay, and to save the Administrative Agent and the Lenders harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments,

suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement to the extent the Borrower would be required to do so pursuant to Section 10.5 of the DIP Credit Agreement.

(d)    The agreements in this Section 8.4 shall survive repayment of the Obligations and all other amounts payable under the DIP Credit Agreement and the other Loan Documents or the earlier resignation or removal of the Administrative Agent.

8.5    <u>Successors and Assigns</u>.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Administrative Agent and the Secured Parties and their successors and assigns; provided that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Administrative Agent.

8.6    <u>Set-Off</u>.  Subject to the DIP Order, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without notice to any Grantor, any such notice being expressly waived by each Grantor to the extent permitted by applicable law, upon any Obligations becoming due and payable by any Grantor (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of such Grantor.  Each Lender agrees promptly to notify the relevant Grantor and the Administrative Agent after any such application made by such Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such application.

8.7    <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by email or telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

8.8    <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.9    <u>Section Headings</u>.  The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

8.10    <u>Integration</u>.  This Agreement and the other Loan Documents represent the agreement of the Grantors, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.

**8.11    <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REFERENCES TO CONFLICT OF LAWS PRINCIPLES, EXCEPT TO THE EXTENT THE LAW OF THE STATE OF NEW YORK IS SUPERSEDED BY THE BANKRUPTCY CODE.**

8.12    <u>Submission To Jurisdiction; Waivers</u>.  Each Grantor hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Bankruptcy Court and, to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction, the courts of the State of New York and the courts of the United States for the Southern District of New York, in each case sitting in the City and County of New York, and appellate courts from any thereof; <u>provided</u>, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Grantor at its address referred to in Section 8.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any indirect, special, exemplary, punitive or consequential damages.

8.13    <u>Acknowledgements</u>.  Each Grantor hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(b)    neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Grantors, on the one hand, and the Administrative Agent and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Grantors and the Lenders.

8.14    <u>Additional Grantors</u>.  Each Subsidiary of the Borrower that is required to become a party to this Agreement pursuant to Section 6.9 of the DIP Credit Agreement shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of Annex 1 hereto.

8.15    <u>Release</u>.  (a)  Except as expressly provided in the DIP Order or in the DIP Credit Agreement, upon the occurrence of the Discharge of Secured Obligations (or as otherwise provided in Section 3.1(a)(iv)), the Collateral shall automatically be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Grantor hereunder shall automatically terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Grantors.  At the request and sole expense of any Grantor following any such termination, the Administrative Agent shall deliver to such Grantor any Collateral held by the Administrative Agent hereunder, and execute and deliver to such Grantor such documents prepared by the Grantor as such Grantor shall reasonably request to evidence such termination.

(b)    If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the DIP Credit Agreement, then the Administrative Agent, at the request and sole expense of such Grantor, shall execute and deliver to such Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral.  At the request and sole expense of the Borrower, a Subsidiary Guarantor shall be released from its obligations hereunder in the event that all the Capital Stock of such Subsidiary Guarantor shall be sold, transferred or otherwise disposed of in a transaction permitted by the DIP Credit Agreement; <u>provided</u> that the Borrower shall have delivered to the Administrative Agent, at least ten Business Days prior to the date of the proposed release, a written request for release identifying the relevant Subsidiary Guarantor and the terms of the sale or other disposition in reasonable detail, including the price thereof and any material expenses in connection therewith, together with a certification by the Borrower stating that such transaction and the corresponding release are in compliance with the DIP Credit Agreement and the other Loan Documents and that all conditions precedent to such release have been satisfied.

8.16    <u>**WAIVER OF JURY TRIAL**</u>.  **EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

8.17    <u>Conflicts</u>.  In the event of any inconsistency between the provisions of the DIP Order and this Agreement, the provisions of the DIP Order shall govern.

[*Remainder of page intentionally blank.*]

IN WITNESS WHEREOF, each of the undersigned has caused this Guarantee and Collateral Agreement to be duly executed and delivered as of the date first above written.

MAGNETATION LLC

By: _____
    Name:
    Title:

MAG FINANCE CORP.

By: _____
    Name:
    Title:

MAG LANDS, LLC

By: _____
    Name:
    Title:

MAG MINING, LLC

By: _____
    Name:
    Title:

MAG PELLET LLC

By: _____
    Name:
    Title:

[Signature Page to DIP Guarantee and Collateral Agreement]

Exhibit C

Budget

**Project Maxwell - 13 Week DIP Budget**

| | ACTUAL | Estimate | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | Filing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Week # | | | | | | | | | | | | | | | | |
| Week Ending | 24-Apr | 1-May | 8-May | 15-May | 22-May | 29-May | 5-Jun | 12-Jun | 19-Jun | 26-Jun | 3-Jul | 10-Jul | 17-Jul | 24-Jul | 31-Jul | Cumulative |
| **Revenue Assumptions** | | | | | | | | | | | | | | | | |
| # Trains Payments Received from AK Steel | 3.0 | 4.0 | 4.0 | 5.0 | 4.0 | 5.0 | 4.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 62.0 |
| # Train Payments Received from AHMSA | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | – | – | – | – | – | – | – | – | – | 4.0 |
| Revenue / Train from AK Steel | $1,217,141 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,094,096 | $1,094,096 | $1,094,096 | $1,094,096 | $1,094,096 | |
| Revenue / Train from AHMSA | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | |
| **Receipts** | | | | | | | | | | | | | | | | |
| AK Steel | $3,651,423 | $4,885,672 | $– | $– | $– | $– | $– | $– | $4,885,672 | $6,107,090 | $4,885,672 | $6,107,090 | $4,885,672 | $6,107,090 | $6,107,090 | $39,085,376 |
| AHMSA | 454,656 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | | | | | | | | | | 1,882,656 |
| Mesabi Nugget | – | – | | | | | | | | | | | | | | |
| Proceeds from Mag, Inc. | – | – | | | | | | | | | | | | | | |
| MN Dept of Refund - Sales Tax | – | 3,865,177 | | | | | | | | | | | | | | |
| Miscellaneous | – | – | | | | | | | | | | | | | | |
| **Total Receipts** | **$4,106,079** | **$9,221,513** | **$470,664** | **$470,664** | **$470,664** | **$470,664** | **$0** | **$0** | **$4,885,672** | **$6,107,090** | **$4,885,672** | **$6,107,090** | **$4,885,672** | **$6,107,090** | **$6,107,090** | **$40,968,032** |
| **Disbursements** | | | | | | | | | | | | | | | | |
| **Production Expenses (Check):** | | | | | | | | | | | | | | | | |
| Payroll | ($1,054,669) | ($1,184,886) | ($1,131,149) | ($460,295) | ($1,131,149) | $– | ($1,106,557) | ($460,295) | ($1,106,557) | $– | ($1,123,631) | $– | ($1,583,926) | $– | ($1,126,631) | ($9,230,190) |
| Utilities - Gas | (834,591) | – | | | (939,806) | | (700,417) | | (964,466) | | | | (700,417) | | | (2,844,078) |
| Utilities - Electricity | (241,630) | – | | | (700,417) | | | | | | | | | | | (2,124,598) |
| Utilities - Propane | – | – | (1,813) | (1,813) | (1,813) | (1,813) | | | | | | | | | | (7,252) |
| Repair & Maintenance | (251,981) | (522,888) | (172,192) | (172,192) | (172,192) | (172,192) | (375,113) | (375,113) | (375,113) | (375,113) | (405,841) | (405,841) | (405,841) | (405,841) | (405,841) | (4,218,423) |
| Fuel - Pellet Plant | – | – | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (139,009) |
| Raw Materials | (244,212) | (784,273) | (183,815) | (183,815) | (183,815) | (183,815) | (735,260) | (735,260) | (735,260) | (735,260) | (772,760) | (772,760) | (772,760) | (885,260) | (772,760) | (7,652,600) |
| Trucking | (150,000) | – | (102,486) | (113,076) | (113,076) | (113,076) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (1,332,318) |
| Equipment | (33,480) | (27,845) | (113,076) | | | | (226,152) | (226,152) | (226,152) | (226,152) | (226,152) | (226,152) | (226,152) | (226,152) | (226,152) | (2,487,672) |
| Mining | – | – | | | | | | | (98,735) | | | | | | | (98,735) |
| Royalties | – | (485,633) | | (70,635) | | | | | | | | | | (2,311,761) | | (2,481,131) |
| Contracted Services | – | – | | | | | (50,833) | (50,833) | (50,833) | (50,833) | (50,833) | (50,833) | (50,833) | (50,833) | (50,833) | (457,497) |
| Environmental | – | – | (37,926) | (37,926) | (37,926) | (37,926) | (58,622) | (58,622) | (58,622) | (58,622) | (48,241) | (48,241) | (48,241) | (48,241) | (48,241) | (623,184) |
| Other Overhead | (49,444) | (226,607) | (79,676) | (79,676) | (79,676) | (79,676) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (1,752,861) |
| **Production Expenses (Check)** | **($2,860,007)** | **($3,232,132)** | **($1,832,826)** | **($1,232,607)** | **($3,473,049)** | **($701,677)** | **($2,825,107)** | **($2,178,845)** | **($4,612,072)** | **($1,718,550)** | **($2,899,988)** | **($1,776,357)** | **($3,360,283)** | **($5,728,341)** | **($3,011,115)** | **($35,350,813)** |
| **Automatic ACH** | | | | | | | | | | | | | | | | |
| Freight - BNSF | ($426,917) | ($1,070,532) | $– | $– | ($848,000) | ($1,060,594) | ($848,000) | ($1,060,594) | ($848,000) | ($1,060,594) | ($848,000) | ($1,060,594) | ($848,000) | ($1,060,594) | ($848,000) | ($10,388,000) |
| Rail Car Lease - CAT | – | – | | | | | | | | | | | | | | |
| Mobile Equipment Lease - Various | (80,814) | (9,598) | | | | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (1,059,530) |
| Fuel - Davis Petroleum | (175,000) | (125,000) | (159,786) | (159,786) | (219,940) | (159,786) | (574,476) | (219,940) | (159,786) | (159,786) | (159,786) | (159,786) | (159,786) | (159,786) | (159,786) | (2,077,218) |
| Utilities - PL 1, PL 2, PL 4 and JLO | – | (757,115) | | | (219,940) | (219,940) | | (574,476) | | (277,658) | | (410,784) | (277,658) | (216,449) | (480,910) | (3,453,071) |
| Other - JPMorgan | – | – | | | | | | | | | | | | | | |
| Mgmt Services to Inc. | (550,000) | – | (550,000) | – | (550,000) | – | (550,000) | – | (550,000) | – | (550,000) | – | (550,000) | – | (550,000) | (3,850,000) |
| Production Tax Payment | – | – | | | | | (20,000) | | | | | | | | | (20,000) |
| Sales Tax - Plant 4 | – | – | | | | | | | | | | (400,000) | | | | (420,000) |
| **Automatic ACH** | **($1,232,731)** | **($1,962,245)** | **($709,786)** | **($159,786)** | **($1,777,786)** | **($1,545,679)** | **($2,258,215)** | **($1,545,679)** | **($1,941,397)** | **($1,603,397)** | **($2,074,523)** | **($2,003,397)** | **($1,941,397)** | **($1,542,188)** | **($2,144,649)** | **($21,247,819)** |
| **Other** | | | | | | | | | | | | | | | | |
| Capex Disbursements | $– | ($250,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($6,500,000) |
| Critical Vendor Disbursements | – | (49,096) | (12,500,000) | (12,500,000) | | | (49,096) | | | | | | | | | (25,000,000) |
| Less: Payments to JPM Regarding Equipment Loans | – | – | (90,397) | (82,761) | (88,474) | – | – | (90,397) | (82,761) | – | (88,474) | (49,096) | – | (90,397) | (82,761) | (412,710) |
| Less: Capital Lease Payments | – | – | | (1,045,400) | | | | | | | | | | | | (519,474) |
| Less: Utility Adequate Assurance Deposits | – | – | | | | | | | | | | | | | | (1,045,400) |
| Less: DIP Cash Interest | – | – | | | | | | | | | | | | | | |
| Less: Existing RCF Interest | – | – | | | (149,722) | | | | (144,375) | | | | (149,722) | | | (443,819) |
| Less: Professional Fee Payments | (1,025) | (754,667) | | | | | | | | | (3,673,280) | | | (3,673,280) | | (3,673,280) |
| Plus/ (Less): Other | – | – | | | | | | | | | | | | | | (420,000) |
| **Total Disbursements** | **($4,093,763)** | **($6,248,140)** | **($15,633,009)** | **($15,520,554)** | **($5,988,971)** | **($2,747,356)** | **($5,632,418)** | **($4,314,921)** | **($7,280,605)** | **($3,910,421)** | **($9,196,887)** | **($4,370,151)** | **($6,034,163)** | **($7,859,003)** | **($5,704,860)** | **($94,193,315)** |
| **Cash Balance & Liquidity** | | | | | | | | | | | | | | | | |
| Starting Cash Balance | $463,142 | $475,458 | $3,448,831 | $32,657,945 | $17,608,055 | $12,089,749 | $9,813,057 | $4,180,640 | $12,365,719 | $9,970,787 | $12,167,456 | $7,856,241 | $9,593,180 | $8,444,689 | $6,692,776 | $3,448,831 |
| Plus: Total Receipts | 4,106,079 | 9,221,513 | 470,664 | 470,664 | 470,664 | 470,664 | – | – | 4,885,672 | 6,107,090 | 4,885,672 | 6,107,090 | 4,885,672 | 6,107,090 | 6,107,090 | 40,968,032 |
| Less: Total Disbursements | (4,093,763) | (6,248,140) | (15,633,009) | (15,520,554) | (5,988,971) | (2,747,356) | (5,632,418) | (4,314,921) | (7,280,605) | (3,910,421) | (9,196,887) | (4,370,151) | (6,034,163) | (7,859,003) | (5,704,860) | (94,193,315) |
| Plus: DIP Financing | – | – | 45,158,252 | 12,500,000 | | | | | | | | | | | | 63,658,252 |
| Less: DIP Financing Costs | – | – | (5,488,243) | | | | | | | | | | | | | (5,488,243) |
| Less: Wilmington Trust Indemnity Escrow | – | – | (1,298,552) | | | | | | | | | | | | | (1,298,552) |
| **Ending Cash Balance** | **$475,458** | **$3,448,831** | **$32,657,945** | **$17,608,055** | **$12,089,749** | **$9,813,057** | **$4,180,640** | **$12,365,719** | **$9,970,787** | **$12,167,456** | **$7,856,241** | **$9,593,180** | **$8,444,689** | **$6,692,776** | **$7,095,006** | **$7,095,006** |

**Collateral Schedule**

*($ in millions)*

| | Pre-Filing | | Filing Period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Week | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Week Ending | 4/24/15 | 5/1/15 | 5/8/15 | 5/15/15 | 5/22/15 | 5/29/15 | 6/5/15 | 6/12/15 | 6/19/15 | 6/26/15 | 7/3/15 | 7/10/15 | 7/17/15 | 7/24/15 | 7/31/15 |
| Cash | $0.5 | $3.4 | $32.7 | $17.6 | $12.1 | $9.8 | $4.2 | $12.4 | $10.0 | $12.2 | $7.9 | $9.6 | $8.4 | $6.7 | $7.1 |
| Accounts Receivable | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 24.5 | 24.5 | 24.5 | 24.5 | 41.1 | 41.1 | 41.1 | 41.1 | 41.1 |
| Inventory | 60.6 | 49.9 | 49.9 | 49.9 | 49.9 | 49.9 | 45.6 | 45.6 | 45.6 | 45.6 | 41.1 | 41.1 | 41.1 | 41.1 | 41.1 |
| Prepaid Exp & Other Assets | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 |
| Net PP&E | 757.6 | 755.3 | 755.3 | 755.3 | 755.3 | 755.3 | 753.2 | 753.2 | 753.2 | 753.2 | 751.5 | 751.5 | 751.5 | 751.5 | 751.5 |
| **Total Collateral** | **$830.3** | **$820.3** | **$849.5** | **$834.4** | **$828.9** | **$826.6** | **$836.5** | **$844.7** | **$842.3** | **$844.5** | **$850.6** | **$852.3** | **$851.2** | **$849.4** | **$849.8** |
| Bridge Term Loan Facility | $3.8 | $3.8 | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– |
| DIP Facility | – | – | 57.0 | 57.0 | 57.0 | 57.0 | 57.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 |
| RCF Principal | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 |
| RCF Letters of Credit | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 |
| Senior Secured Notes Principal | 425.0 | 425.0 | 425.0 | 425.0 | 425.0 | 425.0 | 425.0 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 |
| Capital Leases | 9.3 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.0 | 9.0 | 9.0 | 9.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 |
| Accrued Interest | 18.2 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 22.6 | 22.6 | 22.6 | 22.6 | 22.6 |
| **Total Financial Obligations** | **$517.4** | **$520.5** | **$577.5** | **$577.5** | **$577.5** | **$577.5** | **$577.3** | **$589.8** | **$589.8** | **$589.8** | **$590.9** | **$590.9** | **$590.9** | **$590.9** | **$590.9** |
| **Equity Cushion** | **$312.8** | **$299.8** | **$272.0** | **$256.9** | **$251.4** | **$249.2** | **$259.2** | **$254.9** | **$252.5** | **$254.7** | **$259.7** | **$261.4** | **$260.2** | **$258.5** | **$258.9** |
| ***Equity Cushion (% of Financial Obligations)*** | *60.5%* | *57.6%* | *47.1%* | *44.5%* | *43.5%* | *43.1%* | *44.9%* | *43.2%* | *42.8%* | *43.2%* | *43.9%* | *44.2%* | *44.0%* | *43.7%* | *43.8%* |

<u>Exhibit D</u>

Plan Term Sheet

# RESTRUCTURING TERM SHEET
## MAGNETATION LLC

This term sheet (this "Term Sheet") is a summary of indicative terms and conditions for a proposed restructuring transaction (the "Restructuring") concerning Magnetation LLC, a Delaware limited liability company ("Magnetation" or the "Company"), to be effectuated through a plan of reorganization (the "Plan") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") that is materially consistent with the terms and conditions as set forth in this Term Sheet and otherwise acceptable in form and substance to the Company and the Ad Hoc Committee (as defined below). The implementation of the terms and conditions reflected herein and all definitive documents in connection with the Restructuring are subject to the terms and conditions in a Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "RSA"), by and among the Company, Magnetation, Inc., a Minnesota Corporation ("MagInc") and the Ad Hoc Committee of Senior Secured Notes (the "Ad Hoc Committee"), the holders of the 11.0% senior secured notes due 2018 (as amended, supplemented or otherwise modified from time to time, the "Existing Notes") issued by Magnetation pursuant to that certain Indenture, dated as of May 20, 2013 (as amended, supplemented or otherwise modified from time to time, the "Existing Notes Indenture"), between Magnetation and Wells Fargo Bank, National Association, as trustee.

This Term Sheet is non-binding and does not purport to summarize all of the terms, conditions, covenants and other provisions that may be contained in the fully negotiated and executed definitive documentation in connection with the Restructuring. No provision of this Term Sheet should be considered separate and apart from the whole. The transactions described in this Term Sheet are subject in all respects to, among other things, the execution and delivery of definitive documentation satisfactory in form and substance to the Company and the Ad Hoc Committee, satisfaction or waiver of the conditions precedent set forth therein and, the Company's and Ad Hoc Committee's determination that the new debt and securities contemplated herein are supportable by Plan value. This Term Sheet does not constitute either (a) an offer for the purchase, sale or subscription of, or solicitation or invitation of any offer to buy, sell or subscribe for, any securities or (b) a solicitation of acceptances or rejections of a chapter 11 plan of reorganization pursuant to the Bankruptcy Code. Any such offer or solicitation shall be made only in compliance with all applicable securities laws of the United States and with the provisions of the Bankruptcy Code.

Capitalized terms used in this Term Sheet and not defined herein shall have the meanings ascribed to them in the RSA.

| **DEBT AND EQUITY CAPITAL**<br>**STRUCTURE OF REORGANIZED DEBTORS** | |
|---|---|
| **New First Lien Term Loan Credit Facility** | On the Effective Date (as defined below), reorganized Magnetation will enter into a new first lien term loan credit facility (the "New First Lien Term Loan Credit Facility") pursuant to which reorganized Magnetation will issue new first lien term loans on a first out basis (the "New First Out First Lien Term Loans") in an original aggregate principal amount sufficient to refinance the JPM Facility in cash in full, and new first lien term loans on a second out basis (the "New Second Out First Lien Term Loans" and together with the New First Out First Lien Term Loans, the "New First Lien Term Loans") in an original principal amount sufficient to refinance the DIP Facility, the rolled up Existing Notes, the rolled up Prepetition Term Loans and any interest and fees accrued thereon. |
| | The New Second Out First Lien Term Loans shall bear interest at a rate of 10% per annum to be paid in cash or 12% per annum to be paid in kind on a quarterly basis, with the requirement to pay in cash subject to certain conditions including a minimum EBITDA and minimum liquidity tests. All of the direct and indirect domestic subsidiaries of reorganized Magnetation shall guarantee the payment of the New First Lien Term Loans.  The New First Lien Term Loan Credit Facility will mature on the fifth anniversary of the Effective Date, but can be prepaid in whole or in part after the second anniversary of the Effective Date. |
| | The New First Lien Term Loan will carry customary covenants regarding reporting, limitations on indebtedness, limitations on liens and certain financial covenants.  The New First Lien Term Loan Credit Facility shall be in form and substance acceptable to the Company and the Ad Hoc Committee. |
| **New Second Lien Notes** | On the Effective Date, reorganized Magnetation will issue new second lien notes (the "New Second Lien Notes") in an original aggregate principal amount of $232.5 million plus accrued interest through the Effective Date (to the extent the holders of the Existing Notes are entitled to post-petition interest) on the Existing Notes that were not subject to the roll-up, and all of the direct and indirect domestic subsidiaries of reorganized Magnetation shall guarantee the payment of the New Second Lien Notes. |

|  | The New Second Lien Notes shall mature on the ten year anniversary of the Effective Date. The New Second Lien Notes shall bear interest at a rate of 5.0%, and such interest shall be paid in kind on a semi-annual basis. The New Second Lien Notes shall be redeemable at the option of reorganized Magnetation at par. |
|---|---|
| **New Convertible Preferred Stock** | On the Effective Date, reorganized Magnetation will issue to holders of the Existing Notes 90% of the new convertible preferred stock (the "New Convertible Preferred Stock") in an original aggregate face amount of $138.9 million. Shares representing approximately 10% of the New Convertible Preferred stock on the Effective Date will be distributed as part of the Management Incentive Plan and will vest after 3 years. |
|  | The New Convertible Preferred Stock shall accrete at a rate of 5.0%. Holders of the New Convertible Preferred Stock may convert such preferred stock into New Common Stock (as defined below) at Plan value as determined by the Debtors and the Ad Hoc Committee. |
|  | The New Convertible Preferred Stock Notes will include customary provisions for such a security. |
| **Interest Escrow Reserve** | The funds in the existing interest escrow account shall be maintained by the Debtors and be available for use upon the Effective Date for (i) distribution to JPM on account of the JPM Facility Claims; (ii) distribution to the lenders under the New Second Out First Lien Term Loans to reduce the principal of such loans; or (iii) for such other purposes as agreed by the holders of $2/3^{rds}$ of the Existing Notes; *provided, however*, that, to the extent that any funds are distributed to holders of the Existing Notes on account of Existing Notes Claims, the amount of allowed Existing Notes Claims shall be reduced by the amount of such distribution. |
| **New Common Stock** | On the Effective Date, reorganized Magnetation will issue one or more classes of common stock (the "New Common Stock"), which New Common Stock shall be deemed validly issued, fully paid and non-assessable. 75% of the New Common Stock issued on the Effective Date will be distributed to holders of claims under the Existing Notes. The remaining 25% of the New Common Stock (including anti-dilution protection to maintain a 25% ownership in the event the New Convertible Preferred Stock is converted) on the Effective Date will be distributed as part of the |

|  | Management Incentive Plan and will vest after 3 years. |
|---|---|
|  | If at any point the New Common Stock is not registered under the Securities Exchange Act of 1934, as amended, the Company will post annual and quarterly financial reports in a timely manner on a publicly available website. |

**TREATMENT OF
CLAIMS AND INTERESTS**

| **Administrative Expense Claims** | On the effective date of the Plan (the "Effective Date") or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date thereof), all allowed administrative expense claims of each of the Debtors shall be paid in full in cash or on such other terms as the applicable Debtor or reorganized Debtor and the holder thereof may agree. |
|---|---|
| **Priority Claims** | On the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date thereof), all allowed priority claims (*e.g.,* tax and "other" priority claims) against each of the Debtors shall be paid in full in cash, unimpaired and reinstated, or treated on such other terms as the applicable Debtor or reorganized Debtor and the holder thereof may agree. |
| **Other Secured Claims** | On the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date thereof), all allowed secured claims against each of the Debtors shall be paid in full in cash, unimpaired and reinstated, or treated on such other terms as the applicable Debtor or reorganized Debtor and the holder thereof may agree. |
| **JPM Facility Claims** | On the Effective Date, unless otherwise agreed to by JPM, the Debtors and the Ad Hoc Committee, all remaining allowed JPM Facility Claims shall be paid in cash in full. |
| **DIP Facility Claims** | On the Effective Date, all allowed claims arising under the DIP Facility shall be exchanged for (x) New First Lien Second Out Term Loans in an aggregate principal amount equal to the amount of such DIP Facility Claims (including any interest thereon); it being understood and agreed that the DIP Lenders' consent to such treatment shall be deemed to have been given upon the consent of two-thirds in amount of DIP Facility Claims and more than one-half in number of holders of DIP Facility Claims, in each case, that have timely responded to a request for such consent by the Administrative Agent under the DIP Credit Agreement in accordance with |

| | |
|---|---|
| | the standards set forth in section 1126(c) of the Bankruptcy Code or (y) such other treatment as may be consented to by two-thirds in amount of DIP Facility Claims and more than one-half in number of holders of DIP Facility Claims, in each case, that have timely responded to a request for such consent by the Administrative Agent under the DIP Credit Agreement in accordance with section 1126(c) of the Bankruptcy Code. |
| **Existing Notes Claims** | On the Effective Date, all allowed claims arising under the Existing Notes and the Existing Notes Indenture that were not rolled up shall be exchanged for (x) a pro rata share of 100% of the New Second Lien Notes, 90% of the New Convertible Preferred Stock, 75% of the New Common Stock subject to further dilution on account of the Management Incentive Plan plus accrued interest through the Effective Date (to the extent the holders of the Existing Notes are entitled to post-petition interest) or (y) such other treatment as may be consented to by two-thirds in amount of Existing Notes Claims and more than one-half in number of holders of Existing Notes Claims, in each case, that have timely responded to a request for such consent by the Indenture Trustee under the Indenture in accordance with section 1126(c) of the Bankruptcy Code. |
| **General Unsecured Claims** | Treatment of General Unsecured Claims is [TBD] to the satisfaction of the Company and the Ad Hoc Committee. |
| **Management Services Agreement** | The Management Services Agreement will be replaced with appropriate contractual arrangements that provide for existing senior management and officers (CEO-Larry Lehtinen, President/COO-Matt Lehtinen, CFO-Joe Broking, Vice President-Danilo Bibancos, and Vice President-Hope Wilson (collectively, the "<u>Senior Management</u>")) to become subject to customary employment agreements with the Company for the first to occur of (i) 3 years, (ii) MagInc no longer being the beneficial holder of the Company's securities described herein (terminable only for cause, including material breach by either party), and (iii) termination for cause. MagInc will support the Company's assumption of any remaining aspects of the existing Management Services Agreement. |
| **Technology License Agreement** | The Technology License Agreement will be amended to grant the Company a perpetual, royalty free, exclusive (subject to the MR License) license in North America for all rights and improvements to the Licensed Technology. |
| **Intercompany Loan** | Upon the Effective Date, the Promissory Note between |

| | |
|---|---|
| | MagInc and the Company is considered paid in full. |
| **AK Steel Offtake Contract** | The AK Steel Offtake Contract will be assumed, rejected, or assumed as modified each to the satisfaction of the Ad Hoc Committee. |
| **Existing Equity Interests** | On the Effective Date, holders of the existing common stock of Magnetation ("Existing Common Stock") will be extinguished. |
| **Restructuring Advisory Agreement** | The Company and MagInc will enter into a Restructuring Advisory Agreement pursuant to which MagInc will pay the Company an advisory fee equal to 15% of the Net Proceeds (as defined below) of any disposition or sale of MagInc's assets (excluding any value attributable to MagInc's equity in the Company and sales in the ordinary course of business). For the purposes of this provision, "Net Proceeds" means the amount of the proceeds from the disposition or sale of MagInc's assets in excess of (i) any debt of MagInc payable in connection with the disposition or sale of such assets plus (ii) the reasonable transaction costs incurred in connection with such disposition or sale, excluding any value attributable to MagInc's equity in the Company and sales in the ordinary course of business.

The Restructuring Advisory Agreement shall include the following provisions:  (i) MagInc will provide the Company quarterly reports with regard to the activities of MagInc (including, without limitation, audited and unaudited financial statements), (ii) the Company may assign the Restructuring Advisory Agreement, and MagInc consents to such assignment, to any purchaser of or equity holders of the Company, (iii) the Restructuring Advisory Agreement shall be in effect for the period of 20 years after the Effective Date, and (iv) during the term of the Restructuring Advisory Agreement, other than dividends/distributions made to MagInc from Company and distributions to Mag Inc shareholders to pay taxes on allocated income, there will be no restricted payments by MagInc. The parties acknowledge that Mag Inc is an S corporation.  Nothing herein is intended to cause a termination of such status.  If Mag Inc determines that these arrangements may cause such termination, Mag Inc and the Ad Hoc Committee will negotiate other arrangements intended to preserve such status and achieve the economic |

| | |
|---|---|
| | objectives reflected in these terms. |
| **Employees of MagInc** | All employees of MagInc shall be transitioned to and become employees of the Company. |
| **Management Incentive Plan** | Compensation for the Senior Management of MagInc shall include the following: (i) 25% of the New Common Stock at emergence (including anti-dilution protection to maintain a 25% ownership in the event the New Convertible Preferred Stock is converted), and (ii) 10% of New Convertible Preferred Stock to be distributed in accordance with Schedule 1 attached hereto, provided, however, that in no event shall Senior Management be entitled to more than 25% of the fully diluted equity of the Company, after giving effect to the New Convertible Preferred.<br><br>All New Preferred Convertible Stock and New Common Stock distributed pursuant to the Management Incentive Plan shall vest upon the earlier of (i) 3 years with 1/3 vesting annually for each year; or (ii) upon a sale of the Company (including, without limitation, the sale of substantially all or all of the Company's assets or stock, a merger, or the combination of any of the foregoing).  In the event of a Senior Management Departure (as defined below), the equity to former shareholders of MagInc shall be terminated.  For the purposes of this provision, a "Senior Management Departure" means that any two of Larry Lehtinen, Matt Lehtinen, or Joe Broking voluntarily terminating their employment or greater than 50% of the entire management team voluntarily terminating their employment within a 6 month period. |
| **Section 363 Sale Process** | If requested by the Ad Hoc Committee as contemplated by the milestones set forth in the DIP Credit Agreement and the DIP Order, the Company will pursue a sale of all or substantially all of the Company's assets pursuant to section 363(b) of the Bankruptcy Code. |
| **Chapter 11 Litigation** | Nothing in this Term Sheet shall impair the Company's right to pursue estate causes of action against any party, including creditors or equityholders of any Debtor. |

| **OTHER PROVISIONS** | |
|---|---|
| **Board of Directors** | The New Board will consist of one member appointed by MagInc, which initially is Larry Lehtinen and 6 additional members to be appointed by the Ad Hoc Committee in consultation with Larry Lehtinen. |
| **Organizational Documents** | The organizational documents of each of the reorganized Debtors, including (upon agreement by the Company and the Ad Hoc Committee) a stockholders agreement of reorganized Magnetation (the "Stockholders Agreement"), shall contain terms and provisions, and be in form and substance, satisfactory to the Ad Hoc Committee and the Company. If a Stockholders Agreement is put in place, any holder of a claim that is to be distributed shares of New Common Stock pursuant to the Plan shall have duly executed and delivered to reorganized Magnetation, as an express condition precedent to such holder's receipt of such shares of New Common Stock, a counterpart to the Stockholders Agreement. |
| **Exemption from Registration** | The issuance of all securities under the Plan will be exempt from registration with the Securities Exchange Commission under section 1145 of the Bankruptcy Code to the extent permitted by applicable law. |
| **Conditions to Effective Date** | The Plan shall contain customary conditions to confirmation/effectiveness to be agreed upon by the Company and the Ad Hoc Committee, including, among other conditions, that: <br><br> 1) The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtors and the Ad Hoc Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code. <br><br> 2) The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order (a) shall be in form and substance acceptable to the Debtors and the Ad Hoc Committee and (b) shall not be subject to a stay or have been vacated on appeal. <br><br> 3) All of the schedules, documents, supplements, and exhibits to the Plan shall be in form and substance as required by the RSA. |

|  | 4) The RSA shall not have been terminated.<br><br>5) The aggregate amount of allowed administrative expense claims of each of the Debtors (excluding professional fees and expenses incurred by persons or firms retained by the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Ad Hoc Committee and the Official Committee of Unsecured Creditors) of each of the Debtors shall not exceed an amount to be determined by the Debtors and the Ad Hoc Committee. |
|---|---|
| **Fiduciary Out** | The RSA shall provide that nothing will prevent any of the Debtors from taking or failing to take any action that it is obligated to take (or fail to take) in the performance of any fiduciary duty or as otherwise required by applicable law that such Debtor owes to any other person or entity under applicable law. |

HIGHLY CONFIDENTIAL

**<u>Schedule 1</u>**

<u>Exhibit E</u>

Solicitation Procedures

# MAGNETATION

## PROPOSED SOLICITATION PROCEDURES[1]

Pursuant to that certain Debtor-In-Possession Credit Agreement (the "<u>DIP Credit Agreement</u>") among Magnetation LLC, the Lenders from time to time party thereto and Wilmington Trust, National Association, as the Administrative Agent (the "<u>Administrative Agent</u>"), the Prepetition Senior Secured Note Holders (the "<u>Other Prepetition Note Holders</u>") that are not initial Lenders under the DIP Credit Agreement as of the Closing Date (such initial Lenders, the "<u>Original DIP Lenders</u>") will have the opportunity to participate on a pro rata basis in the DIP Credit Agreement, which provides for a secured super-priority debtor-in-possession term loan facility in an aggregate original principal amount of up to $135,000,000 (plus capitalized fees and interest), comprising $63,658,252.45 of NM Loans, $3,841,747.55 of Bridge Roll-Up Loans[2] and up to $67,500,000 of Note Roll-Up Loans, as lenders (such participants, the "<u>Subsequent DIP Lenders</u>" and, together with the Original DIP Lenders, the "<u>DIP Lenders</u>") as described below (the "<u>DIP Solicitation</u>").

Pursuant to an offer to purchase (the "<u>Offer to Purchase</u>"), each DIP Lender will have the option to exchange a pro rata share of a portion of the Prepetition Senior Secured Notes held by such DIP Lender for a portion of the DIP Financing as described below (the "<u>Tender Offer</u>").

### I.    The DIP Solicitation

1)    The record date for the DIP Solicitation will be date that the DIP Solicitation is commenced as described in paragraph 3 below (the "<u>DIP Solicitation Record Date</u>").

2)    Commencement of the DIP Solicitation will occur promptly, but in any event no later than three Business Days, after entry by the Bankruptcy Court of the Interim Order (referred to herein as the "<u>DIP Solicitation Procedures Order</u>") reasonably acceptable to the Required Lenders approving these Solicitation Procedures and the conduct of the DIP Solicitation by the Debtors with the assistance of an information agent that the Debtors and the Required Lenders select (in such capacity, the "<u>Information Agent</u>") in the implementation of these procedures by the Debtors, provided that, in the event the Bankruptcy Court fails to enter the DIP Solicitation Procedures Order, the Debtors and the Required Lenders will work in good faith to establish alternative solicitation procedures.

3)    The Debtors will commence the DIP Solicitation by (A) issuing a press release announcing the commencement of and briefly describing the DIP Solicitation and directing interested Other Prepetition Note Holders to the Information Agent and (B) using reasonable efforts to send (including, if reasonably practicable, via the Prepetition Senior Secured Note Trustee) to as many of the Other Prepetition Note Holders as is reasonably practicable under the circumstances a notice in form reasonably satisfactory to the Required Lenders and the Debtors (the "<u>DIP Solicitation Notice</u>") (i) generally describing the debtor-in-possession credit facility established under the DIP Credit Agreement (the "<u>DIP Financing</u>"), (ii) providing instructions pursuant to which each Other Prepetition Note Holder can elect to purchase by assignment and assume its Pro

---

[1]    Capitalized terms used in these Proposed Solicitation Procedures that are not defined herein shall have the meanings provided in the DIP Credit Agreement (as defined herein).

[2]    Amounts of NM Loans and Bridge Roll-Up Loans are based on a Closing Date of May 7, 2015.  If the Closing Date does not occur on such date, the amount will be updated to reflect the principal amount of Prepetition Term Loans (including accrued and unpaid interest) on the Closing Date, with an interest per diem of $1,492.27.

Rata Portion (as defined herein) of the aggregate principal amount of all Loans and Commitments, and (iii) providing the form of subscription to participate in the DIP Financing and a signature page to the proposed Assignment and Assumption (which may be a consolidated Assignment and Assumption to which multiple assignors and multiple assignees are party and otherwise reasonably satisfactory to the Administrative Agent and the Information Agent), which Assignment and Assumption shall include certain representations and warranties to be made by the assignors and assignees party thereto.

4)      All Other Prepetition Note Holders, other than natural persons, any Debtor or any Affiliates of any Debtor, will be eligible to participate in the DIP Solicitation.

5)      The DIP Solicitation will expire at 5:00 p.m., New York time, on the 10th Business Day after commencement thereof (the "DIP Solicitation Expiration Date"), provided that the Debtors may extend such DIP Solicitation Expiration Date with the consent of the Required Lenders by prompt public announcement in a press release.

6)      Any Other Prepetition Note Holder as of the DIP Solicitation Record Date that wants to participate as a Lender in the DIP Financing must provide a completed subscription form and an executed signature page to the proposed Assignment and Assumption to be delivered on or prior to the Expiration Date to the Information Agent in accordance with the instructions in the DIP Solicitation Notice. The subscription form will require each Other Prepetition Note Holder that wishes to participate to provide a representation and warranty that they owned Prepetition Senior Secured Notes as of the DIP Solicitation Record Date and the aggregate principal amount of such Prepetition Senior Secured Notes owned as of the DIP Solicitation Record Date.

7)      Other Prepetition Note Holders may subscribe to the DIP Solicitation on behalf of, and instead of, any affiliates who are Other Prepetition Note Holders, provided such affiliate provides to the Information Agent a certification of this affiliate relationship and completes the certification of holdings of Prepetition Senior Secured Notes contained in the subscription form attached to the DIP Solicitation Notice.

8)      Each Other Prepetition Note Holder may purchase by assignment and assume an aggregate principal amount of Loans and Commitments equal to the aggregate principal amount of all Loans and Commitments multiplied by a fraction (expressed as a percentage) (its "Pro Rata Portion"), (i) the numerator of which is the aggregate outstanding principal amount of Prepetition Senior Secured Notes owned by such Other Prepetition Note Holder and subscribed pursuant to in the DIP Solicitation, and (ii) the denominator of which is the aggregate outstanding principal amount of all Prepetition Senior Secured Notes held by the Original Lenders plus the aggregate outstanding principal amount of Prepetition Senior Secured Notes owned by Other Prepetition Note Holders that participate in the DIP Financing pursuant to the DIP Solicitation, in each case under clauses (i) and (ii) as of the DIP Solicitation Record Date. For purpose of clause (i), Other Prepetition Note Holders may subscribe to the DIP Solicitation in any principal amount of Prepetition Senior Secured Notes up to the principal amount that they own.

9)      Subscription to the DIP Solicitation will be irrevocable and may not be withdrawn by subscribing Other Prepetition Note Holders. In the event that the terms of the DIP Solicitation are amended in a manner materially adverse to the Other Prepetition Note Holders, withdrawal rights will be provided to subscribing Other Prepetition Note Holders in accordance with applicable law.

10)     The terms of the DIP Solicitation may not be amended by the Debtors without the prior written consent of the Required Lenders.

11)   Other Prepetition Note Holders that by the DIP Solicitation Expiration Date do not return the subscription form and signature page to the Information Agent will not be permitted to participate in the DIP Financing.  The Debtors in consultation with the Information Agent shall determine whether any Other Prepetition Note Holder or Subsequent DIP Lender has made the representations referenced above and has properly executed and delivered the required documentation and whether to reject or accept, in their sole discretion after consultation with the Required Lenders, any subscription to participate that has not been properly completed and delivered.

12)   Subject to entry of an order by the Bankruptcy Court approving the DIP Financing, promptly following the DIP Solicitation Expiration Date, and in no case more than three Business Days after (the "Assignment Date"), (i) each Original DIP Lender and each Other Prepetition Note Holder participating in the DIP Financing pursuant to the DIP Solicitation shall (x) execute and deliver to the Administrative Agent an Assignment and Assumption (which may be a consolidated Assignment and Assumption to which multiple assignors and multiple assignees are party and otherwise reasonably satisfactory to the Administrative Agent and the Information Agent, and in any event shall be completed, as to all amounts, dates and parties, by the Administrative Agent and the Information Agent in accordance with the DIP Solicitation and the results thereof) reflecting the ratable sale and assignment (in the case of the Original DIP Lenders) and purchase and assumption (in the case of such Other Prepetition Note Holders) of such Other Prepetition Note Holder's Pro Rata Portion of the aggregate principal amount of all Loans and Commitments as contemplated hereby at a purchase price equal to 96.4489% of par (plus all accrued but unpaid interest on such Loans), in the case of such purchased Loans, and 100% of par, in the case of such assumed Commitments, and (y) execute and deliver, as applicable, to the Administrative Agent or the Debtors, as applicable, such other documentation or other items as may be required pursuant to Section 10.6(b) of the Credit Agreement (and, to the extent required by the Administrative Agent, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act), and (ii) each such Other Prepetition Note Holder shall pay in cash (in immediately available funds) such purchase price to the Original DIP Lenders (either directly to the Original DIP Lenders or through the Information Agent, as selected by the Original DIP Lenders and the Information Agent) in accordance with the Assignment and Assumption and the wire instructions separately furnished by the Information Agent.

## II.   The Tender Offer

A PREPETITION SENIOR SECURED NOTE HOLDER MAY ONLY PARTICIPATE IN THE TENDER OFFER IF AND TO THE EXTENT IT PARTICIPATES IN THE DIP SOLICITATION.  PREPETITION SENIOR SECURED NOTE HOLDERS THAT PARTICIPATE IN THE DIP SOLICITATION HAVE NO OBLIGATION TO PARTICIPATE IN THE TENDER OFFER.

1)   Commencement of the Tender Offer will occur promptly after the  DIP Solicitation Expiration Date.

2)   The record date for the Tender Offer will be the date that the Tender Offer is commenced as described in paragraph 3 below (the "Tender Offer Record Date").

3)   The Debtors will commence the Tender Offer by (A) issuing a press release announcing the commencement of and briefly describing the Tender Offer and directing interested DIP Lenders

to the Information Agent and (B) using reasonable efforts to send (including, if reasonably practicable, via the Prepetition Senior Secured Note Trustee or the Administrative Agent) to the DIP Lenders a notice in form reasonably satisfactory to the Required Lenders and the Debtors (the "<u>Tender Offer Notice</u>") (i) generally describing the DIP Financing, (ii) providing instructions pursuant to which each DIP Lender can elect to roll up Prepetition Senior Secured Notes in an aggregate principal amount equal to its Tender Offer Pro Rata Portion (as defined below) into Note Roll-Up Loans, (iii) providing the letter of transmittal to participate in the Tender Offer (the "<u>Letter of Transmittal</u>"), (iv) describing the procedures for tendering the Prepetition Senior Secured Notes, and (v) describing the terms of the Tender Offer, including withdrawal rights.

4)    Prepetition Senior Secured Notes validly tendered in accordance with the Tender Offer and accepted by the Company will be cancelled and tendering DIP Lenders will receive Note Roll-Up Loans as consideration, in the same principal amount as cancelled Prepetition Senior Secured Notes.

5)    All DIP Lenders will be eligible to participate in the Tender Offer.

6)    The Tender Offer will expire at 11:59 p.m., New York time, on the 20th Business Day after commencement thereof (the "<u>Tender Offer Expiration Date</u>"), provided that, subject to the prior written consent of the Required Lenders, the Debtors may extend such Tender Offer Expiration Date with the consent of the Required Lenders by prompt public announcement in a press release in accordance with applicable law.  DIP Lenders who have tendered their Prepetition Senior Secured Notes will be permitted to withdraw such tender at any time prior to the Tender Offer Expiration Date.

7)    The terms of the Tender Offer may not be amended by the Debtors without the prior written consent of the Required Lenders.

8)    Any DIP Lender as of the Tender Offer Record Date that wants to participate in the Tender Offer must provide a completed Letter of Transmittal provided to such DIP Lender in connection with this Tender Offer to be delivered on or prior to the Expiration Date to the Information Agent in accordance with the instructions in the Letter of Transmittal.

9)    Each DIP Lender may tender, and roll up Prepetition Senior Secured Notes up to an aggregate principal amount equal to $67,500,000 multiplied by a fraction (expressed as a percentage), (i) the numerator of which is the principal amount of such DIP Lender's Commitment and outstanding Loans under the DIP Credit Agreement, and (ii) the denominator of which is the aggregate principal amount of all Commitments and outstanding Loans under the DIP Credit Agreement, in each case under clauses (i) and (ii) as of the Tender Offer Record Date (its "<u>Tender Offer Pro Rata Portion</u>"), into Note Roll-Up Loans in an aggregate principal amount equal to its Tender Offer Pro Rata Portion.

10)    In the event that all DIP Lenders tender Prepetition Senior Secured Notes in an aggregate amount less than $67,500,000, the aggregate principal amount of Note Roll-Up Loans will be reduced by such amount.

11)    DIP Lenders that by the Tender Offer Expiration Date do not properly return the subscription form and signature page to the Information Agent will not be permitted to participate in the Tender Offer.  The Debtors in consultation with the Information Agent shall determine whether any DIP Lender has made the representations referenced above and has properly executed and delivered the required documentation and whether to reject or accept, in their sole discretion after

consultation with the Required Lenders, any subscription to participate that has not been properly completed and delivered.

12)  DIP Lenders may tender Prepetition Senior Secured Notes on behalf of, and instead of, any affiliates who are Prepetition Senior Secured Note Holders, provided such affiliate of the DIP Lender provides to the Information Agent a certification of this affiliate relationship in the form that will be attached to the Offer to Purchase.  If the DIP Lender and such affiliate or affiliates hold Prepetition Senior Secured Notes through a broker, dealer, commercial bank, trust company, custodian or other nominee through The Depository Trust Company ("DTC"), DIP Lenders may be unable to tender Prepetition Senior Secured Notes held by such Prepetition Senior Secured Note Holder affiliates held through different DTC Participant accounts.  VALID TENDER THROUGH DTC OF ANY PREPETITION SENIOR SECURED NOTE HOLDER AFFILIATE'S PREPETITION SENIOR SECURED NOTES SHALL BE THE SOLE RESPONSIBILITY OF THE TENDERING DIP LENDER.

13)  If a DIP Lender holds Prepetition Senior Secured Notes through a broker, dealer, commercial bank, trust company, custodian or other nominee through DTC, such DIP Lender must promptly contact such DIP Lender's nominee and instruct such nominee to tender the Prepetition Senior Secured Notes on its behalf and comply with the procedures set forth in the Offer to Purchase.

14)  Subject to entry of an order by the Bankruptcy Court approving the DIP Financing, by no later than the Tender Offer Expiration Date, (a) each DIP Lender participating in the Tender Offer pursuant to the Offer to Purchase shall (i) execute and deliver to the Information Agent the Letter of Transmittal reflecting the ratable exchange of such DIP Lender's validly tendered Prepetition Senior Secured Notes for Note Roll-Up Loans in an aggregate principal amount equal to its Tender Offer Pro Rata Portion and (ii) execute and deliver, as applicable, to the Information Agent or the Debtors, as applicable, such other joinder or assignment documentation or other items as may be required pursuant to Section 10.6(b) of the Credit Agreement (and, to the extent required by the Administrative Agent, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act), and (b) each such DIP Lender shall transfer such Prepetition Senior Secured Notes in accordance with the Letter of Transmittal.

THE DIP CREDIT AGREEMENT WILL NOT BE HELD THROUGH THE DEPOSITORY TRUST COMPANY; THEREFORE, ANY DIP LENDER WILL BE IDENTIFIED AS A DIRECT LENDER TO THE DEBTORS.

III.     Miscellaneous

1)  If the Credit Agreement terminates, the DIP Financing otherwise fails to close or the Debtors terminate the DIP Solicitation, the subscription forms submitted by participating Other Prepetition Note Holders will automatically terminate.

2)  In the event of a termination or cancellation of the Tender Offer, Other Prepetition Note Holders may continue to participate in the DIP Solicitation.

3)  The Bankruptcy Court has not reviewed or approved any financial or diligence information with respect to the Debtors that may be or have been provided to any parties in connection with the DIP Solicitation or Tender Offer, and all rights of such parties with respect to any such information are preserved.

Exhibit F

Disclosure

**1)  Consolidated EBITDA IODEX Sensitivity**

*($ in millions)*

| | Run-rate EBITDA Sensitivity | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Average IODEX Level | $40.00 | $50.00 | $60.00 | $70.00 | $80.00 | $90.00 | $100.00 | $110.00 | $120.00 |
| Average Freight | $9.50 | $9.50 | $10.50 | $15.00 | $17.00 | $17.00 | $20.00 | $20.00 | $20.00 |
| Brazil Netback | $30.50 | $40.50 | $49.50 | $55.00 | $63.00 | $73.00 | $80.00 | $90.00 | $100.00 |
| EBITDA | ($14.8) | $11.1 | $34.4 | $48.6 | $69.4 | $95.2 | $113.4 | $139.3 | $165.2 |

The above sensitivity reflects estimated full-year consolidated operating EBITDA for Magnetation LLC, taking into account the following key assumptions:

▲  Plant 4 and Pellet Plant have been completed and have reached a run-rate output of approximately 3.1mm TPA

▲  Plant 1 has been idled and is not producing concentrate

▲  Potential annual cost savings of $5-10mm are not reflected in the above full-year EBITDA sensitivity

•  Some of the potential cost savings could require one-time upfront investment

**2)   2015 Capex Detail**

| 2015 Capex Payments | 2015 | | | |
|---|---|---|---|---|
| *($ in millions)* | Q1 | Q2 | Q3 | Q4 |
| Pellet Plant | $17.6 | $8.4 | $– | $– |
| Plant 4 | 10.7 | 14.1 | 19.8 | 6.4 |
| Maintenance / Sustaining | 0.6 | 1.4 | 1.5 | 1.5 |
| **Total** | **$28.9** | **$23.9** | **$21.3** | **$7.9** |

| 2015 Capex Incurred | 2015 | | | |
|---|---|---|---|---|
| *($ in millions)* | Q1 | Q2 | Q3 | Q4 |
| Pellet Plant | $– | $– | $– | $– |
| Plant 4 | 14.1 | 4.8 | 2.2 | – |
| Maintenance / Sustaining | – | 0.5 | 4.2 | 5.5 |
| **Total** | **$14.1** | **$5.3** | **$6.3** | **$5.5** |

**3)  Cost Detail**

| Cost of Sales Detail | Full Run Rate Production[1] | |
| --- | --- | --- |
| | Total $mm | Per Ton $ |
| **Concentrate Plants** | | |
| Variable Costs: | | |
|   Direct Consumables | $10.9 | |
|   Royalties & Production Taxes | 21.2 | |
|   Other | 11.4 | |
|     **Total Variable** | **$43.4** | |
| | | |
| Fixed Costs: | | |
|   Labor | $18.4 | |
|   Repairs & Maintenance | 15.4 | |
|   Utilities & Fuel | 24.9 | |
|   Other | 16.3 | |
|     **Total Fixed** | **$75.0** | |
| | | |
|     **Total COS for Concentrate Plants** | **$118.5** | |
| **Pellet Plant** | | |
| Variable Costs: | | |
|   Raw Materials[2] | $19.1 | $6.15 |
|   Transportation Costs | 66.2 | 21.35 |
|     **Total Variable** | **$85.2** | **$27.50** |
| | | |
| Fixed Costs: | | |
|   Labor | $11.9 | $3.85 |
|   Repairs & Maintenance | 3.2 | 1.02 |
|   Utilities & Fuel | 21.8 | 7.02 |
|   Other | 19.0 | 6.12 |
|     **Total Fixed** | **$55.8** | **$18.01** |
| | | |
|     **Total COS for Pellet Plant** | **$141.1** | **$45.50** |
| | | |
| **Total Consolidated COS** | **$259.5** | **$83.72** |

| Corporate-Level SG&A | Run Rate $mm |
| --- | --- |
| Corporate-Level SG&A | $7.4 |

(1)  Based on full run rate production of approximately three million tons of pellets per annum.
(2)  Excludes the purchase of concentrate by the pellet plant from the concentrate plants.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Magnetation LLC, | | Case No. 15-50307 |
| | Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | | Case No. 15-50308 |
| | Debtor. | Chapter 11 Case |
| Mag Finance Corp., | | Case No. 15-50309 |
| | Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | | Case No. 15-50310 |
| | Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | | Case No. 15-50311 |
| | Debtor. | Chapter 11 Case |

**MEMORANDUM IN SUPPORT OF THE DEBTORS' JOINT MOTION FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) GRANTING AN EXPEDITED HEARING, (II)
AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e)
AND 507 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363
AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507**

Magnetation LLC ("**Mag LLC**") and its subsidiaries that are debtors and debtors in possession in these cases (the "**Debtors**") submit this memorandum of law in support of the motion submitted herewith (the "**Motion**"), in accordance with Local Rule 9013-2(a).

## BACKGROUND

The supporting facts are set forth in the Motion, verified by Joseph A. Broking, Chief Financial Officer of Magnetation LLC.  All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

<u>**LEGAL ANALYSIS**</u>

**I.    THE DEBTORS' REQUEST FOR EXPEDITED RELIEF SHOULD BE GRANTED**

The Debtors request expedited relief on the Motion.  Bankruptcy Rule 9006(c) provides that the Court may reduce the notice period for a Motion "for cause shown."  Cause exists here to grant the Motion on an expedited basis.  As described in the Motion, the liquidity to be provided under the DIP Financing is essential to the Debtors' continued operations and the success of the Debtors' reorganization efforts under chapter 11, and is needed on the most urgent basis possible.  Without the proceeds of the DIP Financing, the Debtors would be at serious risk of a shutdown, which would likely lead to their liquidation, the loss of hundreds of jobs and severe prejudice to their creditors.  In the days and weeks leading up to the Petition Date, the Debtors have exhausted every reserve, resource and strategy for operating with the cash available to them, but have reached the limit of what can be achieved under the circumstances.  Accordingly, expedited relief requested is necessary to avoid immediate and irreparable harm.

**II.    THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE DIP FINANCING UNDER SECTION 364 OF THE BANKRUPTCY CODE**

The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property.  Specifically, section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; [or]

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).  Further, section 364(d) of the Bankruptcy Code provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit.  *See, e.g.*, *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business

3

judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc*., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

Further, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

Here, given all the facts and circumstances present in these cases, the Debtors have amply satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Financing.  The Debtors exercised proper business judgment in securing the DIP Financing on terms that are fair and reasonable and the best available to them in the current market.  Given the circumstances, the Debtors could not obtain credit on an unsecured or administrative expense basis, and the Debtors have provided the Prepetition Secured Parties with adequate protection against any potential diminution in value of

their interests.   Moreover, the Prepetition Revolving Agent and the Prepetition Revolving

Lenders have consented to both the terms of the DIP Financing and the adequate protection

proposed in connection therewith.   For all the reasons discussed further below, therefore, the

Court should grant the Debtors' request to enter into the DIP Financing pursuant to sections

364(c) and (d) of the Bankruptcy Code.

> **i.    The Debtors Exercised Sound and Reasonable Business Judgment in
> Deciding to Enter into the DIP Financing**

Based on the facts of these Cases, the DIP Financing represents a proper exercise

of the Debtors' business judgment.   Bankruptcy courts routinely defer to the debtor's business

judgment on most business decisions, including decisions about whether and how to borrow

money.   *Grp. of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523,

550 (1943); *In re Farmland Indus., Inc.*, 294 B.R. 855, 882 (Bankr. W.D. Mo. 2003) ("Business

judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod.

Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17

(Bankr. S.D. Ohio 1983).   "More exacting scrutiny would slow the administration of the debtor's

estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, a bankruptcy court defers to a debtor's business judgment regarding

the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages

the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party

in interest.   *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*,

14 B.R. 506, 511-13 (Bankr. D. Utah 1981).   Courts generally will not second-guess a debtor's

business decisions when those decisions involve "a business judgment made in good faith, upon

a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14 (footnote omitted).

To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

Here, the Debtors have exercised sound business judgment in determining that the DIP Financing is appropriate. As discussed in the Buschmann Declaration, the Debtors have obtained the best terms available to them under the circumstances. Importantly, the DIP Financing that emerged out of this process provided for the continuation of the existing letters of credit issued under the Prepetition Revolving Facility, without the need to cash collateralize those letters of credit. Although the Prepetition Revolving Agent and Prepetition Revolving Lenders will be under no obligation to extend, renew or otherwise modify any letters of credit, the fact that the existing letters of credit will not need to be cash collateralized has reduced the size of the DIP Financing, and therefore its cost, while providing the same level of liquidity that a larger facility that did not have this feature would have. Both the amount of the commitments under the DIP Financing and this arrangement with the Prepetition Revolving Agent and Prepetition Revolving Lenders were crucial in allowing the Debtors to ensure that they would be able to continue operating in the ordinary course following commencement of these Cases. With the assistance of their advisors, the Debtors concluded that the DIP Financing represented the best terms available in the current market. *See* Buschmann Decl. ¶¶ 16-17. The Debtors' decision is therefore sound and reasonable under the circumstances.

The terms of the DIP Financing are also fair and reasonable in light of current market conditions.  With approximately $63.7 million of incremental availability, the DIP Financing represents a robust new source of liquidity for the Debtors.  If the Debtors cannot raise adequate financing and are instead forced to cease operations, they will likely be forced to liquidate, costing hundreds of jobs and leaving virtually all constituencies in a worse position. Further, the Prepetition Revolving Agent and the Prepetition Revolving Lenders have consented to the terms of the DIP Financing and their treatment thereunder.[10]  The Prepetition Revolving Lenders will retain their senior position, and holders of more than 70% of the principal amount of the Prepetition Notes, the Ad Hoc Senior Secured Committee of Note Holders, are committed to be both DIP Lenders and backstop parties under the DIP Financing, and so clearly consent to the DIP Financing as well.  Moreover, participation in the DIP Financing is open to all Prepetition Noteholders, who have the option to support the Debtors' efforts to restructure by becoming DIP Lenders pursuant to the Solicitation Procedures, or to passively benefit from the preservation and improvement of the Debtors' financial condition accomplished through these Cases.  In either event, all Prepetition Secured Parties will be adequately protected through the provision of replacement liens and administrative claims.  Absent the DIP Financing, the Debtors would face an increased risk of having to cease operations, which would likely lead to liquidation and a substantial decline in the value of the Prepetition Secured Parties' collateral. Instead, the fully committed nature of the DIP Financing will send a strong signal to the Debtors' employees, vendors and other parties in interest regarding the Debtors' viability.  Accordingly, if approved, the DIP Financing will preserve and enhance the value of the Debtors' estates and, as

---

[10] Letters of credit under the Prepetition Revolving Credit Agreement will remain outstanding, provided that the Issuing Lenders shall have no obligation to extend, renew or otherwise modify such letters of credit.

such, entry into the DIP Financing is therefore a sound exercise of the Debtors' business judgment.

> ### ii. The Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . ." 11 U.S.C. § 364(c).

Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

    (a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;

    (b)    the credit transaction is necessary to preserve the assets of the estate; and

    (c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *accord In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah* Fed*. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *accord In re Ames Dep't Stores, Inc.*, 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. at 549 (secured credit under section

364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  This is true especially when time is of the essence.  *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).  When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

As set forth in the Buschmann Declaration, the Debtors and Blackstone made every reasonable effort to secure the best postpetition financing possible under the circumstances.  However, given the Debtors' urgent need for liquidity, the challenging state of the iron ore and steel markets and the Debtors' highly-leveraged balance sheets and lack of unencumbered assets, the Debtors were unable to solicit any viable proposals that authorized financing on an unsecured or administrative expense basis.  On the contrary, the Debtors' negotiations made clear that the Debtors could only obtain the financing necessary to preserve their estates if they extended superpriority to these obligations.  *See* Buschmann Decl. ¶ 14.

The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of the DIP Lenders, superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in section 364(c)(1) of the Bankruptcy Code, subject to the superpriority adequate protection claims in favor of the Prepetition Revolving Agent and the Prepetition Revolving Lenders, and the DIP Liens with respect to the Funding Account and the Carve-Out Account.

### iii.    The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens that are Senior to the Liens Securing the Prepetition Secured Debt

In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on the encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1).

When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed.).

The DIP Financing satisfies each of these factors. First, as described above, the Debtors and their advisors undertook a focused process appropriate to the circumstances, and only received a competitive financing proposal from the Ad Hoc Senior Secured Note Holder Committee. The Debtors conducted arm's-length negotiations with the Ad Hoc Senior Secured Note Holder Committee, and the ultimate agreement reflects the most favorable terms on which the Debtors were able to obtain financing. The Debtors are not able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting liens senior in priority to those securing the Prepetition Notes.

Second, the Debtors urgently need the funds to be provided under the DIP Financing to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Financing, the Debtors will continue to be significantly liquidity constrained. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Cases is in the best interests of all stakeholders.

Third, the terms of the DIP Financing are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Cases, as the DIP Financing will allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these Cases.

Fourth, as described in greater detail above and in the Buschmann Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arms'-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business

judgment.  The DIP Financing is on the most favorable terms available to the Debtors under current market conditions and the Debtors' financial condition.  In light of all these factors, therefore, it is clear that the Debtors should be authorized to secure the DIP Financing with first priority senior priming liens, junior only to the liens securing indebtedness under the Prepetition Revolving Credit Agreement.

> ### iv.    The Interests of the Prepetition Secured Parties Are Adequately Protected

The Prepetition Secured Parties are advantaged by the DIP Financing, as the Prepetition Revolving Lenders will retain their senior lien position and remain senior in right of payment.  Significantly, the Prepetition Revolving Lenders have also consented to the DIP Financing and the adequate protection provided to them therein.  The Prepetition Noteholders have the opportunity to participate as DIP Lenders in the DIP Financing, including rolling up the *pro rata* portion of their notes, and non-participating Prepetition Noteholders will be adequately protected through replacement liens, superpriority administrative claims and the preservation of the going concern value of the Debtors.

A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest or granting of replacement liens or administrative claims.  *See, e.g.*, *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and development.'") (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, *reprinted in* 1978 U.S. Code Cong. & Ad. News 5963, 6295); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996)

("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).   The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession.   *See Martin*, 761 F.2d at 474; *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

Further, courts in this district and others have approved similar forms of adequate protection for prepetition secured creditors.   *See, e.g.*, *In re Duke and King Acquisition Corp.*, No. 10-38652 (GFK) (Bankr. D. Minn. Jan. 24, 2011) [ECF No. 138] (authorizing replacement liens to prepetition secured creditors for the use of cash collateral); *In re Otter Tail AG Enters., LLC*, 2009 Bankr. LEXIS 5352, at *10-11 (Bankr. D. Minn. Nov. 20, 2009) (grating, *inter alia*, adequate protection liens for the use of cash collateral); *In re Schwing America, Inc.*, No. 09-36760 (NCD) (Bankr. D. Minn. Oct. 2, 2009) [ECF No. 15] (granting replacement liens in authorizing postpetition financing on an interim basis); *In re Polaroid Corp.*, No. 08-46617 (GFK) (Bankr. D. Minn. Jan. 27, 2009) [ECF No. 70] (authorizing replacement liens to

prepetition secured creditors for the use of cash collateral); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at \*26–27 (Bankr. D. Neb. Nov. 18, 2009) (granting adequate protection liens and superpriority claims pursuant to 507(b) to prepetition lenders); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 12, 2012) (granting, *inter alia*, first and second lien adequate protection liens); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012) [ECF No. 275] (granting, *inter alia*, DIP liens, adequate protection liens and superpriority claims to secure DIP obligations); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011).

Accordingly, the Court should find that the adequate protection provided to the Prepetition Secured Parties is fair and reasonable, and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

### v.    The Term Roll-Up and the Prepetition Notes Roll-Up Should Be Approved

As a condition to providing the Debtors the funding they need to operate their businesses, the Ad Hoc Senior Secured Note Holder Committee is requiring the Debtors to consummate the Term Roll-Up at the outset of these Cases and the Prepetition Notes Roll-Up on or following entry of the Final Order.  *See* Buschmann Decl. ¶ 18.  Taking into account the nature of this proposed transaction and its implications for creditors, the Debtors carefully considered its terms.  The Prepetition Term Facility was provided by the same Prepetition Noteholders that are proposing to provide the DIP Financing, and but for the Prepetition Term Facility, the Debtors would likely have been forced to file chapter 11 cases with limited preparation and no committed financing, which would have been catastrophic for the Debtors' businesses and harmful to all creditors.  Likewise, the DIP Financing itself is essential to the Debtors' continued operations, and the Prepetition Noteholders are the only viable source of this

crucial financing. Additionally, because the participation in the DIP Financing (including with respect to the Prepetition Notes Roll-Up) is being offered to every Prepetition Noteholder, all such parties have equal opportunity to benefit from the Prepetition Notes Roll-Up without prejudice to any Prepetition Noteholder. Given that the liquidity provided by the Prepetition Term Lenders was essential to ensuring the Debtors' continued operations and to achieving an orderly commencement of these Cases, and that the DIP Financing is similarly essential to the Debtors' continued operations and successful restructuring through these Cases, the Debtors submit that the Term Roll-Up and Prepetition Notes Roll-Up are appropriate and in the best interests of their estates.

Moreover, such roll-ups of prepetition debt are often approved at the outset of a chapter 11 case. *See, e.g.*, *In re Patriot Coal Corp.*, No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Bear Island Paper Co., L.L.C.*, No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Mar. 5. 2007); *In re Rowe Cos.*, No. 06-11142 (KRH) (Bankr. E.D. Va. Oct. 16, 2006).

## III.   THE DEBTORS SHOULD BE AUTHORIZED TO USE THE CASH COLLATERAL

Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

The trustee may not use, sell, or lease cash collateral . . . unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

15

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an

interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or

without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide

adequate protection of such interest."  11 U.S.C. § 363(e).

       The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and

should be authorized to use the Cash Collateral.  First, as explained above, the Prepetition

Revolving Agent and the Prepetition Revolving Lenders have consented to the use of their Cash

Collateral.  Second, as described above, the Debtors are providing the Prepetition Secured Parties

with replacement liens on the Prepetition Secured Parties' collateral, including Cash Collateral,

and superpriority administrative claims.  The interests of the Prepetition Secured Parties are thus

adequately protected from diminution under the DIP Financing.  Accordingly, the Court should

authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

## IV.    THE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES IN CONNECTION WITH THE DIP FINANCING

       As described above, the Debtors have agreed, subject to Court approval, to pay

certain fees to the DIP Agent and the DIP Lenders in connection with the DIP Financing.

Specifically, the Debtors will pay:  (a) a closing fee that is not payable in cash in favor of the

DIP Lenders who are DIP Lenders as of the Closing Date, (b) a backstop fee to the DIP Lenders

who are DIP Lenders as of the Closing Date and (c) an agency fee to the DIP Agent.  The fees

the Debtors have agreed to pay to the DIP Agent and the DIP Lenders and other obligations

under the DIP Credit Agreement represent the most favorable terms on which the DIP Lenders

would agree to make the DIP Financing available.  The Debtors considered the fees described

above when determining in their sound business judgment that the DIP Documents constituted

the best terms on which the Debtors could obtain the postpetition financing necessary to continue

their operations and prosecute these Cases, and paying these fees in order to obtain the DIP

Financing is in the best interests of the Debtors' estates and creditors and other parties in interest.

## V.      THE SCOPE OF THE CARVE-OUT IS APPROPRIATE

The DIP Financing subjects the security interests and administrative expense

claims of the DIP Lenders to the Carve-Out.  Such carve-outs for professional fees have been

found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee

can retain assistance from their professionals in certain circumstances during an event of default

under the terms of the debtor's postpetition financing.  *See Ames*, 115 B.R. at 40.  The DIP

Financing does not directly or indirectly deprive the Debtors' estates or other parties in interest

of possible rights and powers by restricting the services for which professionals may be paid in

these cases.  *Id.* at 38 (observing that courts insist on carve-outs for professionals representing

parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all

parties-in-interest are sorely prejudiced").    Additionally, the Carve-Out protects against

administrative insolvency during the course of these Cases by ensuring that assets remain for the

payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee

notwithstanding the grant of superpriority claims and DIP and adequate protection liens.

Courts in this district and others routinely approve of carve-outs agreed to by the

debtors and their DIP financing lenders.  *See, e.g.*, *In re Genmar Holdings, Inc.*, No. 09-43537

(Bankr. D. Minn. June 4, 2009) [ECF No. 23]; *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS 5837,

at *18 (Bankr. E.D. Mo. May 28, 2010); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at

*18-19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495

(KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549

(RDD) (Bankr. S.D.N.Y. Jan. 11, 2011).

## VI.   THE DIP LENDERS SHOULD BE DEEMED GOOD FAITH LENDERS UNDER SECTION 364(E)

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

As explained in detail herein and in the Buschmann Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of arm's-length, good faith negotiations between the Debtors and the DIP Lenders.  Buschmann Decl. ¶¶ 13-14.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VII.   MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED FOR THE DIP LENDERS AND DIP AGENT

The DIP Documents contemplate, upon entry of the Final Order, that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to

the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court.

Stay modification provisions of this sort are ordinary features of DIP financing and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *31–32 (Bankr. D. Neb. Nov. 18, 2009); *In re Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at *19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 18, 2012); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012); *In re Roomstore, Inc.*, No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re The Great Atl. & Pac. Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Canal Corp. f/k/a Chesapeake Corp.*, No. 08-36642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008).

## VIII.   THE DEBTORS REQUIRE IMMEDIATE ACCESS TO THE DIP FINANCING

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $55 million under the DIP Financing, is not granted promptly after the Petition Date. Further, the Debtors

anticipate that the commencement of these Cases will significantly and immediately increase the

demands on their free cash as a result of, among other things, the costs of administering these

Cases and addressing key constituents' concerns regarding the Debtors' financial health and

ability to continue operations in light of these Cases. Accordingly, the Debtors have an

immediate need for access to liquidity to, among other things, continue the operation of their

businesses, maintain their relationships with customers, meet payroll, pay capital expenditures,

procure goods and services from vendors and suppliers and otherwise satisfy their working

capital and operational needs, all of which is required to preserve and maintain the Debtors'

enterprise value for the benefit of all parties in interest.

The importance of a debtor's ability to secure postpetition financing to prevent

immediate and irreparable harm to its estate has been repeatedly recognized in this district and

others in similar circumstances. *See, e.g.*, *In re Genmar Holdings, Inc.*, No. 09-43537 (Bankr. D.

Minn. June 4, 2009) [ECF No. 23] (approving DIP loan with granting of senior lien); *In re US*

*Fidelis, Inc.*, 2010 Bankr. LEXIS 5837, at *10 (Bankr. E.D. Mo. May 28, 2010) (authorizing

secured postpetition financing on a superpriority basis); *In re Premium Protein Prods., LLC*,

2009 Bankr. LEXIS 5285, at *6-9 (Bankr. D. Neb. Nov. 18, 2009) (authorizing debtor to incur

postpetition secured indebtedness on an interim basis); *In re Trilogy Dev. Co.*, 2009 Bankr.

LEXIS 5178, at *7 (Bankr. W.D. Mo. July 14, 2009) (authorizing postpetition secured financing

with superpriority DIP liens priming prepetition secured construction loan); *In re Va. United*

*Methodist Homes of Williamsburg, Inc.*, No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013)

(approving postpetition financing on an interim basis); *In re AMF Bowling Worldwide, Inc.*, No.

12-36495 (KRH) (Bankr. E.D. Va. Nov. 14, 2012) (same); *In re Patriot Coal Corp.*, No. 12-

12900 (ALG) (Bankr. S.D.N.Y. July 11, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG)

(Bankr. S.D.N.Y. Jan. 20, 2012) (same); *In re Roomstore, Inc.*, No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011) (same); *In re Bear Island Paper Co., L.L.C.*, No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010) (same); *In re Lyondell Chem. Co*., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same).  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the Court grant the relief requested in the Motion.

Dated:  May 5, 2015                                FREDRIKSON & BYRON, P.A.

                                                   */e/ Clinton E. Cutler*
                                                   Clinton E. Cutler (#158094)
                                                   James C. Brand (#387362)
                                                   Sarah M. Olson (#390238)
                                                   200 South Sixth Street, Suite 4000
                                                   Minneapolis, Minnesota 55402
                                                   Telephone: (612) 492-7000
                                                   Facsimile:  (612) 492-7077
                                                   ccutler@fredlaw.com
                                                   jbrand@fredlaw.com
                                                   solson@fredlaw.com

                                                   *Proposed Local Counsel to the Debtors*
                                                   *and Debtors in Possession*

                                                   – and –

                                                   DAVIS POLK & WARDWELL LLP
                                                   Marshall S. Huebner (NY #2601094)
                                                   Damian S. Schaible (NY #4086864)
                                                   Michelle M. McGreal (NY #4599031)
                                                   450 Lexington Avenue
                                                   New York, New York 10017
                                                   Telephone: (212) 450-4000
                                                   Facsimile:  (212) 701-5800
                                                   marshall.huebner@davispolk.com
                                                   damian.schaible@davispolk.com
                                                   michelle.mcgreal@davispolk.com

                                                   *Proposed Counsel to the Debtors*
                                                   *and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | | |
|---|---|---|
| Magnetation LLC, | | Case No. 15-50307 |
| | Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | | Case No. 15-50308 |
| | Debtor. | Chapter 11 Case |
| Mag Finance Corp., | | Case No. 15-50309 |
| | Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | | Case No. 15-50310 |
| | Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | | Case No. 15-50311 |
| | Debtor. | Chapter 11 Case |

**INTERIM ORDER (I) GRANTING AN EXPEDITED HEARING;
(II) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e)
AND 507 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363
AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507**

Upon the motion (the "***Motion***"), [1] dated May 5, 2015, of Magnetation LLC (the "***Borrower***") and its affiliated debtors in possession (the "***Guarantors***" and, together with the Borrower, collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Cases***"), pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "***Bankruptcy Code***"), rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "***Bankruptcy Rules***"); and rules 9013-1, 9013-2 and 9013-3 of the Local Bankruptcy Rules for the District of Minnesota (the "***Local Rules***"), seeking, among other things:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

\

(1)      authorization for the Borrower to obtain, and for each Guarantor to guaranty, post-petition financing (the "***DIP Financing***") up to the aggregate principal amount of $135 million (plus capitalized fees and interest), consisting of (i) up to $63,658,252.45 of new money loans (the "***NM DIP Loans***"); (ii) $3,841,747.55 (the "***Term Roll-Up DIP Loans***")[2] resulting from a dollar-for-dollar roll-up of the aggregate principal amount outstanding and accrued interest under that certain Credit Agreement, dated as of April 17, 2015 (the "***Prepetition Term Credit Agreement***") among the Debtors, Wilmington Trust, National Association, as agent (in such capacity, the "***Prepetition Term Agent***") and the lenders from time to time party thereto (in such capacities, the "***Prepetition Term Lenders***", and together with the Prepetition Term Agent, the "***Prepetition Secured Term Parties***"); and (iii) up to $67,500,000 (the "***Notes Roll-Up DIP Loans***" and together with the NM DIP Loans and the Term Roll-Up DIP Loans, the "***DIP Loans***")) resulting from a dollar-for-dollar roll-up of Prepetition Notes (as defined below) held by the DIP Lenders (as defined below) in an aggregate principal amount of up to $67,500,000 on a pro rata basis, in each case, on the terms and subject to the conditions, set forth herein and in the Debtor In Possession Credit Agreement (the "***DIP Credit Agreement***" and, together with the schedules and exhibits thereto and all ancillary agreements executed in connection therewith, including, without limitation, the Security Documents (as defined in the DIP Credit Agreement), the "***DIP Documents***") among the Debtors, the

---

[2] Amounts indicated for NM DIP Loans and Term Roll-Up DIP Loans are based on a Closing Date (as defined in the DIP Credit Agreement) of May 7, 2015. If the Closing Date does not occur on such date, the amounts will be updated to reflect the principal amount of Prepetition Term Facility Debt (including accrued and unpaid interest) on the Closing Date, with an interest per diem of $1,492.27.

lenders party thereto from time to time (in such capacities, the "***DIP Lenders***") and Wilmington Trust, National Association, as administrative agent (in such capacity, the "***DIP Agent***");

(2)     authorization for the Debtors to execute and deliver the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Financing;

(3)     authorization for the Debtors to grant to the DIP Agent, for itself and for the benefit of the DIP Lenders, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below);

(4)     authorization for the Debtors to maintain and renew existing letters of credit under, and to the extent permitted by, the Prepetition Revolving Credit Agreement (as defined below) (provided that, any Issuing Lender (as defined in the Prepetition Revolving Credit Agreement) shall have no obligation to extend, renew or otherwise modify any letters of credit, but the obligations of the parties with respect to existing letters of credit shall not be modified by the Interim Order (as defined below)), obtain new letters of credit to replace or backstop the existing letters of credit, cash collateralize new letters of credit and perform all acts related thereto, in each case, to the extent permitted by the DIP Documents;

(5)     authorization for the Debtors to use Cash Collateral (as defined below) and the other Prepetition Collateral (as defined below) of the Prepetition Secured Parties (as defined below);

(6)      the grant of adequate protection to the Prepetition Secured Parties with respect to, inter alia, the use of their Cash Collateral and the other Prepetition Collateral;

(7)      approving certain stipulations by the Debtors with respect to the Prepetition Secured Facilities and the related liens and security interests;

(8)      subject only to and effective upon entry of the Final Order (as defined below), the limitation of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(9)      modification of the automatic stay under section 362 of the Bankruptcy Code to the extent set forth herein and in the DIP Documents;

(10)     scheduling an interim hearing (the "***Interim Hearing***") with respect to the relief sought by the Motion to be held before this Court to consider entry of an interim order in the form filed with the Motion (the "***Interim Order***"), authorizing the Borrower, on an interim basis, to forthwith borrow from the DIP Lenders under the DIP Documents up to an aggregate principal or face amount not to exceed $55,000,000 to (i) provide working capital to the Debtors; (ii) pay (a) all amounts payable to the DIP Agent and the DIP Lenders (as defined below) pursuant to the DIP Documents and/or this Interim Order, including, without limitation, the Backstop Fee (as defined in the DIP Credit Agreement) and (b) all reasonable and documented pre- and post-petition professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and

4

expenses) incurred by the DIP Lenders, the DIP Agent, the Prepetition Secured

Parties, the Prepetition Secured Term Parties, and the Ad Hoc Senior Secured

Note Holder Committee (as defined in the DIP Credit Agreement), in each case,

as set forth in the DIP Documents and/or this Interim Order, as applicable; (iii)

fund the Prepetition Secured Note Trustee Escrow Account (as defined in the DIP

Credit Agreement) and the fees related thereto as set forth in the Citibank

Preferred Custody Services Agreement by and among Magnetation LLC, the

Prepetition Notes Trustee (as defined below), and Citibank, N.A., as escrow agent

(the "***Prepetition Notes Trustee Escrow Agreement***"), in each case, in accordance

with the DIP Documents and this Interim Order; and (iv) make all adequate

protection payments authorized hereunder

(11)    that this Court schedule a final hearing (the "***Final Hearing***") to be

held within 45 days of the entry of the Interim Order to consider entry of the order

authorizing the balance of the borrowings under the DIP Documents and other

relief sought by the Motion on a final basis (the "***Final Order***");

and due and appropriate notice of the Motion, the relief requested therein and of the

Interim Hearing having been served by the Debtors in accordance with Local Rule

9013-3(a); and the Interim Hearing having been held before this Court on May 7, 2015;

and upon the record made by the Debtors at the Interim Hearing and after due

deliberation and consideration and sufficient cause appearing therefor:

IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion and of the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(b) and (c) and Local Rule 9013-3(a)(2).

3.    *Immediate Entry*.    Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).  No party has interposed an objection to the relief granted hereby or any such objection (to the extent not withdrawn) is hereby overruled.

4.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraphs 18 and 19 below), the Debtors admit, stipulate and agree that:

    (a)    The Prepetition Revolving Credit Facility.

        (i)    (A) As of the filing of the Cases (the "***Petition Date***"), the Debtors are truly and justly indebted and liable to the lenders (the "***Prepetition Revolving Lenders***") and (as applicable) the Prepetition Revolving Agent under that certain Credit Agreement, dated as of May 20, 2013 (as heretofore amended, supplemented or otherwise modified, the "***Prepetition Revolving Credit Agreement***" and, together with all security, pledge and guaranty agreements and all other documentation heretofore executed in connection with any of the foregoing, each as heretofore amended, supplemented or otherwise modified, the "***Prepetition Revolving Credit Documents***") among the Borrower, the Prepetition Revolving Lenders, and JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "***Prepetition Revolving Agent***"), without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less

than $56,000,000 in respect of loans made and not less than $8,877,700 in face amount of undrawn letters of credit issued pursuant to the Prepetition Revolving Credit Documents, plus accrued and unpaid interest, and any costs, fees, charges and expenses, in each case, that are chargeable and reimbursable under the Prepetition Revolving Credit Documents, secured swap agreements, cash management arrangements and purchasing card arrangements provided by the Prepetition Revolving Lenders, in each case, in accordance with the terms thereof, and other Obligations (as defined in the Prepetition Revolving Credit Documents) in connection therewith (collectively, the "***Prepetition Revolving Facility Debt***"), (B) the Prepetition Revolving Facility Debt constitutes the legal, valid and binding obligations of the Debtors enforceable in accordance with its terms (except to the extent such enforcement is stayed by section 362 of the Bankruptcy Code) and (C) no portion of the Prepetition Revolving Facility Debt is subject to objection, defense, counterclaim, claim (as such term is defined in the Bankruptcy Code), offset, contest, avoidance, reduction, disallowance, recharacterization, recovery or subordination (whether equitable, contractual or otherwise) of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(ii)     As of the Petition Date, the liens and security interests (the "***Prepetition Revolving Facility Liens***") granted to the Prepetition Revolving Agent, for the benefit of the Prepetition Revolving Lenders and certain affiliates thereof, to secure the Prepetition Revolving Facility Debt (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Prepetition Revolving Agent, or the Prepetition Revolving Lenders or their affiliates) are (A) valid, binding, perfected, enforceable, first-priority liens (subject to permitted exceptions under the Prepetition Revolving Credit Documents) on and security

interests in substantially all of the personal and real property of the Debtors constituting "Collateral" under, and as defined in, the Prepetition Revolving Credit Agreement (the "***Prepetition Revolving Facility Collateral***"); (B) not subject to objection, defense, counterclaim, claim (as such term is defined in the Bankruptcy Code), offset, contest, avoidance, reduction, disallowance, recharacterization or subordination (whether equitable, contractual or otherwise) of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (C) subject and subordinate only to certain valid, perfected and unavoidable liens permitted under the Prepetition Revolving Credit Facility as senior to the Prepetition Revolving Facility Liens (the "***Permitted Senior Liens***");

(iii)    As of the Petition Date, the aggregate value of the Prepetition Revolving Facility Collateral substantially exceeds the aggregate amount of the Prepetition Revolving Facility Debt; and

(iv)    The Prepetition Revolving Agent and the Prepetition Revolving Lenders consent to the Debtors' use of Cash Collateral and other Prepetition Collateral, and the Debtors' entry into the DIP Documents, in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

(b)    The Prepetition Term Facility.

(i)    (A) As of the Petition Date, the Debtors were indebted and liable to the Prepetition Term Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $3,837,270.74 (inclusive of capitalized payment in kind interest) in respect of loans made by the Prepetition Term Lenders pursuant to, and in accordance with the terms of, the Prepetition Term Credit Agreement, plus interest, fees, charges and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees), in

each case, that are chargeable and reimbursable under the Prepetition Term Credit Agreement and related documents, in each case in accordance with the Prepetition Term Credit Agreement, and other obligations incurred in connection therewith as provided in the Prepetition Term Credit Agreement (collectively, the "***Prepetition Term Facility Debt***"), (B) the Prepetition Term Facility Debt constitutes legal, valid and binding obligation of the Debtors enforceable in accordance with its terms and (C) no portion of the Prepetition Term Facility Debt is subject to objection, defense, counterclaim, offset, avoidance, disallowance, recharacterization, recovery or subordination (except solely as to the order of application of Proceeds as defined and provided in that certain Intercreditor Agreement, dated as of April 17, 2015 (the "***Term Intercreditor Agreement***"), among the Borrower, the Prepetition Revolving Agent, the Prepetition Term Agent and the other parties thereto) pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(ii)     As of the Petition Date, the liens and security interests granted to the Prepetition Term Agent (the "***Prepetition Term Facility Liens***") to secure the Prepetition Term Facility Debt (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Prepetition Term Agent, for its benefit and for the benefit of the Prepetition Term Lenders), are (A) valid, binding, perfected, enforceable, first-priority liens on and security interests in the personal and real property described in the Prepetition Term Credit Agreement and related documents (the "***Prepetition Term Collateral***"); (B) not subject to objection, defense avoidance, recharacterization or subordination (except solely as to the order of application of Proceeds (as defined and provided in the Term Intercreditor Agreement)) pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (C) subject and subordinate only to the

Prepetition Revolving Facility Liens (solely as to the order of application of Proceeds (as provided in the Term Intercreditor Agreement)), and any Permitted Senior Liens;

(iii)    As of the Petition Date, the aggregate value of the Prepetition Term Collateral substantially exceeds the aggregate amount of the Prepetition Term Facility Debt.

(c)    The Prepetition Senior Secured Notes.

(i)    (A) As of the Petition Date, the Debtors were indebted and liable, without defense, counterclaim or offset of any kind, in respect of the 11.0% senior secured notes of the Borrower due 2018 (the "*Prepetition Notes*") issued pursuant to the Indenture dated May 20, 2013 (as heretofore amended, supplemented or otherwise modified, the "*Prepetition Notes Indenture*" and, together with the Prepetition Revolving Credit Agreement, the "*Prepetition Secured Facilities*") among the Debtors and Wilmington Trust, National Association, as successor Trustee and Collateral Agent (in such capacity, the "*Prepetition Notes Trustee*" and, together with the holders of the Prepetition Notes (the "*Prepetition Noteholders*"), the Prepetition Revolving Agent and the Prepetition Revolving Lenders, the "*Prepetition Secured Parties*"), in the aggregate principal amount of not less than $425,000,000, plus interest, fees, charges and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Prepetition Notes Indenture), and other obligations incurred in connection therewith as provided in the Prepetition Notes Indenture (collectively, the "*Prepetition Notes Debt*" and, together with the Prepetition Revolving Facility Debt, the "*Prepetition Secured Debt*"), (B) the Prepetition Notes Debt constitutes legal, valid and binding obligation of the Debtors enforceable in accordance with its terms and (C) no portion of the Prepetition Notes Debt is subject to objection, defense, counterclaim, offset,

10

avoidance, disallowance, recharacterization, recovery or subordination (except solely as to the order of application of Proceeds (as defined and provided in that certain Intercreditor Agreement, dated as of May 20, 2013 (as heretofore amended, supplemented or otherwise modified, the "***Notes Intercreditor Agreement***"), among the Borrower, the Prepetition Revolving Agent, the Prepetition Term Agent, the Prepetition Notes Trustee and the other parties thereto) pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(ii)    As of Petition Date, the liens and security interests (the "***Prepetition Notes Liens***" and, together with the Prepetition Revolving Facility Liens, the "***Prepetition Liens***") securing the Prepetition Notes (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Prepetition Notes Trustee, for its benefit and for the benefit of the Prepetition Noteholders), are (A) valid, binding, perfected, enforceable, first-priority liens on and security interests in the personal and real property described in the Prepetition Notes Indenture and related documents (the "***Prepetition Notes Collateral***" and, together with the Prepetition Revolving Facility Collateral, the "***Prepetition Collateral***"); (B) not subject to objection, defense avoidance, recharacterization or subordination (except solely as to the order of application of Proceeds as provided in the Notes Intercreditor Agreement) pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (C) subject and subordinate only to (1) the Prepetition Revolving Facility Liens (solely as to the order of application of Proceeds pursuant to the Notes Intercreditor Agreement); (2) the Prepetition Term Facility Liens (solely as to the order of application of Proceeds pursuant to the Notes Intercreditor Agreement); and (3) the Permitted Senior Liens; and

(iii)    As of the Petition Date, the aggregate value of the Prepetition Notes Debt substantially exceeds the aggregate amount of the Prepetition Notes Collateral.

(d)    The Prepetition Secured Facilities and the Prepetition Term Credit Agreement

(i)    As of the Petition Date, the Debtors have no claims, objections, challenges, counterclaims, causes of action and/or choses in action, defenses or setoff rights (other than any setoff rights under any swap agreements in accordance with their terms) against any of the Prepetition Secured Parties, the Prepetition Secured Term Parties, the Prepetition Secured Debt, the Prepetition Term Facility Debt, the Prepetition Term Facility Liens, and the Prepetition Liens under any contract or tort (including, without limitation, lender liability) theories of recovery, whether arising at law or in equity, including any recharacterization, subordination (whether equitable, contractual or otherwise, except solely as to the order of application of Proceeds as provided in the Term Intercreditor Agreement and the Notes Intercreditor Agreement, as applicable), avoidance or other claim arising under or pursuant to section 105 or chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code or under any other similar provisions of applicable state or federal law (all of the foregoing, the "*Challenges*"), and to the extent any Challenges are deemed to have existed, the Debtors hereby forever waive, discharge and release any and all Challenges and the assertion of them against the Prepetition Secured Parties, the Prepetition Secured Term Parties, and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors, in each case, in connection with any matter related to the Prepetition Secured Debt, the Prepetition Term Facility Debt, the Prepetition Term Facility Liens, the Prepetition Liens, the Prepetition Secured Facilities, the Prepetition Term Credit Agreement or the financings and transactions contemplated thereby; and

12

(ii)    As of the Petition Date, the Prepetition Secured Debt and the Prepetition Term Facility Debt are subject to the Term Intercreditor Agreement and the Notes Intercreditor Agreement (as applicable), and the provisions of each of the Term Intercreditor Agreement and the Notes Intercreditor Agreement are valid and enforceable, and not subject to any defense or claim of invalidity.  The Prepetition Revolving Facility Debt constitutes "Priority Payment Lien Obligations" under, and as defined in, each of the Term Intercreditor Agreement, the Notes Intercreditor Agreement and the Prepetition Notes Indenture.

5.    *Findings Regarding DIP Financing and Use of Cash Collateral.*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    The Debtors have an immediate need to obtain the DIP Financing and to use Cash Collateral (as defined below) and the other Prepetition Collateral to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and the other Prepetition Collateral, incurrence of indebtedness under the DIP Documents, and other financial accommodations provided under the DIP Financing is vital to the preservation and maintenance of the Debtors' going concern values and to their successful reorganization.

(c)    The Debtors are unable to obtain financing from other sources on more favorable terms than the DIP Financing provided by the DIP Lenders.  The Debtors are (i) unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, and (ii) unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting to the DIP

Agent and the DIP Lenders the DIP Liens and the DIP Superpriority Claims under the terms and

subject to the conditions set forth in this Interim Order and the DIP Documents, as well as any

and all other protections provided to the DIP Agent and the DIP Lenders herein and therein.

(d)     The terms of the DIP Financing and the conditions for the use of the Cash

Collateral are fair and reasonable, reflect the Debtors' prudent business judgment consistent with

their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Financing has been negotiated in good faith and at arm's length

among the Debtors, the DIP Agent, and the DIP Lenders, and all of the Debtors' obligations and

indebtedness arising under, in respect of or in connection with the DIP Documents (collectively,

the "***DIP Obligations***"), shall be deemed to have been extended by the DIP Agent and the DIP

Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in

express reliance upon the protections granted by section 364(e) of the Bankruptcy Code, and

shall be entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code in the

event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal

or otherwise.

(f)     No party in interest has filed or objected to the relief sought in the Motion

or to the entry of this Interim Order, and if any objections to the foregoing were made, to the

extent such objections have not been withdrawn, they are hereby overruled on the merits.

(g)     Absent the relief sought by this Interim Order, the Debtors' estates will be

immediately and irreparably harmed.  Consummation of the DIP Financing and the use of Cash

Collateral in accordance with this Interim Order and the DIP Documents are therefore in the best

interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

6.     *Authorization of the DIP Financing and the DIP Documents.*

14

(a)     The Debtors are hereby authorized to enter into and perform all obligations under the DIP Documents.  The Borrower is hereby authorized to borrow money and roll up the Term Roll-Up DIP Loans and the Notes Roll-Up DIP Loans pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty the Borrower's obligations with respect to such borrowings, the Term Roll-Up DIP Loans and the Notes Roll-Up DIP Loans up to $135 million (plus capitalized fees and interest) upon entry of this Interim Order, in accordance with the terms of this Interim Order and the DIP Documents, which shall be used for all purposes permitted under the DIP Documents, including, without limitation, (i) to provide working capital to the Debtors (but not, for the avoidance of doubt, to any equityholder or other affiliate of the Debtors); (ii) to pay (a) all amounts payable to the DIP Agent and the DIP Lenders under the DIP Documents, including, without limitation, the Backstop Fee, (b) the reasonable and documented pre- and post-petition professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lenders, the DIP Agent, the Prepetition Secured Term Parties, and the Ad Hoc Senior Secured Note Holder Committee, including, without limitation, those incurred in connection with the preparation, negotiation, documentation and court approval of the documentation and transactions contemplated by the DIP Documents and the restructuring of the Prepetition Secured Debt and the Prepetition Term Facility Debt, in each case, as provided for in this Interim Order and/or the DIP Documents, as applicable, and (c) JPMorgan Chase Bank, N.A. in accordance with the Business Purpose Promissory Note, dated as of June 22, 2012, and the Business Purpose Promissory Note, dated as of February 29, 2012, (in each case, together with related collateral and other documentation and as heretofore amended, supplemented or otherwise modified) in the amounts and as set forth in the DIP Budget; (iii) to fund the Prepetition Secured Note Trustee

Escrow Account and any fees related thereto as set forth in the Prepetition Notes Trustee Escrow

Agreement; and (iv) to make all adequate protection payments authorized hereunder.

(b)     In furtherance of the foregoing and without further approval of this Court,

each Debtor is authorized and directed to perform, all acts, to make, execute and deliver all

instruments and documents (including, without limitation, security agreements, mortgages and

financing statements), and to pay all fees that may be reasonably required or necessary for the

Debtors' performance of their obligations under the DIP Documents or related to the DIP

Financing, including, without limitation:

(i)     the execution and delivery of, and performance under, each of the

DIP Documents;

(ii)     the execution and delivery of, and performance under, one or more

amendments to or waiver of the requirements of the DIP Documents for, among other things, the

purpose of adding additional financial institutions or qualified institutions as DIP Lenders and

reallocating the commitments for the DIP Financing among the DIP Lenders, in each case in

such form as the Debtors, the DIP Agent, the DIP Lenders, and the Ad Hoc Senior Secured Note

Holder Committee may agree (it being understood that no further approval of the Court shall be

required for amendments to the DIP Documents (and any fees paid in connection therewith) that

do not alter the maturity of the extensions of credit thereunder or increase the commitments or

the rate of interest payable thereunder); provided that the Prepetition Revolving Agent shall be

given five (5) days' notice of any proposed amendments or other modifications to any DIP

Document, and (x) with respect to any amendments or other modifications to any DIP Document

that adversely affect the adequate protection rights of the Prepetition Revolving Agent or the

Prepetition Revolving Lenders or their respective rights under paragraph 16 of this Interim

Order, in each case as provided in this Interim Order and the DIP Credit Agreement, the prior written consent of the Prepetition Revolving Agent and the Prepetition Revolving Lenders shall be required, and (y) with respect to any change to the rights of the Prepetition Revolving Agent under Section 10.1(b) of the DIP Credit Agreement, the prior written consent of the Prepetition Revolving Agent shall be required.

(iii)    the non-refundable payment to the DIP Agent or those of the DIP Lenders that are members of the Ad Hoc Senior Secured Note Holder Committee (the "***DIP Backstop Lenders***") of the fees referred to in the DIP Credit Agreement or in any separate letter agreements between them in connection with the DIP Financing (including, without limitation, the Backstop Fee and the Commitment Fee (as defined in the form of DIP Credit Agreement attached to the Motion)), and the costs and expenses due from time to time to any of them, including, without limitation, fees and expenses of the professionals retained by any of them, in each case, as provided for in the DIP Documents and this Interim Order; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents, including the granting and perfection of the DIP Liens and the DIP Superpriority Claims as permitted herein and therein.

(c)    Upon execution and delivery of the DIP Documents, the Debtors' obligations thereunder shall constitute valid and binding obligations of the Debtors and their respective estates, enforceable against each Debtor and its estate in accordance with their respective terms.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code (including, without limitation, under section 502(d) of the Bankruptcy Code) or under any other applicable law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

(d)     Upon entry of this Interim Order, all Prepetition Noteholders shall have the opportunity to become DIP Lenders in accordance with the Solicitation Procedures attached to the Motion as Exhibit E, _provided, however_, that a Prepetition Noteholder may only participate in the Notes Roll-Up DIP Loans if such Prepetition Noteholder also participates in the NM DIP Loans.

(e)     Except as otherwise provided in the DIP Credit Agreement, all NM DIP Loans shall be funded into or credited to the Funding Account (as defined in the DIP Credit Agreement) to be withdrawn therefrom in accordance with the conditions and procedures set forth in the DIP Credit Agreement, and the use of all such proceeds for the purposes set forth in the DIP Documents shall be deemed authorized hereby.

7.     *DIP Superpriority Claims.*  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims are secured by a judgment lien or other non-consensual lien, levy or attachment, which claims (the "***DIP Superpriority Claims***") shall be payable from and have recourse to all pre-and post-petition property of the Debtors and the Debtors' estates and all proceeds thereof, including, effective upon entry of the Final Order, any Avoidance Proceeds (as defined below) (but excluding Avoidance Actions (as defined below)), subject, solely to (i) the Prepetition Revolving Facility Section 507(b) Claim (as defined below); (ii) the provisions of paragraph 16 below, and (iii) in the event of the occurrence and during the continuance of an Event of Default (as defined

in the DIP Credit Agreement), the payment of the Carve-Out, <u>provided, however</u>, that an amount of the DIP Superpriority Claims equal to the amount of all funds that shall have been funded to the Carve-Out Account (as defined in the DIP Credit Agreement) from proceeds of the NM DIP Loans or the Funding Account and then actually applied to pay the Carve-Out (which amount shall not in any event exceed the Carve-Out Cap) (the "***Carve-Out Claim***") shall constitute a superpriority claim against the Debtors that is senior in priority to the Prepetition Revolving Facility Section 507(b) Claim (the "***Carve-Out Claim***").

8.      *DIP Liens*.   As security for the DIP Obligations, the DIP Agent, for its own benefit and for the benefit of the DIP Lenders, is hereby granted, effective and perfected upon the entry of this Interim Order (without the necessity for the execution, recordation or filing of any mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent of, or over, any DIP Collateral (as defined below)), the following security interests in and liens on (the "***DIP Liens***") all of the property identified in clauses (a), (b) and (c) below (collectively, the "***DIP Collateral***"), which security interests and liens shall be (i) junior in lien and payment priority to the Prepetition Revolving Facility Liens and the Prepetition Revolving Facility Adequate Protection Liens (as defined below), except for such liens on and security interests in the Funding Account and the Carve-Out Account, which at all times shall be subject to a first priority security interest and lien in favor of the DIP Lenders, and (ii) subject to, upon the occurrence and during the continuance of an Event of Default, the payment of the Carve-Out as described herein;

(a)      <u>First Lien on Unencumbered Property</u>.   Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority

security interest in and lien on all pre-and post-petition property of the Debtors, including

without limitation the Funding Account and the Carve-Out Account, whether existing on the

Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid,

perfected and non-avoidable liens (collectively, "***Unencumbered Property***"), and the proceeds of

all the foregoing, other than the proceeds of the Funding Account and the Carve-Out Account,

which are subject to the provisions of paragraph 11(a).  For the purposes of this Interim Order,

Unencumbered Property does not include the Debtors' claims and causes of action (or any

proceeds therefrom) under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy

Code, or any other avoidance actions under the Bankruptcy Code or otherwise (collectively, the

"***Avoidance Actions***"), but, subject to and effective upon entry of the Final Order,

Unencumbered Property shall include all proceeds or property recovered, unencumbered or

otherwise the subject of successful Avoidance Actions, whether by judgment, settlement or

otherwise (the "***Avoidance Proceeds***").

(b)    <u>Liens Priming Certain Prepetition Liens</u>.  Pursuant to section 364(d)(1) of

the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority

priming security interest in and lien upon all pre-and post-petition property of the Debtors and

their estates, whether now existing or hereafter acquired, that is subject to any liens in existence

as of the Petition Date, except for (i) the Prepetition Revolving Facility Liens and the Prepetition

Revolving Facility Adequate Protection Liens (other than with respect to the Funding Account

and the Carve-Out Account) and (ii) the Permitted Senior Liens.

(c)    <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in

and lien upon all pre-and post-petition property of the Debtors (other than the property described

in clauses (a) and (b) of this paragraph 8, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence on the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interest and lien shall be immediately junior to such valid, perfected and unavoidable liens.

9.       *Carve-Out*.

(a)       For purposes of this Interim Order, the "***Carve-Out***" means (i) all fees required to be paid pursuant to 28 U.S.C. § 1930 and 31 U.S.C. § 3717, whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; (iii) to the extent allowed by the Court at any time, whether by interim order, procedural order or otherwise, and whether before or after delivery of a Carve-Out Trigger Notice, all unpaid fees, costs, disbursements and expenses of professionals retained by the Debtors or the official committee of unsecured creditors appointed in these Cases (the "***Creditors' Committee***") (but excluding fees and expenses of any professionals employed individually by members of the Creditors' Committee) pursuant to sections 327 and 1103 of the Bankruptcy Code, respectively (collectively, the "***Professionals***") incurred at any time on or prior to the first Business Day (as defined in the DIP Credit Agreement) following the delivery by the DIP Agent or the Prepetition Revolving Agent, as applicable, of a Carve-Out Trigger Notice in accordance with terms of this Interim Order; and (iv) to the extent allowed at any time by the Court, whether by interim order, procedural order or otherwise, the unpaid fees, costs,

disbursements and expenses incurred by Professionals after the first Business Day following the delivery by the DIP Agent or the Prepetition Revolving Agent of the Carve-Out Trigger Notice not to exceed $3,500,000 (the "***Carve-Out Cap***").  Notwithstanding anything to the contrary in this Interim Order, all liens and claims (including claims with superpriority) granted pursuant to this Interim Order shall be subject to the Carve-Out as provided for herein.

(b)      "***Carve-Out Trigger Notice***" shall mean a written notice delivered by the DIP Agent on behalf of the DIP Lenders or, in the case of a material violation of paragraph 11 or 16 of this Interim Order, the Prepetition Revolving Agent on behalf of the Prepetition Revolving Lenders (with copy to the DIP Agent), to the Debtors' lead counsel, the U.S. Trustee, the lead counsel to the Creditors' Committee, and the lead counsel to the DIP Agent or the lead counsel to the Prepetition Revolving Agent, as applicable, following the occurrence and continuation of an Event of Default, describing the Event of Default that is alleged to have occurred and be continuing, or, in the case of the Prepetition Revolving Agent, the material violation that is alleged to have occurred and be continuing, and expressly stating that the Carve-Out Cap has been invoked.

(c)      Upon the receipt of a Carve-Out Trigger Notice, the Borrower shall (i) submit a Withdrawal Request (as defined in the DIP Credit Agreement) for the amount of the Carve-Out Cap (or such amount as is then available in the Funding Account if the amount in the Funding Account is less than the Carve-Out Cap) and (ii) unless waived by the Required Lenders (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement, prepay DIP Loans in an amount equal to the amount of any funds in the Funding Account in excess of the Carve-Out Cap, in each case, in accordance with Section 2.3 of the DIP Credit Agreement. Upon receipt of the amount described in clause (i) of this subparagraph (c), the Borrower shall

transfer such amount to the Carve-Out Account, the proceeds of which shall be available only to pay the Carve-Out. The DIP Lenders shall not sweep or foreclose on the cash in the Funding Account to the extent the amount remaining therein thereafter would be less than the Carve-Out Cap (less any amounts already funded to the Carve-Out Account). Upon payment in full of the amounts set forth in clause (iv) of paragraph 9(a), the Borrower shall promptly remit all amounts remaining in the Carve-Out Account, if any, to the Funding Account.

10.    *Use of Cash Collateral*. The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents and this Interim Order, to use the collateral of the Prepetition Secured Parties that constitutes cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "***Cash Collateral***") in accordance with the Budget (as defined in the DIP Credit Agreement) and as otherwise provided in the DIP Credit Agreement. The Debtors' right to use Cash Collateral shall terminate automatically on the Final Maturity Date (as defined in the DIP Credit Agreement). In addition, (i) upon the occurrence of and during the continuance of an Event of Default by the Debtors of this Interim Order, the DIP Agent shall have the immediate right unilaterally to terminate the Debtors' right to use Cash Collateral subject to the giving of five (5) Business Days' prior written notice to the Debtors (with a copy to counsel to the Creditors' Committee, the U.S. Trustee, the Prepetition Revolving Agent, and the Prepetition Notes Trustee) and (ii) upon the occurrence of a material violation of paragraphs 11 or 16 of this Interim DIP Order, either the DIP Agent or the Prepetition Revolving Agent shall have the immediate right unilaterally to terminate the Debtors' right to use Cash Collateral subject to the giving of five (5) Business Days' prior written notice to the Debtors (with a copy to counsel to the Creditors' Committee, the U.S. Trustee, the DIP Agent or the Prepetition Revolving Agent (as applicable), and the Prepetition Notes Trustee); provided that the Debtors reserve their rights

to challenge such termination and/or seek to continue to use Cash Collateral under the terms determined by the Court at such time.

11.    *Adequate Protection of the Prepetition Secured Parties' Interests*.    The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in their respective Cash Collateral, as well as for (and equal in amount to) the aggregate diminution, if any, in the value of their respective interests in the Prepetition Collateral, resulting, without limitation, from the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the applicable Prepetition Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "***Adequate Protection Claims***").    As adequate protection of the Adequate Protection Claims, the Prepetition Secured Parties are hereby granted the following:

(a)    <u>Adequate Protection Liens</u>.    Effective and perfected upon the date of entry of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, in the amount of such diminution, a senior replacement security interest in and lien upon all DIP Collateral (the "***Adequate Protection Liens***"), subject and subordinate only (i) in the case of the Adequate Protection Liens granted to the Prepetition Revolving Agent (the "***Prepetition Revolving Facility Adequate Protection Liens***"), to the DIP Liens on the Funding Account and the Carve-Out Account, (ii) in the case of the Adequate Protection Liens granted to the Prepetition Notes Trustee (the "***Prepetition Notes Adequate Protection Liens***"), to the DIP Liens, the Prepetition Revolving Facility Liens, and the Prepetition Revolving Facility Adequate Protection Liens, and (iii) in the case of all Adequate Protection Liens, to the payment of the Carve-Out.

(b)      Section 507(b) Claims.  Superpriority claims under section 507(b) of the Bankruptcy Code (the "***Section 507(b) Claims***"), (i) in the case of the Prepetition Revolving Agent, in the amount of the Adequate Protection Claim of the Prepetition Revolving Lenders (the "***Prepetition Revolving Facility Section 507(b) Claim***"), subject solely to (x) the Carve-Out Claim and (y) the payment of the Carve-Out, and (ii) in the case of the Prepetition Notes Trustee, in the amount of the Adequate Protection Claim of the Prepetition Noteholders (such claim, together with the DIP Superpriority Claim and the Prepetition Revolving Facility Section 507(b) Claim, the "***Superpriority Claims***")), subject to (w) the Carve-Out Claim, (x) the DIP Superpriority Claim, (y) the Prepetition Revolving Facility Section 507(b) Claim, and (z) the payment of the Carve-Out.

(c)      Payments, Fees, and Expenses.  In addition, with respect to the Prepetition Revolving Credit Agreement: (i) upon entry of the Interim Order, immediate cash payment of all accrued and unpaid (A) fees and disbursements of counsel to the Prepetition Revolving Agent and the fees of counsel to Associated Bank, N.A., in each case, chargeable and reimbursable under the Prepetition Revolving Credit Agreement (with all fees and expenses invoiced as of the Petition Date being deemed reasonable and reimbursable under the Prepetition Revolving Credit Agreement), (B) all accrued interest (at the non-default interest rate) on loans outstanding under the Prepetition Revolving Credit Agreement that is due and owing pursuant to the Prepetition Revolving Credit Agreement as of the Petition Date, (C) all amounts under any swap agreements (other than termination payments), cash management arrangements and purchasing cards constituting Obligations (as such term is defined in the Prepetition Revolving Credit Agreement) under the Prepetition Revolving Credit Agreement, in each case, that are due and owing as of the Petition Date, and (D) all letter of credit fees and all other accrued and unpaid disbursements, in

25

each case, due and owing to the Prepetition Revolving Agent and the Prepetition Revolving Lenders pursuant to the Prepetition Revolving Credit Agreement as of the Petition Date; and (ii) thereafter, payment in cash (A) monthly of an amount equal to accrued post-petition interest and letter of credit fees under the Prepetition Revolving Credit Agreement at the non-default interest rate, (B) all amounts due and owing under any swap agreements, cash management arrangements and purchasing cards constituting Obligations (as such term is defined in the Prepetition Revolving Credit Agreement), and (C) monthly of the reasonable and documented costs, fees and expenses of the Prepetition Revolving Agent and the Prepetition Revolving Lenders (including the reasonable and documented fees and expenses of one primary counsel and one local counsel to the Prepetition Revolving Agent, counsel to Associated Bank, N.A. (provided that, the post-petition fees and expenses of counsel to Associated Bank, N.A. shall not exceed $20,000 in the aggregate) and, after the occurrence of an Event of Default, one financial advisor to the Prepetition Revolving Agent, (it being understood that nothing herein shall impair the right of the Prepetition Revolving Agent to seek approval of the Court to modify the adequate protection granted herein to include payment of the reasonable and documented fees and expenses of one financial advisor to the Prepetition Revolving Agent in the absence of or before the occurrence of an Event of Default or the right of the Debtors or any other party to object thereto) (the "***Prepetition Revolving Facility Adequate Protection Payments***").  With respect to the Prepetition Notes Indenture: upon entry of the Interim Order, (i) immediate cash payment of all accrued and unpaid costs, fees and expenses of the Prepetition Notes Trustee, including fees and disbursements of counsel to the Prepetition Notes Trustee chargeable and reimbursable under the Prepetition Notes Indenture, and (ii) thereafter, payment in cash monthly of the reasonable and documented fees of the Prepetition Notes Trustee chargeable and reimbursable

26

under the Prepetition Notes Indenture (including the reasonable and documented fees and expenses of one primary counsel and one local counsel). None of the costs, fees and expenses payable under this paragraph 11 shall be subject to separate court approval and the recipients shall not be required to file any fee applications therefor; provided, that this Court shall resolve any disputes as to the reasonableness of such fees and expenses.

(d)    Information. Contemporaneous provision to the Prepetition Revolving Agent of any required periodic reporting or notices (other than any notices provided pursuant to Sections 2.2, 2.3, 5.3 or 5.4 of the DIP Credit Agreement) that are provided to the DIP Agent, the DIP Lenders, the Ad Hoc Senior Secured Note Holder Committee, or the Prepetition Notes Trustee pursuant to the DIP Credit Agreement or the Prepetition Notes Indenture, respectively.

12.    *Reservation of Rights of Prepetition Secured Parties*. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties; *provided* that the Prepetition Secured Parties and the Prepetition Secured Term Parties may request further or different adequate protection (and in the case of the Prepetition Secured Term Parties, to the extent that the Term Roll-Up DIP Loans are unwound, rejected, or reversed, the Prepetition Secured Term Parties shall be entitled to seek adequate protection), and the Debtors, the DIP Agent, and the DIP Lenders or any other party may contest any such request (subject to the Term Intercreditor Agreement and the Notes Intercreditor Agreement). Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization to use Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity

to the Prepetition Secured Parties, the DIP Agent or any DIP Lender to assert rights of setoff or other rights with respect thereto as permitted by law.

13.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     The DIP Agent, the DIP Lenders, and each Prepetition Secured Party are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over any DIP Collateral, or take any other action in order to validate and perfect, the liens and security interests granted to them hereunder.  Whether or not the DIP Agent, the Prepetition Revolving Agent or the Prepetition Notes Trustee (each, on behalf of its constituency) file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over any DIP Collateral, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at any time after the entry of this Interim Order.  Upon the request of the DIP Agent, without any further consent of any party, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors are authorized to execute, deliver and file any instruments necessary or desirable to enable the DIP Agent to further validate, perfect, preserve and enforce the DIP Liens.

(b)     A certified copy of this Interim Order may be filed with or recorded in any filing or recording offices in addition to or in lieu of financing statements, mortgages, notices of lien or similar instruments, and all filing or recording officers are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.

(c)      Notwithstanding anything to the contrary in the Motion, the DIP Documents or this Interim Order, for purposes of this Interim Order, in no event shall the DIP Collateral include, or the DIP Liens or Adequate Protection Liens attach to, any lease, license, contract or agreement or other property right, to which any Debtor is a party, or any of such relevant Debtor's rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in:  (x) the abandonment, invalidation, unenforceability or other impairment of any right, title or interest of any Debtor therein, or (y) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract or agreement or other property right pursuant to any provision thereof, unless, in the case of each of clauses (x) and (y), the applicable provision is rendered ineffective or unenforceable by applicable non-bankruptcy law or the Bankruptcy Code.

14.      *Limitation on Certain Rights.*  Notwithstanding anything to the contrary in the Bankruptcy Code, but in each case subject to entry of the Final Order, (a) except to the extent of the Carve-Out, the Debtors shall not have the right to surcharge the Prepetition Secured Parties, the DIP Lenders, or their respective collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, and (b) each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception provided by section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Secured Parties.

15.      *Protection of DIP Lenders' Rights.*

(a)      Until such time as all DIP Loans and other amounts outstanding under the DIP Documents (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid) have been indefeasibly paid in full in cash, and

all Commitments (as defined in the DIP Credit Agreement) under the DIP Credit Agreement have been terminated (collectively, the "**_Discharge of DIP Obligations_**") and so long as the Prepetition Revolving Lenders are continuing to receive without interruption their adequate protection as and when due (including all payments as set forth in paragraph 11 hereof), each of the Prepetition Secured Parties shall (i) have no right to and take no action to foreclose upon, or recover in connection with, the Prepetition Liens, or otherwise seek or exercise any enforcement rights or remedies against any Prepetition Collateral, (ii) be deemed to have consented to any release of the DIP Collateral authorized under the DIP Documents, and (iii) except as provided for in paragraph 13(a), not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Prepetition Collateral.

(b)      Subject to paragraph 16, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders (i) upon two (2) Business Days' prior written notice to the Debtors (with copy to counsel to the Creditors' Committee, the U.S. Trustee, and the Prepetition Revolving Agent) of the occurrence and continuance of an Event of Default to exercise all rights and remedies under the DIP Documents other than rights and remedies against the DIP Collateral, and (ii) upon the occurrence and during the continuance of an Event of Default and five (5) Business Days' prior written notice to the Debtors (with a copy to counsel to any Committee, the U.S. Trustee, and the Prepetition Revolving Agent), to exercise all rights and remedies against the DIP Collateral provided for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Lender).  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by

any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors, and the Prepetition Secured Parties shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Agent or the DIP Lenders set forth in this Interim Order or the DIP Documents.  In no event shall the DIP Agent, the DIP Lenders, or any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

(c)     Any order approving (i) any refinancing of the DIP Facility during the Cases, (ii) any of the Debtors subsequently obtaining any credit or incurring any debt pursuant to section 364 of the Bankruptcy Code during the Cases, or (iii) any refinancing of the Prepetition Revolving Facility Debt during the Cases (each of (i), (ii), and (iii), a "***DIP Refinancing***") shall provide (w) to the extent that such DIP Refinancing results in an amount of indebtedness or credit exceeding an amount necessary to result in the Discharge of Prepetition Revolving Obligations (as defined below) and provides any party with liens priming the DIP Liens, for the Discharge of DIP Obligations and Discharge of Prepetition Revolving Obligations; (x) for appropriate adequate protection for the Prepetition Notes Trustee and the Prepetition Noteholders; (y) that the Debtors shall not amend, modify, or assign any of the Material Contracts (as defined in the DIP Credit Agreement) without the prior written consent of the Ad Hoc Senior Secured Note Holder Committee; and (z) that the Debtors continue to comply with any remaining milestones provided for in the DIP Credit Agreement, unless otherwise ordered by the Court.

16.     *Protection of Prepetition Revolving Lenders' Rights.*  Notwithstanding anything herein to the contrary, until the Prepetition Revolving Facility Debt (other than contingent

indemnity obligations as to which no claim has been asserted when all other amounts have been paid) is paid in full in cash and all issued and undrawn letters of credit under the Prepetition Revolving Facility Documents are 103% cash collateralized pursuant to arrangements satisfactory to the issuer(s) thereof (collectively, the "*Discharge of Prepetition Revolving Obligations*"), the DIP Agent and the DIP Lenders shall not receive or retain any payments, distributions or other amounts on account of the DIP Loans, whether such payments, distributions or amounts are from proceeds of the DIP Collateral or DIP Refinancings or from any other source (including debt or equity issued or distributed in connection with a plan of reorganization or any proceeds of such debt or equity) and whether such payments, distributions or amounts are distributed or made in connection with or pursuant to a plan of reorganization or liquidation, sale pursuant to section 363 of the Bankruptcy Code, foreclosure or otherwise, other than (u) funds deposited in or otherwise credited to the Funding Account at the time of such payment or other distribution to the DIP Agent or the DIP Lenders, (v) funds deposited in the Carve-Out Account; (w) the Backstop Fee and the Commitment Fee, (x) interest that is paid in kind, (y) indemnification payments (to the extent provided in the DIP Credit Agreement; provided that, such amounts in no event shall include principal, interest or amounts or payments in lieu thereof), and (z) the fees and expenses required to be paid pursuant to the DIP Documents.  If the DIP Agent or any DIP Lender receives any payments, distributions or other amounts in violation of this paragraph 16, then the DIP Agent or such DIP Lender, as applicable, shall hold such amounts in trust for the benefit of the Prepetition Revolving Agent and the Prepetition Revolving Lenders and shall promptly turn over such amounts to the Prepetition Revolving Agent.

17.    *Preservation of Rights Granted Under this Interim Order*.

(a)       No claims or liens having a priority senior to or *pari passu* with those granted by the Interim Order to the Prepetition Secured Parties, other than (i) with respect to the Prepetition Revolving Agent, the DIP Liens on the Funding Account, the Carve-Out Account, and the Carve-Out Claim and (ii) with respect to the Prepetition Notes, the DIP Liens, the Prepetition Revolving Facility Liens, the Prepetition Revolving Facility Section 507(b) Claims, the Prepetition Revolving Facility Adequate Protection Liens, the Funding Account, the Carve-Out Account, the Carve-Out Claim, and the DIP Superpriority Claims, shall be granted or allowed while any portion of the Adequate Protection Claims or the Prepetition Secured Debt remain outstanding, and the Adequate Protection Liens shall not be, except as provided herein, (y) subject or junior to any lien or security interest that is avoided and preserved for the benefit of any Debtor's estate under section 551 of the Bankruptcy Code, or (z) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)       If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity or priority of any DIP Obligations, the Prepetition Secured Debt, the Prepetition Term Facility Debt, or Adequate Protection Claims incurred prior to the actual receipt by the DIP Agent or the applicable Prepetition Secured Party, as applicable, of written notice of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority  or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations, the Prepetition Revolving Facility Debt or Adequate Protection Claims.  Notwithstanding any such reversal, stay, modification or vacatur, any DIP Obligations and Adequate Protection Claims accrued prior to the actual receipt of such notice by the DIP

Agent or the applicable Prepetition Secured Party shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents.

(c)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties, as applicable, granted by this Interim Order and the DIP Documents shall continue in full force and effect until the Discharge of DIP Obligations, Discharge of Prepetition Revolving Obligations and the payment in full of all other Prepetition Secured Debt have occurred, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases, terminating the joint administration of these Cases or appointing a trustee or examiner with expanded powers in any of the Cases, (ii) the entry of an order approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents) or (iii) the entry of an order confirming a plan of reorganization or liquidation in any of the Cases.  Notwithstanding the preceding sentence, until the Discharge of Prepetition Revolving Obligations, the Adequate Protection Claims of the Prepetition Revolving Agent and the Prepetition Revolving Lenders, the Prepetition Revolving Facility Section 507(b) Claim, and all other rights and remedies of the Prepetition Revolving Agent the Prepetition Revolving Lenders shall continue in full force and effect and not be modified, impaired or discharged by any of the events described in the foregoing clauses (i), (ii) or (iii).  The terms and

provisions of this Interim Order and the DIP Documents shall continue in these Cases, and in any

successor or superseding cases.

18.     *Effect of Stipulations on Third Parties.*   The stipulations and admissions contained

in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be

binding upon the Debtors and any successor(s) thereto (including, without limitation, any

chapter 7 or chapter 11 trustee appointed or elected in any of the Cases) in all circumstances, as

of the time this Interim Order is entered by the Court, and any and all Claims and Defenses (as

defined below) are hereby irrevocably waived and relinquished by the Debtors (on their own

behalf and on behalf of their estates and any of their successors in interest).   The stipulations and

admissions contained in this Interim Order, including, without limitation, in paragraph 4 of this

Interim Order, shall be binding upon all other parties in interest, including, without limitation,

any statutory or non-statutory committee appointed or formed in these Cases (a "***Committee***"),

unless (a) a party in interest has filed an adversary proceeding or contested matter by no later

than the date that is 30 days after the date of entry of the Final Order (or such later date (x) as has

been agreed to, in writing, by the applicable Prepetition Secured Parties and the Prepetition

Secured Term Parties in their respective sole discretion or (y) as has been ordered by the Court)

(the "***Challenge Period***") (i) challenging the validity, enforceability, priority or extent of the

Prepetition Secured Debt, the Prepetition Term Facility Debt,  the Prepetition Liens, or the

Prepetition Term Facility Liens, or (ii) asserting or prosecuting any action for preferences,

fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or

causes of action, objections, contests or defenses (collectively, "***Claims and Defenses***") against

any of the Prepetition Secured Parties, the Prepetition Secured Term Parties, or any of their

respective affiliates, representatives, attorneys or advisors in connection with matters related to

the Prepetition Secured Facilities, the Prepetition Term Credit Agreement, the Prepetition Secured Debt, the Prepetition Term Facility Debt, the Prepetition Liens, the Prepetition Term Facility Liens, the Adequate Protection Liens, the Prepetition Term Collateral or the Prepetition Collateral, and (b) a final order is entered in favor of the plaintiff sustaining any such challenge or claim in such timely filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is timely filed, (x) the Prepetition Secured Debt and the Prepetition Term Facility Debt shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 cases and (y) the Prepetition Liens, the Prepetition Term Facility Liens, and the Adequate Protection Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, and not subject to any challenge by any party in interest. If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraph 4 of this Interim Order shall remain binding and preclusive on all Persons (as defined in the Bankruptcy Code), except to the extent that any particular finding or admission was expressly challenged in such adversary proceeding or contested matter. Nothing in this Interim Order vests or confers on any Person, including any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Claims and Defenses.

19.     *Limitation on Use of Financing Proceeds and Collateral.*

(a)     Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings under the DIP Financing, no DIP Collateral or Prepetition Collateral (including Cash Collateral), or any portion of the Carve-Out may be used for the payment of fees and expenses of any Professional incurred to (i) object or contest, or raise any defense to, the

36

validity, perfection, priority, extent or enforceability of any amount due under the DIP

Documents, the Prepetition Secured Facilities, or the Prepetition Term Credit Agreement, or the

liens or claims (including any superpriority claims or adequate protection claims) granted under

this Interim Order, the DIP Documents, the Prepetition Secured Facilities or the Prepetition Term

Credit Agreement; (ii) contest the roll-up of the Prepetition Term Facility Debt or the Prepetition

Secured Notes, (iii) assert any Claims and Defenses or causes of action against the DIP Agent,

any of the DIP Lenders, any of the Prepetition Secured Parties, any of the Prepetition Secured

Term Parties, or any of their respective agents, affiliates, representatives, attorneys or advisors,

(iv) prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Revolving Agent's

assertion, enforcement or realization on any DIP Collateral in accordance with the DIP

Documents or this Interim Order, (v) seek to modify any of the rights granted to the DIP Agent,

the DIP Lenders, the Prepetition Secured Term Parties or the Prepetition Secured Parties

hereunder or under the DIP Documents, the Prepetition Secured Facilities, or the Prepetition

Term Credit Agreement,  without the prior written consent of the applicable party, or (vi) pay

any amount on account of any claims arising prior to the Petition Date unless such payments are

(A) approved by an order of this Court and (B) in accordance with the DIP Documents and the

DIP Budget; *provided*, *however*, that in the case of clauses (i) and (iii) above, such limitations

shall not apply to any investigation by the Creditors' Committee to the extent that the aggregate

amount spent on such investigation does not exceed $50,000; and *provided further* that, to the

extent any party in interest, including the Creditors' Committee, incurs any fees or expenses in

violation of clauses (i) through (vi) above, the non-payment of such fees and expenses shall not

constitute grounds to deny confirmation of any plan of reorganization for any of the Debtors.

(b)    <u>Funding Account</u>.  The proceeds of the NM DIP Loans shall be funded into or credited to a Funding Account in accordance with the DIP Credit Agreement.  The Borrower may withdraw funds from the Funding Account solely in the amounts and subject to the conditions set forth in the DIP Documents.

20.    *Milestone Defaults*.  Unless waived by the Required Lenders or otherwise ordered by the Court, the occurrence of any of the following shall be an Event of Default under the DIP Credit Agreement:

(a)    <u>Chief Restructuring Officer</u>:  The Debtors shall not have hired a Chief Restructuring Officer that is acceptable to the Required Lenders on or before the 15th day after the Petition Date.

(b)    <u>Restructuring Support Agreement</u>:  The Debtors shall not have entered into a restructuring support agreement (the "***RSA***") with the Required Lenders giving effect to the Plan Term Sheet (as defined in the DIP Credit Agreement) in form and substance acceptable to the Required Lenders on or before the 25th day after the Petition Date.

(c)    <u>Motion to Approve a Restructuring Support Agreement</u>:  The Debtors shall not have filed with the Court a motion to approve the RSA (the "***RSA Motion***") on or before the 40th day after the Petition Date.

(d)    <u>Final Order</u>:  The Court shall not have entered the Final Order on or before the 45th day after the Petition Date.

(e)    <u>Approval of Restructuring Support Agreement</u>:  The Court shall not have entered an order approving the RSA Motion on or before the 75th day after the Petition Date.

(f)      Filing of Disclosure Statement and Plan:  The Debtors shall not have filed with the Court a plan of reorganization in form and substance acceptable to the Required Lenders that gives effect to the terms of this Interim Order with respect to the Discharge of Prepetition Revolving Obligations and the Plan Term Sheet or, if executed, the RSA (the "**Plan**") and a disclosure statement in form and substance acceptable to the Required Lenders (the "**Disclosure Statement**") on or before the 90th day after the Petition Date.

(g)      Approval of Disclosure Statement or Filing of Sale Motion:   At the election of the Required Lenders, either (i) the Disclosure Statement shall not have been approved by the Court or, in the alternative, (ii) the Debtors shall not have filed a motion with the Court seeking approval of a sale of all, or substantially all, of the Debtors' assets on terms acceptable to the Required Lenders pursuant to section 363 of the Bankruptcy Code (the "**363 Sale**"), in either case on or before the 120th day after the Petition Date.

(h)      Confirmation of Plan or Approval of 363 Sale Motion:  At the election of the Required Lenders, either (i) the Plan shall not have been confirmed by the Court or, in the alternative, (ii) an order approving the 363 Sale shall not have been entered by the Court, in either case on or before the 175th day after the Petition Date.

(i)      Consummation:  The effective date of the Plan shall not have occurred on or before the 190th day after the Petition Date.

21.      *Consensual Plan Treatment in Respect of the DIP Facility.*  Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the DIP Lenders may consent to a different treatment under a chapter 11 plan, and such consent shall be deemed to have been given, in accordance with the standards set forth in section 1126(c) of the Bankruptcy Code, upon the consent of two-thirds in amount of holders of claims under the DIP Facility and

more than one-half in number of holders of claims under the DIP Facility, in each case, of those holders that have timely responded to a request for such consent.

22.      *Maintenance of Letters of Credit.*   Following entry of this Interim Order, the Debtors shall be authorized, but not directed, to (i) maintain and renew letters of credit issued or deemed issued under the Prepetition Revolving Credit Agreement on an uninterrupted basis, in accordance with the same practices and procedures as were in effect prior to the Petition Date and subject to the terms and conditions of the Prepetition Revolving Credit Agreement, and to take all actions reasonably appropriate with respect thereto (provided that any Issuing Lender shall have no obligation to extend, renew or otherwise modify any letters of credit, but the obligations of the parties with respect to existing letters of credit shall not be modified by the Interim Order), and (ii) obtain new letters of credit to replace or backstop such existing letters of credit and to cash collateralize such new letters of credit, and to take all actions reasonably appropriate with respect thereto, in each case, as permitted under the DIP Documents.

23.      *No Waiver by Failure to Seek Relief.*   The delay or failure of the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the DIP Lenders, or any other party in interest, unless such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

24.      *Interim Order Governs.*   In the event of any inconsistency between the provisions of this Interim Order and any of the DIP Documents, the provisions of this Interim Order shall govern.

25.     *Retention of Jurisdiction*.  This Court has and will retain exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Documents or this Interim Order.

26.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Cases, including, without limitation, the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Prepetition Secured Term Parties, any Committee, and the respective successors and assigns of any of the foregoing (including any chapter 7 or chapter 11 trustee appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns; *provided*, *however*, that the DIP Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 or chapter 11 trustee or similar responsible person appointed or elected for the estate of any of the Debtors.

27.     *Final Hearing*.  The Final Hearing will be held at a time, date and location to be determined.

28.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule, the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

29.     *Notice*.  The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing and the relief the Debtors intend to seek at such hearing, including, without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, to any additional party that has filed a request for

41

notices with this Court, and to any Committee after the same has been appointed or formed, or such Committee's counsel, if the same shall have been retained.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections in accordance with Local Rules 9006-1(c) and 9013-3(b).

Dated: _____            _____
                                          The Honorable Gregory F. Kishel
                                          Chief United States Bankruptcy Judge