UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Magnetation LLC, | Case No. 15-50307 |
| Debtor. | Chapter 11 Case |
| Mag Lands, LLC, | Case No. 15-50308 |
| Debtor. | Chapter 11 Case |
| Mag Finance Corp., | Case No. 15-50309 |
| Debtor. | Chapter 11 Case |
| Mag Mining, LLC, | Case No. 15-50310 |
| Debtor. | Chapter 11 Case |
| Mag Pellet LLC, | Case No. 15-50311 |
| Debtor. | Chapter 11 Case |

**DECLARATION OF MARK BUSCHMANN IN SUPPORT OF DEBTORS' JOINT MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) GRANTING AN EXPEDITED HEARING, (II) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507**

I, Mark Buschmann, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1. I am a Senior Managing Director of Blackstone Advisory Services L.P. ("**Blackstone**"), a provider of financial advisory services that maintains offices at 345 Park Avenue, New York, New York 10154. I am authorized to make this declaration (the "**Declaration**") on behalf of Blackstone. I submit this Declaration in support of *Debtors' Joint Motion for Entry of Interim and Final Orders (i) Granting an Expedited Hearing, (ii) Authorizing the Debtors (a) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and (b) to Utilize Cash*

*Collateral Pursuant to 11 U.S.C. § 363 and (iii) Granting Adequate Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507* (the "**DIP Motion**")[1] filed by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**") on May 5, 2015 (the "**Petition Date**").

## QUALIFICATIONS

2. I hold a Bachelor of Arts in Economics and German Literature from Dartmouth College and a Master of Business Administration with a concentration in finance from the Kellogg Graduate School of Management at Northwestern University.

3. Prior to joining Blackstone, I worked in the Financial Institutions Group of Salomon Smith Barney, where I executed various mergers and acquisitions and financing assignments. I have considerable experience advising distressed companies, including advising both debtors and creditors in chapter 11 restructurings.

4. Members of my team and I have been working closely with the Debtors since January 2015, when the Company selected Blackstone to be its investment banker. In my representation of the Debtors, I have, among other things, provided advice on strategic transaction alternatives and restructuring options. I have participated in negotiations between the Debtors and their creditors and other interested parties. Members of my team and I have also assisted the Debtors in reviewing the terms, conditions and impact of any proposed transaction or restructuring. Finally, I have participated in meetings with the Debtors' boards of directors to keep the boards apprised of the transaction process and provide advice regarding the financing and bankruptcy.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

5. Blackstone has become intimately familiar with the Debtors' businesses, affairs, assets[2] and contractual arrangements. Members of the Blackstone team and I have worked closely with the Debtors and their management, analyzing the Debtors' financial position and assisting the Debtors' employees and boards of directors in evaluating various restructuring alternatives.

6. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, experience and information concerning the Debtors, my review of relevant business records and information provided to me by the Debtors and their professionals and Blackstone employees working under my supervision.

7. I am not being compensated specifically for this testimony other than through payments received by Blackstone as a professional proposed to be retained by the Debtors. I am authorized to submit this Declaration on behalf of Blackstone, and if called upon to testify, I would testify competently to the facts set forth herein.

### SUMMARY OF SECURED DEBT AS OF THE PETITION DATE

8. The Debtors have a highly leveraged capital structure. Magnetation LLC ("**Mag LLC**") is the borrower under that certain credit agreement dated as of May 20, 2013 (as amended, supplemented or otherwise modified from time to time, the "**Prepetition Revolving Credit Agreement**"), and each of the other Debtors are guarantors under the same. The Prepetition Revolving Credit Agreement provides for direct borrowings of up to $65 million, including the issuance of up to $20 million in letters of credit. Outstanding letters of credit reduce the commitments on a dollar-for-dollar basis. As of the Petition Date, the facilities

---

[2] Pursuant to Local Rule 4001-2, attached to the DIP Motion as <u>Exhibit C</u> is a schedule of the Debtors' encumbered collateral. This valuation reflects estimated book values for the Debtors' assets and liabilities and not market values.

3

established under the Prepetition Revolving Credit Agreement were fully drawn, with approximately $56 million in direct borrowings and approximately $8.9 million in outstanding letters of credit.  The outstanding letters of credit support the Debtors' obligations to the State of Minnesota in connection with certain mining permits as well as obligations to certain equipment lessors and utility providers.  The indebtedness under the Prepetition Revolving Credit Agreement is secured by first priority liens on substantially all of the Debtors' assets.

9. Pursuant to that certain indenture dated as of May 20, 2013, (as amended, supplemented or otherwise modified from time to time, the "**Prepetition Notes Indenture**"), Mag LLC and Mag Finance Corp. co-issued, and each of the other Debtors guaranteed, $325 million in senior secured notes (the "**Prepetition Notes**").  By that certain supplemental indenture dated as of July 7, 2014, the Debtors issued an additional $100 million in Prepetition Notes under the Prepetition Notes Indenture.  Interest on the Prepetition Notes is payable on May 15 and November 15 of each year, and the Debtors are required to maintain an interest escrow account (the "**Interest Escrow Account**") containing, at all times, no less than the amount required to make the interest payment on the Prepetition Notes due on the next succeeding interest payment date.  The indebtedness evidenced by the Prepetition Notes is secured by liens on substantially all of the Debtors' assets, ranking *pari passu* with the liens securing the indebtedness under the Prepetition Revolving Facility, except with respect to the Interest Escrow Account, which constitutes collateral for the exclusive benefit of the holders of the Prepetition Notes (the "**Prepetition Noteholders**").  However, pursuant to an intercreditor agreement among the Prepetition Revolving Agent, the Prepetition Notes Trustee, Mag LLC and certain other parties thereto, the lenders under the Prepetition Revolving Facility (the "**Prepetition Revolving Lenders**") are senior in right of payment to the Prepetition Noteholders.

10. Finally, in the weeks just prior to filing, as they faced a liquidity crisis, the Debtors entered into a term loan facility with certain of the Prepetition Noteholders in the amount of approximately $3.8 million (the "**Prepetition Term Facility**") in order to fund operations while they continued to negotiate with certain of their stakeholders and to prepare for an orderly chapter 11 filing if such discussions did not result in an out-of-court solution to the Debtors' restructuring needs. The Prepetition Term Facility is secured by liens on the same assets that secure the indebtedness under the Prepetition Revolving Credit Agreement and Prepetition Notes Indenture, and, pursuant to an intercreditor agreement among the Prepetition Revolving Agent, the Prepetition Term Agent, Mag LLC and certain other parties thereto, the Prepetition Term Facility is junior in right of payment to the Prepetition Revolving Lenders, but senior in right of payment to the Prepetition Noteholders.

## THE DEBTORS' NEED FOR DIP FINANCING AND USE OF CASH COLLATERAL

11. In the months prior to filing, the Debtors' financial position precipitously and significantly deteriorated, leaving them with approximately $3 million in cash on hand as of the Petition Date. Consequently, the Debtors urgently need the relief requested in the DIP Motion, including access to the postpetition financing described therein (the "**DIP Financing**") and use of the prepetition lenders' Cash Collateral in order to continue operations. The nature of the Debtors' businesses makes a shutdown of any length a serious threat to the survival of the enterprise as a going concern as the Debtors' major supply contracts require that the Debtors maintain uninterrupted production in order to meet their obligations. Moreover, any cessation of operations will damage valuable relationships with vendors and suppliers, as well as with employees who will be instrumental in effectuating a chapter 11 restructuring. A shutdown of the Debtors' plants would likely lead to the loss of hundreds of jobs and cause immediate and irreparable harm to the Debtors and their estates and creditors.

5

12. The Debtors have been liquidity constrained for many weeks. Certain of the Debtors' critical vendors have ceased providing goods and services, and certain other critical vendors and utility providers have threatened to do the same in the near-term. Without access to cash for operations, the Debtors will be unable to fund payroll and benefit obligations to employees, resulting in substantial job losses. Immediate access to the funds proposed to be advanced under the DIP Financing is essential to the Debtors' efforts to (a) continue their ordinary course, day-to-day operations, including satisfying payroll obligations, (b) meet their obligations under their major supply agreements and provide goods to their customers and (c) engage in a comprehensive restructuring under chapter 11 in order to chart a path out of bankruptcy and back to profitability. Based on the Debtors' projected cash flows for the early portion of their chapter 11 cases, the $55 million portion[3] of the DIP Financing proposed to be made available upon entry of the Interim Order is necessary and appropriate to provide the Debtors with interim operating liquidity pending entry of the Final Order and in order to avoid immediate and irreparable harm to the Debtors and their estates.

13. As described in detail in the Declaration of Joseph A. Broking, Chief Financial Officer of Magnetation LLC, the Debtors responded proactively to the rapidly deteriorating conditions in the iron ore and steel markets in order to secure the best possible financing available under the circumstances while simultaneously continuing to explore out-of-court restructuring alternatives. Given their ongoing out-of-court restructuring efforts and the immediacy of the Debtors' liquidity needs, the Debtors, with the assistance of Blackstone, turned first to the Prepetition Revolving Lenders and certain Prepetition Noteholders as potential

---

[3] Includes the Term Roll-Up (as defined below).

6

sources of financing in chapter 11 and determined that, under the circumstances, it would not be productive to actively solicit interest from additional third-party sources at that time.

14. As a result of their efforts, the Debtors received two DIP financing proposals, one from the Prepetition Revolving Agent and one from the Ad Hoc Senior Secured Note Holder Committee. The Prepetition Revolving Agent's proposal was structured as an arranged financing (not a commitment), whereas the proposal by the Ad Hoc Senior Secured Note Holder Committee was structured as an underwritten financing. The Debtors' management, advisors (including myself) and boards of directors ultimately concluded that the proposal by the Ad Hoc Senior Secured Note Holder Committee was the most advantageous proposal for financing under the circumstances.

15. As set forth in detail in the DIP Motion, the Debtors have obtained a commitment for a $135 million DIP financing, of which approximately $3.8 million represents a roll-up of outstanding debt under the Prepetition Term Facility (the "**Term Roll-Up**") and $67.5 million represents a roll-up of an equivalent aggregate principal amount of Prepetition Notes[4] held by members of the Ad Hoc Senior Secured Note Holder Committee (the "**Prepetition Notes Roll-Up**" and, together with the Term Roll-Up, the "**Roll-Ups**"). In addition, as required by the terms of the DIP Credit Agreement, the Debtors and the Ad Hoc Senior Secured Note Holder Committee have agreed to the principal terms of a plan of reorganization and post-reorganization capital structure as set forth in the Plan Term Sheet, which the parties intend to formalize through a restructuring support agreement in the coming weeks. After taking into account the

---

[4] The aggregate principal amount of Prepetition Notes given here as the amount of the Prepetition Notes Roll-Up assumes that every Lender (as that term is defined in the DIP Credit Agreement) elects to roll up the maximum amount to which it is entitled under the DIP Credit Agreement. The Prepetition Notes Roll-Up cannot exceed $67.5 million.

7

Roll-Ups, the Debtors will benefit from incremental liquidity of approximately $51.2 million[5] in the aggregate upon interim funding and a total of approximately $63.7 million upon final funding.

16. The DIP Financing will provide the Debtors with sufficient liquidity to operate their businesses while they continue to negotiate with their stakeholders and work towards a successful emergence from chapter 11. Among other things, I believe that the proceeds of and availability of credit under the DIP Financing will instill confidence in the Debtors' various constituencies, and encourage them to continue their relationships with the Debtors, supporting the goal of preserving and maximizing going concern value. I also believe that the DIP Financing will allow the Debtors to meet their working capital requirements, in accordance with the budget agreed to in connection therewith, and position them to realize the full benefit of the eventual recovery of iron ore prices and steel demand. Importantly, the DIP Financing will also be entered into with the consent of the Prepetition Revolving Lenders, who have agreed to continue to support the Debtors' restructuring efforts during these Cases by allowing the Debtors to maintain their existing letters of credit issued under the Prepetition Revolving Credit Facility without requiring that such letters of credit be cash collateralized. The existing letters of credit are a vital and difficult-to-replace component of the Debtors' ability to operate in the ordinary course and meet their obligations under state and local regulations. Given the Debtors' liquidity needs and current financial position, a requirement to cash collateralize the existing letters of

---

[5] The exact amount of incremental liquidity depends on the size of the Term Roll-Up, which depends on the date that the initial funding of the DIP Financing occurs, due to the continuing accrual of interest under the Prepetition Term Facility at a rate of $1,492.27 per diem. Assuming an initial funding date of May 7, 2015, the amount of the Term Roll-Up would be $3,841,747.55, and the initial funding under the DIP Financing would provide incremental liquidity of $51,158,252.45.

credit would have severely strained their resources and made any prospective DIP financing significantly more costly to the Debtors' estates.

17. In sum, without immediate access to the DIP Financing and the use of Cash Collateral, I believe the Debtors would suffer immediate and irreparable harm, which would threaten their ability to reorganize successfully. By contrast, once the relief sought in the Motion is approved, the Debtors will be able to (i) make necessary capital expenditures and capital lease payments and satisfy other working capital and operational needs; (ii) pay employee wages and benefits in the ordinary course; (iii) pay administrative expenses in connection with the Cases; (iv) pay related transaction costs, fees and expenses; (v) make adequate protection payments to the Prepetition Secured Parties; and (vii) make payments to critical vendors and certain other creditors in accordance with the first day orders approved by this Court, which payments, are essential to the preservation and maximization of the value of the Debtors' businesses as going concerns. Accordingly, I believe that the Debtors' need for access to the DIP Facility and the use of Cash Collateral is urgent and necessary.

## THE TERMS OF THE DIP FINANCING ARE FAIR AND REASONABLE

18. As a restructuring professional with substantial expertise with DIP financings, I am well aware that seeking approval of a DIP financing that provides for the roll-up of existing indebtedness requires careful scrutiny by this Court. I believe the Debtors' request to approve the DIP Financing should be granted for a variety of reasons. ***First***, it was negotiated in good faith at arms'-length and contains the best terms available to the Debtors given their current capital structure, level of secured debt, lack of unencumbered assets, urgent cash needs and cash requirements to complete the build-out of the Debtors' iron ore facilities, and the rapid deterioration of iron ore and steel prices. ***Second***, after taking into account the Roll-Ups, the DIP Financing provides the Debtors with substantial incremental liquidity of up to approximately

9

$63.6 million[6] which is both immediately necessary and sufficient to continue operations on an uninterrupted basis, benefiting the Debtors and their estates.  ***Third***, I believe no prospective postpetition lenders would be willing to fund on a different basis given the current circumstances.  ***Last***, the DIP Financing will not prime all existing secured lenders; importantly, the Prepetition Revolving Lenders will retain their senior position and have consented to their treatment as proposed in the DIP Documents and the Interim Order.

19.     The DIP Financing will address the Debtors' liquidity needs, enable the Debtors to preserve going concern value and increase their prospects for completing an expeditious, successful reorganization.[7]

## THE DIP FINANCING AND USE OF CASH COLLATERAL SHOULD BE APPROVED

20.     Based on my experience and my specific involvement in the negotiation of this DIP Financing, I believe that the process undertaken by the Debtors was appropriate under the circumstances and produced the best available financing.  I also believe that, all things considered, the DIP Financing is fairly priced and an appropriate fit for the Debtors at this time.

21.     The Debtors urgently need the significant additional liquidity offered by the DIP Financing.  The DIP Financing will preserve the Debtors' ability to maintain letters of credit under the Prepetition Revolving Credit Facility without the need to cash collateralize such letters of credit, preserving a substantial amount of liquidity for use in the Debtors' operations.  Further, because the Prepetition Revolving Lenders will retain their senior position, the secured creditors that will be primed by the DIP Financing are the Prepetition Noteholders, a significant majority of whom are already committed to be both DIP Lenders and backstop parties under the DIP

---

[6] Includes both the initial and final funding amounts.

[7] A more detailed summary of the terms of the DIP Financing can be found in the DIP Motion.

10

Financing, and therefore obviously consent to the DIP Financing. Moreover, participation in the DIP Financing is open to all Prepetition Noteholders, who will have the option to support the Debtors' efforts in these Cases or to passively benefit from the preservation and improvement of the Debtors' financial condition accomplished through these Cases. In either event, the Prepetition Noteholders will be adequately protected through the provision of replacement liens and administrative claims, as more fully described in the DIP Motion. Absent the DIP Financing, the Debtors' businesses likely would be forced to shut down and the value of the Prepetition Noteholders' collateral would substantially decline. Instead, the fully committed nature of the DIP Financing will send a strong signal to the Debtors' employees, vendors and other parties regarding the Debtors' viability. Accordingly, if approved, the DIP Financing will preserve and enhance the value of the Debtors' businesses and, as such, is in the best interests of the Debtors and their estates and creditors.

[*Signature page follows.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: _____May 5_____, 2015

_____
Mark Buschmann

*Signature Page to Blackstone Declaration*