# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 15-50307 |
| Magnetation LLC, | Chapter 11 |
| Debtor. | |
| Mag Lands, LLC, | Case No. 15-50308 |
| Debtor. | Chapter 11 |
| Mag Finance Corp., | Case No. 15-50309 |
| Debtor. | Chapter 11 |
| Mag Mining, LLC, | Case No. 15-50310 |
| Debtor. | Chapter 11 |
| Mag Pellet LLC, | Case No. 15-50311 |
| Debtor. | Chapter 11 |

**RESPONSE OF CATERPILLAR FINANCIAL SERVICES CORPORATION AND PROGRESS RAIL LEASING CORPORATION TO NOTICE OF HEARING AND JOINT MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) GRANTING AN EXPEDITED HEARING, (II) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507**

Caterpillar Financial Services Corporation ("CFSC") and Progress Rail Leasing Corporation ("PRL"), each wholly owned subsidiaries of Caterpillar Inc., by and through their undersigned attorneys, file this response to the Debtors' Motion for Entry of Interim and Final Orders (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507 (the "Financing Motion"), and respectfully state as follows:

**The CFSC Master Lease**

CFSC and Mag Pellet LLC are parties to a Master Tax Lease for Railcars dated as of March 14, 2014 (the "CFSC Lease"). A true and correct copy of the CFSC Lease is attached hereto as Exhibit A. Under the CFSC Lease, Mag Pellet LLC leases 390 railcars from CFSC (the "CFSC Railcars"), as set forth on Lease Schedule Nos. 01 through 04 to CFSC Lease (the "CFSC Lease Schedules"). True and correct copies of the CFSC Lease Schedules are attached hereto as Exhibit B. The CFSC Railcars are used in the Debtors' operations. CFSC is owed $262,881.57 per month in rent for the Debtors' use of the CFSC Railcars.

Pursuant to a Guaranty dated March 10, 2014 (the "CFSC Guaranty"), Magnetation LLC guaranteed Mag Pellet LLC's payments under the CFSC Lease. A true and correct copy of the CFSC Guaranty is attached hereto as Exhibit C.

CFSC received its last payment under the CFSC Lease in April 2015. Accordingly, the Debtors are in default under the CFSC Lease in the amount of $182,006.68.[1]

**The PRL Master Lease**

PRL and Mag Pellet LLC are parties to a Master Tax Lease for Railcars dated as of March 11, 2014 (the "PRL Lease," and together with the CFSC Lease, the "Master Leases"). A true and correct copy of the PRL Lease is attached hereto as Exhibit D. Under the PRL Lease, Mag Pellet LLC leases 390 railcars from PRL (the "PRL Railcars"), as set forth on Lease Schedule No. 01 to Progress Rail Lease for Railcars (the "PRL Schedule"). A true and correct copy of the PRL Schedule is attached hereto as Exhibit E. The PRL Railcars are used in the

---

[1] Certain of the Debtors also lease 31 pieces of miscellaneous equipment from CFSC, for which it is owed $214,854.43 per month (the "Miscellaneous Equipment Leases"). The Debtors are past due in their lease payments for such equipment in the amount of $178,267.78.

Debtors' operations.  PRL is owed $245,700.00 per month in rent for the Debtors' use of the PRL Railcars.

Pursuant to a Guaranty dated March 10, 2014 (the "PRL Guaranty"), Magnetation LLC guaranteed Mag Pellet LLC's payments under the PRL Lease.  A true and correct copy of the Guaranty is attached hereto as Exhibit F.

PRL received its last payment under the PRL Lease on March 27, 2015.  Accordingly, the Debtors are in default under the PRL Lease in the amount of $528,255, for amounts due and owing for the months of April and May.

On May 5, 2015, the Debtors filed the Financing Motion seeking, *inter alia*, Court authorization to enter into a Debtor-in-Possession financing agreement in order to "fund the operational and working capital needs of the Debtors, all in accordance with the budget, attached [to the Financing Motion] as Exhibit C (the "Budget")." Financing Motion, ¶ 8.  A true and correct copy of the Budget is attached hereto as Exhibit G.  While the Budget contains a line item for "Rail Car Lease – CAT," the budget reflects that no payments will be made to CFSC or PRL for the 13-week period.  As stated above, as of the Petition Date, the Debtors were in default (1) under the CFSC Lease in the amount of $182,006.68; (2) under the PRL Lease in the amount of $528,255; and (3) under the Miscellaneous Equipment Leases in the amount of $178,267.78.  Monthly payments under the Master Leases and the Miscellaneous Equipment Leases total $723,436.

Counsel for the Debtors have indicated, in discussions with counsel for CFSC and PRL, that the Debtors intend to make full monthly payments under the Master Leases and the Miscellaneous Equipment Leases, and that such payments are included in the Budget under the line item for "Equipment."  Importantly, it is unclear whether the budgeted amounts for

"Equipment" are adequate to satisfy the Debtors' obligations to CFSC, PRL, and other equipment lessors.  While CFSC and PRL support the Debtors' reorganization efforts, because of the confusion caused by the "Rail Car Lease – CAT" line item, and in order to preserve their rights, CFSC and PRL file this response seeking clarification on the record that the Debtors intend to make full monthly payments under the Master Leases and the Miscellaneous Equipment Leases.

Dated:  May 6, 2015

DORSEY & WHITNEY LLP

By:  e/ Monica Clark
Monica Clark (MN Atty. #28211X)
Elizabeth A. Hulsebos (MN Atty. # 0390389
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
(612) 340-2600

Attorneys for Caterpillar Financial Services Corporation

## VERIFICATION

I, Monica Bueno, Litigation Paralegal for Caterpillar Financial Services Corporation, declare under penalty of perjury that the facts set forth in the foregoing Response, are true and correct according to the best of my knowledge, information, and belief.

Dated:  May 6, 2015

Monica Bueno, Litigation Paralegal
Caterpillar Financial Services Corporation

Monica Bueno
Litigation Paralegal
Law and Public Policy │ Legal Services Division
2120 West End Avenue
Nashville, TN 37203-0001
P:  (615) 341-1059 │ F:  (615) 341-1083
Monica.Bueno@cat.com

## VERIFICATION

I, J. Duane Cantrell, Senior Vice President for Progress Rail Leasing Corporation, declare under penalty of perjury that the facts set forth in the foregoing Response, are true and correct according to the best of my knowledge, information, and belief.

Dated:  May 6, 2015

J. Duane Cantrell, Senior Vice President
Progress Rail Leasing Corporation

J. Duane Cantrell
Senior Vice President
Progress Rail Services Corporation | A Caterpillar Company
1600 Progress Drive | P.O. Box 1037
Albertville, AL 35950
dcantrell@progressrail.com

<u>Exhibit A</u>
CFSC Lease

# Master Tax Lease for Railcars



This Master Tax Lease (together with any amendments made from time to time, this "Master Agreement") is entered into by Caterpillar Financial Services Corporation ("we", "us" or "our") and the Lessee named below ("you" or "your").

## 1. PARTIES

**LESSOR:**

CATERPILLAR FINANCIAL SERVICES CORPORATION
2120 West End Avenue
Nashville, TN 37203-0001

**LESSEE:**

Mag Pellet LLC
Attn: Joe Broking, Chief Financial Officer
102 NE 3rd Street, Suite 120
Grand Rapids, MN 55744

## TERMS AND CONDITIONS

**2. Agreement to Lease** Subject to the terms and conditions of this Master Agreement, we lease to you, and you lease from us, all of the units (described, with all attachments, accessories and optional features, whether or not installed with any of those units, and all manufacturer manuals and instructions being the "Units" and, individually, a "Unit") described in the Lease Schedules (each, a "Lease Schedule", executed from time to time pursuant to and made a part of this Master Agreement. Unless the context otherwise provides, each item of "Additional Collateral" identified in any Lease Schedule is considered a Unit under the terms of such Lease Schedule and this Master Agreement. Each Lease Schedule, together with this Master Agreement as it relates to such Lease Schedule, is referred to in this Master Agreement as a "Lease". Capitalized terms used in this Master Agreement in relation to a Lease and not defined in this Master Agreement will have the meanings given to them in the applicable Lease Schedule. Each Addendum, Schedule, and Rider that is referred to in a Lease Schedule and is attached to such Lease Schedule or is deemed to be attached to such Lease Schedule is incorporated into such Lease Schedule by reference and is deemed to be a part of such Lease Schedule. In the event of any conflict or inconsistency between the provisions of a Lease Schedule and the provisions of this Master Agreement, the provisions of such Lease Schedule will govern. We have the right at any time to divide any Lease Schedule by issuing and executing two or more Lease Schedules for the Units contained in the original Lease Schedule. Thereafter, the split Lease Schedules will supersede the original Lease Schedule. Any split Lease Schedule(s) will be on the same terms and conditions as the original Lease Schedules, except that provisions applying to specific Units will be included only in the Lease Schedule covering those Units.

**3. Purchase and Lease of Railcars** We, or an affiliate of ours, will issue a purchase order and execute the Terms and Conditions of Sale with the Supplier (as defined below), as accepted by you and attached as Addendum No. 1, based on your agreement to execute a Lease Schedule for each Unit that is produced by Supplier containing the general commercial terms outlined in our proposal letter to you dated January 22, 2014. Should there be any increase in price or other costs associated with any Unit pursuant to the terms contained in Addendum No. 1, then we shall have the right to adjust your Rent accordingly. The following conditions must be satisfied before we are obligated to purchase and pay for any Unit to be leased under any Lease Schedule. (a) no Event of Default (as defined in Section 14) or any event which, with the giving of notice, the lapse of time or both, would become an Event of Default exists as of the date we sign the applicable Lease Schedule; (b) no material adverse change in your financial or operating condition has occurred after you and we have signed such Lease Schedule and before the Delivery Date of such Unit; (c) you have delivered to us a duly executed delivery certificate ("Delivery Supplement") for the Unit(s) and all other documents that we may reasonably request, and (d) if you have taken title to any Unit to be leased under this Master Agreement, and we agree to purchase from and lease such Units back to you, and you agree to sell to and lease back from us such Units, (i) you will have executed and delivered to us or our designee a bill of sale, in our standard form, with respect to such Units and (ii) you represent and warrant to us that, as of the date of signing the applicable Lease Schedule, such Units and your right, title and interest in and to such Units will be free from all claims, liens, security interests and encumbrances (other than under any Lease or this Master Agreement or any Blanket Liens (as defined in Section 8) that your lenders may have in your rights, provided in no event will any such Blanket Liens be superior to our interest in the Units). If any of these conditions are not met with respect to any Unit, you will, upon our request, promptly discharge any obligation to pay for such Unit which we may have assumed or incurred, and, upon such discharge, we will sell to you, without recourse, representation, warranty or condition of any kind, all of our interest in such Unit.

**4. Lease Term** This Master Agreement is effective on the date that you and we sign it and will continue for as long as any Lease remains in effect. Each Lease becomes effective on, and the "Lease Term" for each Unit will start on, the date that we sign the applicable Lease Schedule and, unless terminated earlier or extended in accordance with the terms of such Lease, will continue for the term set forth in the applicable Lease Schedule.

**5. Rent** You will pay us the scheduled rent payments ("Scheduled Payments") in such amounts and starting on such dates as set out in the applicable Lease Schedule. All Scheduled Payments will be due without demand. You will also pay us all other amounts payable under the terms of this Master Agreement, any Lease and under any other document executed in connection with this Master Agreement or any Lease Schedule (collectively, the "Lease Documents") when due (all such other payments, the "Other Payments" and, together with all Scheduled Payments, the "Rent"). You will pay all Rent not otherwise payable by pre-authorized debit to us at P.O. Box 730669, Dallas, TX 76373-0669 or such other location that we designate in writing. You agree that each Lease constitutes a non-cancelable net lease. You also agree that your duties and liabilities under this Master Agreement, each Lease and the other Lease Documents are absolute and unconditional. Your payment and performance obligations are not subject to cancellation, reduction, or setoff for any reason. You agree to settle all claims, defenses, setoffs, counterclaims and other disputes you may have with the Supplier, the manufacturer of such Unit, or any other third party directly with the Supplier, the manufacturer or the third party, as the case may be. You will not assert, allege or make any such claim, defense, setoff, counterclaim or other dispute against us or with respect to the payments due to us under this Master Agreement, any Lease or any other Lease Documents.

**6. Late Charges** If we do not receive a Rent payment or any payment under this Master Agreement or a Lease Schedule within ten (10) days after the date it is due, you will pay us, on demand, a late payment charge equal to five percent (5%) of the late Rent payment.

**7. Disclaimer of Warranties** You have selected each Unit to be leased pursuant to this Master Agreement based upon your own judgment. You understand that we are not the manufacturer or the seller of the Units. WE MAKE NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THIS MASTER AGREEMENT, ANY LEASE OR TO ANY UNIT, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH UNIT IS LEASED "AS IS, WHERE IS." WE MAKE NO WARRANTIES AS TO THE QUALITY OF MATERIALS OR WORKMANSHIP OR THAT THE MATERIALS OR WORKMANSHIP COMPLY WITH THE TERMS OF ANY PURCHASE ORDER OR AGREEMENT. WE EXPRESSLY DISCLAIM, AND YOU WAIVE ALL OTHER WARRANTIES AND CLAIMS EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY UNIT, THIS MASTER AGREEMENT OR ANY LEASE, INCLUDING WITHOUT LIMITATION: (A) ANY IMPLIED WARRANTY THAT ANY UNIT IS MERCHANTABLE; (B) ANY IMPLIED WARRANTY THAT ANY UNIT IS FIT FOR A PARTICULAR PURPOSE; (C) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE, (D) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY IN TORT; AND (E) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY FOR LOSS OF ANY UNIT, FOR LOSS OF USE, REVENUE, OR PROFIT WITH RESPECT TO ANY UNIT, FOR ANY LIABILITY TO ANY THIRD PARTY, OR FOR ANY OTHER DIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING STRICT OR ABSOLUTE LIABILITY IN TORT. Nothing in this Master Agreement takes away any rights you may have against any other parties (such as the Supplier or the manufacturer of any Unit or the Supplier or manufacturer of the components used in any Unit). You agree to pursue only these third parties for any and all claims concerning any Unit except as to ownership and title. You are entitled to all the promises and warranties made by the Supplier to us with respect to any applicable Units, and you may contact such Supplier in order to receive a description of those promises and warranties.

**8. Possession, Use, and Maintenance** (a) At your own expense, you will use and keep the Units in the same condition as when received, ordinary wear and tear excepted (which in any event will be no less than good and fully serviceable operating order and condition, free of broken, damaged or missing parts) and suitable for unrestricted revenue and interchange service (unless such

AMB
JAB

Unit is restricted at the time delivered to you by us), in accordance with Supplier's and manufacturer's recommendations and all maintenance and operating manuals and service agreements, and in accordance with all applicable laws and regulations, including the rules of the Federal Railroad Administration ("FRA"), the Association of American Railroads ("AAR"), the U.S. Department of Transportation ("DOT"), the Surface Transportation Board ("STB") or any government, agency, group or committee exercising authority over railcar design or operation, for which you have sole responsibility for compliance. If a physical alteration or modification to the Units is required by any of the foregoing entities ("Required Modifications"), you will make the Required Modifications at your own cost and expense. (b) You will not abandon a Unit. (c) You will not sublease a Unit or permit the use of a Unit by anyone other than you. (d) You will not change the use of a Unit from that specified in the applicable Lease Schedule, without our prior written consent. (e) You will not load or permit the loading of any Unit (1) in excess of the load limit stenciled on such Unit, or (2) with any commodities or materials other than the Permitted Commodities (as defined in the applicable Lease Schedule). (f) You will not remove a Unit from the United States; (g) You will not sell, assign, transfer, create or allow to exist a lien, claim, security interest, or encumbrance on any of your rights under this Master Agreement or any Lease or with respect to a Unit other than liens granted to your lenders on all or substantially all of your assets ("Blanket Liens"), provided in no event will any such Blanket Liens be superior to our interest in the Units; (h) You will not modify a Unit from its original configuration or paint colors without our prior written approval, and (i) No Unit will be subjected to augers or any other loading or unloading practices damaging to or which may damage the Units (we acknowledge that you plan to use a thaw shed on the Units; however, you agree to remain liable for any damage, which may include, but is not limited to, loss of camber and damage to paint, caused by such use and that any damage will not be deemed ordinary wear and tear on the Units). Each Unit is and will remain personal property regardless of its use or manner of attachment to realty. We have the right (but not the obligation) to inspect each Unit and its maintenance records. All sheet metal, ladders and hand holds must be in serviceable and commercially intended condition without tears, gouges, corrosion or other structural damage. We also have the right to observe the use of each Unit and determine its usage. You will not alter a Unit or affix any accessory or equipment to a Unit if doing so will impair its originally intended function or use or reduce its value. You will not make any "non-severable" addition (as defined for federal income tax purposes) to a Unit without our prior written consent. If added to a Unit, the following will immediately become our property. (i) replacement parts, (ii) parts essential to the operation of the Unit; (iii) parts that cannot be detached from the Unit without interfering with the operation of the Unit or adversely affecting the value or utility the Unit would have had without the addition, and (iv) Required Modifications. All such parts will be deemed incorporated in the applicable Unit and will be subject to the terms of the applicable Lease as if originally leased under such Lease. If an Event of Default has occurred and is continuing, all parts, accessories, and equipment affixed to a Unit will become our property.

**8. Taxes** Rent includes all taxes arising from, or due in connection with, this Master Agreement, any Lease or the Units. You will pay when due, or promptly reimburse us for payment of, all taxes (other than our federal, state, or local net income taxes) imposed on a Unit, or the Rent. You will also pay or reimburse us for all (i) license and registration fees, (ii) fines, penalties, interest, or additions to any tax, (iii) charges similar to those stated in clauses (i) and (ii) that are imposed in connection with the ownership, possession, use, or lease of a Unit from the time we purchase the Unit until it is returned to us or purchased by you. You will remain responsible for the payment, or reimbursement of, any such charges, regardless of when we receive notice of the change. You will prepare and file, in a manner satisfactory to us, all reports or returns required with respect to a Unit. You will reimburse us in full for any amounts that we pay or advance without regard to early payment discounts. We may estimate the amount of, and bill you periodically in advance for, any charge. You will be responsible, however, for any difference between the estimated amount and the actual amount. Except as provided in this section, you agree that we are entitled to receive any and all federal, state, or local tax credits and benefits, if any, applicable to a Unit. We are entitled to income tax depreciation deduction for each Unit based on the use as described in the applicable Lease Schedule.

**9. Tax Indemnity** Each Lease is entered into on the basis that we are entitled to claim certain depreciation deductions on the Units in accordance with Section 168(a) of the Internal Revenue Code of 1986, as amended (the "Code"), based upon the applicable depreciation method and recovery period specified in Code Sections 168(b) and (c), and to similar state and local income tax deductions (collectively, the "Tax Benefits"). Our classification of a Unit under Code Section 168(e), our determination of the applicable depreciation method and recovery period, and our claim for an entitlement to the Tax Benefits are based solely upon your representations in Section 8 and the applicable Lease Schedule. If we do not receive or retain all of the Tax Benefits anticipated with respect to any Unit (a "Tax Loss"), because (a) of a change in the US federal income tax rate, (b) you move any Unit outside the United States, or (c) you use any Unit for a different purpose than stated in the applicable Lease Schedule; you will pay us, within thirty (30) days after we provide you written notice of such Tax Loss, an amount which, in our opinion, will cause our net after-tax rate of return over the Lease Term in respect to the Unit to equal the net after-tax rate of return we would have realized if such Tax Loss had not occurred. For purposes of this section, we may be included in any affiliated group (within the meaning of Section 1504 of the Code) of which we are a member for any year in which a consolidated or combined income tax return is filed for the affiliated group

**11. Loss or Damage** (a) You bear the risk of loss or damage to each Unit from the time we purchase such Unit (or from the beginning of the applicable Lease Term, if earlier) until such Unit is returned to us or purchased by you in accordance with this Master Agreement, including any damage covered under AAR Interchange Rule 95, damages resulting from loading or unloading procedures including heating, washing and or additives, and damages arising from commodities, products and/or goods carried in any Unit (such as tears, gouges, corrosion and other structural damage). Should any loss or damage occur, you will not be released from your obligations under this Master Agreement, any Lease or any other Lease Document. (b) You will provide prompt, written notice to us of any Total Loss (as defined below) or any material damage to any Unit. Any such notice will include any damage reports provided to any governmental authority, an Insurer, or the Supplier, and any documents pertaining to the repair of such damage, including copies of work orders and all invoices for related charges. (c) Without limiting any other term in this Master Agreement or the applicable Lease, you will promptly repair all damage that does not constitute a Total Loss, so as to restore the applicable Unit to the condition required by the applicable Lease. (d) A Unit has incurred a "Total Loss" upon: (i) the disappearance, theft or destruction or any other total loss of such Unit; (ii) damage to the Unit that is uneconomical to repair; or (iii) the condemnation, confiscation, or other taking of title to or use of a Unit or the imposition of any lien on such Unit by any governmental authority. In the event of a Total Loss, you will pay to us, on the next Scheduled Payment due date, as set out in the applicable Lease Schedule, following the Total Loss (a "Loss Payment Date") (i) 30 days after the Total Loss if there is no Scheduled Payment due date remaining under such Lease Schedule) the Scheduled Payment due on that date plus the Casualty Loss Value of the Unit with respect to which the Total Loss has occurred (the "Lost Units"), together with any Other Payments due with respect to the Lost Units. Until such payment is made, you will continue to pay us the Scheduled Payments on the due dates set forth in the applicable Lease Schedule. Upon making the full payment required on the Loss Payment Date, your obligation to pay future Scheduled Payments on the Lost Units will terminate, but you will remain liable for all Scheduled Payments and all Other Payments on any remaining Units. Furthermore, upon receipt of the full payment required on the Loss Payment Date, we will convey to you all of our right, title, and interest in the Lost Units, "AS IS WHERE IS", but subject to the requirements of any third party insurance carrier in order to settle an insurance claim and subject to the rights of any railroad under the AAR Interchange Rules, including AAR Interchange Rule 107. "Casualty Loss Value" means the greater of: (i) the then current settlement value received by you from a railroad under AAR Rule 107, or (ii) the casualty value as shown in the applicable Lease Schedule. If the Total Loss occurs after the final Rent due date of the Lease Term, the Casualty Loss Value will be determined as of the last Scheduled Payment due date during the Lease Term. (e) We are not required to pursue any claim against any person in connection with a Total Loss or other loss or damage. (f) If we receive a payment under an insurance policy required under this Lease in connection with any Total Loss or other loss or damage to a Unit, and such payment is both unconditional and indefeasible, then provided you have complied with the applicable provisions of this section, we will either (i) if the payment results from a Total Loss, send you proceeds up to an amount equal to the Casualty Loss Value you previously paid us, or credit the proceeds against any amounts you owe us or (ii) if the payment results from repairs made pursuant to Section 11(c), send you proceeds up to an amount equal to the amount of your actually incurred costs of repair.

**12. Waiver and Indemnity** You release and agree to indemnify, defend, and keep harmless, us (including any assignee of ours) and our directors, officers, agents and employees (each, an "Indemnitee"), from and against any and all Claims (defined below) (other than those directly resulting from the actual gross negligence or willful misconduct of the Indemnitee). To meet this obligation, you will pay, on a net after-tax basis (which shall include credit for any deductions or other benefits related to a Claim accruing to us), or otherwise discharge such Claims, when and as they become due. We will give you prompt notice of a Claim. You are entitled to control the defense of or to settle a Claim, so long as: (a) no Event of Default has occurred and is then continuing; (b) you are financially capable of satisfying your obligations under this section, and (c) we approve your proposed defense counsel "Claims" means all claims, allegations, judgments, settlements, suits, actions, damages (whether incidental, consequential or direct), demands (for compensation, indemnification, reimbursement or otherwise), losses, penalties, fines, kickbaks (including strict liability), and charges that we incur or for which we are or may be responsible, in the nature of interest, liens, and costs (including attorneys' fees and disbursements and any other legal or non-legal expenses of investigation or defense of any Claim, whether or not the Claim is ultimately defeated, or enforcing the rights, remedies, or indemnities provided for hereunder, or otherwise available at law or in equity to us), of whatever kind or nature, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable, by or against any person. Claims include any of the foregoing arising from: (i) any Lease or any Lease Document, (ii) a Unit, including the contents and any regulated or hazardous substances at any time contained in a Unit or emitted from a Unit, (iii) the purchase, lease, and they may be located from time to time, including any demurrage, track storage or detention charges; (iv) the ordering, acquisition, delivery, installation, or rejection of a Unit; (v) the possession of a Unit or any property to which the Unit may be attached from time to time, (vi) the maintenance, use, condition, ownership, movement or operation of any Unit, (vii) any Claim or Unit, including without limitation payments we may be required to make to a railroad pertaining to the movement of any Unit, (viii) the existence of a latent or other defect (whether or not discoverable by you or us) with respect to a Unit, (viii) any Claim in tort for negligence or strict liability in relation to a Unit, (ix) any Claim for patent, trademark or copyright infringement in relation to a Unit, (x) the Total Loss or damage, return, surrender, sale, or other disposition of any

Unit or any part thereof, or (d) any Claim involving or alleging environmental damage, or any criminal or terrorist act, relating in any way to a Unit. If any Claim is made against you or an indemnitee, the party receiving notice of the Claim will promptly notify the other. If the party receiving notice of the Claim fails to notify the other, however, your obligations are still in effect. You agree to be responsible for all costs and expenses, including reasonable attorneys' fees, incurred by us or our directors, officers, employees, agents, or assigns in defending such claims or in enforcing this section. Under no condition or cause of action will we be liable for any loss of actual or anticipated business or profits or any special, indirect, or consequential damages. We are not responsible for the failure or the railroads to grant approval for use of the Units under AAR Circular No. OT-5.

**13. Insurance**  You, at your expense, must keep each Unit insured with a commercial insurance policy for our benefit. This insurance must include physical damage insurance that will protect each Unit against all risks for an amount at least equal to the then-applicable Casualty Loss Value. You will also maintain comprehensive general liability insurance (including product and broad form contractual liability) covering each Unit for at least $10,000,000 combined coverage for bodily injury and property damage per occurrence. All insurance must be in a form and with companies approved by us. The physical damage insurance shall specify you as named insured and us as loss payees, and the general liability policy shall specify you as named insured and us as additional insured. The insurance shall be primary, without the right of contribution from any insurance carried by us. You must promptly notify us of any occurrence that may become the basis of a claim. You must also provide us with all requested pertinent data. Upon demand, you must promptly deliver to us evidence of insurance coverage.

**14. Events of Default**  Each of the following is an event of default ("Event of Default") under this Master Agreement and each Lease: (a) You fail to make a payment when due under this Master Agreement or any Lease and such failure continues for ten (10) days after written notice to you. (b) You fail to execute a Lease Schedule after Units have been delivered by the Supplier in accordance with the terms contained in Addendum No. 1. (c) A representation or warranty made to us in connection with this Master Agreement or any Lease is incorrect or misleading. (d) You fail to observe or perform a covenant, agreement, or warranty under this Master Agreement or any Lease and the failure continues for ten days after written notice to you. (e) A default occurs under any other agreement between you or a guarantor of this Master Agreement or any Lease (each a "Guarantor") and us or an affiliate of ours. (f) You, or any Guarantor, cease to do business, die, become insolvent, make an assignment for the benefit of creditors or file a petition or action under a bankruptcy, reorganization, insolvency or moratorium law, or a law for the relief of, or relating to, debtors. (g) Any filing of an involuntary petition under a bankruptcy statute against you or a Guarantor, or appointment of a receiver, trustee, custodian or similar official to take possession of your properties or those of a Guarantor, unless the petition or appointment ceases to be in effect within thirty days after filing or appointment. (h) There is a material adverse change in your, or a Guarantor's, financial condition, business operations or prospects which has or may be reasonably expected to have a material adverse effect upon: (i) the business, operations, or financial condition of you or the Guarantor; (ii) the validity or enforceability of any Lease Document or guaranty; (iii) your ability, or the ability of a Guarantor, to perform obligations under any Lease Document or the guaranty, respectively; or (iv) our ability to exercise any rights or enforce or collect the obligations of you or the guarantor in accordance with any Lease Document or the guaranty, respectively, or at law. (i) There is a termination, breach, or repudiation of a Guarantor's guaranty.

**15. Remedies**  (a) If an Event of Default occurs, we will have the rights and remedies provided by this Master Agreement and any Lease and under the Uniform Commercial Code ("UCC") and any other law. Among these rights and remedies are to: (i) proceed at law or in equity, to enforce specifically your performance or to recover damages, (ii) declare this Master Agreement or any Lease in default, and cancel this Master Agreement or any Lease or otherwise terminate your right to use any Unit and your other rights, but not your obligations, (iii) require you to assemble Units and make them available to us at a place we designate, (iv) enter premises where a Unit may be located and take immediate possession of such Unit and remove (or disable in place) such Unit (and any unattached parts) without notice, liability, or legal process; (v) use your premises for storage without liability; (vi) sell or lease any of the Units, whether or not in our possession, at public or private sale, with or without notice to you; and apply or retain the net proceeds of such disposition in accordance with this Master Agreement and any Lease; (vii) enforce any or all of the preceding remedies with respect to any related collateral, and apply any deposit or other cash collateral, or any proceeds of any such collateral, at any time to reduce any amounts you owe us; (viii) demand and recover from you all Liquidated Damages (as defined below) and all Other Payments whenever they are due, and (ix) if we financed your obligations under a warranty agreement such as an Equipment Protection Plan, Customer Service Agreement, or similar agreement, we may cancel the agreement on your behalf and receive the refund of the fees that we financed but had not received from you as of the date of the Event of Default. As used herein, "Liquidated Damages" means the liquidated damages (all of which, you hereby acknowledge, are damages to be paid in lieu of future Scheduled Payments and expected Casualty Loss Values and are reasonable in light of the anticipated harm arising by reason of an Event of Default, and are not a penalty) described in the first sentence of parts (i) or (ii) of Section 15(b) below, depending upon the recovery and disposition of the Units

(b) If an Event of Default occurs and

(i) we recover a Unit and dispose of it by a lease or elect not to dispose of the Unit after recovery, you will pay us on demand an amount equal to the

sum of (A) any accrued and unpaid Rent as of the date we recover the Unit, plus (B) the present value as of such date of the total Scheduled Payments for the then remaining Lease Term, minus (C) either (1) the present value, as of the commencement date of any substantially similar re-lease of the Unit, of the re-lease rent payable to us for the period, commencing on such commencement date, which is comparable to the then remaining Lease Term or (2) the present value of the "market rent" for such Unit (as computed pursuant to Article 2A of the UCC ("Article 2A")) in the continental United States as of the date on which we have a reasonable opportunity to remarket the Unit for the period, commencing on such date, which is comparable to the then remaining Lease Term, as applicable; provided, however, you acknowledge that if we are unable after a reasonable effort to dispose of the Unit at a reasonable price and pursuant to other reasonable terms, or the circumstances reasonably indicate that such an effort will be unavailing, the "market rent" in such event will be deemed to be $0.00, but in the event that we do eventually re-lease or otherwise dispose of the Unit, we will apply the net proceeds of such disposition, to the extent received in good and indefeasible funds, as a credit or reimbursement, as applicable, in a manner consistent with the terms of this Master Agreement and any Lease and the applicable provisions of Article 2A. Any amounts discounted to present value, shall be discounted at the rate of three percent (3%) per annum, compounded annually;

(ii) you fail to return a Unit in the manner and condition required by this Master Agreement or the applicable Lease, or we recover and sell the Unit, you will pay to us on demand an amount calculated as the Casualty Loss Value of the Unit (determined as of the next Scheduled Payment due date after the date of the Event of Default), together with all costs and expenses (as defined below), less a credit for any disposition proceeds, if applicable pursuant to the application provisions in the next sentence. If we demand the Liquidated Damages under this part (ii) and recover and sell the Unit, we will apply any proceeds received in good and indefeasible funds; first, to pay all costs and expenses not already paid; second, to pay us an amount equal to any unpaid Rent due and payable, together with the Liquidated Damage amounts specified in this part (ii), to the extent such amounts are not previously paid; third, to pay us any interest accruing on the amounts covered by the preceding clauses, plus late charges, from and after the date the same becomes due, through the date of payment; fourth, to pay us an amount equal to any remaining obligations that you owe us under this Lease.

The remedies provided to us are cumulative and in addition to all other remedies at law or in equity. You will remain liable for any deficiency and we will retain any excess after our exercise of these remedies. To the extent you are entitled to a refund from us, you agree we have the right to offset any obligation that you have with us or our affiliates with such refund.

**16. Return of Unit**  For ninety (90) days prior to return of any Unit, you must make the Unit available to our agents during normal business hours for purposes of conducting a detailed appraisal and/or inspection. On expiration of the Lease Term of a Unit or if we demand possession of a Unit pursuant to the terms of this Master Agreement and the applicable Lease Schedule, you will, at your expense, promptly deliver such Unit to us properly protected and in the Required Condition. If a Unit bears your mark, you shall bear the costs associated with re-marking any such Unit and the application of replacement automatic equipment identifier (AEI) tags to any such Unit. You will deliver the Unit to a Return Point set forth in the applicable Lease Schedule. If the Unit is not in the Required Condition, you must pay us, on demand, all costs and expenses incurred by us to bring the Unit into the Required Condition. The "Required Condition" means the condition required by Section 8 and the other provisions of this Master Agreement or any applicable Lease Schedule, suitable for immediate, unrestricted 286,000 lb gross rail load service, cleaned of or otherwise free from hazardous materials (as defined by applicable laws, including radiation), with no prior lading (other than trace amounts), and free from any liens, claims or other encumbrances arising by or through you. You are obligated to pay holdover rent as specified in the Lease Schedule applicable to such Unit, plus any other costs and expenses, for each day following the end of the applicable Lease Term on any Unit that is not returned or purchased pursuant to the terms of this Master Agreement and the applicable Lease Schedule. You may be required, at our discretion, to provide safe and secure storage for any Unit being returned to us for no more than ninety (90) days after expiration of the Lease Term at a location satisfactory to us.

**17. Intentionally Omitted.**

**18. Your Assurances and Representations**  Each of us intends that: (i) each Lease constitutes a true "lease" and a "finance lease" as such terms are defined in Article 2A and not a sale or retention of a security interest; (ii) you have selected the "Supplier" (as defined in Article 2A) and have directed us to purchase each applicable Unit (excluding any Additional Collateral) from such Supplier; (iii) you were informed, before your execution of this Master Agreement and each Lease, and are hereby informed in writing, that you are entitled under Article 2A to the promises and warranties, including those of any third party, provided to us by the Supplier in connection with or as part of the purchase of the Units, and that you may communicate directly with the Supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations on remedies relating thereto; and (iv) we are and will remain the owner of each Unit (unless sold by us pursuant to any Lease Document), and you shall not acquire any right, title or interest in or to such Unit except the right to use it in accordance with the terms hereof.

*AJS*
*JAB*

You represent and warrant to us that: (a) You will use each Unit for business purposes only and not for personal, family or household use. (b) You will provide all financial information and reporting as may reasonably require. (c) All credit, financial and other information submitted by you or on your behalf to us in connection with this Master Agreement and any Lease is and will be true, correct and complete. (d) You will not change your name, principal place of business or primary residence and, if you are a business entity, your state of formation or form of business organization (including by merger, consolidation, reincorporation or restructure) without prior written notice to us. (e) We may share any of your information provided by you, or gathered by us, with any affiliate of ours that has or may extend credit to you. (f) You will not assign this Master Agreement or any Lease or any right or obligation under this Master Agreement or any Lease without our prior written consent.

You agree, at your expense, to do any act and execute, acknowledge, authorize, deliver, file, register, and record any documents that we deem desirable in our reasonable discretion to protect our title or rights in a Unit and our rights and benefits under this Master Agreement or any Lease, including the Record Keeping and recordation of a memorandum of any Lease with the STB. You will (or will cause your agent to) perform the following registration and record keeping functions ("Record Keeping") unless otherwise instructed by us to you in writing: (i) registration of the Units in the Official Railway Equipment Register ("ORER") and the Universal Machine Language Equipment Register ("UMLER") by placing ownership marks provided by us in the UMLER ownership field, and (ii) completion of reports pertaining to maintenance, repair and billing in accordance with the AAR Interchange Rules and AAR format, and provision of such reports to us upon such completion and at any other time upon demand. You will at all times ensure we have access to the ORER and UMLER, and provide pass key(s) and other access information to us for ORER, UMLER and any other register containing information relating to any Unit. Upon termination of a Lease, you will transfer the applicable UMLER data to us for re-registration under new marks. You hereby irrevocably appoint us as your attorney-in-fact for the signing and filing of such documents and authorize us to delegate these limited powers.

You will not remove, disable, or impair any Unit monitoring system if the Unit is equipped with such system. You agree to permit Caterpillar Inc. or its subsidiaries or affiliates, including us (collectively "Caterpillar") and Caterpillar dealers to access data concerning the Unit, its condition, and its operation transmitted from the monitoring system. The information may be used: (1) to administer, implement, and enforce the terms of this Master Agreement and any Lease, (2) to recover the Unit if necessary, and (3) to improve Caterpillar's products and services. You agree that information transmitted may include, among other things, the serial number, VIN and location.

19. **Assignment; Counterparts.** We may assign, sell or encumber all or any part of the Lease Documents, the Leases, the Rent, and the Units with or without notice to you. THE RIGHTS OF ANY SUCH ASSIGNEE WILL NOT BE SUBJECT TO ANY DEFENSE, COUNTERCLAIM OR SET OFF WHICH YOU MAY HAVE AGAINST US. If requested by us, you will assist us in the assignment of any of our rights under any Lease. If requested by us, you will also sign a notice of assignment in a form approved by us. If notified by us, you will make all payments due under any Lease to the party designated in the notice without offset or deduction. In connection with any potential or actual assignment, you consent to the sharing of your credit file information, including personal information relating to your principals, with any potential assignee. Upon any assignment by us of our rights under any Lease, and except as may

otherwise be provided herein, all references in this Master Agreement and such Lease to "Lessor", "we", "us", and "our" will mean the assignee. Each of this Master Agreement and the Leases is for the benefit of, and is binding upon, your and our respective successors and assigns. Though multiple counterparts of a Lease may be signed, only the counterpart accepted, acknowledged, and certified by us on the signature page of the applicable Lease Schedule as the original will constitute original chattel paper. A photocopy or facsimile of this Master Agreement or any Lease Schedule will be legally admissible under the "best evidence rule." A signed copy of this Master Agreement, any Lease Schedule or any related document sent electronically will be treated as an original document and be admissible as evidence thereof, and all signatures thereon will be binding as if manual signatures were personally delivered. You are hereby notified that we may assign our rights (but not our obligations) under any Lease and in any Units to CF Exchange, LLC, a qualified intermediary, as part of a 1031 exchange.

20. **Effect of Waiver; Entire Agreement; Notices; Applicable Law.** Our delay or omission in exercising any right or remedy will not impair such right or remedy. A delay or omission by us will not be construed as a waiver of any Event of Default. Any waiver or consent by us must be in writing. This Master Agreement and all Lease Documents completely state our and your rights and supersede all prior agreements with respect to any Unit. All notices must be in writing, addressed to the other party at the address stated on the front of this Master Agreement or at such other address as may be furnished in writing. This Master Agreement and each Lease are governed by and construed under the laws of the State of Tennessee, without giving effect to the conflict-of-laws principles. You consent to the jurisdiction of any state or federal court located within the State of Tennessee. THE PARTIES WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATED TO THIS MASTER AGREEMENT, ANY LEASE, ANY OF THE OBLIGATIONS, OR ANY OF THE UNITS.

21. **No Agency; Modification of Agreement; Miscellaneous.** No person or entity, including, without limitation, the Supplier or the manufacturer of the Units, is authorized to act as our agent regarding this Master Agreement or any Lease. No waiver, modification, or change in this Master Agreement or any Lease will bind us unless provided by us in writing. Oral agreements are not binding. You agree that we may correct patent errors in this Master Agreement, any Lease and the Lease Documents and fill in blanks including, for example, correcting or filing in serial numbers, VIN numbers, and dates. Headings in this Master Agreement or any Lease are inserted for convenience only. Headings do not affect the meaning or interpretation of this Master Agreement or any Lease. If a provision of this Master Agreement or any Lease is invalid under any law, it will be deemed omitted. Any such omission will not invalidate the remaining provisions. To the extent any payment due to us under this Master Agreement or any Lease is deemed to be usurious, the payment obligation will be amended and limited to the maximum lawful amount. All obligations under this Master Agreement or any Lease survive the expiration or termination of this Master Agreement or such Lease if necessary to give full effect to the terms of this Master Agreement or such Lease.

By signing this Master Agreement, you certify that you have read this Master Agreement.

## SIGNATURES

| LESSOR | CATERPILLAR FINANCIAL SERVICES CORPORATION | LESSEE | MAG PELLET LLC |
|---|---|---|---|
| Signature | _(signature)_ | Signature | _(signature)_ |
| Name (print) | James A. Duensing | Name (print) | Joe Braking |
| Title | Executive Vice President & CFO | Title | CFO |
| Date | 3/14/14 | Date | 3/10/2014 |

<u>Exhibit B</u>
CFSC Lease Schedules



Lease Schedule No. 1 to Master Tax Lease for Railcars
Transaction Number 2287270

This Lease Schedule dated as of 6|6|14 (together with each addendum, schedule, and rider attached to, or made a part of, this lease schedule, this "Lease Schedule") is by and between Caterpillar Financial Services Corporation ("we", "us" or "our") and the Lessee named below ("you" or "your") to the Master Tax Lease for the Transaction Number set out above (the "Master Agreement").

## 1.  PARTIES

LESSOR:

CATERPILLAR FINANCIAL SERVICES CORPORATION
2120 WEST END AVENUE
NASVILLE, TN  37203

LESSEE:

MAG PELLET LLC
ATTN:  JOE BROKING, CHIEF FINANCIAL OFFICER
102 NE 3RD STREET, SUITE 120
GRAND RAPIDS, MN  55744

Until this Lease Schedule has been signed by our duly authorized representative, this Lease Schedule will constitute an offer by you to enter into this Lease Schedule with us on the terms stated in this Lease Schedule and the Master Agreement.

## 2.  LEASE OF THE UNITS

This Lease Schedule is entered into pursuant to the Master Agreement.  Capitalized terms used and not defined in this Lease Schedule will have the meanings given to them in the Master Agreement.  This Lease Schedule and the Master Agreement as it relates to this Lease Schedule (collectively, this "Lease") constitute a lease from us to you of the Units described on Schedule A (excluding any Additional Collateral).  By execution and delivery of this Lease Schedule, you and we reaffirm and incorporate into this Lease Schedule by reference all of the terms, conditions, representations, warranties and covenants of the Master Agreement, except as specifically modified in this Lease Schedule, as if such terms, conditions, representations, warranties and covenants were fully set out in this Lease Schedule

## 3.  DESCRIPTION OF THE UNITS

SEE SCHEDULE A FOR A DESCRIPTION OF THE UNITS.

LEASE TERM:        For each Unit, commencing upon delivery of such Unit to you at the Delivery Point, and terminating seven (7) years from the first day of the first month following delivery of the last Unit subject to this Schedule to you at the Delivery Point.

RENEWAL OPTION:      You may renew the Lease Term for one (1) additional period of five (5) years by providing no less than 180 days' prior written notice to us of your election to renew, which renewal election shall be binding and irrevocable and subject to credit approval of Lessee for the extended Lease Term by Lessor.

DELIVERY LOCATION OF UNITS: FreightCar America's manufacturing facility in Cherokee, Alabama (the "Delivery Point")

RETURN POINT:  A location designated by us within the continental United States.

PERMITTED COMMODITIES: Iron Ore, Coal

FREIGHT·  You are responsible for all costs and expenses of moving the Units, including freight and any switching fees, from the Delivery Point until returned to us in compliance with the Master Agreement at the Return Point.

## OTHER TERMS AND CONDITIONS

4. **Scheduled Payments.** You will pay us the Monthly Rent set forth on Schedule A for each Unit beginning on the date you take delivery of such Unit at the Delivery Point and thereafter in advance on the first day of each month for the entire Lease Term, prorating any period which is less than a full month (with any such proration based on a thirty (30) day period).

5. The casualty value referenced in Section 11 of the Master Agreement is set forth on Schedule B.

6. For the purposes of Section 16 of the Master Agreement, the monthly holdover rental charge shall be an amount equal to 150% of the Monthly Lease Payment for the applicable Unit.

7. You agree to sign and deliver to us a separate Delivery Supplement in the form attached as Exhibit C promptly upon delivery of the Units to you.

8. Although multiple counterparts of this document may be signed, only the counterpart of this Lease Schedule accepted, acknowledged and certified by us on the signature page as the original Lease will constitute original chattel paper.

By signing this Lease Schedule, you certify that you have read the Master Agreement and this Lease Schedule.

## SIGNATURES

| LESSOR | CATERPILLAR FINANCIAL SERVICES CORPORATION | LESSEE | MAG PELLET LLC |
|--------|---------|--------|--------|
| Signature | *Karen C. Johnson* | Signature | *Joe Bra* |
| Name (print) | Karen C. Johnson | Name (print) | Joe Broking |
| Title | Credit Manager - Central Region | Title | CFO |
| Date | 6.6.14 | Date | 6/4/2014 |

SCHEDULE A
TO
LEASE SCHEDULE NO. 1 TO MASTER TAX LEASE FOR RAILCARS

| DESCRIPTION OF UNITS | INITIALS/NUMBER (Unique ID # for this Unit) | MONTHLY RENT |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 101 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 102 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 103 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 104 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 105 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 106 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 107 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 108 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 109 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 110 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 111 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 112 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 113 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 114 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 115 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 116 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 117 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 118 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 119 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 120 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 121 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 122 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 123 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 124 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 125 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 126 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 127 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 128 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 129 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 130 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 131 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 132 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 133 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 134 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 135 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 136 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 137 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 138 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 139 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 140 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 141 | $630.00 |

| | | |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 142 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 143 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 144 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 145 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 146 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 147 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 148 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 149 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 150 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 151 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 152 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 153 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 154 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 155 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 156 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 157 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 158 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 159 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 160 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 161 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 162 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 163 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 164 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 165 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 166 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 167 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 168 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 169 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 170 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 171 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 172 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 173 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 174 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 175 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 176 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 177 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 178 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 179 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 180 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 181 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 182 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 183 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 184 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 185 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 186 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 187 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 188 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 189 | $630.00 |

| | | |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 190 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 191 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 192 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 193 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 194 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 195 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 196 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 197 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 198 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 199 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 200 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 201 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 202 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 203 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 204 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 205 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 206 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 207 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 208 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 209 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 210 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 211 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 212 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 213 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 214 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 215 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 216 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 217 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 218 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 219 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 220 | $630.00 |



**Lease Schedule No. 2 to Master Tax Lease for Railcars**
**Transaction Number 2311627**

This Lease Schedule dated as of _____ (together with each addendum, schedule, and rider attached to, or made a part of, this lease schedule, this "Lease Schedule") is by and between Caterpillar Financial Services Corporation ("we", "us" or "our") and the Lessee named below ("you" or "your") to the Master Tax Lease for the Transaction Number set out above (the "Master Agreement").

## 1. PARTIES

LESSOR:

CATERPILLAR FINANCIAL SERVICES CORPORATION
2120 WEST END AVENUE
NASHVILLE, TN 37203

LESSEE:

MAG PELLET LLC
ATTN: JOE BROKING, CHIEF FINANCIAL OFFICER
102 NE 3RD STREET, SUITE 120
GRAND RAPIDS, MN 55744

Until this Lease Schedule has been signed by our duly authorized representative, this Lease Schedule will constitute an offer by you to enter into this Lease Schedule with us on the terms stated in this Lease Schedule and the Master Agreement.

## 2. LEASE OF THE UNITS

This Lease Schedule is entered into pursuant to the Master Agreement. Capitalized terms used and not defined in this Lease Schedule will have the meanings given to them in the Master Agreement. This Lease Schedule and the Master Agreement as it relates to this Lease Schedule (collectively, this "Lease") constitute a lease from us to you of the Units described on Schedule A (excluding any Additional Collateral). By execution and delivery of this Lease Schedule, you and we reaffirm and incorporate into this Lease Schedule by reference all of the terms, conditions, representations, warranties and covenants of the Master Agreement, except as specifically modified in this Lease Schedule, as if such terms, conditions, representations, warranties and covenants were fully set out in this Lease Schedule.

## 3. DESCRIPTION OF THE UNITS

SEE SCHEDULE A FOR A DESCRIPTION OF THE UNITS

**LEASE TERM:** For each Unit, commencing upon delivery of such Unit to you at the Delivery Point, and terminating seven (7) years from the first day of the first month following delivery of the last Unit subject to this Schedule to you at the Delivery Point.

**RENEWAL OPTION:** You may renew the Lease Term for one (1) additional period of five (5) years by providing no less than 180 days' prior written notice to us of your election to renew, which renewal election shall be binding and irrevocable and subject to credit approval of Lessee for the extended Lease Term by Lessor.

**DELIVERY LOCATION OF UNITS:** FreightCar America's manufacturing facility in Cherokee, Alabama (the "Delivery Point")

**RETURN POINT:** A location designated by us within the continental United States.

**PERMITTED COMMODITIES:** Iron Ore, Coal

**FREIGHT:** You are responsible for all costs and expenses of moving the Units, including freight and any switching fees, from the Delivery Point until returned to us in compliance with the Master Agreement at the Return Point

## OTHER TERMS AND CONDITIONS

4. **Scheduled Payments.** You will pay us the Monthly Rent set forth on Schedule A for each Unit beginning on the date you take delivery of such Unit at the Delivery Point and thereafter in advance on the first day of each month for the entire Lease Term, prorating any period which is less than a full month (with any such proration based on a thirty (30) day period).

5. The casualty value referenced in Section 11 of the Master Agreement is set forth on Schedule B

6. For the purposes of Section 16 of the Master Agreement, the monthly holdover rental charge shall be an amount equal to 150% of the Monthly Lease Payment for the applicable Unit

7. You agree to sign and deliver to us a separate Delivery Supplement in the form attached as Exhibit C promptly upon delivery of the Units to you

8. Although multiple counterparts of this document may be signed, only the counterpart of this Lease Schedule accepted, acknowledged and certified by us on the signature page as the original Lease will constitute original chattel paper

By signing this Lease Schedule, you certify that you have read the Master Agreement and this Lease Schedule.

## SIGNATURES

| LESSOR | CATERPILLAR FINANCIAL SERVICES CORPORATION | LESSEE | MAG PELLET LLC |
|---|---|---|---|
| Signature | *Ken L. Sloan* | Signature | *Joe Braley* |
| Name (print) | Robert L. Sloan | Name (print) | Joe Braking |
| Title | Sr. Svcs Mgr. | Title | CFO |
| Date | 6.30.14 | Date | 6/27/14 |

SCHEDULE A
TO
LEASE SCHEDULE NO. 2 TO MASTER TAX LEASE FOR RAILCARS

| DESCRIPTION OF UNITS | INITIALS/NUMBER (Unique ID # for this Unit) | MONTHLY RENT |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 221 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 222 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 223 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 224 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 225 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 226 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 227 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 228 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 229 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 230 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 231 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 232 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 233 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 234 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 235 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 236 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 237 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 238 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 239 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 240 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 241 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 242 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 243 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 244 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 245 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 246 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 247 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 248 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 249 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 250 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 251 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 252 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 253 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 254 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 255 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 256 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 257 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 258 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 259 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 260 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 261 | $630.00 |

| | | |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 262 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 263 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 264 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 265 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 266 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 267 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 268 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 269 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 270 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 271 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 272 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 273 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 274 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 275 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 276 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 277 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 278 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 279 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 280 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 281 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 282 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 283 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 284 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 285 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 286 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 287 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 288 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 289 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 290 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 291 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 292 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 293 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 294 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 295 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 296 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 297 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 298 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 299 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 300 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 301 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 302 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 303 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 304 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 305 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 306 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 307 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 308 | $630.00 |

| | | |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 309 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 310 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 311 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 312 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 313 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 314 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 315 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 316 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 317 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 318 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 319 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 320 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 321 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 322 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 323 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 324 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 325 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 326 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 327 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 328 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 329 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 330 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 331 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 332 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 333 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 334 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 335 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 336 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 337 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 338 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 339 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 340 | $630.00 |

**CAT**
Financial

**Lease Schedule No. 3 to Master Tax Lease for Railcars**
**Transaction Number 2348020**

This Lease Schedule dated as of ⎯7/31/14⎯ (together with each addendum, schedule, and rider attached to, or made a part of, this lease schedule, this "Lease Schedule") is by and between Caterpillar Financial Services Corporation ("we", "us" or "our") and the Lessee named below ("you" or "your") to the Master Tax Lease for the Transaction Number set out above (the "Master Agreement").

## 1. PARTIES

LESSOR:

CATERPILLAR FINANCIAL SERVICES CORPORATION
2120 WEST END AVENUE
NASHVILLE, TN 37203

LESSEE:

MAG PELLET LLC
ATTN: JOE BROKING, CHIEF FINANCIAL OFFICER
102 NE 3RD STREET, SUITE 120
GRAND RAPIDS, MN 55744

Until this Lease Schedule has been signed by our duly authorized representative, this Lease Schedule will constitute an offer by you to enter into this Lease Schedule with us on the terms stated in this Lease Schedule and the Master Agreement.

## 2. LEASE OF THE UNITS

This Lease Schedule is entered into pursuant to the Master Agreement. Capitalized terms used and not defined in this Lease Schedule will have the meanings given to them in the Master Agreement. This Lease Schedule and the Master Agreement as it relates to this Lease Schedule (collectively, this "Lease") constitute a lease from us to you of the Units described on Schedule A (excluding any Additional Collateral). By execution and delivery of this Lease Schedule, you and we reaffirm and incorporate into this Lease Schedule by reference all of the terms, conditions, representations, warranties and covenants of the Master Agreement, except as specifically modified in this Lease Schedule, as if such terms, conditions, representations, warranties and covenants were fully set out in this Lease Schedule.

## 3. DESCRIPTION OF THE UNITS

SEE SCHEDULE A FOR A DESCRIPTION OF THE UNITS.

LEASE TERM:        For each Unit, commencing upon delivery of such Unit to you at the Delivery Point, and terminating seven (7) years from the first day of the first month following delivery of the last Unit subject to this Schedule to you at the Delivery Point

RENEWAL OPTION:        You may renew the Lease Term for one (1) additional period of five (5) years by providing no less than 180 days' prior written notice to us of your election to renew, which renewal election shall be binding and irrevocable and subject to credit approval of Lessee for the extended Lease Term by Lessor.

DELIVERY LOCATION OF UNITS: FreightCar America's manufacturing facility in Cherokee, Alabama (the "Delivery Point")

RETURN POINT: A location designated by us within the continental United States.

PERMITTED COMMODITIES: Iron Ore, Coal

FREIGHT: You are responsible for all costs and expenses of moving the Units, including freight and any switching fees, from the Delivery Point until returned to us in compliance with the Master Agreement at the Return Point.

## OTHER TERMS AND CONDITIONS

4. **Scheduled Payments.** You will pay us the Monthly Rent set forth on Schedule A for each Unit beginning on the date you take delivery of such Unit at the Delivery Point and thereafter in advance on the first day of each month for the entire Lease Term, prorating any period which is less than a full month (with any such proration based on a thirty (30) day period).

5. The casualty value referenced in Section 11 of the Master Agreement is set forth on Schedule B.

6. For the purposes of Section 16 of the Master Agreement, the monthly holdover rental charge shall be an amount equal to 150% of the Monthly Lease Payment for the applicable Unit.

7. You agree to sign and deliver to us a separate Delivery Supplement in the form attached as Exhibit C promptly upon delivery of the Units to you.

8. Although multiple counterparts of this document may be signed, only the counterpart of this Lease Schedule accepted, acknowledged and certified by us on the signature page as the original Lease will constitute original chattel paper.

By signing this Lease Schedule, you certify that you have read the Master Agreement and this Lease Schedule.

## SIGNATURES

| LESSOR | CATERPILLAR FINANCIAL SERVICES CORPORATION | LESSEE | MAG PELLET LLC |
|---|---|---|---|
| Signature | *RL Sloan* | Signature | *Joe Brol* |
| Name (print) | Robert L. Sloan | Name (print) | Joe Broking |
| Title | Acc Svcs Mgr. | Title | CFO |
| Date | 7.30.14 | Date | 7/30/2014 |

SCHEDULE A
TO
LEASE SCHEDULE NO. 3 TO MASTER TAX LEASE FOR RAILCARS

| DESCRIPTION OF UNITS | INITIALS/NUMBER (Unique ID # for this Unit) | MONTHLY RENT |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 341 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 342 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 343 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 344 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 345 | $630.00 |
| New MGPX Freight Car America Open Flat Bottom Gondola Car | 346 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 347 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 348 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 349 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 350 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 351 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 352 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 353 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 354 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 355 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 356 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 357 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 358 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 359 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 360 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 361 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 362 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 363 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 364 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 365 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 366 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 367 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 368 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 369 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 370 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 371 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 372 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 373 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 374 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 375 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 376 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 377 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 378 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 379 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 380 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 381 | $630.00 |

3

| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 382 | $630.00 |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 383 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 384 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 385 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 386 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 387 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 388 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 389 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 390 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 391 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 392 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 393 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 394 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 395 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 396 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 397 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 398 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 399 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 400 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 401 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 402 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 403 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 404 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 405 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 406 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 407 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 408 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 409 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 410 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 411 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 412 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 413 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 414 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 415 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 416 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 417 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 418 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 419 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 420 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 421 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 422 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 423 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 424 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 425 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 426 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 427 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 428 | $630.00 |

| | | |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 429 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 430 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 431 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 432 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 433 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 434 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 435 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 436 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 437 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 438 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 439 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 440 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 441 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 442 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 443 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 444 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 445 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 446 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 447 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 448 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 449 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 450 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 451 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 452 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 453 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 454 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 455 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 456 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 457 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 458 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 459 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 460 | $630.00 |



Lease Schedule No. 4 to Master Tax Lease for Railcars
Transaction Number 2365622

This Lease Schedule dated as of ▓▓▓▓▓ (together with each addendum, schedule, and rider attached to, or made a part of, this lease schedule, this "Lease Schedule") is by and between Caterpillar Financial Representative, this Lease Schedule (collectively, this Lessee named below ("you" or "your") to the Master Tax Lease for the Transaction Number set out above (the "Master Agreement").

## 1. PARTIES

LESSOR:

CATERPILLAR FINANCIAL SERVICES CORPORATION
2120 WEST END AVENUE
NASHVILLE, TN 37203

LESSEE:

MAG PELLET LLC
ATTN. JOE BROKING, CHIEF FINANCIAL OFFICER
102 NE 3RD STREET, SUITE 120
GRAND RAPIDS, MN 55744

Until this Lease Schedule has been signed by our duly authorized representative, this Lease Schedule will constitute an offer by you to enter into this Lease Schedule with us on the terms stated in this Lease Schedule and the Master Agreement.

## 2. LEASE OF THE UNITS

This Lease Schedule is entered into pursuant to the Master Agreement. Capitalized terms used and not defined in this Lease Schedule will have the meanings given to them in the Master Agreement. This Lease Schedule and the Master Agreement as it relates to this Lease Schedule (collectively, this "Lease") constitute a lease from us to you of the Units described on Schedule A (excluding any Additional Collateral). By execution and delivery of this Lease Schedule, you and we reaffirm and incorporate into this Lease Schedule by reference all of the terms, conditions, representations, warranties and covenants of the Master Agreement, except as specifically modified in this Lease Schedule, as if such terms, conditions, representations, warranties and covenants were fully set out in this Lease Schedule.

## 3. DESCRIPTION OF THE UNITS

SEE SCHEDULE A FOR A DESCRIPTION OF THE UNITS.

LEASE TERM:        For each Unit, commencing upon delivery of such Unit to you at the Delivery Point, and terminating seven (7) years from the first day of the first month following delivery of the last Unit subject to this Schedule to you at the Delivery Point

RENEWAL OPTION:        You may renew the Lease Term for one (1) additional period of five (5) years by providing no less than 180 days' prior written notice to us of your election to renew, which renewal election shall be binding and irrevocable and subject to credit approval of Lessee for the extended Lease Term by Lessor

DELIVERY LOCATION OF UNITS: FreightCar America's manufacturing facility in Cherokee, Alabama (the "Delivery Point")

RETURN POINT:  A location designated by us within the continental United States.

PERMITTED COMMODITIES: Iron Ore, Coal

FREIGHT:  You are responsible for all costs and expenses of moving the Units, including freight and any switching fees, from the Delivery Point until returned to us in compliance with the Master Agreement at the Return Point.

## OTHER TERMS AND CONDITIONS

4. **Scheduled Payments.** You will pay us the Monthly Rent set forth on Schedule A for each Unit beginning on the date you take delivery of such Unit at the Delivery Point and thereafter in advance on the first day of each month for the entire Lease Term, prorating any period which is less than a full month (with any such proration based on a thirty (30) day period)

6. For the purposes of Section 16 of the Master Agreement, the monthly holdover rental charge shall be an amount equal to 150% of the Monthly Lease Payment for the applicable Unit

7. You agree to sign and deliver to us a separate Delivery Supplement in the form attached as Exhibit C promptly upon delivery of the Units to you

8. Although multiple counterparts of this document may be signed, only the counterpart of this Lease Schedule accepted, acknowledged and certified by us on the signature page as the original Lease will constitute original chattel paper

By signing this Lease Schedule, you certify that you have read the Master Agreement and this Lease Schedule.

## SIGNATURES

| LESSOR | CATERPILLAR FINANCIAL SERVICES CORPORATION | LESSEE | MAG PELLET LLC |
|--------|---------|--------|--------|
| Signature | | Signature | _Joe Bro___ |
| Name (print) | _Ashlie M. Johnson_ | Name (print) | _Joe Broking_ |
| Title | Ashlie M. Johnson Documentation Manager | Title | CFO |
| Date | 8-27-14 | Date | 8/22/2014 |

2

SCHEDULE A
TO
LEASE SCHEDULE NO. 4 TO MASTER TAX LEASE FOR RAILCARS

| DESCRIPTION OF UNITS | INITIALS/NUMBER (Unique ID # for this Unit) | MONTHLY RENT |
|---|---|---|
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 461 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 462 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 463 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 464 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 465 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 466 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 467 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 468 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 469 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 470 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 471 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 472 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 473 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 474 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 475 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 476 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 477 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 478 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 479 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 480 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 481 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 482 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 483 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 484 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 485 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car | 486 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car - Double Rotary | 487 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car - Double Rotary | 488 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car - Double Rotary | 489 | $630.00 |
| New MGPX Freight Car America Open Top Flat Bottom Gondola Car - Double Rotary | 490 | $630.00 |

Exhibit C
CFSC Guaranty

## GUARANTY

This Guaranty is entered into between Magnetation LLC ("we", "us", or "our") and Caterpillar Financial Services Corporation ("you" or "your").

## PARTIES

| Guarantor (we) | Beneficiary (you) |
|---|---|
| Magnetation LLC | Caterpillar Financial Services Corporation |
| 102 NE 3rd Street, Suite 120 | 2120 West End Ave. |
| Grand Rapids, MN 55744 | Nashville, TN 37203 |

## AGREEMENT

1. To induce you to enter into or purchase, now or in the future, any promissory notes, security agreements, installment sale agreements, lease agreements, and any other documents or instruments relating to any loan, lease, extension of credit or other financial accommodation to Mag Pellet LLC ("Customer") and in consideration thereof and of benefits to accrue to each of us therefrom, each of us, as a primary obligor, jointly and severally and unconditionally guarantees to you that the Customer will fully and promptly pay and perform all its present and future obligations to you, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured and whether originally contracted with you or otherwise acquired by you, irrespective of any invalidity or unenforceability of any such obligation or the insufficiency, invalidity or unenforceability of any security therefor; and agrees, without your first having to proceed against the Customer or any security therefor, to pay on demand all sums due and to become due to you from the Customer and all losses, costs, attorneys' fees or expenses that may be suffered by you by reason of the Customer's default or default of any of the undersigned hereunder; and agrees to be bound by and on demand to pay any deficiency established by a sale of any security, with or without notice to us. This Guaranty is an unconditional guarantee of prompt payment and performance. No guarantor shall be released or discharged, either in whole or in part, by your failure or delay to perfect or continue the perfection of any security interest in any property which secures the obligations of the Customer or any of us to you, or to protect the property covered by such security interest.

2. This Guaranty is irrevocable. It may be terminated, however, as to future obligations of the Customer if we send you written notice by certified mail return receipt requested specifying a termination date that is at least 60 days after your actual receipt of the written notice ("Termination Date"). Any obligations of the Customer arising pursuant to a commitment by you to the Customer prior to the Termination Date are not affected by the termination and are fully covered by this Guaranty. The death of any or all of us will not terminate this Guaranty or discharge our obligations hereunder, but shall bind our respective heirs, executors, administrators and assigns.

3. Each of us waives: (a) notice of acceptance of this Guaranty; (b) notice of the existence, creation or incurrence of new or additional obligations owing from the Customer to you; (c) presentment, demand, protest and notice of nonpayment or protest as to any note or obligation signed, accepted, endorsed or assigned to you

by the Customer; (d) any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim that any of us may now or hereafter have against the Customer or any other person directly or contingently liable for the obligations, arising from the existence or performance of this guaranty; (e) all exemptions and homestead laws and any other demands and notices required by law; (f) all setoffs and counterclaims; (g) any and all defenses based on suretyship or any other applicable law, including without limitation all rights and defenses arising out of (i) an election of remedies by you even though that election of remedies may have destroyed rights of subrogation and reimbursement against the Customer by operation of law or otherwise, (ii) protections afforded to the Customer pursuant to antideficiency or similar laws limiting or discharging the Customer's obligations to you, (iii) the invalidity or unenforceability of this guaranty, (iv) the failure to notify any of us of the disposition of any property securing the obligations of the Customer, (v) the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property, and (vi) any duty on your part to disclose to any of us any matter, fact or thing related to the business operations or condition (financial or otherwise) of the Customer or its affiliates or property, whether now or hereafter known by you.

4. You may at any time and from time to time, without our consent, without notice to us and without affecting or impairing the obligation of any of us hereunder, do any of the following:

   (a) renew, extend (including extensions beyond the original term), modify (including changes in interest rates), release or discharge any obligations of the Customer, of its customers, of co-guarantors (whether hereunder or under a separate agreement) or of any other party at any time directly or contingently liable for the payment of any of the obligations;

   (b) accept partial payments of the obligations;

   (c) accept new or additional documents, instruments or agreements relating to or in substitution of the obligations;

   (d) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of the obligations and the security in any manner;

   (e) consent to the transfer or return of the security, take

and hold additional security or guaranties for said obligations;

(f) amend, exchange, release or waive any security or guarantee; or

(g) bid and purchase at any sale of security and apply any proceeds or security, and direct the order and manner of sale.

5. If a claim is made upon you at any time for repayment or recovery of any amounts or other value received by you, from any source, in payment of or on account of any of the obligations of the Customer guaranteed hereunder and you repay or otherwise become liable for all or any part of such claim by reason of:

(a) any judgment, decree or order of any court or administrative body, or

(b) any settlement or compromise of any such claim,

we shall remain jointly and severally liable to you for the amount so repaid or for which you are otherwise liable to the same extent as if such amounts had never been received by you, notwithstanding any termination hereof or the cancellation of any note or other agreement evidencing any of the obligations of the Customer.

6. This Guaranty is for the benefit of your successors and assigns, and we hereby waive notice of any such assignment. This Guaranty will bind our respective heirs, administrators, representatives, successors, and assigns. This Guaranty is intended as a final expression of the guarantee of the undersigned and is intended as a complete and exclusive statement of the terms thereof. No course of dealing, course of performance or trade usage shall be used to waive, supplement or modify the terms hereof. The terms and provisions of this Guaranty may only be waived, modified, varied, released, terminated or surrendered, in whole or in part, by a duly authorized written instrument signed by you. This Guaranty will be construed liberally in your favor.

7. This Guaranty is governed by and construed under the laws of the State of Tennessee, without giving effect to the conflict-of-laws principles. We consent to the jurisdiction of any state or federal court located within the State of Tennessee. Each of us agrees to waive all rights to trial by jury in any action, proceeding, or counterclaim on any matter whatsoever arising out of, in connection with, or related to this Guaranty. This waiver is irrevocable and all-encompassing of any and all disputes that may be filed in any court. This waiver cannot be modified orally and applies to all amendments, modifications and supplements hereto.

8. This Guaranty may be executed in one or more counterparts, and by different Guarantors on separate counterparts, each of which will be considered an original, but all of which together will constitute one Guaranty.

## SIGNATURES

EACH GUARANTOR HAS READ AND FULLY UNDERSTANDS ALL OF THE PROVISIONS OF THIS GUARANTY

Date: 3/10/2014

Guarantor: Magnetation LLC

Signature: Joe Broking

Name (PRINT): Joe Broking

Title: CFO

Exhibit D
PRL Lease

**Master Tax Lease for Railcars**
**Transaction Number 4050-R**


**CAT**
Financial

This Master Tax Lease (together with any amendments made from time to time, this "Master Agreement") is entered into by Progress Rail Leasing Corporation ("we", "us" or "our") and the Lessee named below ("you" or "your").

## 1. PARTIES

**LESSOR:**

PROGRESS RAIL LEASING CORPORATION
1600 Progress Drive
Albertville, AL 35950

**LESSEE:**

MAG PELLET LLC
102 NE 3rd Street, Suite 120
Grand Rapids, MN 55744

## TERMS AND CONDITIONS

2. **Agreement to Lease** Subject to the terms and conditions of this Master Agreement, we lease to you, and you lease from us, all of the Units (together with any attachments, accessories and optional features, whether or not installed with any of those units, and all manufacturer manuals and instructions being the "Units" and, individually, a "Unit") described in the Lease Schedules (each, a "Lease Schedule"), executed from time to time pursuant to and made a part of this Master Agreement. Unless the context otherwise provides, each item of "Additional Collateral" identified in any Lease Schedule is considered a Unit under the terms of such Lease Schedule and this Master Agreement. Each Lease Schedule, together with this Master Agreement as it relates to such Lease Schedule, is referred to in this Master Agreement as a "Lease". Capitalized terms used in this Master Agreement in relation to a Lease and not defined in this Master Agreement will have the meanings given to them in the applicable Lease Schedule. Each Addendum, Schedule, and Rider that is referred to in a Lease Schedule and is attached to such Lease Schedule or is deemed to be attached to such Lease Schedule is incorporated into such Lease Schedule by reference and is deemed to be a part of such Lease Schedule. In the event of any conflict or inconsistency between the provisions of a Lease Schedule and the provisions of this Master Agreement, the provisions of such Lease Schedule will govern. We have the right at any time to divide any Lease Schedule by issuing and executing two or more Lease Schedules for the Units contained in the original Lease Schedule. Thereafter, the split Lease Schedules will supersede the original Lease Schedule. Any split Lease Schedule(s) will be on the same terms and conditions as the original Lease Schedules, except that provisions applying to specific Units will be included only in the Lease Schedule covering those Units.

3. **Purchase and Lease of Railcars** We, or an affiliate of ours, will issue a purchase order and execute the Terms and Conditions of Sale with the Supplier (as defined below), as accepted by you and attached as Addendum No. 1, based on your agreement to execute a Lease Schedule for each Unit that is produced by Supplier containing the general commercial terms outlined in our proposal letter to you dated January 22, 2014. Should there be any increase in price or other costs associated with any Unit pursuant to the terms contained in Addendum No. 1, then we shall have the right to adjust your Rent accordingly. The following conditions must be satisfied before we are obligated to purchase and pay for any Unit to be leased under any Lease Schedule: (a) no Event of Default (as defined in Section 14) or any event which, with the giving of notice, the lapse of time or both, would become an Event of Default exists as of the date we sign the applicable Lease Schedule; (b) no material adverse change in your financial or operating condition has occurred after you and we have signed such Lease Schedule and before the Delivery Date of such Unit; (c) you have delivered to us a duly executed delivery certificate ("Delivery Supplement") for the Unit(s) and all other documents that we may reasonably request; and (d) if you have taken title to any Unit to be leased under this Master Agreement, and we agree to purchase from and lease such Unit back to you, and you agree to sell to and lease back from us such Units, (i) you will have executed and delivered to us or our designee a bill of sale, in our standard form, with respect to such Units and (ii) you represent and warrant to us that, as of the date of signing the applicable Lease Schedule, such Units and your right, title and interest in and to such Units will be free from all claims, liens, security interests and encumbrances (other than under any Lease or this Master Agreement or any Blanket Liens (as defined in Section 8) that your lenders may have in your rights, provided in no event will any such Blanket Liens be superior to our interest in the Units). If any of these conditions are not met with respect to any Unit, you will, upon our request, promptly discharge any obligation to pay for such Unit which we may have assumed or incurred, and, upon such discharge, we will sell to you, without recourse, representation, warranty or condition of any kind, all of our interest in such Unit.

4. **Lease Term** This Master Agreement is effective on the date that you and we sign it and will continue for as long as any Lease remains in effect. Each Lease becomes effective on, and the "Lease Term" for each Unit will start on, the date that we sign the applicable Lease Schedule and, unless terminated earlier as provided in accordance with the terms of such Lease, will continue for the term set forth in the applicable Lease Schedule.

5. **Rent** You will pay us the scheduled rent payments ("Scheduled Payments") in such amounts and starting on such dates as set out in the applicable Lease Schedule. All Scheduled Payments will be due without demand. You will also pay us all other amounts payable under the terms of this Master Agreement, any Lease and under any other document executed in connection with this Master Agreement or any Lease Schedule (collectively, the "Lease Documents") when due (all such other payments, the "Other Payments" and, together with all Scheduled Payments, the "Rent"). You will pay all Rent not otherwise payable by pre-authorized debit to us at 25083 Network Place, Chicago, Illinois 60673-1260, or such other location that we designate in writing. You agree that each Lease constitutes a non-cancelable net lease. You also agree that your rights and liabilities under this Master Agreement, each Lease and the other Lease Documents are absolute and unconditional. Your payment and performance obligations are not subject to cancellation, reduction, or setoff for any reason. You agree to settle all claims, defenses, setoffs, counterclaims and other disputes you may have with the Supplier, the manufacturer of each Unit, or any other third party directly with the Supplier, the manufacturer or the third party, as the case may be. You will not assert, allege or make any such claim, defense, setoff, counterclaim or other dispute against us or with respect to the payments due to us under this Master Agreement, any Lease or any other Lease Documents.

6. **Late Charges** If we do not receive a Rent payment or any payment under this Master Agreement or a Lease Schedule within ten (10) days after the date it is due, you will pay us, on demand, a late payment charge equal to five percent (5%) of the late Rent payment.

7. **Disclaimer of Warranties** You have selected each Unit to be leased pursuant to this Master Agreement based upon your own judgment. You understand that we are not the manufacturer or the seller of the Units. WE MAKE NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THIS MASTER AGREEMENT, ANY LEASE OR TO ANY UNIT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH UNIT IS LEASED "AS IS, WHERE IS." WE MAKE NO WARRANTIES AS TO THE QUALITY OF MATERIALS OR WORKMANSHIP OR THAT THE MATERIALS OR WORKMANSHIP COMPLY WITH THE TERMS OF ANY PURCHASE ORDER OR AGREEMENT. WE EXPRESSLY DISCLAIM, AND YOU WAIVE ALL OTHER WARRANTIES AND CLAIMS EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY UNIT. THIS MASTER AGREEMENT OR ANY LEASE, INCLUDING WITHOUT LIMITATION: (A) ANY IMPLIED WARRANTY THAT ANY UNIT IS MERCHANTABLE; (B) ANY IMPLIED WARRANTY THAT ANY UNIT IS FIT FOR A PARTICULAR PURPOSE; (C) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE; (D) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY IN TORT; AND (E) ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY FOR LOSS OF OR DAMAGE TO ANY UNIT, FOR LOSS OF USE, REVENUE, OR PROFIT WITH RESPECT TO ANY UNIT, FOR ANY LIABILITY TO ANY THIRD PARTY, OR FOR ANY OTHER DIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING STRICT OR ABSOLUTE LIABILITY IN TORT. Nothing in this Master Agreement takes away any rights you may have against any other parties (such as the Supplier or the manufacturer of any Unit or the Supplier or manufacturer of the components used in any Unit). You agree to pursue only these third parties for any and all claims concerning any Unit except as to ownership and title. You are entitled to all the promises and warranties made by the Supplier to us with respect to any applicable Units, and you may contact such Supplier in order to receive a description of those promises and warranties.

8. **Possession, Use, and Maintenance** (a) At your own expense, you will use and keep the Units in the same condition as when received, ordinary wear and tear excepted (which in any event will be no less than good and fully serviceable operating order and condition, free of broken, damaged or missing parts) and suitable for unrestricted revenue and interchange service (unless such Unit is restricted at the time delivered to you by us), in accordance with Supplier's and manufacturer's recommendations and all maintenance and operating

manuals and service agreements, and in accordance with all applicable laws and regulations, including the rules of the Federal Railroad Administration ("FRA"), the Association of American Railroads ("AAR"), the U.S. Department of Transportation ("DOT"), the Surface Transportation Board ("STB") or any government, agency, group or committee exercising authority over railcar design or operation, for which you have sole responsibility for compliance. If a physical alteration or modification to the Units is required by any of the foregoing entities ("Required Modifications"), you will make the Required Modifications at your own cost and expense. (b) You will not abandon a Unit. (c) You will not sublease a Unit or permit the use of a Unit by anyone other than you. (d) You will not change the use of a Unit from that specified in the applicable Lease Schedule, without our prior written consent. (e) You will not load or permit the loading of any Unit (1) in excess of the load limit stenciled on such Unit, or (2) with any commodities or materials other than the Permitted Commodities (as defined in the applicable Lease Schedule); (f) You will not remove a Unit from the United States; (g) You will not sell, assign, transfer, create or allow to exist a lien, claim, security interest, or encumbrance on any of your rights under this Master Agreement or any Lease or with respect to a Unit other than liens granted to your lenders on all or substantially all of your assets ("Blanket Liens"), provided in no event will any such Blanket Liens be superior to our interest in the Units; (h) You will not modify a Unit from its original configuration or paint colors without our prior written approval; and (i) No Unit will be subjected to augers or any other loading or unloading practices damaging to or which may damage the Units (we acknowledge that you plan to use a thaw shed on the Units; however, you agree to remain liable for any damage, which may include, but is not limited to, loss of camber and damage to paint, caused by such use and that any damage will not be deemed ordinary wear and tear on the Units). Each Unit is and will remain personal property regardless of its use or manner of attachment to realty. We have the right (but not the obligation) to inspect each Unit and its maintenance records. All sheet metal, ladders and hand holds must be in serviceable and commercially intended condition without tears, gouges, corrosion or other structural damage. We also have the right to observe the use of each Unit and determine its usage. You will not alter a Unit or affix any accessory or equipment to a Unit if doing so will impair its originally intended function or use or reduce its value. You will not make any "non-severable" addition (as defined for federal income tax purposes) to a Unit without our prior written consent. If added to a Unit, the following will immediately become our property: (i) replacement parts; (ii) parts essential to the operation of the Unit; (iii) parts that cannot be detached from the Unit without interfering with the operation of the Unit or adversely affecting the value or utility the Unit would have had without the addition; and (iv) Required Modifications. All such parts will be deemed incorporated in the applicable Unit and will be subject to the terms of the applicable Lease as if originally leased under such Lease. If an Event of Default has occurred and is continuing, all parts, accessories, and equipment affixed to a Unit will become our property.

9. **Taxes**   Rent includes all taxes arising from, or due in connection with, this Master Agreement, any Lease or the Units. You will pay when due, or promptly reimburse us for payment of, all taxes (other than our federal, state, or local net income taxes) imposed on a Unit, or the Rent. You will also pay or reimburse us for all (i) license and registration fees, (ii) fines, penalties, interest, or additions to any tax, (iii) charges similar to those stated in clauses (i) and (ii) that are imposed in connection with the ownership, possession, use, or lease of a Unit from the time we purchase the Unit until it is returned to us or purchased by you. You will remain responsible for the payment, or reimbursement of, any such charges, regardless of when we receive notice of the charge. You will prepare and file, in a manner satisfactory to us, all reports or returns required with respect to a Unit. You will reimburse us in full for any amounts that we pay or advance without regard to early payment discounts. We may estimate the amount of, and bill you periodically in advance for, any charge. You will be responsible, however, for any difference between the estimated amount and the actual amount. Except as provided in this section, you agree that we are entitled to receive any and all federal, state, or local tax credits and benefits, if any, applicable to a Unit. We are entitled to income tax depreciation deduction for each Unit based on the use as described in the applicable Lease Schedule.

10. **Tax Indemnity**   Each Lease is entered into on the basis that we are entitled to claim certain depreciation deductions on the Units in accordance with Section 168(a) of the Internal Revenue Code of 1986, as amended (the "Code"), based upon the applicable depreciation method and recovery period specified in Code Sections 168(b) and (c), and to similar state and local income tax deductions (collectively, the "Tax Benefits"). Our classification of a Unit under Code Section 168(e), our determination of the applicable depreciation method and recovery period, and our claim for an entitlement to the Tax Benefits are based solely upon your representations in Section 8 and the applicable Lease Schedule. If we do not receive or retain all of the Tax Benefits anticipated with respect to any Unit (a "Tax Loss"), because (a) of a change in the US federal income tax rate, (b) you move any Unit outside the United States, or (c) you use any Unit for a different purpose than stated in the applicable Lease Schedule; you will pay us, within thirty (30) days after we provide you written notice of such Tax Loss, an amount which, in our opinion, will cause our net after-tax rate of return over the Lease Term in respect to the Unit to equal the net after-tax rate of return we would have realized if such Tax Loss had not occurred. For purposes of this section, we may be included in any affiliated group (within the meaning of Section 1504 of the Code) of which we are a member for any year in which a consolidated or combined income tax return is filed for the affiliated group.

11. **Loss or Damage**   (a) You bear the risk of loss or damage to each Unit from the time we purchase such Unit (or from the beginning of the applicable Lease Term, if earlier) until such Unit is returned to us or purchased by you in accordance with this Master Agreement, including any damage covered under

AAR Interchange Rule 95, damages resulting from loading or unloading procedures including heating, washing and or additives, and damages arising from commodities, products and/or goods carried in any Unit (such as tears, gouges, corrosion and other structural damage). Should any loss or damage occur, you will not be released from your obligations under this Master Agreement, any Lease or any other Lease Document. (b) You will provide prompt, written notice to us of any Total Loss (as defined below) or any material damage to any Unit. Any such notice will include any damage reports provided to any governmental authority, an insurer, or the Supplier, and any documents pertaining to the repair of such Units. Without limiting any other term in this Master Agreement or the applicable Lease, you will promptly repair all damage that does not constitute a Total Loss, so as to restore the applicable Unit to the condition required by the applicable Lease. (d) A Unit has incurred a "Total Loss" upon: (i) the disappearance, theft or destruction or any other total loss of such Unit; (ii) damage to the Unit that is uneconomical to repair, or (iii) the condemnation, confiscation, or other taking of title to or use of a Unit or the imposition of any lien on such Unit by any governmental authority. In the event of a Total Loss, you will pay to us, on the next Scheduled Payment due date, as set out in the applicable Lease Schedule, following the Total Loss (a "Loss Payment Date") (or 30 days after the Total Loss if there is no Scheduled Payment due date remaining under such Lease Schedule) the Scheduled Payment due on that date plus the Casualty Loss Value of the Unit with respect to which the Total Loss has occurred (the "Lost Units"), together with any Other Payments due with respect to the Lost Units. Until such payment is made, you will continue to pay us the Scheduled Payments on the due dates set forth in the applicable Lease Schedule. Upon making the full payment required on the Loss Payment Date, your obligation to pay future Scheduled Payments on the Lost Units will terminate, but you will remain liable for all Scheduled Payments and all Other Payments on any remaining Units. Furthermore, upon receipt of the full payment required on the Loss Payment Date, we will convey to you all of our right, title, and interest in the Lost Units, "AS IS WHERE IS", but subject to the requirements of any third party insurance carrier in order to settle an insurance claim and subject to the rights of any railroad under the AAR Interchange Rules, including AAR Interchange Rule 107. "Casualty Loss Value" means the greater of: (i) the then current settlement value received by you from a railroad under AAR Rule 107, or (ii) the casualty value as shown in the applicable Lease Schedule. If the Total Loss occurs after the first Rent due date of the Lease Term, the Casualty Loss Value will be determined as of the last Scheduled Payment due date during the Lease Term. (e) We are not required to pursue any claim against any person in connection with a Total Loss or other loss or damage. (f) If we receive a payment under an insurance policy required under this Lease in connection with any Total Loss or other loss or damage to a Unit, and such payment is both unconditional and indefeasible, then provided you have complied with the applicable provisions of this section, we will either (i) if the payment results from a Total Loss, send you proceeds up to an amount equal to the Casualty Loss Value you previously paid us, or credit the proceeds against any amounts you owe us or (ii) if the payment results from repairs made pursuant to Section 11(c), send you proceeds up to an amount equal to the amount of your actually incurred costs of repair.

12. **Waiver and Indemnity**   You release and agree to indemnify, defend, and keep harmless, us (including any assignee of ours) and our directors, officers, agents and employees (each, an "Indemnitee"), from and against any and all Claims (defined below) (other than those directly resulting from the actual gross negligence or willful misconduct of the Indemnitee). To meet this obligation, you will pay, on a net after-tax basis (which shall include credit for any deductions or other benefits related to a Claim accruing to us), or otherwise discharge such Claims, when and as they become due. We will give you prompt notice of a Claim. You are entitled to control the defense of or to settle a Claim, so long as: (a) no Event of Default has occurred and is then continuing; (b) you are financially capable of satisfying your obligations under this section; and (c) we approve your proposed defense counsel. "Claims" means all claims, allegations, judgments, settlements, suits, actions, damages (whether incidental, consequential or direct), demands (for compensation, indemnification, reimbursement or otherwise), losses, penalties, fines, liabilities (including strict liability), and charges that we incur or for which we are or may be responsible, in the nature of interest, liens, and costs (including attorneys' fees and disbursements and any other legal or non-legal expenses of investigation or defense of any Claim, whether or not the Claim is ultimately defeated, or enforcing the rights, remedies, or indemnities provided for hereunder, or otherwise available at law or in equity to us), of whatever kind or nature, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable, by or against any person. Claims include any of the foregoing arising from: (i) any Lease or any Lease Document; (ii) a Unit, including the contents and any regulated or hazardous substances at any time contained in a Unit or omitted from a Unit, (iii) the premises at which any Unit may be located from time to time, including any demurrage, track storage or detention charges; (iv) the ordering, acquisition, delivery, installation, or rejection of a Unit; (v) the possession of a Unit or any property to which the Unit may be attached from time to time; (vi) the maintenance, use, condition, ownership, movement or operation of any Unit, during the Lease Term, including without limitation payments we may be required to make to a railroad pertaining to the movement of any Unit; (vii) the existence of a latent or other defect (whether or not discoverable by you or us) with respect to a Unit; (viii) any Claim in tort for negligence or strict liability in relation to a Unit; (ix) any Claim for patent, trademark or copyright infringement in relation to a Unit; (x) the Total Loss or damage, return, surrender, sale, or other disposition of any Unit or any part thereof; or (xi) any Claim involving or alleging environmental damage, or any criminal or terrorist act, relating in any way to a Unit. If any Claim is made against you or an Indemnitee, the party receiving notice of the Claim will promptly notify the other. If the party receiving notice of the Claim fails to notify the other, however, your obligations are still in effect. You agree to be responsible for all costs and expenses, including reasonable attorneys' fees, incurred by us or

our directors, officers, employees, agents, or assigns in defending such claims or in enforcing this section. Under no condition or cause of action will we be liable for any loss of actual or anticipated business or profits or any special, indirect, or consequential damages. We are not responsible for the failure of the railroads to grant approval for use of the Units under AAR Circular No. OT-5.

**13. Insurance** You, at your expense, must keep each Unit insured with a commercial insurance policy for our benefit. This insurance must include physical damage insurance that will protect each Unit against all risks for an amount at least equal to the then-applicable Casualty Loss Value. You will also maintain comprehensive general liability insurance (including product and broad form contractual liability) covering each Unit for at least $10,000,000 combined coverage for bodily injury and property damage per occurrence. All insurance must be in a form and with companies approved by us. The physical damage insurance shall specify you as named insured and us as loss payee, and the general liability policy shall specify you as named insured and us as additional insured. The insurance shall be primary, without the right of contribution from any insurance carried by us. You must promptly notify us of any occurrence that may become the basis of a claim. You must also provide us with all requested pertinent data. Upon demand, you must promptly deliver to us evidence of insurance coverage.

**14. Events of Default** Each of the following is an event of default ("Event of Default") under this Master Agreement and each Lease: (a) You fail to make a payment when due under this Master Agreement or any Lease and such failure continues for ten (10) days after written notice to you. (b) You fail to execute a Lease Schedule after Units have been delivered by the Supplier in accordance with the terms contained in Addendum No. 1. (c) A representation or warranty made to us in connection with this Master Agreement or any Lease is incorrect or misleading. (d) You fail to observe or perform a covenant, agreement, or warranty under this Master Agreement or any Lease and the failure continues for ten days after written notice to you. (e) A default occurs under any other agreement between you or a guarantor of this Master Agreement or any Lease (each a "Guarantor") and us or an affiliate of ours. (f) You, or any Guarantor, cease to do business, die, become insolvent, make an assignment for the benefit of creditors or file a petition or action under a bankruptcy, reorganization, insolvency or moratorium law, or a law for the relief of, or relating to, debtors, (g) any filing of an involuntary petition under a bankruptcy statute against you or a Guarantor, or appointment of a receiver, trustee, custodian or similar official to take possession of your properties or those of a Guarantor, unless the petition or appointment ceases to be in effect within thirty days after filing or appointment. (h) There is a material adverse change in your, or a Guarantor's, financial condition, business operations or prospects which has or may be reasonably expected to have a material adverse effect upon: (i) the business, operations, or financial condition of you or the Guarantor; (ii) the validity or enforceability of any Lease Document or guaranty; (iii) your ability, or the ability of a Guarantor, to perform obligations under any Lease Document or the guaranty, respectively; or (iv) our ability to exercise any rights or enforce or collect the obligations of you or the guarantor in accordance with any Lease Document or the guaranty, respectively, or at law; (i) There is a termination, breach, or repudiation of a Guarantor's guaranty.

**15. Remedies** (a) If an Event of Default occurs, we will have the rights and remedies provided by this Master Agreement and Lease and under the Uniform Commercial Code ("UCC") and any other law. Among these rights and remedies are to: (i) proceed at law or in equity, to enforce specifically your performance or to recover damages; (ii) declare this Master Agreement or any Lease in default, and cancel this Master Agreement or any Lease or otherwise terminate your right to use any Unit and your other rights, but not your obligations, (iii) require you to assemble Units and make them available to us at a place we designate; (iv) enter premises where a Unit may be located and take immediate possession of such Unit and remove (or disable in place) such Unit (and any unattached parts) without notice, liability, or legal process; (v) use your premises for storage without liability; (vi) sell or lease any of the Units, whether or not in our possession, at public or private sale, with or without notice to you, and apply or retain the net proceeds of such disposition in accordance with this Master Agreement and any Lease; (vii) enforce any or all of the preceding remedies with respect to any related collateral, and apply any deposit or other cash collateral, or any proceeds of any such collateral, at any time to reduce remedies with respect to any related collateral, and apply any deposit or other cash collateral, or any proceeds of any such collateral, at any time to reduce your obligations; (viii) demand and recover from you all Liquidated Damages (as defined below) and all Other Payments whenever they are due; and (ix) if we financed your obligations under a warranty agreement such as an Equipment Protection Plan, Customer Service Agreement, or similar agreement, we may cancel the agreement on your behalf and receive the refund of the fees that we financed but had not received from you as of the date of the Event of Default. As used herein, "Liquidated Damages" means the liquidated damages (all of which, you hereby acknowledge, are damages to be paid in lieu of future Scheduled Payments and expected Casualty Loss Values and are reasonable in light of the anticipated harm arising by reason of an Event of Default, and are not a penalty) described in the first sentence of parts (i) or (ii) of Section 15(b) below, depending upon the recovery and disposition of the Units.

(b) If an Event of Default occurs and:

(i) we recover a Unit and dispose of it by a lease or elect not to dispose of the Unit after recovery, you will pay us on demand an amount equal to the sum of (A) any accrued and unpaid Rent as of the date we recover the Unit, plus (B) the present value as of such date of the total Scheduled Payments for the then remaining Lease Term, minus (C) either (1) the present value, as of the commencement date of any substantially similar re-lease of the Unit, of the re-lease rent payable to us for the period, commencing on such commencement date, which is comparable to the then remaining Lease Term or (2) the present value of the "market rent" for such Unit (as computed pursuant to Article 2A of the UCC ("Article 2A")) in

the continental United States as of the date on which we have a reasonable opportunity to remarket the Unit for the period, commencing on such date, which is comparable to the then remaining Lease Term, as applicable; provided, however, you acknowledge that if we are unable after a reasonable effort to dispose of the Unit at a reasonable price and pursuant to other reasonable terms, or the circumstances reasonably indicate that such an effort will be unavailing, the "market rent" in such event will be deemed to be $0.00, but in the event that we do eventually re-lease or otherwise dispose of the Unit, we will apply the net proceeds of such disposition, to the extent received in good and indefeasible funds, as a credit or reimbursement, as applicable, in a manner consistent with the terms of this Master Agreement and any Lease and the applicable provisions of Article 2A. Any amounts discounted to present value, shall be discounted at the rate of three percent (3%) per annum, compounded annually;

(ii) you fail to return a Unit in the manner and condition required by this Master Agreement or the applicable Lease, or we recover and sell the Unit, you will pay to us on demand an amount calculated as the Casualty Loss Value of the Unit (determined as of the next Scheduled Payment due date after the date of the Event of Default), together with all costs and expenses (as defined below), less a credit for any disposition proceeds, if applicable pursuant to the application provisions in the next sentence. If we demand the Liquidated Damages under this part (ii) and recover and sell the Unit, we will apply any proceeds received in good and indefeasible funds: first, to pay all costs and expenses not already paid; second, to pay us an amount equal to any unpaid Rent due and payable, together with the Liquidated Damage amounts specified in this part (ii), to the extent not previously paid; third, to pay us any interest accruing on the amounts covered by the preceding clauses, plus late charges, from and after the date the same becomes due, through the date of payment; fourth, to pay us an amount equal to any remaining obligations that you owe us under this Lease.

The remedies provided to us are cumulative and in addition to all other remedies at law or in equity. You will remain liable for any deficiency and we will retain any excess after our exercise of these remedies. To the extent you are entitled to a refund from us, you agree we have the right to offset any obligation that you have with us or our affiliates with such refund.

**16. Return of Unit** For ninety (90) days prior to return of any Unit, you must make the Unit available to our agents during normal business hours for purposes of conducting a detailed appraisal and/or inspection. On expiration of the Lease Term of a Unit or if we demand possession of a Unit pursuant to the terms of this Master Agreement and the applicable Lease Schedule, you will, at your expense, promptly deliver such Unit to us properly protected and in the Required Condition. If a Unit bears your mark, you shall bear the costs associated with re-marking any such Unit and the application of replacement automatic equipment identifier (AEI) tags to any such Unit. You will deliver the Unit to a the Return Point set forth in the applicable Lease Schedule. If the Unit is not in the Required Condition, you must pay us, on demand, all costs and expenses incurred by us to bring the Unit into the Required Condition. The "Required Condition" means the condition required by Section 8 and the other provisions of this Master Agreement or any applicable Lease Schedule, suitable for immediate, unrestricted 286,000 lb gross rail load service, cleaned of or otherwise free from hazardous materials (as defined by applicable laws, including radiation), with no prior lading (other than trace amounts), and free from any liens, claims or other encumbrances arising by or through you. You are obligated to pay holdover rent as specified in the Lease Schedule applicable to such Unit, plus any other costs and expenses, for each day following the end of the applicable Lease Term on any Unit that is not returned or purchased pursuant to the terms of this Master Agreement and the applicable Lease Schedule. You may be required, at our discretion, to provide safe and secure storage for any Unit being returned to us for no more than ninety (90) days after expiration of the Lease Term at a location satisfactory to us.

**17.** Intentionally Omitted.

**18. Your Assurances and Representations** Each of us intends that: (i) each Lease constitutes a true "lease" and a "finance lease" as such terms are defined in Article 2A and not a sale or retention of a security interest; (ii) you have selected the "Supplier" (as defined in Article 2A) and have directed us to purchase each applicable Unit (excluding any Additional Collateral) from such Supplier; (iii) you were informed, before your execution of this Master Agreement and each Lease, and are hereby informed in writing, that you are entitled under Article 2A to the promises and warranties, including those of any third party, provided to us by the Supplier in connection with or as part of the purchase of the Units, and that you may communicate directly with the Supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations on remedies relating thereto; and (iv) we are and will remain the owner of each Unit (unless sold by us pursuant to any Lease Document), and you shall not acquire any right, title or interest in or to such Unit except the right to use it in accordance with the terms hereof.

You represent and warrant to us that: (a) You will use each Unit for business purposes only and not for personal, family or household use. (b) You will provide all financial information and reporting as we may reasonably require. (c) All credit, financial and other information submitted by you or on your behalf to us in connection with this Master Agreement and any Lease is and will be true, correct and complete. (d) You will not change your name, principal place of business or primary residence and, if you are a business entity, your state of formation or form of business organization (including by merger, consolidation, reincorporation or restructure) without prior written notice to us. We may

share any of your information provided by you, or gathered by us, with any affiliate of ours that has or may extend credit to you. (f) You will not assign this Master Agreement or any Lease or any right or obligation under this Master Agreement or any Lease without our prior written consent.

You agree, at your expense, to do any act and execute, acknowledge, authorize, deliver, file, register, and record any documents that we deem desirable in our reasonable discretion to protect our title or rights in a Unit and our rights and benefits under this Master Agreement and any Lease, including the Record Keeping and recordation of a memorandum of any Lease with the STB. You will (or will cause your agent to) perform the following registration and record keeping functions ("Record Keeping") unless otherwise instructed by us to you in writing: (i) registration of the Units in the Official Railway Equipment Register ("ORER") and the Universal Machine Language Equipment Register ("UMLER") by placing ownership marks provided by us in the UMLER ownership field; and (ii) completion of reports pertaining to maintenance, repair and billing in accordance with the AAR Interchange Rules and AAR format, and provision of such reports to us upon such completion and at any other time upon demand. You will at all times ensure we have access to the ORER and UMLER, and provide pass key(s) and other access information to us for ORER, UMLER and any other register containing information relating to any Unit. Upon termination of a Lease, you will transfer the applicable UMLER data to us for re-registration under new marks. You hereby irrevocably appoint us as your attorney-in-fact for the signing and filing of such documents and authorize us to delegate these limited powers.

You will not remove, disable, or impair any Unit monitoring system if the Unit is equipped with such system. You agree to permit Caterpillar Inc. or its subsidiaries or affiliates, including us (collectively "Caterpillar") and Caterpillar dealers to access data concerning the Unit, its condition, and its operation transmitted from the monitoring system. The information may be used: (1) to administer, implement, and enforce the terms of this Master Agreement and any Lease, (2) to recover the Unit if necessary, and (3) to improve Caterpillar's products and services. You agree that information transmitted may include, among other things, the serial number, VIN and location.

19. **Assignment; Counterparts** We may assign, sell or encumber all or any part of the Lease Documents, the Leases, the Rent, and the Units with or without notice to you. THE RIGHTS OF ANY SUCH ASSIGNEE WILL NOT BE SUBJECT TO ANY DEFENSE, COUNTERCLAIM OR SET OFF WHICH YOU MAY HAVE AGAINST US. If requested by us, you will assist us in the assignment of any of our rights under any Lease. If requested by us, you will also sign a notice of assignment in a form approved by us. If notified by us, you will make all payments due under any Lease to the party designated in the notice without offset or deduction. In connection with any potential or actual assignment, you consent to the sharing of your credit file information, including personal information relating to your principals, with any potential assignee. Upon any assignment by us of our rights under any Lease, and except as may otherwise be provided herein, all references in this Master Agreement and such Lease to "Lessor", "we", "us", and "our" will mean the assignee. Each of this Master Agreement and the Leases is for the benefit of, and is binding upon, your and our respective successors and assigns. Though multiple counterparts of a Lease may be signed, only the counterpart accepted, acknowledged, and

certified by us on the signature page of the applicable Lease Schedule as the original will constitute original chattel paper. A photocopy or facsimile of this Master Agreement or any Lease Schedule will be legally admissible under the "best evidence rule." A signed copy of this Master Agreement, any Lease Schedule or any related document sent electronically will be treated as an original document and will be admissible as evidence thereof, and all signatures thereon will be binding as if manual signatures were personally delivered. You are hereby notified that we may assign our rights (but not our obligations) under any Lease and in any Units to CF Exchange, LLC, a qualified intermediary, as part of a 1031 exchange.

20. **Effect of Waiver; Entire Agreement; Notices; Applicable Law** Our delay or omission in exercising any right or remedy will not impair such right or remedy. A delay or omission by us will not be construed as a waiver of any Event of Default. Any waiver or consent by us must be in writing. This Master Agreement and all Lease Documents completely state our and your rights and supersede all prior agreements with respect to any Unit. All notices must be in writing, addressed to the other party at the address stated on the front of this Master Agreement or at such other address as may be furnished in writing. This Master Agreement and each Lease are governed by and construed under the laws of the State of Tennessee, without giving effect to the conflict-of-laws principles. You consent to the jurisdiction of any state or federal court located within the State of Tennessee. THE PARTIES WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION ARISING OUT OF OR RELATED TO THIS MASTER AGREEMENT, ANY LEASE, ANY OF THE OBLIGATIONS, OR ANY OF THE UNITS.

21. **No Agency; Modification of Agreement; Miscellaneous** No person or entity, including, without limitation, the Supplier or the manufacturer of the Units, is authorized to act as our agent regarding this Master Agreement or any Lease. No waiver, modification, or change in this Master Agreement or any Lease will bind us unless provided by us in writing. Oral agreements are not binding. You agree that we may correct patent errors in this Master Agreement, any Lease and the Lease Documents and fill in blanks including, for example, correcting or filling in serial numbers, VIN numbers, and dates. Headings in this Master Agreement or any Lease are inserted for convenience only. Headings do not affect the meaning or interpretation of this Master Agreement or any Lease. If a provision of this Master Agreement or any Lease is invalid under any law, it will be deemed omitted. Any such omission will not invalidate the remaining provisions. To the extent any payment due to us under this Master Agreement or any Lease is deemed to be usurious, the payment obligation will be amended and limited to the maximum lawful amount. All obligations under this Master Agreement or any Lease survive the expiration or termination of this Master Agreement or such Lease if necessary to give full effect to the terms of this Master Agreement or such Lease.

By signing this Master Agreement, you certify that you have read this Master Agreement.

## SIGNATURES

| LESSOR | **PROGRESS RAIL LEASING CORPORATION** | MAG PELLET LLC |
|---|---|---|
| Signature | | Signature |
| Name (print) | J Duane Cantrell | Name (print)  Joe Broking |
| Title | SVP | Title  CFO |
| Date | 3-11-2014 | Date  3/10/2014 |

<u>Exhibit E</u>
PRL Lease Schedule

Lease Schedule No. 01 to Master Tax Lease for Railcars
Transaction Number 4050-R

This Lease Schedule dated as of August 22, 2014 (together with each addendum, schedule, and rider attached to, or made a part of, this lease schedule, this "Lease Schedule") is by and between **Progress Rail Leasing Corporation** ("we", "us" or "our") and the Lessee named below ("you" or "your") to the Master Tax Lease for the Transaction Number set out above (the "Master Agreement").

## 1.  PARTIES

LESSOR:                                             LESSEE:

**PROGRESS RAIL LEASING CORPORATION**               **MAG PELLET LLC**
1600 Progress Drive                                 102 NE 3rd Street, Suite 120
Albertville, AL 35950                               Grand Rapids, MN 55744

Until this Lease Schedule has been signed by our duly authorized representative, this Lease Schedule will constitute an offer by you to enter into this Lease Schedule with us on the terms stated in this Lease Schedule and the Master Agreement.

## 2.  LEASE OF THE UNITS

This Lease Schedule is entered into pursuant to the Master Agreement.  Capitalized terms used and not defined in this Lease Schedule will have the meanings given to them in the Master Agreement.  This Lease Schedule and the Master Agreement as it relates to this Lease Schedule (collectively, this "Lease") constitute a lease from us to you of the Units described on Schedule A (excluding any Additional Collateral).  By your and our execution and delivery of this Lease Schedule, you and we reaffirm and incorporate into this Lease Schedule by reference all of the terms, conditions, representations, warranties and covenants of the Master Agreement, except as specifically modified in this Lease Schedule, as if such terms, conditions, representations, warranties and covenants were fully set out in this Lease Schedule.

## 3.  UNITS AND TERMS

**UNITS:**  SEE **SCHEDULE A** FOR A DESCRIPTION OF THE UNITS.

**MONTHLY RENT:**  $630.00 per Unit per month

**LEASE TERM:**  For each Unit, commencing upon delivery of such Unit to you at the Delivery Point, and terminating seven (7) years from the first day of the first month following delivery of the last Unit subject to this Schedule to you at the Delivery Point.

**RENEWAL OPTION:**  You may renew the Lease Term for one (1) additional period of five (5) years by providing no less than 180 days' prior written notice to us of your election to renew, which renewal election shall be binding and irrevocable and subject to credit approval of Lessee for the extended Lease Term by Lessor.

**DELIVERY LOCATION OF UNITS:** FreightCar America's manufacturing facility in Cherokee, Alabama (the "Delivery Point")

**RETURN POINT:**  A location designated by us within the continental United States.

**PERMITTED COMMODITIES:** Iron Ore, Coal

**FREIGHT:**  You are responsible for all costs and expenses of moving the Units, including freight and any switching fees, from the Delivery Point until returned to us in compliance with the Master Agreement at the Return Point.

**CASUALTY VALUE:**  SEE **SCHEDULE B**

## 4.  OTHER TERMS AND CONDITIONS

You will pay us the Monthly Rent for each Unit beginning on the date you take delivery of such Unit at the Delivery Point, and thereafter in advance on the first day of each month for the entire Lease Term, prorating any period which is less than a full month (with any such proration based on a thirty (30) day period).

For the purposes of Section 16 of the Master Agreement, the monthly holdover rental charge shall be an amount equal to 150% of the Monthly Lease Payment for the applicable Unit.

You agree to sign and deliver to us a separate Delivery Supplement in the form attached as **EXHIBIT C** promptly upon delivery of the Units to you.

Although multiple counterparts of this document may be signed, only the counterpart of this Lease Schedule accepted, acknowledged and certified by us on the signature page as the original Lease will constitute original chattel paper.

By signing this Lease Schedule, you certify that you have read the Master Agreement and this Lease Schedule.

## SIGNATURES

| LESSOR | PROGRESS RAIL LEASING CORPORATION | LESSEE | MAG PELLET LLC |
|---|---|---|---|
| Signature | | Signature | |
| Name (print) | J. Duane Cantrell | Name (print) | Joe Broking |
| Title | Senior Vice President | Title | Chief Financial Officer |
| Date | August | Date | August 22, 2014 |



EXHIBIT A

Description of Units

Three hundred ninety (390) 286,000 pound gross rail load (GRL) bulk commodity gondola railcars, with the specifications attached to the Master Tax Lease, to be marked with the following marks and numbers:

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | MGPX | 491 | | 48 | MGPX | 538 | | 95 | MGPX | 585 |
| 2 | MGPX | 492 | | 49 | MGPX | 539 | | 96 | MGPX | 586 |
| 3 | MGPX | 493 | | 50 | MGPX | 540 | | 97 | MGPX | 587 |
| 4 | MGPX | 494 | | 51 | MGPX | 541 | | 98 | MGPX | 588 |
| 5 | MGPX | 495 | | 52 | MGPX | 542 | | 99 | MGPX | 589 |
| 6 | MGPX | 496 | | 53 | MGPX | 543 | | 100 | MGPX | 590 |
| 7 | MGPX | 497 | | 54 | MGPX | 544 | | 101 | MGPX | 591 |
| 8 | MGPX | 498 | | 55 | MGPX | 545 | | 102 | MGPX | 592 |
| 9 | MGPX | 499 | | 56 | MGPX | 546 | | 103 | MGPX | 593 |
| 10 | MGPX | 500 | | 57 | MGPX | 547 | | 104 | MGPX | 594 |
| 11 | MGPX | 501 | | 58 | MGPX | 548 | | 105 | MGPX | 595 |
| 12 | MGPX | 502 | | 59 | MGPX | 549 | | 106 | MGPX | 596 |
| 13 | MGPX | 503 | | 60 | MGPX | 550 | | 107 | MGPX | 597 |
| 14 | MGPX | 504 | | 61 | MGPX | 551 | | 108 | MGPX | 598 |
| 15 | MGPX | 505 | | 62 | MGPX | 552 | | 109 | MGPX | 599 |
| 16 | MGPX | 506 | | 63 | MGPX | 553 | | 110 | MGPX | 600 |
| 17 | MGPX | 507 | | 64 | MGPX | 554 | | 111 | MGPX | 601 |
| 18 | MGPX | 508 | | 65 | MGPX | 555 | | 112 | MGPX | 602 |
| 19 | MGPX | 509 | | 66 | MGPX | 556 | | 113 | MGPX | 603 |
| 20 | MGPX | 510 | | 67 | MGPX | 557 | | 114 | MGPX | 604 |
| 21 | MGPX | 511 | | 68 | MGPX | 558 | | 115 | MGPX | 605 |
| 22 | MGPX | 512 | | 69 | MGPX | 559 | | 116 | MGPX | 606 |
| 23 | MGPX | 513 | | 70 | MGPX | 560 | | 117 | MGPX | 607 |
| 24 | MGPX | 514 | | 71 | MGPX | 561 | | 118 | MGPX | 608 |
| 25 | MGPX | 515 | | 72 | MGPX | 562 | | 119 | MGPX | 609 |
| 26 | MGPX | 516 | | 73 | MGPX | 563 | | 120 | MGPX | 610 |
| 27 | MGPX | 517 | | 74 | MGPX | 564 | | 121 | MGPX | 611 |
| 28 | MGPX | 518 | | 75 | MGPX | 565 | | 122 | MGPX | 612 |
| 29 | MGPX | 519 | | 76 | MGPX | 566 | | 123 | MGPX | 613 |
| 30 | MGPX | 520 | | 77 | MGPX | 567 | | 124 | MGPX | 614 |
| 31 | MGPX | 521 | | 78 | MGPX | 568 | | 125 | MGPX | 615 |
| 32 | MGPX | 522 | | 79 | MGPX | 569 | | 126 | MGPX | 616 |
| 33 | MGPX | 523 | | 80 | MGPX | 570 | | 127 | MGPX | 617 |
| 34 | MGPX | 524 | | 81 | MGPX | 571 | | 128 | MGPX | 618 |
| 35 | MGPX | 525 | | 82 | MGPX | 572 | | 129 | MGPX | 619 |
| 36 | MGPX | 526 | | 83 | MGPX | 573 | | 130 | MGPX | 620 |
| 37 | MGPX | 527 | | 84 | MGPX | 574 | | 131 | MGPX | 621 |
| 38 | MGPX | 528 | | 85 | MGPX | 575 | | 132 | MGPX | 622 |
| 39 | MGPX | 529 | | 86 | MGPX | 576 | | 133 | MGPX | 623 |
| 40 | MGPX | 530 | | 87 | MGPX | 577 | | 134 | MGPX | 624 |
| 41 | MGPX | 531 | | 88 | MGPX | 578 | | 135 | MGPX | 625 |
| 42 | MGPX | 532 | | 89 | MGPX | 579 | | 136 | MGPX | 626 |
| 43 | MGPX | 533 | | 90 | MGPX | 580 | | 137 | MGPX | 627 |
| 44 | MGPX | 534 | | 91 | MGPX | 581 | | 138 | MGPX | 628 |
| 45 | MGPX | 535 | | 92 | MGPX | 582 | | 139 | MGPX | 629 |
| 46 | MGPX | 536 | | 93 | MGPX | 583 | | 140 | MGPX | 630 |
| 47 | MGPX | 537 | | 94 | MGPX | 584 | | 141 | MGPX | 631 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 142 | MGPX | 632 | 195 | MGPX | 685 | 248 | MGPX | 738 |
| 143 | MGPX | 633 | 196 | MGPX | 686 | 249 | MGPX | 739 |
| 144 | MGPX | 634 | 197 | MGPX | 687 | 250 | MGPX | 740 |
| 145 | MGPX | 635 | 198 | MGPX | 688 | 251 | MGPX | 741 |
| 146 | MGPX | 636 | 199 | MGPX | 689 | 252 | MGPX | 742 |
| 147 | MGPX | 637 | 200 | MGPX | 690 | 253 | MGPX | 743 |
| 148 | MGPX | 638 | 201 | MGPX | 691 | 254 | MGPX | 744 |
| 149 | MGPX | 639 | 202 | MGPX | 692 | 255 | MGPX | 745 |
| 150 | MGPX | 640 | 203 | MGPX | 693 | 256 | MGPX | 746 |
| 151 | MGPX | 641 | 204 | MGPX | 694 | 257 | MGPX | 747 |
| 152 | MGPX | 642 | 205 | MGPX | 695 | 258 | MGPX | 748 |
| 153 | MGPX | 643 | 206 | MGPX | 696 | 259 | MGPX | 749 |
| 154 | MGPX | 644 | 207 | MGPX | 697 | 260 | MGPX | 750 |
| 155 | MGPX | 645 | 208 | MGPX | 698 | 261 | MGPX | 751 |
| 156 | MGPX | 646 | 209 | MGPX | 699 | 262 | MGPX | 752 |
| 157 | MGPX | 647 | 210 | MGPX | 700 | 263 | MGPX | 753 |
| 158 | MGPX | 648 | 211 | MGPX | 701 | 264 | MGPX | 754 |
| 159 | MGPX | 649 | 212 | MGPX | 702 | 265 | MGPX | 755 |
| 160 | MGPX | 650 | 213 | MGPX | 703 | 266 | MGPX | 756 |
| 161 | MGPX | 651 | 214 | MGPX | 704 | 267 | MGPX | 757 |
| 162 | MGPX | 652 | 215 | MGPX | 705 | 268 | MGPX | 758 |
| 163 | MGPX | 653 | 216 | MGPX | 706 | 269 | MGPX | 759 |
| 164 | MGPX | 654 | 217 | MGPX | 707 | 270 | MGPX | 760 |
| 165 | MGPX | 655 | 218 | MGPX | 708 | 271 | MGPX | 761 |
| 166 | MGPX | 656 | 219 | MGPX | 709 | 272 | MGPX | 762 |
| 167 | MGPX | 657 | 220 | MGPX | 710 | 273 | MGPX | 763 |
| 168 | MGPX | 658 | 221 | MGPX | 711 | 274 | MGPX | 764 |
| 169 | MGPX | 659 | 222 | MGPX | 712 | 275 | MGPX | 765 |
| 170 | MGPX | 660 | 223 | MGPX | 713 | 276 | MGPX | 766 |
| 171 | MGPX | 661 | 224 | MGPX | 714 | 277 | MGPX | 767 |
| 172 | MGPX | 662 | 225 | MGPX | 715 | 278 | MGPX | 768 |
| 173 | MGPX | 663 | 226 | MGPX | 716 | 279 | MGPX | 769 |
| 174 | MGPX | 664 | 227 | MGPX | 717 | 280 | MGPX | 770 |
| 175 | MGPX | 665 | 228 | MGPX | 718 | 281 | MGPX | 771 |
| 176 | MGPX | 666 | 229 | MGPX | 719 | 282 | MGPX | 772 |
| 177 | MGPX | 667 | 230 | MGPX | 720 | 283 | MGPX | 773 |
| 178 | MGPX | 668 | 231 | MGPX | 721 | 284 | MGPX | 774 |
| 179 | MGPX | 669 | 232 | MGPX | 722 | 285 | MGPX | 775 |
| 180 | MGPX | 670 | 233 | MGPX | 723 | 286 | MGPX | 776 |
| 181 | MGPX | 671 | 234 | MGPX | 724 | 287 | MGPX | 777 |
| 182 | MGPX | 672 | 235 | MGPX | 725 | 288 | MGPX | 778 |
| 183 | MGPX | 673 | 236 | MGPX | 726 | 289 | MGPX | 779 |
| 184 | MGPX | 674 | 237 | MGPX | 727 | 290 | MGPX | 780 |
| 185 | MGPX | 675 | 238 | MGPX | 728 | 291 | MGPX | 781 |
| 186 | MGPX | 676 | 239 | MGPX | 729 | 292 | MGPX | 782 |
| 187 | MGPX | 677 | 240 | MGPX | 730 | 293 | MGPX | 783 |
| 188 | MGPX | 678 | 241 | MGPX | 731 | 294 | MGPX | 784 |
| 189 | MGPX | 679 | 242 | MGPX | 732 | 295 | MGPX | 785 |
| 190 | MGPX | 680 | 243 | MGPX | 733 | 296 | MGPX | 786 |
| 191 | MGPX | 681 | 244 | MGPX | 734 | 297 | MGPX | 787 |
| 192 | MGPX | 682 | 245 | MGPX | 735 | 298 | MGPX | 788 |
| 193 | MGPX | 683 | 246 | MGPX | 736 | 299 | MGPX | 789 |
| 194 | MGPX | 684 | 247 | MGPX | 737 | 300 | MGPX | 790 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 301 | MGPX | 791 | 332 | MGPX | 822 | 363 | MGPX | 853 |
| 302 | MGPX | 792 | 333 | MGPX | 823 | 364 | MGPX | 854 |
| 303 | MGPX | 793 | 334 | MGPX | 824 | 365 | MGPX | 855 |
| 304 | MGPX | 794 | 335 | MGPX | 825 | 366 | MGPX | 856 |
| 305 | MGPX | 795 | 336 | MGPX | 826 | 367 | MGPX | 857 |
| 306 | MGPX | 796 | 337 | MGPX | 827 | 368 | MGPX | 858 |
| 307 | MGPX | 797 | 338 | MGPX | 828 | 369 | MGPX | 859 |
| 308 | MGPX | 798 | 339 | MGPX | 829 | 370 | MGPX | 860 |
| 309 | MGPX | 799 | 340 | MGPX | 830 | 371 | MGPX | 861 |
| 310 | MGPX | 800 | 341 | MGPX | 831 | 372 | MGPX | 862 |
| 311 | MGPX | 801 | 342 | MGPX | 832 | 373 | MGPX | 863 |
| 312 | MGPX | 802 | 343 | MGPX | 833 | 374 | MGPX | 864 |
| 313 | MGPX | 803 | 344 | MGPX | 834 | 375 | MGPX | 865 |
| 314 | MGPX | 804 | 345 | MGPX | 835 | 376 | MGPX | 866 |
| 315 | MGPX | 805 | 346 | MGPX | 836 | 377 | MGPX | 867 |
| 316 | MGPX | 806 | 347 | MGPX | 837 | 378 | MGPX | 868 |
| 317 | MGPX | 807 | 348 | MGPX | 838 | 379 | MGPX | 869 |
| 318 | MGPX | 808 | 349 | MGPX | 839 | 380 | MGPX | 870 |
| 319 | MGPX | 809 | 350 | MGPX | 840 | 381 | MGPX | 871 |
| 320 | MGPX | 810 | 351 | MGPX | 841 | 382 | MGPX | 872 |
| 321 | MGPX | 811 | 352 | MGPX | 842 | 383 | MGPX | 873 |
| 322 | MGPX | 812 | 353 | MGPX | 843 | 384 | MGPX | 874 |
| 323 | MGPX | 813 | 354 | MGPX | 844 | 385 | MGPX | 875 |
| 324 | MGPX | 814 | 355 | MGPX | 845 | 386 | MGPX | 876 |
| 325 | MGPX | 815 | 356 | MGPX | 846 | 387 | MGPX | 877 |
| 326 | MGPX | 816 | 357 | MGPX | 847 | 388 | MGPX | 878 |
| 327 | MGPX | 817 | 358 | MGPX | 848 | 389 | MGPX | 879 |
| 328 | MGPX | 818 | 359 | MGPX | 849 | 390 | MGPX | 880 |
| 329 | MGPX | 819 | 360 | MGPX | 850 | | | |
| 330 | MGPX | 820 | 361 | MGPX | 851 | | | |
| 331 | MGPX | 821 | 362 | MGPX | 852 | | | |



<u>Exhibit F</u>
PRL Guaranty

## GUARANTY

This Guaranty is entered into between Magnetation LLC ("we", "us", or "our") and Progress Rail Leasing Corporation ("you" or "your").

## PARTIES

| Guarantor (we) | Beneficiary (you) |
|---|---|
| Magnetation LLC | Progress Rail Leasing Corporation |
| 102 NE 3rd Street, Suite 120 | 1600 Progress Drive |
| Grand Rapids, MN 55744 | Albertville, AL 35950 |

## AGREEMENT

1. To induce you to enter into or purchase, now or in the future, any promissory notes, security agreements, installment sale agreements, lease agreements, and any other documents or instruments relating to any loan, lease, extension of credit or other financial accommodation to Mag Pellet LLC("Customer") and in consideration thereof and of benefits to accrue to each of us therefrom, each of us, as a primary obligor, jointly and severally and unconditionally guarantees to you that the Customer will fully and promptly pay and perform all its present and future obligations to you, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured and whether originally contracted with you or otherwise acquired by you, irrespective of any invalidity or unenforceability of any such obligation or the insufficiency, invalidity or unenforceability of any security therefor; and agrees, without your first having to proceed against the Customer or any security therefor, to pay on demand all sums due and to become due to you from the Customer and all losses, costs, attorneys' fees or expenses that may be suffered by you by reason of the Customer's default or default of any of the undersigned hereunder; and agrees to be bound by and on demand to pay any deficiency established by a sale of any security, with or without notice to us. This Guaranty is an unconditional guarantee of prompt payment and performance. No guarantor shall be released or discharged, either in whole or in part, by your failure or delay to perfect or continue the perfection of any security interest in any property which secures the obligations of the Customer or any of us to you, or to protect the property covered by such security interest.

2. This Guaranty is irrevocable. It may be terminated, however, as to future obligations of the Customer if we send you written notice by certified mail return receipt requested specifying a termination date that is at least 60 days after your actual receipt of the written notice ("Termination Date"). Any obligations of the Customer arising pursuant to a commitment by you to the Customer prior the Termination Date are not affected by the termination and are fully covered by this Guaranty. The death of any or all of us will not terminate this Guaranty or discharge our obligations hereunder, but shall bind our respective heirs, executors, administrators and assigns.

3. Each of us waives: (a) notice of acceptance of this Guaranty; (b) notice of the existence, creation or incurrence of new or additional obligations owing from the Customer to you; (c) presentment, demand, protest and notice of nonpayment or protest as to any note or obligation signed, accepted, endorsed or assigned to you

by the Customer; (d) any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim that any of us may now or hereafter have against the Customer or any other person directly or contingently liable for the obligations, arising from the existence or performance of this guaranty; (e) all exemptions and homestead laws and any other demands and notices required by law; (f) all setoffs and counterclaims; (g) any and all defenses based on suretyship or any other applicable law, including without limitation all rights and defenses arising out of (i) an election of remedies by you even though that election of remedies may have destroyed rights of subrogation and reimbursement against the Customer by operation of law or otherwise, (ii) protections afforded to the Customer pursuant to antideficiency or similar laws limiting or discharging the Customer's obligations to you, (iii) the invalidity or unenforceability of this guaranty, (iv) the failure to notify any of us of the disposition of any property securing the obligations of the Customer, (v) the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property, and (vi) any duty on your part to disclose to any of us any matter, fact or thing related to the business operations or condition (financial or otherwise) of the Customer or its affiliates or property, whether now or hereafter known by you.

4. You may at any time and from time to time, without our consent, without notice to us and without affecting or impairing the obligation of any of us hereunder, do any of the following:

   (a) renew, extend (including extensions beyond the original term), modify (including changes in interest rates), release or discharge any obligations of the Customer, of its customers, of co-guarantors (whether hereunder or under a separate agreement) or of any other party at any time directly or contingently liable for the payment of any of the obligations;

   (b) accept partial payments of the obligations;

   (c) accept new or additional documents, instruments or agreements relating to or in substitution of the obligations;

   (d) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of the obligations and the security in any manner;

   (e) consent to the transfer or return of the security, take and hold additional security or guaranties for said



obligations;

(f) amend, exchange, release or waive any security or guarantee; or

(g) bid and purchase at any sale of security and apply any proceeds or security, and direct the order and manner of sale.

5. If a claim is made upon you at any time for repayment or recovery of any amounts or other value received by you, from any source, in payment of or on account of any of the obligations of the Customer guaranteed hereunder and you repay or otherwise become liable for all or any part of such claim by reason of:

(a) any judgment, decree or order of any court or administrative body, or

(b) any settlement or compromise of any such claim,

we shall remain jointly and severally liable to you for the amount so repaid or for which you are otherwise liable to the same extent as if such amounts had never been received by you, notwithstanding any termination hereof or the cancellation of any note or other agreement evidencing any of the obligations of the Customer,

6. This Guaranty is for the benefit of your successors and assigns, and we hereby waive notice of any such assignment. This Guaranty will bind our respective

heirs, administrators, representatives, successors, and assigns. This Guaranty is intended as a final expression of the guarantee of the undersigned and is intended as a complete and exclusive statement of the terms thereof. No course of dealing, course of performance or trade usage shall be used to waive, supplement or modify the terms hereof. The terms and provisions of this Guaranty may only be waived, modified, varied, released, terminated or surrendered, in whole or in part, by a duly authorized written instrument signed by you. This Guaranty will be construed liberally in your favor.

7. This Guaranty is governed by and construed under the laws of the State of Tennessee, without giving effect to the conflict-of-laws principles. We consent to the jurisdiction of any state or federal court located within the State of Tennessee. Each of us agrees to waive all rights to trial by jury in any action, proceeding, or counterclaim on any matter whatsoever arising out of, in connection with, or related to this Guaranty. This waiver is irrevocable and all-encompassing of any and all disputes that may be filed in any court. This waiver cannot be modified orally and applies to all amendments, modifications and supplements hereto.

8. This Guaranty may be executed in one or more counterparts, and by different Guarantors on separate counterparts, each of which will be considered an original, but all of which together will constitute one Guaranty.

## SIGNATURES

**EACH GUARANTOR HAS READ AND FULLY UNDERSTANDS ALL OF THE PROVISIONS OF THIS GUARANTY**

Date: 3/10/2014

Guarantor: Magnetation LLC

Signature: Joe Bro

Name (PRINT): Joe Broking

Title: CFO

<u>Exhibit G</u>
Budget

**Project Maxwell - 13 Week DIP Budget**

| | ACTUAL | Estimate | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | Filing Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Week # / Week Ending | 24-Apr | 1-May | 8-May | 15-May | 22-May | 29-May | 5-Jun | 12-Jun | 19-Jun | 26-Jun | 3-Jul | 10-Jul | 17-Jul | 24-Jul | 31-Jul | |
| **Revenue Assumptions** | | | | | | | | | | | | | | | | |
| # Train Payments Received from AK Steel | 3.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 62.0 |
| # Train Payments Received from AHMSA | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | | | | | | | | | | 4.0 |
| Revenue / Train from AK Steel | $1,217,141 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,221,418 | $1,094,096 | $1,094,096 | $1,094,096 | $1,094,096 | $1,094,096 | |
| Revenue / Train from AHMSA | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | |
| **Receipts** | | | | | | | | | | | | | | | | |
| AK Steel | $3,651,423 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $4,885,672 | $39,085,376 |
| AHMSA | 454,656 | 470,664 | 470,664 | 470,664 | 470,664 | 470,664 | | | | | | | | | | 1,832,656 |
| Mesabi Nugget | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| Proceeds from Mag, Inc. | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| MN Dept of Refund - Sales Tax | 3,865,177 | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| Miscellaneous | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| **Total Receipts** | $4,106,079 | $9,221,513 | $470,664 | $470,664 | $470,664 | $470,664 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $40,948,032 |
| **Disbursements** | | | | | | | | | | | | | | | | |
| **Production Expenses (Check):** | | | | | | | | | | | | | | | | |
| Payroll | ($1,054,669) | ($51,184,886) | ($51,131,149) | ($51,131,149) | ($51,131,149) | — | ($51,106,557) | ($460,295) | ($51,106,557) | ($51,123,613) | — | ($51,123,613) | ($51,585,936) | — | ($51,126,633) | ($59,230,190) |
| Utilities - Gas | (834,591) | | (939,806) | (939,806) | (700,417) | | (964,466) | | (964,466) | | | | | (939,806) | | (2,844,078) |
| Utilities - Electricity | (241,630) | | (700,417) | (700,417) | | | (723,764) | | (723,764) | | | | | (700,417) | | (2,124,598) |
| Utilities - Water/Sewer | — | (1,813) | (1,813) | (1,813) | (1,813) | | | | | | | | | | | (7,252) |
| Repair & Maintenance | (251,981) | (522,888) | (172,192) | (172,192) | (172,192) | | (375,113) | (375,113) | (375,113) | (375,113) | (405,841) | (405,841) | (405,841) | (405,841) | (405,841) | (4,218,423) |
| Fuel - Pellet Plant | — | | (10,693) | (10,693) | (10,693) | | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (10,693) | (139,009) |
| Raw Materials | (244,212) | (784,273) | (183,835) | (183,835) | (183,835) | | (735,260) | (735,260) | (735,260) | (735,260) | (772,760) | (772,760) | (772,760) | (772,760) | (880,260) | (7,552,600) |
| Trucking | (150,000) | | (102,486) | (102,486) | (102,486) | | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (102,486) | (1,332,338) |
| Equipment | (33,480) | (27,845) | (113,076) | (113,076) | (113,076) | | (113,076) | (113,076) | (113,076) | (113,076) | (226,152) | (226,152) | (226,152) | (226,152) | (226,152) | (2,497,672) |
| Mining | — | | | | | | | | | | | | | | | |
| Royalties | — | (485,633) | | | | | | (98,735) | (98,735) | | | | | (2,211,761) | | (2,481,131) |
| Contracted Services | (485,633) | | (70,035) | | (70,035) | | (50,833) | (58,662) | (58,662) | (50,833) | (48,241) | (48,241) | (48,241) | (50,833) | (50,833) | (457,097) |
| Environmental | — | (37,926) | (37,926) | (37,926) | (37,926) | | (58,662) | (58,662) | (58,662) | (58,662) | (48,241) | (48,241) | (48,241) | (48,241) | (43,868) | (623,184) |
| Other Overhead | (49,644) | (228,607) | (79,676) | (79,676) | (79,676) | | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (159,351) | (1,752,861) |
| **Production Expenses (Check)** | ($2,860,007) | ($51,832,836) | ($51,232,607) | ($51,473,049) | ($50,473,049) | | ($52,825,107) | ($52,178,845) | ($53,245,079) | ($51,718,530) | ($52,899,988) | ($51,776,357) | ($53,360,283) | ($55,728,341) | ($53,011,115) | ($35,350,818) |
| **Automatic ACH** | | | | | | | | | | | | | | | | |
| Freight - BNSF | ($426,917) | ($51,070,532) | — | ($848,000) | — | — | ($1,060,000) | ($51,060,000) | ($848,000) | ($51,060,000) | ($848,000) | ($51,060,000) | ($848,000) | ($51,060,000) | ($848,000) | ($51,388,000) |
| Rail Car Lease - GIT | — | (9,598) | | | (1,813) | | | | | | | | | | | (1,059,530) |
| Mobile Equipment Lease - Various | (80,814) | (125,000) | (159,786) | (159,786) | (159,786) | | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (105,953) | (2,077,218) |
| Fuel - Diesel Production | (175,000) | (157,115) | | | (219,740) | | (219,476) | (219,476) | (219,476) | (219,476) | (277,658) | (277,658) | (277,658) | (277,658) | (277,658) | (1,453,671) |
| Utilities - IN, L, M-1, 2-R-K and LD | — | | | | | | | | | | | | | | | |
| Other - JPMorgan | (550,000) | (550,000) | (550,000) | (550,000) | (550,000) | | | | (550,000) | | (550,000) | | (550,000) | | (550,000) | (3,850,000) |
| Other - Sales Tax | — | | | | | | | (200,000) | | | | | | | | (420,000) |
| Production Tax Payment | — | | | (149,722) | (149,722) | | | (144,375) | (144,375) | | (1,673,280) | | (149,722) | (1,542,188) | | (443,819) |
| Sales Tax - Plant 4 | (1,025) | (754,667) | | | | | | | | | | | | | | (3,673,280) |
| **Automatic ACH** | ($1,232,731) | ($51,962,245) | ($709,786) | ($51,392,393) | ($51,392,393) | | ($52,268,215) | ($52,264,215) | ($51,545,679) | ($51,341,397) | ($52,074,523) | ($53,779,754) | ($51,341,397) | ($57,270,529) | ($51,542,188) | ($21,247,818) |
| **Other** | | | | | | | | | | | | | | | | |
| Capex Disbursements | — | ($250,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($848,000) | ($56,500,000) |
| Critical Vendor Disbursements | | | (12,500,000) | (12,500,000) | | | | | | | | | | | (49,096) | (25,000,000) |
| Less: Payments to JPM Regarding Equipment Loans | (49,096) | | | (88,474) | (88,474) | | (49,096) | | (88,474) | | (90,397) | | (82,763) | | (88,474) | (412,710) |
| Less: Capital Lease Payments | | (90,397) | (82,761) | | | | | (90,397) | | | | | (149,722) | | | (513,474) |
| Less: Utility Adequate Assurance Deposits | | | (1,045,400) | (1,045,400) | | | | | | | (1,673,280) | | | | | (1,045,400) |
| Less: Exiting RCF Interest | | | | | | | | (144,375) | | | | | | | | (443,819) |
| Less: Professional Fee Payments | (1,025) | | | | | | | | | | | | | | | (3,673,280) |
| Plug / (less): Other | | | | | | | | | | | | | | | | (1,258,561) |
| **Total Disbursements** | ($4,093,763) | ($54,248,140) | ($15,630,099) | ($55,888,071) | ($55,388,216) | | ($55,833,418) | ($54,614,921) | ($57,286,085) | ($53,970,421) | ($59,156,887) | ($54,370,111) | ($56,030,163) | ($57,850,093) | ($55,304,860) | ($594,199,315) |
| **Cash Balance & Liquidity** | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | $463,142 | $475,458 | $3,448,831 | $17,608,055 | $12,089,749 | $9,813,057 | $4,180,640 | $12,365,719 | $59,970,787 | $12,167,456 | $57,856,241 | $59,591,180 | $84,885,672 | $56,692,776 | $56,693,776 | $3,448,831 |
| Plus: Total Receipts | 4,106,079 | 9,221,513 | 470,664 | 470,664 | 470,664 | | | | | 4,885,672 | 6,107,090 | 6,107,090 | 4,885,672 | 6,107,090 | 6,107,090 | 40,968,032 |
| Less: Total Disbursements | (4,093,763) | (54,248,140) | (15,630,099) | (5,988,971) | (2,747,356) | (4,314,921) | | (12,500,000) | | | | | | | (5,704,860) | (594,199,315) |
| Plus: Draw on Financing | | 51,158,252 | 51,633,554 | 12,008,055 | 9,813,057 | 4,180,640 | 12,365,719 | 59,970,787 | 12,167,456 | 57,856,241 | 59,591,180 | 84,885,672 | 56,692,776 | 56,693,776 | 57,095,006 | 63,410,232 |
| Less: DIP Financing Costs | (5,488,243) | (5,488,243) | | | | | | | | | | | | | | (5,488,243) |
| Less: Cash Held in Indemnity Escrow | (1,258,561) | | | | | | | | | | | | | | | (1,258,561) |
| **Ending Cash Balance** | $475,458 | $3,448,831 | $17,608,055 | $12,089,749 | $9,813,057 | $4,180,640 | $12,365,719 | $59,970,787 | $12,167,456 | $57,856,241 | $59,591,180 | $84,885,672 | $56,692,776 | $56,693,776 | $57,095,006 | $7,095,006 |

**Collateral Schedule**

*($ in millions)*

| Case Week | Pre-Filing | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 4/24/15 | 5/1/15 | 5/8/15 | 5/15/15 | 5/22/15 | 5/29/15 | 6/5/15 | 6/12/15 | 6/19/15 | 6/26/15 | 7/3/15 | 7/10/15 | 7/17/15 | 7/24/15 | 7/31/15 |
| Cash | $0.5 | $3.4 | $32.7 | $17.6 | $12.1 | $9.8 | $4.2 | $12.4 | $10.0 | $12.2 | $7.9 | $9.6 | $8.4 | $6.7 | $7.1 |
| Accounts Receivable | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 2.6 | 24.5 | 24.5 | 24.5 | 24.5 | 41.1 | 41.1 | 41.1 | 41.1 | 41.1 |
| Inventory | 60.6 | 49.9 | 49.9 | 49.9 | 49.9 | 49.9 | 45.6 | 45.6 | 45.6 | 45.6 | 41.1 | 41.1 | 41.1 | 41.1 | 41.1 |
| Prepaid Exp & Other Assets | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 | 9.0 |
| Net PP&E | 757.6 | 755.3 | 755.3 | 755.3 | 755.3 | 755.3 | 753.2 | 753.2 | 753.2 | 753.2 | 751.5 | 751.5 | 751.5 | 751.5 | 751.5 |
| **Total Collateral** | **$830.3** | **$820.3** | **$849.5** | **$834.4** | **$828.9** | **$826.6** | **$836.5** | **$844.7** | **$842.3** | **$844.5** | **$850.6** | **$852.3** | **$851.2** | **$849.4** | **$849.7** |
| Bridge Term Loan Facility | $3.8 | $3.8 | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– | $– |
| DIP Facility | – | – | 57.0 | 57.0 | 57.0 | 57.0 | 57.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 | 137.0 |
| RCF Principal | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 | 56.0 |
| RCF Letters of Credit | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 |
| Senior Secured Notes Principal | 425.0 | 425.0 | 425.0 | 425.0 | 425.0 | 425.0 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 | 357.5 |
| Capital Leases | 9.3 | 9.2 | 9.2 | 9.2 | 9.2 | 9.2 | 9.0 | 9.0 | 9.0 | 9.0 | 8.9 | 8.9 | 8.9 | 8.9 | 8.9 |
| Accrued Interest | 18.2 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 21.4 | 22.6 | 22.6 | 22.6 | 22.6 | 22.6 |
| **Total Financial Obligations** | **$517.4** | **$520.5** | **$577.5** | **$577.5** | **$577.5** | **$577.5** | **$577.3** | **$589.8** | **$589.8** | **$589.8** | **$590.9** | **$590.9** | **$590.9** | **$590.9** | **$590.9** |
| **Equity Cushion** | **$312.8** | **$299.8** | **$272.0** | **$256.9** | **$251.4** | **$249.2** | **$259.2** | **$254.9** | **$252.5** | **$254.7** | **$259.7** | **$261.4** | **$260.2** | **$258.5** | **$258.8** |
| *Equity Cushion (% of Financial Obligations)* | *60.5%* | *57.6%* | *47.1%* | *44.5%* | *43.5%* | *43.1%* | *44.9%* | *43.2%* | *42.8%* | *43.2%* | *43.9%* | *44.2%* | *44.0%* | *43.7%* | *43.8%* |