UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **Jointly Administered under**<br>**Case No. 15-50307** |
| MAGNETATION LLC, et al, | Court File No. 15-50307 (GFK) |
| Debtors. | |
| (includes: | Court File Nos.: |
| Mag Lands, LLC | 15-50308 (GFK) |
| Mag Finance Corp. | 15-50309 (GFK) |
| Mag Mining, LLC | 15-50310 (GFK) |
| Mag Pellet LLC) | 15-50311 (GFK) |
| | Chapter 11 Cases<br>Chief Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**NOTICE OF HEARING AND JOINT MOTION FOR AN ORDER
AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO
A RESTRUCTURING SUPPORT AGREEMENT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO:    The parties in interest as specified in Local Rule 9013-3(a)(2).

1.    Magnetation LLC ("**Mag LLC**") and its subsidiaries that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**") by this motion (this "**Motion**") move this Court for the relief requested below and give notice of hearing.

2.    The Court will hold a hearing on the Motion at 1:00 p.m. (prevailing Central time) on July 14, 2015 in Courtroom No. 2A, U.S. Courthouse, 316 North Robert Street, St. Paul, Minnesota 55101.

3.    Any response to this Motion must be filed and served not later than July 9, 2015, which is five days before the time set for the hearing.  **UNLESS A RESPONSE OPPOSING**

**THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**.

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rules 1070-1 and 1073-1.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and may be determined by this Court.   Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.   On May 5, 2015 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**").  The Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

5.      This Motion arises under sections 105(a) and 363(b) of the Bankruptcy Code. This Motion is filed under Local Rules 9013-1, 9013-2 and 9013-3.  Notice of the hearing on this Motion is provided pursuant to Bankruptcy Rules 2002(a) and 9013 and Local Rules 2002-1(b), 9013-2 and 9013-3.

## BACKGROUND

6.      Additional information about the Debtors' businesses and the events leading up to the Petition Date can be found in the *Declaration of Joseph A. Broking in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [ECF No. 8] (the "**Officer Declaration**"), filed on May 5, 2015, which is incorporated herein by reference.

7.      As set forth in the *Final Order (I) Granting an Expedited Hearing; (II) Authorizing the Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition*

*Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507* [ECF No. 169] (the

"**Final DIP Order**"), the Debtors are required to satisfy certain milestones in connection with

these chapter 11 cases, including (i) entering into a restructuring support agreement with the

Required Lenders (as defined in the Final DIP Order) in form and substance acceptable to the

Required Lenders on or before the 27th day after the Petition Date and (ii) filing with the Court a

motion to approve such restructuring support agreement on or before the 40th day after the

Petition Date.

## RELIEF REQUESTED

8.      By this Motion, the Debtors request entry of an order (the "**Order**"), substantially

in the form attached hereto, authorizing and approving the Debtors' entry into that certain

restructuring support agreement dated as of June 1, 2015 (including any schedules, annexes and

exhibits attached thereto and as it may be amended, supplemented or otherwise modified from

time to time, the "**Restructuring Support Agreement**" or "**RSA**"),[1] by and among the Debtors

and the Consenting Noteholders, and consented to by Magnetation, Inc. ("**Mag Inc.**", together

with the Consenting Noteholders, the "**Supporting Parties**", and each, a "**Supporting Party**"), a

copy of which is attached hereto as Exhibit A.

## THE RESTRUCTURING SUPPORT AGREEMENT[2]

9.      As a condition to agreeing to provide the DIP Facility, the Ad Hoc Senior Secured

Note Holder Committee (as defined in the Officer Declaration) required, among other things,

that the Debtors agree to the principal terms of a plan of reorganization.  To that end, in the days

---

[1] Capitalized words used herein and not otherwise defined shall have the meanings ascribed to them in the RSA.

[2] The following description is a summary only and is qualified in its entirety by reference to the RSA and, if there is any inconsistency between this Motion and the RSA, the RSA shall govern.

leading up to the Petition Date, the Debtors, the Ad Hoc Senior Secured Note Holder Committee and Mag Inc., the majority owner of Mag LLC, negotiated the principal terms of a plan of reorganization and post-reorganization capital structure as set forth in the plan term sheet attached as <u>Exhibit D</u> to the *Notice of Hearing and Joint Motion for Entry of Interim and Final Orders (I) Granting an Expedited Hearing, (II) Authorizing the Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (III) Granting Adequate Protection to Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507* [ECF No. 18] (as may be amended, supplemented or otherwise modified from time to time, the "**Plan Term Sheet**").  In the weeks after the Petition Date, the parties worked to memorialize their support of the Plan Term Sheet through the RSA.

10.     The RSA is the product of arm's-length, good-faith negotiations among the parties thereto and represents the commitment of holders of over 78% in amount of Mag LLC's prepetition senior secured Notes.  Further, Mag Inc. has consented to the RSA and is a Supporting Party thereunder.  The RSA is an integral step toward the Debtors' goal of expeditiously emerging from chapter 11 pursuant to a plan of reorganization.

11.     As set forth in the Plan Term Sheet, which is included as <u>Exhibit A</u> to the RSA and incorporated therein, to the extent supportable by Plan value, reorganized Mag LLC will (i) enter into a new first lien term loan credit facility on a first out basis to refinance the obligations incurred under the Prepetition Revolving Facility (as defined in the Officer Declaration) in cash in full, (ii) enter into a new first lien term loan facility on a second out basis to refinance the DIP Facility, the rolled-up Notes, the rolled-up Prepetition Term Facility (as defined in the Officer Declaration) and any interest and fees accrued thereon, (iii) issue new

second lien notes in an original aggregate principal amount of $232.5 million, plus accrued interest on the Notes that were not rolled up and (iv) issue new convertible preferred stock and new common stock to holders of the Notes and as part of a management incentive plan.  *See* RSA, <u>Exhibit A</u>.  The Plan Term Sheet further sets forth the proposed treatment of (i) various classes of claims against, and interests in, the Debtors and (ii) certain of the reorganized Debtors' key contractual arrangements with Mag Inc.

12.    The RSA requires each Supporting Party to, among other things, (i) support and take all reasonable actions necessary to facilitate the implementation and consummation of the Restructuring Transaction, (ii) subject to certain conditions, timely vote to accept the Plan and not change, withdraw or revoke such vote, (iii) not take any action that is inconsistent with the RSA or the Restructuring Documents, or that would reasonably be expected to delay or impede the implementation or consummation of the Restructuring Transaction, (iv) timely vote against any Alternative Transaction.  In addition, each Consenting Noteholder has agreed, under certain circumstances, to direct the Indenture Trustee not to exercise any rights or remedies or assert or bring any claims under or with respect to the Indenture.  *See* RSA, § 3.

13.    In exchange, the Debtors have agreed that they will, among other things, (i) support and take all reasonable actions necessary to facilitate the implementation and consummation of the Restructuring Transaction and (ii) comply with certain deadlines, including, but not limited to, the following:[3]

(a)    obtain entry by the Court of the RSA Order, in form and substance acceptable to the Requisite Consenting Noteholders, no later than 75 calendar days after the Petition Date;

---

[3] The following deadlines are consistent with the milestones set forth in paragraph 20 of the Final DIP Order.

(b)      file the Plan and the Disclosure Statement (each in form and substance acceptable to the Requisite Consenting Noteholders), and a motion seeking approval of the Disclosure Statement and the Solicitation procedures no later than 90 calendar days after the Petition Date;

(c)      obtain entry by the Court of the Disclosure Statement Order, in form and substance acceptable to the Requisite Consenting Noteholders, no later than 120 calendar days after the Petition Date;

(d)      obtain entry by the Court of the Confirmation Order, in form and substance acceptable to the Requisite Consenting Noteholders, no later than 175 calendar days after the Petition Date; and

(e)      cause the Effective Date to occur no later than 190 calendar days after the Petition Date.

*See* RSA, § 4.  This timeline reflects the commitment of the Debtors and the Supporting Parties to advance these chapter 11 cases as quickly as practicable given their common desire for the Debtors to emerge from chapter 11 as a successfully restructured going concern.

14.      Additionally, as partial consideration for the Consenting Noteholders' agreement to enter into the RSA, the Debtors have agreed to pay in cash all reasonable and documented fees and expenses of the Consenting Noteholders' advisors incurred in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the RSA, the Plan, the other Restructuring Documents and the transactions contemplated thereby, in each case as authorized in the Final DIP Order (the "**Transaction Expenses**").  *See* RSA, § 10.

15.     The Debtors believe that the Restructuring Transaction agreed to and memorialized in the RSA presents the most expedient and cost-effective path towards preserving and maximizing value for the Debtors' estates and their creditors currently available to the Debtors.  Importantly, however, nothing in the RSA requires the Debtors or any of their directors or officers to take any action, or to refrain from taking any action, that would breach, or be inconsistent with, their fiduciary obligations under applicable law.  *See* RSA, § 23.  Indeed, in the event a better alternative to the Restructuring Transaction is presented to the Debtors, the RSA expressly preserves the Debtors' ability to appropriately exercise their fiduciary duties in administering these chapter 11 cases for the benefit of all stakeholders.  *See* RSA, § 5(b)(iii). Further, the Plan Term Sheet provides that the transactions described therein are subject in all respects to the Debtors' and the Ad Hoc Senior Secured Note Holder Committee's determination that the new debt and securities contemplated therein are supportable by Plan value.

### REQUEST FOR WAIVER OF STAY

16.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth herein, the Debtors require immediate relief to continue ordinary business operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

17.     Pursuant to Local Rule 9013-2, this Motion is verified and is accompanied by a memorandum of law, proposed order and proof of service.

18.     Pursuant to Local Rule 9013-2, the Debtors give notice that they may, if necessary, call Joseph A. Broking, Chief Financial Officer of Magnetation LLC, an authorized representative of the Debtors, to testify at the hearing on the Motion regarding the facts set out herein.   The witness's business address is 102 NE 3rd Street, Suite 120, Grand Rapids, Minnesota 55744.

## NO PREVIOUS REQUEST

19.     No previous request for the relief sought herein has been made by the Debtors to this Court or any other court.

WHEREFORE, the Debtors request entry of an order:

A.     authorizing and approving the Debtors' entry into the RSA; and

B.     granting such other relief as the Court deems just and equitable.

Dated:   June 14, 2015

DAVIS POLK & WARDWELL LLP

*/e/ Michelle M. McGreal*
Marshall S. Huebner (NY #2601094)
Michelle M. McGreal (NY #4599031)
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
marshall.huebner@davispolk.com
michelle.mcgreal@davispolk.com

*Counsel to the Debtors
and Debtors in Possession*

-and-

LAPP, LIBRA, THOMSON,
STOEBNER & PUSCH, CHARTERED
Ralph V. Mitchell (#184639)
Mark J. Kalla (#159487)
120 South Sixth Street, Suite 2500
Minneapolis, Minnesota 55402
Telephone:     (612) 338-5815
Facsimile:      (612) 338-6651
RMitchell@lapplibra.com
MKalla@lapplibra.com

*Local Counsel to the Debtors
and Debtors in Possession*

## <u>VERIFICATION</u>

I, Joseph A. Broking, Chief Financial Officer of Magnetation LLC, based upon my personal information and belief, declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: _____ June 14 _____, 2015          Signed: _____

                                                            Joseph A. Broking

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

*******************************************************************************

| | |
|---|---|
| In re: | **Jointly Administered under** |
| | **Case No. 15-50307** |
| | |
| MAGNETATION LLC, et al, | Court File No. 15-50307 (GFK) |
| | |
| Debtors. | |
| | |
| (includes: | Court File Nos.: |
| | |
| Mag Lands, LLC | 15-50308 (GFK) |
| Mag Finance Corp. | 15-50309 (GFK) |
| Mag Mining, LLC | 15-50310 (GFK) |
| Mag Pellet LLC) | 15-50311 (GFK) |
| | |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

*******************************************************************************

**MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR AN ORDER
AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO
A RESTRUCTURING SUPPORT AGREEMENT**

*******************************************************************************

Magnetation LLC and each of its subsidiaries that are debtors and debtors in possession

in these chapter 11 cases (collectively, the "**Debtors**") submit this memorandum of law in

support of the motion submitted herewith (the "**Motion**") in accordance with Local Rule 9013-

2(a).  The Debtors request Court authorization and approval of the Debtors' entry into the RSA.

The Court should grant the relief requested in the Motion because the RSA is a critical

component of the Debtors' ability to maximize value for all stakeholders in these chapter 11

cases.

## BACKGROUND

The supporting facts are set forth in the verified Motion, verified by Joseph A. Broking, Chief Financial Officer of Magnetation LLC.   All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

## LEGAL ANALYSIS

**I.    ENTRY INTO THE RSA IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT.**

Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell or lease assets outside the ordinary course of business must be based upon the sound business judgment of the debtor.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him or her a good business reason to grant such application); *In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. 2010); *In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting the standard for determining a section 363(b) motion is "a good business reason").

Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action *appears* to enhance the debtor's estate.'"  *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558,

566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy").   Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code."   *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) and *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)).

The Debtors' decision to enter into the RSA satisfies the business judgment standard. The RSA is the product of arm's-length, good-faith negotiations among the Debtors and the Supporting Parties.   Furthermore, the execution of the RSA was undertaken only after careful consideration by the Debtors' boards of directors and management in consultation with their financial and legal advisors.

The consensus embodied in the RSA will lay the foundation for a comprehensive and efficient restructuring of the Debtors' businesses in chapter 11.   Without the support of the Supporting Parties—who are the vast majority of the Debtors' secured creditors—the Debtors could face a lengthier, more costly and far more uncertain restructuring process, which could cause further harm to the Debtors' estates.   Moreover, the Debtors would likely not have garnered the liquidity necessary to reorganize.   In light of these substantial benefits, the Debtors have determined further that the payment of the Transaction Expenses is appropriate under the

circumstances and the provisions of the RSA providing for the payment of the Transaction Expenses are fair and reasonable.  Entering into the RSA, and thereby assuring the Supporting Parties' support of the proposed consensual Restructuring Transaction, is a necessary step toward the goal of the Debtors emerging from chapter 11 as quickly as possible and with minimal impact on their day-to-day operations.

Finally, the obligations of the Debtors under the RSA are subject to a "fiduciary out," allowing the Debtors to terminate the RSA if continued performance under the RSA would be inconsistent with their fiduciary duties, including if their fiduciary duties require them to accept an alternative proposal.  While it is the Debtors' belief that the Restructuring Transaction contemplated by the RSA represents the best path forward at this time, the RSA explicitly allows the Debtors to terminate their obligations thereunder if a superior alternative presents itself.  Thus, the RSA allows the Debtors to comply with their fiduciary duties to maximize the value of their estates.  Further, the Plan Term Sheet provides that the transactions described therein are subject in all respects to the Debtors' and the Ad Hoc Senior Secured Note Holder Committee's determination that the new debt and securities contemplated therein are supportable by Plan value.

Based on the foregoing, the Debtors respectfully submit that entry into the RSA is an exercise of the Debtors' sound business judgment.

## II.      THE RSA COMPLIES WITH SECTION 1125 OF THE BANKRUPTCY CODE.

Section 1125(b) provides that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C.  § 1125(b).

It is well settled that the scope of impermissible postpetition solicitation under section 1125(b) should be interpreted narrowly such that it does not inhibit negotiations among the parties in interest.  *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 101 (3rd Cir. 1988); *In re Kellogg Square P'ship*, 160 B.R. 336, 340 (Bankr. D. Minn. 1993). Accordingly, courts routinely authorize debtors to enter into restructuring support agreements when certain conditions are met.  *See, e.g.*, *In re Exide Technologies*, Case No. 13-11482 (KJC) (Bankr. D. Del. Feb. 4, 2015) [ECF No. 3087]; *In re Overseas Shipholding Group*, Case No. 12-20000 (MFW) (Bankr. D. Del. Apr. 7, 2014) [ECF No. 2878]; *In re Residential Capital, LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 26, 2013) [ECF No. 4098].

Here, the RSA was negotiated among parties represented by counsel and at arm's-length and in good faith.  Moreover, under the terms of the RSA, the Supporting Parties' obligation to vote to support the Plan is conditioned upon the Disclosure Statement and Solicitation procedures having first been approved by the Court.  *See* RSA, § 3(ii).  The votes of the Supporting Parties, therefore, will not be solicited or secured unless and until a Court-approved Disclosure Statement is transmitted to the parties, in compliance with section 1125 of the Bankruptcy Code.  Additionally, the Requisite Consenting Noteholders may terminate the RSA if the Disclosure Statement is not in form and substance acceptable to the Requisite Consenting Noteholders.  Accordingly, there is sufficient flexibility such that entry into the RSA does not constitute solicitation of any creditor's vote.

Based on the foregoing, the Debtors submit that the RSA complies with the requirements of section 1125 of the Bankruptcy Code.

**III.   ENTRY INTO THE RSA IS ALSO SUPPORTED BY SECTION 105(a) OF THE BANKRUPTCY CODE.**

Section 105(a) of the Bankruptcy Code provides additional authority for the Court to authorize the Debtors' entry into the RSA.  Section 105(a) provides, in pertinent part, that a court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  Approval of an order authorizing the Debtors to enter into the RSA would be an appropriate exercise of the Court's equitable powers because the requested relief is in the best interests of the Debtors and their estates, is consistent with the Bankruptcy Code and will maximize value for the Debtors' stakeholders.

<u>**CONCLUSION**</u>

The Debtors respectfully request that the Court enter an order authorizing and approving the Debtors' entry into the RSA.

Dated:   June 14, 2015                    DAVIS POLK & WARDWELL LLP

                                          */e/ Michelle M. McGreal*
                                          Marshall S. Huebner (NY #2601094)
                                          Michelle M. McGreal (NY #4599031)
                                          450 Lexington Avenue
                                          New York, New York 10017
                                          Telephone: (212) 450-4000
                                          Facsimile:  (212) 701-5800
                                          marshall.huebner@davispolk.com
                                          michelle.mcgreal@davispolk.com

                                          *Counsel to the Debtors*
                                          *and Debtors in Possession*

                                          -and-

                                          LAPP, LIBRA, THOMSON,
                                          STOEBNER & PUSCH, CHARTERED
                                          Ralph V. Mitchell (#184639)
                                          Mark J. Kalla (#159487)
                                          120 South Sixth Street, Suite 2500
                                          Minneapolis, Minnesota 55402
                                          Telephone:     (612) 338-5815
                                          Facsimile:     (612) 338-6651
                                          RMitchell@lapplibra.com
                                          MKalla@lapplibra.com

                                          *Local Counsel to the Debtors*
                                          *and Debtors in Possession*

## <u>EXHIBIT A</u>

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (together with all exhibits, schedules and attachments hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of June 1, 2015, is entered into by and among (a) Magnetation LLC, a Delaware limited liability company ("**Mag LLC**"), and its undersigned subsidiaries (together with Mag LLC, the "**Company**") and (b)(i) each of the beneficial owners (or investment managers or advisors for the beneficial owners) of the Notes (as defined below) identified on the signature pages hereto (such Persons (as defined below) described in this clause (b)(i), together with their respective successors and permitted assigns under this Agreement, each, an "**Initial Consenting Noteholder**" and, collectively, the "**Initial Consenting Noteholders**") and (ii) each of the other beneficial owners (or investment managers or advisors for the beneficial owners) of the Notes that becomes a party to this Agreement after the Restructuring Support Effective Date (as defined below) in accordance with the terms hereof by executing and delivering a Joinder Agreement (as defined below) (such Persons described in this clause (b)(ii), together with their respective successors and permitted assigns under this Agreement, each, an "**Additional Consenting Noteholder**" and collectively, the "**Additional Consenting Noteholders**" and, together with the Initial Consenting Noteholders, the "**Consenting Noteholders**") and is consented to by Magnetation, Inc., a Minnesota corporation ("**Mag Inc.**", and together with the Consenting Noteholders, the "**Supporting Parties**", and each, a "**Supporting Party**"). The Company and the Supporting Parties are referred to herein as the "**Parties**" and each individually as a "**Party**". Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Plan Term Sheet (as defined below).

## PRELIMINARY STATEMENTS

**WHEREAS**, as of the date hereof, the Initial Consenting Noteholders collectively own or control in excess of 78% of the aggregate outstanding principal amount of the 11.00% senior notes due 2018 (as amended, supplemented or otherwise modified from time to time, the "**Notes**"), issued by Mag LLC and Mag Finance Corporation ("**Mag Finance**") pursuant to that certain Indenture, dated as of May 20, 2013 (as amended, supplemented or otherwise modified from time to time, the "**Indenture**"), among Mag LLC, Mag Finance, the subsidiary guarantors listed on the signature pages thereto and Wilmington Trust, National Association, as successor trustee (in such capacity, together with any successor trustee, the "**Indenture Trustee**");

**WHEREAS**, the Company, the Initial Consenting Noteholders and Mag Inc. have agreed to implement a restructuring transaction for the Company in accordance with, and subject to the terms and conditions set forth in, this Agreement and in the term sheet attached hereto as Exhibit A (including any schedules, annexes and exhibits attached thereto, each as may be modified in accordance with the terms hereof, the "**Plan Term Sheet**") (such restructuring transaction, the "**Restructuring Transaction**");

**WHEREAS**, the Plan Term Sheet, is the product of arm's-length, good faith negotiations among the Company and the Initial Consenting Noteholders and sets forth

the material terms and conditions of the Restructuring Transaction, as supplemented by the terms and conditions of this Agreement;

WHEREAS, the Company has commenced voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**");

WHEREAS, the Company and the Initial Consenting Noteholders have agreed to implement the Restructuring Transaction through a plan of reorganization that is materially consistent with the Plan Term Sheet and otherwise acceptable in form and substance to the Company and the Requisite Consenting Noteholders to be confirmed in the Chapter 11 Cases (such plan, together with all exhibits, schedules and attachments thereto, as amended, supplemented or otherwise modified from time to time, the "**Plan**"); and

WHEREAS, the Parties desire to express to one another their mutual support and commitment in respect of the matters discussed herein.

NOW, **THEREFORE**, in consideration of the promises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.    *Plan Term Sheet*.  The Plan Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Plan Term Sheet sets forth the material terms and conditions of the Plan and the Restructuring Transaction; *provided*, *however*, that the Plan Term Sheet is supplemented by the terms and conditions of this Agreement.

Section 2.    *Certain Definitions; Rules of Construction*.  As used in this Agreement, the following terms have the following meanings:

(a)    "**AK Steel Pellet Purchase Agreement**" means that certain First Amended and Restated Pellet Purchase Agreement, dated as of April 30, 2013, by and between AK Steel Corporation and Mag Pellet LLC, as amended, supplemented or otherwise modified from time to time in accordance with the terms of the DIP Credit Agreement.

(b)    "**Alternative Transaction**" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity) or restructuring of the Company, other than the Restructuring Transaction.

(c)    "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

(d)    "**Claims and Interests**" means, as applicable, Note Claims, Other Claims and Equity Interests.

2

(e)    "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(f)    "**Consenting Noteholders' Advisors**" means (i) Milbank, Tweed, Hadley and McCloy LLP ("**Milbank**"), as lead counsel for the Consenting Noteholders, (ii) Oppenheimer Wolff & Donnelly LLP ("**Oppenheimer**"), as local counsel for the Consenting Noteholders, and (iii) Houlihan Lokey, Inc., as financial advisor to the Consenting Noteholders.

(g)    "**DIP Credit Agreement**" means that certain credit agreement entered into among Mag LLC, the lenders from time to time parties thereto and Wilmington Trust, National Association dated as of May 7, 2015, as it may be amended from time to time in accordance with the terms thereof.

(h)    "**DIP Facility**" means the $135 million term loan credit facility under the DIP Credit Agreement.

(i)    "**DIP Order**" means, as applicable, (i) the interim order entered by the Bankruptcy Court on May 17, 2015 approving, inter alia, the Company's entry into the DIP Credit Agreement or (ii) the Final DIP Order.

(j)    "**Disclosure Statement**" means the disclosure statement for the Plan that is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and other applicable law, and all exhibits, schedules, supplements, modifications and amendments thereto.

(k)    "**Disclosure Statement Order**" means an order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation (as defined below).

(l)    "**Effective Date**" means the date upon which all conditions precedent to the effectiveness of the Plan have either been satisfied or expressly waived in accordance with the terms thereof, and on which the transactions to occur on the Effective Date pursuant to the Plan occur or are consummated.

(m)    "**Equity Interests**" means any capital stock, limited liability company interests, partnership interests or other equity, ownership or profits interests in Mag LLC or in any of its undersigned subsidiaries, and any options, warrants, conversion privileges or rights of any kind to acquire any capital stock, limited liability company interests, partnership interests or other equity, ownership or profits interests in Mag LLC or in any of its undersigned subsidiaries.

(n)    "**Final DIP Order**" means the Final Order approving the *Joint Motion for Entry of Interim and Final Orders (i) Granting an Expedited Hearing, (ii) Authorizing the Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (iii) Granting Adequate Protection to*

*Prepetition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507* filed on May 5, 2015 [ECF No. 18].

(o)     "**Final Order**" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court) that is not subject to a stay and has not been modified, amended, reversed or vacated without the consent of the Company and the Requisite Consenting Noteholders.

(p)     "**Mag Inc. Advisors**" means Krieg DeVault LLP, counsel to Mag Inc.

(q)     "**Material Adverse Effect**" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse effect on the business, results of operations, condition (financial or otherwise), assets or liabilities of the Company, taken as a whole; *provided*, *however*, that Material Adverse Effect shall not include any event, change, effect, occurrence, development, circumstance or change of fact arising out of, resulting from or relating to the commencement or existence of the Chapter 11 Cases, the announcement of the Plan and the Restructuring Transaction, the pendency of the Restructuring Transaction, or compliance by any Party with the covenants and agreements contained herein, in the Plan or in the Restructuring Documents.

(r)     "**Note Claims**" means any and all claims arising under the Indenture or in respect of the Notes.

(s)     "**Other Claims**" means any "claims" (as such term is defined in section 101(5) of the Bankruptcy Code) against Mag LLC and/or any of its undersigned subsidiaries other than Note Claims.

(t)     "**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a governmental or regulatory authority, or any legal entity or association.

(u)     "**Petition Date**" means May 5, 2015.

(v)     "**Plan Supplement**" means the supplement or supplements to the Plan containing certain schedules, documents and/or forms of documents relevant to the implementation of the Plan, to be filed with the Bankruptcy Court prior to the hearing held by the Bankruptcy Court to consider confirmation of the Plan.

(w)     "**Requisite Consenting Noteholders**" means, as of any date of determination, the Consenting Noteholders who own or control as of such date at least 66 and 2/3% in principal amount of the Notes.

(x)     "**Restructuring Documents**" means all agreements, instruments or orders (including all exhibits, schedules, supplements, appendices, annexes and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, this

4

Agreement, the Plan Term Sheet, the Plan and/or the Restructuring Transaction, each in form and substance acceptable to the Company and the Requisite Consenting Noteholders, including (i) the Plan Supplement, (ii) the Disclosure Statement and any motion seeking the approval thereof, (iii) the Disclosure Statement Order, (iv) the Confirmation Order, (v) the RSA Approval Motion and the RSA Order, (vi) the ballots, the motion to approve the form of the ballots and the Solicitation, and the order of the Bankruptcy Court approving the form of the ballots and the Solicitation, (vii) any documentation relating to the DIP Facility, the New First Lien Term Loan Credit Facility, the New Second Lien Notes, the New Convertible Preferred Stock and the New Common Stock, and (viii) any documentation relating to exit financing, post-emergence organizational documents, equityholder-related agreements or other related documents to be executed on the Effective Date.

(y)    "**Restructuring Support Period**" means, with reference to any Party, the period commencing on the Restructuring Support Effective Date and ending on the earlier of (i) the Effective Date and (ii) the date on which this Agreement is terminated with respect to such Party in accordance with Section 5 hereof.

(z)    "**RSA Approval Motion**" means the motion and proposed form of order to be filed by the Debtors with the Bankruptcy Court seeking the approval of this Agreement pursuant to sections 105 and 363 of the Bankruptcy Code.

(aa)    "**RSA Order**" means an order of the Bankruptcy Court approving the RSA Approval Motion.

(bb)    "**Solicitation**" means the solicitation of votes to accept or reject the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(cc)    "**Transaction Expenses**" means all reasonable and documented fees and expenses of the Consenting Noteholders' Advisors in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of this Agreement, the Plan, the Restructuring Documents, and the transactions contemplated thereby, in each case as provided in the DIP Order.

Unless otherwise specified, references in this Agreement to any Section or clause refer to such Section or clause as contained in this Agreement. The words "**herein,**" "**hereof**" and "**hereunder**" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement. Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "**including,**" "**includes**" and "**include**" shall be deemed to be followed by the words "**without limitation**".

Section 3.    *Agreements of the Supporting Parties.*  (a) *Support of Restructuring Transaction.* Each of the Supporting Parties agrees that, for the duration of the Restructuring Support Period (or until such earlier time that this Agreement terminates

5

with respect to such Supporting Party pursuant to the terms hereof), unless otherwise consented to in writing by the Company and the Requisite Consenting Noteholders or unless required (or prohibited) by applicable law, such Supporting Party shall:

(i)    support, and take all reasonable actions necessary to facilitate the implementation and consummation of the Restructuring Transaction (including the Bankruptcy Court's approval of the Restructuring Documents, if applicable, any requests for extensions of exclusivity, the Solicitation and confirmation of the Plan and the consummation of the Restructuring Transaction pursuant to the Plan);

(ii)    (A) subject to the receipt by the Supporting Party of the Disclosure Statement approved by the Disclosure Statement Order, timely vote, or cause to be voted, its Claims and Interests, as applicable, to accept the Plan by delivering a duly executed and completed ballot accepting the Plan on a timely basis following commencement of the Solicitation, and (B) not change, withdraw or revoke such vote (or cause or direct such vote to be changed, withdrawn or revoked); *provided*, *however*, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such Supporting Party at any time following the expiration of the Restructuring Support Period, or upon termination of this Agreement as to such Supporting Party pursuant to the terms hereof;

(iii)    not (A) directly or indirectly propose, support, assist, encourage, solicit, or vote for, any Alternative Transaction, (B) support or encourage the termination or modification of the Company's exclusive period for the filing of a plan or the Company's exclusive period to solicit votes on a plan, (C) take any other action, including initiating any legal proceedings or enforcing rights as a holder of Claims and Interests, as applicable, that is inconsistent with this Agreement or the Restructuring Documents, or that would reasonably be expected to prevent, interfere with, delay or impede the implementation or consummation of the Restructuring Transaction (including the Bankruptcy Court's approval of the Restructuring Documents, the Solicitation and confirmation of the Plan and the consummation of the Restructuring Transaction pursuant to the Plan); and (D) oppose or object to, or support any other Person's efforts to oppose or object to, any motions filed by the Company that are not inconsistent with this Agreement;

(iv)    timely vote or cause to be voted its Claims and Interests, as applicable, against any Alternative Transaction; and

(v)    solely with respect to each Consenting Noteholder, if the requisite number of holders of the Notes have requested the Indenture Trustee to exercise rights or remedies under the Indenture or if the Indenture Trustee has publicly announced that it intends to exercise rights or remedies under the Indenture, direct the Indenture Trustee not to exercise any rights (including rights of acceleration or payment) or remedies or assert or bring any claims under or with respect to the Indenture;

(b)      *Rights of Supporting Parties Unaffected*. Nothing contained herein shall limit (i) the rights of a Supporting Party under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is consistent with such Supporting Party's obligations hereunder; (ii) the ability of a Supporting Party to purchase, sell or enter into any transactions in connection with the Notes or its Claims and Interests, subject to the terms hereof and applicable law; (iii) subject to the terms of Section 3(a) hereof, any right of a Supporting Party under (x) the Indenture, or constituting a waiver or amendment of any provision of the Indenture and (y) any other applicable agreement, instrument or document that gives rise to a Supporting Party's Claims and Interests, as applicable, or constituting a waiver or amendment of any provision of any such agreement, instrument or document; (iv) the ability of a Supporting Party to consult with other Supporting Parties or the Company; or (v) the ability of a Supporting Party to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Restructuring Documents.

(c)      *Transfers*. Each Consenting Noteholder agrees that, for the duration of the Restructuring Support Period, such Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign, grant, or otherwise dispose of (including by participation), directly or indirectly, in whole or in part, any of its Claims and Interests, as applicable, or any option thereon or any right or interest therein (including granting any proxies, depositing any Claims and Interests into a voting trust or entering into a voting agreement with respect to any Claims and Interests) (collectively, a "**Transfer**"), unless the transferee of such Claims and Interests (the "**Transferee**") either (i) is a Consenting Noteholder or, (ii) if such Transferee is not a Consenting Noteholder, prior to the effectiveness of such Transfer, such Transferee agrees in writing, for the benefit of the Parties, to become a Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to a Consenting Noteholder (including with respect to any and all Claims and Interests the Transferee already may then or subsequently own or control) by executing a joinder agreement, substantially in the form attached hereto as Exhibit B (each, a "**Joinder Agreement**"), and by delivering an executed copy thereof to Milbank and the Company (in accordance with the notice provisions set forth in Section 21 hereof and prior to the effectiveness of such Transfer), in which event (x) the Transferee shall be deemed to be a Consenting Noteholder hereunder with respect to all of its owned or controlled Claims and Interests and (y) the transferor Consenting Noteholder shall be deemed to relinquish its rights, and be released from its obligations, under this Agreement to the extent of the transferred Claims and Interests. Notwithstanding the foregoing, the restrictions on Transfers set forth in this Section 3(c) shall not apply to the grant of any liens or encumbrances on any Claims and Interests in favor of a bank or broker-dealer holding custody of such Claims and Interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims and Interests. Each Consenting Noteholder agrees that any Transfer of any Claims and Interests that does not comply with the terms and procedures set forth herein shall be deemed void ab initio, and the Company and each other Consenting Noteholder shall have the right to enforce the voiding of such Transfer.

7

(d)     *Qualified Market Maker*. Notwithstanding anything herein to the contrary, (i) any Consenting Noteholder may Transfer any of its Claims and Interests to an entity that is acting as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become a Consenting Noteholder; *provided*, *however*, that the Qualified Marketmaker subsequently Transfers all right, title and interest in such Claims and Interests to a Transferee that is or becomes a Consenting Noteholder as provided above, and the Transfer documentation between the transferring Consenting Noteholder and such Qualified Marketmaker shall contain a requirement that provides as such (the transferring Consenting Noteholder shall use best efforts to allow the Company to be an explicit third party beneficiary of such requirement); and (ii) to the extent any Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims and Interests that it acquires from a holder of such Claims and Interests that is not a Consenting Noteholder without the requirement that the Transferee be or become a Consenting Noteholder. Notwithstanding the foregoing, if, at the time of a proposed Transfer of any Claims and Interests to the Qualified Marketmaker in accordance with the foregoing such Claims and Interests (x) may be voted on the Plan or any Alternative Transaction, the proposed transferor Consenting Noteholder must first vote such Claims and Interests in accordance with the requirements of Section 3(a) hereof, or (y) have not yet been and may not yet be voted on the Plan or any Alternative Transaction and the Qualified Marketmaker does not Transfer such Claims and Interests to a subsequent Transferee prior to the fifth Business Day before the expiration of the Plan voting deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Noteholder with respect to such Claims and Interests in accordance with the terms hereof (*provided* that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Noteholder with respect to such Claims and Interests at such time as the Transferee of such Claims and Interests becomes a Consenting Noteholder with respect to such Claims and Interests). For these purposes, "**Qualified Marketmaker**" means an entity that (X) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Claims and Interests, or enter with customers into long and/or short positions in Claims and Interests, in its capacity as a dealer or market maker in such Claims and Interests; and (Y) is in fact regularly engaged in the business of making a market in claims, interests and/or securities of issuers or borrowers.  To the extent a Supporting Party transfers its rights, title, or interest in any Claims and Interests to a Person that it believes, in good faith, is a Qualified Marketmaker, and such Qualified Marketmaker subsequently transfers the right, title or interest in such Claims and Interests to a transferee that is not and does not become a Supporting Party, the Supporting Party that had transferred its rights, title, or interest in such Claims and Interests to such Qualified Marketmaker shall not be held liable for any claims or causes of action or be subject to any remedies arising under this Agreement (including pursuant to Section 14 herein) relating to such transfer, provided that such Supporting Party receives from such Qualified Marketmaker confirmation in writing prior to any transfer that such Claims and Interests shall be transferred in accordance with this Section 3(c).

(e)      *Additional Claims and Interests*. To the extent any Supporting Party acquires additional Claims and Interests, as applicable,, such Supporting Party agrees that all such Claims and Interests shall automatically become subject to the provisions set forth in Section 3(a) hereof.

Section 4.      *Agreements of the Company*.  (a) *Affirmative Covenants*. The Company, jointly and severally, agrees that, for the duration of the Restructuring Support Period, unless otherwise consented to in writing by the Requisite Consenting Noteholders, the Company shall:

(i)      (A) support and take all reasonable actions necessary to facilitate the implementation and consummation of the Restructuring Transaction (including seeking the Bankruptcy Court's approval of the Restructuring Documents, as applicable, the Solicitation, confirmation of the Plan and the consummation of the Restructuring Transaction pursuant to the Plan) and (B) not take any action that is inconsistent with the implementation or consummation of the Restructuring Transaction;

(ii)      comply with each of the following deadlines (or other deadline with respect thereto as may be provided in the DIP Order or the DIP Credit Agreement and is not included herein):

(A)      file the RSA Approval Motion, in form and substance acceptable to the Requisite Consenting Noteholders, no later than 40 calendar days after the Petition Date;

(B)      file, no later than 40 days after the Petition Date, a substantive pleading in form and substance acceptable to the Required Lenders with respect to the AK Steel Pellet Purchase Agreement;

(C)      obtain entry of the Final DIP Order by the Bankruptcy Court no later than 45 calendar days after the Petition Date;

(D)      obtain entry of the RSA Order, in form and substance acceptable to the Requisite Consenting Noteholders, by the Bankruptcy Court as no later than 75 calendar days after the Petition Date;

(E)      file the Plan, the Disclosure Statement, in form and substance acceptable to the Requisite Consenting Noteholders, and motion for approval of the Disclosure Statement and the Solicitation procedures no later than 90 calendar days after the Petition Date;

(F)      obtain entry of the Disclosure Statement Order, in form and substance acceptable to the Requisite Consenting Noteholders, by the Bankruptcy Court no later than 120 calendar days after the Petition Date;

(G)     obtain entry of the Confirmation Order by the Bankruptcy Court, in form and substance acceptable to the Requisite Consenting Noteholders, no later than 175 calendar days after the Petition Date; and

(H)     cause the Effective Date to occur no later than 190 calendar days after the Petition Date;

(iii)     timely file an objection to any motion filed with the Bankruptcy Court by any Person seeking an order (A) directing the appointment in the Chapter 11 Cases of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases or (D) granting any relief that is inconsistent with this Agreement in any material respect;

(iv)     timely file an objection to any motion filed with the Bankruptcy Court by any Person seeking an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan;

(v)     provide to the Consenting Noteholders' Advisors, and direct their employees, officers, advisors and other representatives to provide the Consenting Noteholders' Advisors, (A) reasonable access (without any material disruption to the conduct of the Company's businesses) during normal business hours to the Company's books and records, (B) reasonable access to the management and advisors of the Company for the purposes of evaluating the Company's assets, liabilities, operations, businesses, finances, strategies, prospects and affairs and (C) timely and reasonable responses to all reasonable diligence requests;

(vi)     promptly notify the Consenting Noteholders of any newly commenced material governmental or third party litigations, investigations or hearings;

(vii)     promptly notify the Consenting Noteholders of any uncured breach by the Company or Mag Inc. in respect of any of the obligations, representations, warranties, or covenants set forth in this Agreement by furnishing written notice to Milbank within three (3) business days of actual knowledge of such breach;

(viii)     operate its business in the ordinary course and in accordance with the DIP Order and the DIP Credit Agreement, including, but not limited to, maintaining proper books and records with complete and accurate entries in accordance with GAAP; maintaining its current fiscal year; maintaining property useful and necessary in its business in good working order and condition (ordinary wear and tear excepted); preserving and keeping in full force in effect its organizational existence; and not entering into a different line of business;

(ix)     distribute any and all documents and pleadings to be filed with the Bankruptcy Court, in each case, that directly relate to this Agreement, the Plan or any Restructuring Document, to counsel to the Indenture Trustee and Milbank at least two Business Days in advance of filing (or, if impracticable, then as

promptly as practicable in advance of any filing thereof); *provided, however*, that this clause (ix) shall not require delivery of any sealed documents or pleadings or unredacted versions of documents or pleadings for which the Company is seeking or intends to seek sealed treatment, but shall instead require delivery of reasonably complete summaries of the content of any such sealed documents or pleadings and redacted versions of any such documents or pleadings for which sealed treatment is sought or intended to be sought (excluding any content sought or intended to be sought to be sealed or redacted), *provided, further*, that nothing in this clause (ix) shall be deemed to amend, supplement or otherwise modify any contractual confidentiality obligation to which the Company or any of its subsidiaries is a party; and

   (x) use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third party approvals necessary or required for the implementation or consummation of the Restructuring Transaction or the approval by the Bankruptcy Court of the Restructuring Documents, as applicable.

  (b) *Negative Covenants*. The Company, jointly and severally, agrees that, for the duration of the Restructuring Support Period, unless otherwise consented to in writing by the Requisite Consenting Noteholders, the Company shall not, directly or indirectly, do or permit to occur any of the following:

   (i) seek, solicit, propose or support an Alternative Transaction; *provided*, *however*, that the Company, directly or indirectly through any of its representatives or advisors, may participate in negotiations or discussions with (i) the official committee of unsecured creditors appointed in the Chapter 11 Cases regarding any potential Alternative Transaction and (ii) any third party that has (x) made an unsolicited proposal that the Company determines in good faith could lead to an Alternative Transaction or (y) expressed an interest in making a proposal that the Company determines in good faith could lead to an Alternative Transaction (and the Company may, but is not obligated to, furnish to such third party non-public information relating to the Company pursuant to an executed confidentiality agreement); *provided*, that the Company shall, subject to such confidentiality restrictions as may be reasonably required by the Company, within two Business Days of the receipt of such proposal or expression of interest, notify the Consenting Noteholders' Advisors and the Mag Inc. Advisors of the receipt of such proposal or expression of interest, and such notice shall include the material terms thereof, including the identity of the Person or group of Persons making such proposal or expression of interest, and shall thereafter inform the Consenting Noteholders' Advisors and the Mag Inc. Advisors of any amendments, modifications or other changes to, as well as any negotiations, discussions, or further developments with respect to, such proposal or expression of interest; *provided further*, *however*, that, notwithstanding anything to the contrary herein, to the extent the Company, its board of directors, or any of its officers are having discussions with one or more parties regarding an Alternative Transaction as permitted hereunder (the "**Permitted Alternative Transaction Party**"), the Consenting Noteholders shall have the right to participate in such discussions

regarding such Alternative Transaction with the Company, its board of directors, its officers (subject to applicable confidentiality constraints, if any) and/or the Permitted Alternative Transaction Party, and such participation shall not give rise to a Termination Event hereunder;

(ii) (A) publicly announce its intention not to pursue the Restructuring Transaction; (B) suspend or revoke the Restructuring Transaction; or (C) execute, file or agree to file any Restructuring Documents (including any modifications or amendments thereof) that are inconsistent in any material respect with this Agreement or the Plan Term Sheet;

(iii) commence an avoidance action or other legal proceeding that challenges the validity, enforceability or priority of the Indenture, the Notes, any Note Claims, or any Claims of Mag Inc.;

(iv) enter into any commitment or agreement with respect to debtor-in-possession financing, use of cash collateral, adequate protection, exit financing and/or any other financing arrangements, other than the DIP Facility, the New First Lien Term Loan Credit Facility, the New Second Lien Notes, the New Convertible Preferred Stock and the New Common Stock; or

(v) file any motion, pleading or other Restructuring Document with the Bankruptcy Court (including any modifications or amendments thereof), or publicly announce that it intends to take or has taken any action, in each case, that is inconsistent in any material respect with this Agreement or the Plan Term Sheet.

Section 5. *Termination of Agreement*. (a) *Consenting Noteholder Termination Events*. Upon written notice (the "**Consenting Noteholder Termination Notice**") from the Requisite Consenting Noteholders delivered in accordance with Section 21 hereof, the Requisite Consenting Noteholders may terminate this Agreement at any time after the occurrence, and during the continuation, of any of the following events (each, a "**Consenting Noteholder Termination Event**"):

(i) the breach in any material respect by the Company of any of its covenants, obligations, representations or warranties contained in this Agreement, and such breach remains uncured for a period of five Business Days from the date the Company receives a Consenting Noteholder Termination Notice;

(ii) the occurrence of an "**Event of Default**" under the DIP Facility (that is not otherwise cured or waived in accordance with the terms thereof); *provided*, *however*, that if such occurrence is primarily the result of a material breach by any Consenting Noteholder of its obligations under this Agreement, then the Consenting Noteholders shall not be entitled to exercise the Consenting Noteholder Termination Event with respect to such occurrence;

(iii) violation of the DIP Order by the Company;

(iv)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transaction, unless such ruling, judgment or order has not been stayed, reversed or vacated within five Business Days after the date of such issuance; *provided, however*, that if such issuance has been made at the request of any of the Consenting Noteholders, then the Consenting Noteholders shall not be entitled to exercise the Consenting Noteholder Termination Event with respect to such issuance;

(v)    the occurrence of a Material Adverse Effect after the date of the RSA Order;

(vi)    the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect;

(vii)    the Bankruptcy Court enters an order terminating the Company's exclusive right to file and/or solicit acceptances of a plan;

(viii)    the Company proposes or supports an Alternative Transaction;

(ix)    the Company (A) withdraws the Plan or publicly announces its intention to withdraw the Plan or to pursue an Alternative Transaction, (B) moves voluntarily to dismiss any of the Chapter 11 Cases, (C) moves for conversion of any of the Chapter 11 Cases to chapter 7 under the Bankruptcy Code, or (D) moves for the appointment of an examiner with expanded powers or a chapter 11 trustee;

(x)    the waiver, amendment or modification of the Plan or any of the other Restructuring Documents, in a manner materially inconsistent with this Agreement or the Plan without the consent the Requisite Consenting Noteholders;

(xi)    the Bankruptcy Court enters an order disallowing, subordinating or recharacterizing the Note Claims;

(xii)    any breach by Mag Inc. of its covenants, obligations, representations or warranties contained in this Agreement; and

(xiii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing the Chapter 11 Cases.

(b)    *Company Termination Events*. The Company may terminate this Agreement as to all Parties (unless otherwise provided below in this Section 5(b)), upon written notice (the "**Company Termination Notice**") delivered in accordance with Section 21 hereof, upon the occurrence of any of the following events (each, a "**Company Termination Event**"):

13

(i)    the breach in any material respect by one or more of the Consenting Noteholders of any of their covenants, obligations, representations or warranties contained in this Agreement, which breach remains uncured for a period of five Business Days from the date such Consenting Noteholders(s) receive(s) the Company Termination Notice;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transaction, unless, in each case, such ruling, judgment or order has been issued at the request of the Company, or, in all other circumstances, such ruling, judgment or order has not been stayed, reversed or vacated within three Business Days after such issuance;

(iii)    the board of directors of Mag LLC, after consultation with outside counsel, determines in good faith that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law, including because the board's fiduciary obligations require it to direct the Company to accept a proposal for an Alternative Transaction;

(iv)    the Bankruptcy Court enters an order (A) directing the appointment in the Chapter 11 Cases of an examiner with expanded powers or a chapter 11 trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or dismissing the Chapter 11 Cases; or

(v)    the waiver, amendment or modification of the Plan or any of the other Restructuring Documents, in a manner materially inconsistent with this Agreement or the Plan by the Bankruptcy Court without the consent of the Company.

(c)    *Mag Inc. Termination Event*.  Mag Inc. may terminate this Agreement as to Mag Inc. upon written notice delivered in accordance with Section 21 hereof, upon the occurrence of the following event ("**Mag Inc. Termination Event**" and, together with the Consenting Noteholder Termination Events and the Company Termination Events, the "**Termination Events**"):  the adoption, approval, waiver, amendment or modification of the Plan or any of the other Restructuring Documents, in a manner materially adverse to Mag Inc. without the consent of Mag Inc.

(d)    *Mutual Termination*. This Agreement may be terminated by mutual written agreement among the Company and the Requisite Consenting Noteholders.

(e)    *Effect of Termination*. Upon the termination of this Agreement in accordance with Section 5(a) or 5(b), and except as provided in Section 15 herein, this Agreement shall become void and of no further force or effect, and each Party shall, except as otherwise expressly provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall

14

be entitled to take all actions, whether with respect to the Claims and Interests, the Restructuring Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Indenture and/or any ancillary documents or agreements thereto; *provided, however*, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) obligations under this Agreement that by their express terms expressly survive termination of this Agreement. Upon the termination of this Agreement in accordance with Section 5(c), and except as provided in Section 15 herein, this Agreement shall become void and of no further force or effect solely with respect to Mag Inc, and Mag Inc shall, except as otherwise expressly provided in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Claims and Interests, the Restructuring Transaction or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Indenture and any ancillary documents or agreements thereto; *provided, however*, that in no event shall any such termination relieve Mag Inc. from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and (ii) obligations under this Agreement that by their express terms expressly survive termination of this Agreement. Notwithstanding anything to the contrary herein, any of the Termination Events may be waived in accordance with the procedures established by Section 9 hereof, in which case the Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver; *provided further that* in no event shall Mag Inc. have the right to terminate this Agreement other than as provided in Section 5(c) herein.  If this Agreement has been terminated at a time when permission of the Bankruptcy Court shall be required for a Supporting Party to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company shall not oppose any attempt by such Supporting Party to change or withdraw (or cause to change or withdraw) such vote at such time.

(f)     *Automatic Stay*. The Company acknowledges and agrees, and shall not dispute, that the giving of a Consenting Noteholder Termination Notice by any of the Consenting Noteholders or the Indenture Trustee pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice), and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the Requisite Consenting Noteholders.

Section 6.     *Good Faith Cooperation; Further Assurances; Acknowledgement*. The Parties shall cooperate with one another in good faith and shall coordinate their activities with one another (to the extent practicable and subject to the terms hereof) in respect of (a) all matters concerning the implementation of the Restructuring Transaction, and (b) the pursuit and support of the Restructuring Transaction (including confirmation

of the Plan). Furthermore, subject to the terms hereof, each of the Parties shall take such actions as may be reasonably necessary to carry out the purposes and intent of this Agreement and the Restructuring Transaction, including making and filing any required governmental or regulatory filings and voting any Claims and Interests in favor of the Plan, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement. This Agreement is not, and shall not be deemed, a solicitation of votes for the acceptance of a chapter 11 plan or a solicitation to tender or exchange any securities. The acceptance of the Plan by the Consenting Noteholders will not be solicited until the Consenting Noteholders have received the Disclosure Statement and related ballots, as approved by the Bankruptcy Court.

Section 7.    *Restructuring Documents*.  Each Party hereby covenants and agrees to: (a) negotiate in good faith the Plan, the Disclosure Statement and the other Restructuring Documents; and (b) execute (to the extent such Party is a party thereto) and otherwise support the Restructuring Documents, as applicable.

Section 8.    *Representations and Warranties*.  (a) Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and perform its obligations under, and carry out the transactions contemplated in, this Agreement, and the execution and delivery of this Agreement by such Party and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than breaches that arise from the filing of the Chapter 11 Cases;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority, regulatory body or commission, except such filings as may be necessary or required under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended or any rule or regulation promulgated thereunder (the "**Exchange Act**"), "**blue sky**" laws or the Bankruptcy Code; and

(iv)    upon the occurrence of the Restructuring Support Effective Date, this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Noteholder severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the beneficial owner of the principal or notional (as applicable) amount (which amount shall be denominated in the applicable currency) or number of Claims and Interests, as applicable, set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such Claims and Interests, (A) full power and authority to vote on, and consent to, matters concerning such Claims and Interests, or to exchange, assign and Transfer such Claims and Interests, or (B) full power and authority to bind, or act on behalf of, such beneficial owners with respect to such Claims and Interests.

(c)    Each Consenting Noteholder severally (and not jointly) represents and warrants to the Company that, such Consenting Noteholder or has made no prior assignment, sale, participation, grant, conveyance or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any Claims and Interests that is inconsistent with the representations and warranties of such Consenting Noteholder herein or would render such Consenting Noteholder otherwise unable to comply with this Agreement and perform its obligations hereunder.

(d)    Each Consenting Noteholder severally (and not jointly) represents and warrants to the Company that the Claims and Interests owned by such Consenting Noteholder are free and clear of any option, proxy, voting restriction, right of first refusal or other limitation on disposition of any kind, that would reasonably be expected to adversely affect in any way the performance by such Consenting Noteholder of its obligations contained in this Agreement at the time such obligations are required to be performed.

(e)    Each Consenting Noteholder severally (and not jointly) represents and warrants to the Company that it (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement, (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended) and (iii) is not relying on the Company for any legal or financial advice.

(f)    It is understood and agreed that the representations and warranties made by a Consenting Noteholder that is an investment manager of a beneficial owner of Claims and Interests are made with respect to, and on behalf of, such beneficial owner and not such investment manager, and, if applicable, are made severally (and not jointly) with respect to the investment funds, accounts and other investment vehicles managed by such investment manager.

Section 9.    *Amendments and Waivers.*  This Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented except in a writing signed by the Company and the Requisite Consenting Noteholders; *provided*, *however*, that (x) if any such amendment, modification, waiver or supplement would materially and adversely impact any of the rights or obligations (as applicable) of Mag Inc., such amendment, modification, waiver or supplement shall also require the written consent of Mag Inc. and (y) if any such amendment, modification, waiver or supplement would adversely affect any of the rights or obligations (as applicable) of any Consenting Noteholder (in its capacity as a holder of Note Claims) in a manner that is different or disproportionate in any material respect from the effect on the rights or obligations (as applicable) of Consenting Noteholders generally (in their capacity as holders of Note Claims) other than in proportion to the amount of such Note Claims, such amendment, modification, waiver or supplement shall also require the written consent of such affected Consenting Noteholder. In determining whether any consent or approval has been given or obtained by the Requisite Consenting Noteholders, any then-existing Consenting Noteholder that is in material breach of its covenants, obligations or representations under this Agreement (and the Notes held by such Consenting Noteholder) shall be excluded from such determination, and the Notes held by such Consenting Noteholder shall be treated as if they were not outstanding. A Consenting Noteholder Termination Event may not be waived except in a writing signed by the Requisite Consenting Noteholders.

Section 10.    *Transaction Expenses.*  Subject to the terms of the DIP Order, the Company hereby agrees to pay in cash the Transaction Expenses incurred prior to the termination of this Agreement.  The Company hereby acknowledges and agrees that the Transaction Expenses incurred prior to the termination of this Agreement are of the type that should be entitled to treatment as administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

Section 11.    *Effectiveness.*  This Agreement shall become immediately effective and binding with respect to the Supporting Parties on the date when counterpart signature pages to this Agreement have been executed and delivered by the Company and each of the Supporting Parties, and it shall become effective with respect to the Company upon the date on which the RSA Order, in form and substance acceptable to the Requisite Consenting Noteholders, is entered on the docket of the Chapter 11 Cases (such date, as applicable, the "**Restructuring Support Effective Date**"). With respect to any Consenting Noteholder that becomes a party to this Agreement by executing and delivering a Joinder Agreement after the Restructuring Support Effective Date, this Agreement shall become effective as to such Consenting Noteholder at the time such Joinder Agreement is delivered to the Company.

Section 12.   *Conflicts*.  In the event the terms and conditions set forth in the Plan Term Sheet and in this Agreement are inconsistent, the Plan Term Sheet shall control. In the event of any conflict among the terms and provisions of the Plan, this Agreement and the Plan Term Sheet, the terms and provisions of the Plan shall control.  In the event of any conflict among the terms and provisions of the Confirmation Order, the Plan, this Agreement and the Plan Term Sheet, the terms of the Confirmation Order shall control. Notwithstanding the foregoing, nothing contained in this Section 12 shall affect, in any way, the requirements set forth herein for the amendment of this Agreement.

Section 13.   *GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL*. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF NEW YORK, COUNTY OF NEW YORK, AND THE PARTIES HERETO IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, SO LONG AS THE BANKRUPTCY COURT HAS JURISDICTION OVER THE COMPANY, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT. EACH PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.   *Specific Performance/Remedies*.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorney's fees and costs) as a remedy of any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, at law or in equity, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

Section 15.   *Survival*.  Notwithstanding the termination of this Agreement pursuant to Section 5 hereof, the agreements and obligations of the Parties in this Section 15 and Sections 5(d), 5(e), 10, 13, 14, 16, 17, 18, 19, 21, 22, 24, 25 and 26 hereof and the

last paragraph of Section 2, shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

Section 16.  *Headings*.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

Section 17.  *Successors and Assigns; Severability; Several Obligations*.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives; *provided*, *however*, that nothing contained in this Section 17 shall be deemed to permit sales, assignments or other Transfers of the Claims and Interests other than in accordance with Sections 3(c) and 3(d) of this Agreement. If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect; *provided*, *however*, that nothing in this Section 17 shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any Termination Event.

Section 18.  *No Third-Party Beneficiaries*.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Person shall be a third-party beneficiary hereof.

Section 19.  *Prior Negotiations; Entire Agreement*.  This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and any Supporting Party shall continue in full force and effect.

Section 20.  *Counterparts*.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile, e-mail or otherwise, which shall be deemed to be an original for the purposes of this Section 20.

Section 21.  *Notices*.  All notices, requests, demands, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided or made (a) when delivered personally, (b) when sent by electronic mail ("**e-mail**") or (c) one Business Day after deposit with an overnight courier service, with postage prepaid to the Parties at the following addresses or e-mail addresses (or at such other addresses or e-mail addresses for a Party as shall be specified by like notice):

**If to the Company:**

> Magnetation LLC
> 102 NE Third Street
> Grand Rapids, Minnesota 55744
> Attention: Joseph A. Broking (joe.broking@magnetation.com)

**with a copy to (which shall not constitute notice):**

> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, New York 10017
> Attention: Marshall S. Huebner
> (marshall.huebner@davispolk.com) and
> Michelle M. McGreal (michelle.mcgreal@davispolk.com)

**If to the Consenting Noteholders:**

> To each Consenting Noteholder at the addresses or e-mail
> addresses set forth below the Consenting Noteholders' signature
> page to this Agreement (or to the signature page to a Joiner
> Agreement in the case of any Consenting Noteholder that becomes
> a party hereto after the Restructuring Support Effective Date)

**with a copy to (which shall not constitute notice):**

> Milbank, Tweed, Hadley & McCloy LLP
> 28 Liberty Street
> New York, New York 10005
> Attention: Dennis F. Dunne (ddunne@milbank.com) and
> Evan R. Fleck (efleck@milbank.com)

**If to Mag Inc.:**

> Magnetation, Inc.
> 102 NE Third Street
> Grand Rapids, Minnesota 55744
> Attention: Larry Lehtinen (larry.lehtinen@magnetation.com)

**with a copy to (which shall not constitute notice):**

> Krieg DeVault LLP
> One Indiana Square, Suite 2800
> Indianapolis, Indiana 46204
> Attention: Robert A. Greising (rgreising@kdlegal.com) and C.
> Daniel Motsinger (cmotsinger@kdlegal.com)

Section 22.   *Reservation of Rights; No Admission*.   Except as expressly provided in this Agreement or in any amendment thereof agreed upon by the Parties pursuant to the terms hereof, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, if the Restructuring Transaction is not consummated, or if this Agreement is terminated for any reason, nothing in this Agreement shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Agreement shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

Section 23.   *Fiduciary Duties*.

(a)     Notwithstanding anything to the contrary herein, (i) nothing in this Agreement shall require the Company or any directors or officers of the Company to take any action, or to refrain from taking any action, that would breach, or be inconsistent with, its or their fiduciary obligations under applicable law, and (ii) to the extent that such fiduciary obligations require the Company or any directors or officers of the Company to take any such action, or refrain from taking any such action, they may do so without incurring any liability to any Party under this Agreement; *provided*, *however*, that nothing in this Section 23 shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any Termination Event that may arise as a result of any such action or omission.

(b)     Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company or any directors or officers of the Company that did not exist prior to the execution of this Agreement.

Section 24.   *Representation by Counsel*.   Each Party acknowledges that it has been represented by counsel with respect to this Agreement and the Restructuring Transaction. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. Neither Party shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any statute, decision or rule of interpretation or construction that would, or might cause, any provision to be construed against such Party.

22

Section 25.  *Relationship Among Parties*.  Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Parties under this Agreement shall be several, not joint. It is understood and agreed that no Supporting Party has any duty of trust or confidence of any kind or form with respect to any other Supporting Party or the Company, and, except as expressly provided in this Agreement, there are no commitments between or among them. In this regard, it is understood and agreed that any Supporting Party may trade in the Claims and Interests without the consent of the Company or any other Supporting Party, subject to applicable securities laws and the terms of this Agreement; *provided*, *however*, that no Supporting Party shall have any responsibility for any such trading to any other Person by virtue of this Agreement. No prior history, pattern or practice of sharing confidences between or among the Supporting Parties or the Company shall in any way affect or negate this Agreement.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

MAGNETATION LLC

By:  /s/ [          ]_____
     Name:  [          ]
     Title:  [          ]

CONSENTING NOTEHOLDER

By:    /s/ [          ] _____
       Name: [          ]
       Title:  [          ]

CONSENTING NOTEHOLDER

By:    /s/ [          ] _____
       Name: [          ]
       Title:  [          ]

CONSENTING NOTEHOLDER

By:    /s/ [          ] _____
       Name: [          ]
       Title:  [          ]

*[Restructuring Support Agreement Signature Pages]*

**CONSENTED TO BY:**

MAGNETATION, INC.

By:    /s/ [          ] _____
      Name:  [          ]
      Title:   [          ]
             [          ]

**EXHIBIT A**
**PLAN TERM SHEET**

# RESTRUCTURING TERM SHEET
## MAGNETATION LLC

This term sheet (this "Term Sheet") is a summary of indicative terms and conditions for a proposed restructuring transaction (the "Restructuring") concerning Magnetation LLC, a Delaware limited liability company ("Magnetation" or the "Company"), to be effectuated through a plan of reorganization (the "Plan") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") that is materially consistent with the terms and conditions as set forth in this Term Sheet and otherwise acceptable in form and substance to the Company and the Ad Hoc Committee (as defined below). The implementation of the terms and conditions reflected herein and all definitive documents in connection with the Restructuring are subject to the terms and conditions in a Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "RSA"), by and among the Company, Magnetation, Inc., a Minnesota Corporation ("MagInc") and the Ad Hoc Committee of Senior Secured Notes (the "Ad Hoc Committee"), the holders of the 11.0% senior secured notes due 2018 (as amended, supplemented or otherwise modified from time to time, the "Existing Notes") issued by Magnetation pursuant to that certain Indenture, dated as of May 20, 2013 (as amended, supplemented or otherwise modified from time to time, the "Existing Notes Indenture"), between Magnetation and Wells Fargo Bank, National Association, as trustee.

This Term Sheet is non-binding and does not purport to summarize all of the terms, conditions, covenants and other provisions that may be contained in the fully negotiated and executed definitive documentation in connection with the Restructuring. No provision of this Term Sheet should be considered separate and apart from the whole. The transactions described in this Term Sheet are subject in all respects to, among other things, the execution and delivery of definitive documentation satisfactory in form and substance to the Company and the Ad Hoc Committee, satisfaction or waiver of the conditions precedent set forth therein and, the Company's and Ad Hoc Committee's determination that the new debt and securities contemplated herein are supportable by Plan value. This Term Sheet does not constitute either (a) an offer for the purchase, sale or subscription of, or solicitation or invitation of any offer to buy, sell or subscribe for, any securities or (b) a solicitation of acceptances or rejections of a chapter 11 plan of reorganization pursuant to the Bankruptcy Code. Any such offer or solicitation shall be made only in compliance with all applicable securities laws of the United States and with the provisions of the Bankruptcy Code.

Capitalized terms used in this Term Sheet and not defined herein shall have the meanings ascribed to them in the RSA.

| DEBT AND EQUITY CAPITAL STRUCTURE OF REORGANIZED DEBTORS | |
|---|---|
| **New First Lien Term Loan Credit Facility** | On the Effective Date (as defined below), reorganized Magnetation will enter into a new first lien term loan credit facility (the "New First Lien Term Loan Credit Facility") pursuant to which reorganized Magnetation will issue new first lien term loans on a first out basis (the "New First Out First Lien Term Loans") in an original aggregate principal amount sufficient to refinance the JPM Facility in cash in full, and new first lien term loans on a second out basis (the "New Second Out First Lien Term Loans" and together with the New First Out First Lien Term Loans, the "New First Lien Term Loans") in an original principal amount sufficient to refinance the DIP Facility, the rolled up Existing Notes, the rolled up Prepetition Term Loans and any interest and fees accrued thereon. |
| | The New Second Out First Lien Term Loans shall bear interest at a rate of 10% per annum to be paid in cash or 12% per annum to be paid in kind on a quarterly basis, with the requirement to pay in cash subject to certain conditions including a minimum EBITDA and minimum liquidity tests. All of the direct and indirect domestic subsidiaries of reorganized Magnetation shall guarantee the payment of the New First Lien Term Loans. The New First Lien Term Loan Credit Facility will mature on the fifth anniversary of the Effective Date, but can be prepaid in whole or in part after the second anniversary of the Effective Date. |
| | The New First Lien Term Loan will carry customary covenants regarding reporting, limitations on indebtedness, limitations on liens and certain financial covenants. The New First Lien Term Loan Credit Facility shall be in form and substance acceptable to the Company and the Ad Hoc Committee. |
| **New Second Lien Notes** | On the Effective Date, reorganized Magnetation will issue new second lien notes (the "New Second Lien Notes") in an original aggregate principal amount of $232.5 million plus accrued interest through the Effective Date (to the extent the holders of the Existing Notes are entitled to post-petition interest) on the Existing Notes that were not subject to the roll-up, and all of the direct and indirect domestic subsidiaries of reorganized Magnetation shall guarantee the payment of the New Second Lien Notes. |
| | The New Second Lien Notes shall mature on the ten year |

| | anniversary of the Effective Date.  The New Second Lien Notes shall bear interest at a rate of 5.0%, and such interest shall be paid in kind on a semi-annual basis.  The New Second Lien Notes shall be redeemable at the option of reorganized Magnetation at par. |
|---|---|
| **New Convertible Preferred Stock** | On the Effective Date, reorganized Magnetation will issue to holders of the Existing Notes 90% of the new convertible preferred stock (the "New Convertible Preferred Stock") in an original aggregate face amount of $138.9 million.  Shares representing approximately 10% of the New Convertible Preferred stock on the Effective Date will be distributed as part of the Management Incentive Plan and will vest after 3 years.<br><br>The New Convertible Preferred Stock shall accrete at a rate of 5.0%.  Holders of the New Convertible Preferred Stock may convert such preferred stock into New Common Stock (as defined below) at Plan value as determined by the Debtors and the Ad Hoc Committee.<br><br>The New Convertible Preferred Stock Notes will include customary provisions for such a security. |
| **Interest Escrow Reserve** | The funds in the existing interest escrow account shall be maintained by the Debtors and be available for use upon the Effective Date for (i) distribution to JPM on account of the JPM Facility Claims; (ii) distribution to the lenders under the New Second Out First Lien Term Loans to reduce the principal of such loans; or (iii) for such other purposes as agreed by the holders of 2/3$^{rds}$ of the Existing Notes; *provided*, *however*, that, to the extent that any funds are distributed to holders of the Existing Notes on account of Existing Notes Claims, the amount of allowed Existing Notes Claims shall be reduced by the amount of such distribution. |
| **New Common Stock** | On the Effective Date, reorganized Magnetation will issue one or more classes of common stock (the "New Common Stock"), which New Common Stock shall be deemed validly issued, fully paid and non-assessable.  75% of the New Common Stock issued on the Effective Date will be distributed to holders of claims under the Existing Notes. The remaining 25% of the New Common Stock (including anti-dilution protection to maintain a 25% ownership in the event the New Convertible Preferred Stock is converted) on the Effective Date will be distributed as part of the Management Incentive Plan and will vest after 3 years. |

|  | If at any point the New Common Stock is not registered under the Securities Exchange Act of 1934, as amended, the Company will post annual and quarterly financial reports in a timely manner on a publicly available website. |
|---|---|

## TREATMENT OF CLAIMS AND INTERESTS

| | |
|---|---|
| **Administrative Expense Claims** | On the effective date of the Plan (the "<u>Effective Date</u>") or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date thereof), all allowed administrative expense claims of each of the Debtors shall be paid in full in cash or on such other terms as the applicable Debtor or reorganized Debtor and the holder thereof may agree. |
| **Priority Claims** | On the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date thereof), all allowed priority claims (*e.g.,* tax and "other" priority claims) against each of the Debtors shall be paid in full in cash, unimpaired and reinstated, or treated on such other terms as the applicable Debtor or reorganized Debtor and the holder thereof may agree. |
| **Other Secured Claims** | On the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, on the due date thereof), all allowed secured claims against each of the Debtors shall be paid in full in cash, unimpaired and reinstated, or treated on such other terms as the applicable Debtor or reorganized Debtor and the holder thereof may agree. |
| **JPM Facility Claims** | On the Effective Date, unless otherwise agreed to by JPM, the Debtors and the Ad Hoc Committee, all remaining allowed JPM Facility Claims shall be paid in cash in full. |
| **DIP Facility Claims** | On the Effective Date, all allowed claims arising under the DIP Facility shall be exchanged for (x) New First Lien Second Out Term Loans in an aggregate principal amount equal to the amount of such DIP Facility Claims (including any interest thereon); it being understood and agreed that the DIP Lenders' consent to such treatment shall be deemed to have been given upon the consent of two-thirds in amount of DIP Facility Claims and more than one-half in number of holders of DIP Facility Claims, in each case, that have timely responded to a request for such consent by the Administrative Agent under the DIP Credit Agreement in accordance with the standards set forth in section 1126(c) of the Bankruptcy |

-4-

| | |
|---|---|
| | Code or (y) such other treatment as may be consented to by two-thirds in amount of DIP Facility Claims and more than one-half in number of holders of DIP Facility Claims, in each case, that have timely responded to a request for such consent by the Administrative Agent under the DIP Credit Agreement in accordance with section 1126(c) of the Bankruptcy Code. |
| **Existing Notes Claims** | On the Effective Date, all allowed claims arising under the Existing Notes and the Existing Notes Indenture that were not rolled up shall be exchanged for (x) a pro rata share of 100% of the New Second Lien Notes, 90% of the New Convertible Preferred Stock, 75% of the New Common Stock subject to further dilution on account of the Management Incentive Plan plus accrued interest through the Effective Date (to the extent the holders of the Existing Notes are entitled to post-petition interest) or (y) such other treatment as may be consented to by two-thirds in amount of Existing Notes Claims and more than one-half in number of holders of Existing Notes Claims, in each case, that have timely responded to a request for such consent by the Indenture Trustee under the Indenture in accordance with section 1126(c) of the Bankruptcy Code. |
| **General Unsecured Claims** | Treatment of General Unsecured Claims is [TBD] to the satisfaction of the Company and the Ad Hoc Committee. |
| **Management Services Agreement** | The Management Services Agreement will be replaced with appropriate contractual arrangements that provide for existing senior management and officers (CEO-Larry Lehtinen, President/COO-Matt Lehtinen, CFO-Joe Broking, and Vice President-Hope Wilson (collectively, the "Senior Management")) to become subject to customary employment agreements with the Company for the first to occur of (i) 3 years, (ii) Senior Management no longer being the beneficial holder of the Company's securities described herein (terminable only for cause, including material breach by either party), and (iii) termination for cause. MagInc will support the Company's assumption of any remaining aspects of the existing Management Services Agreement. |
| **Technology License Agreement** | The Technology License Agreement will be amended to grant the Company a perpetual, royalty free (other than royalties due to DEED and IRRRB pursuant to the royalty agreement between MagInc. and the State of Minnesota), exclusive (subject to the MR License) license in North America for all rights and improvements to the Licensed Technology. |
| **Intercompany Loan** | Upon the Effective Date, the Promissory Note between |

| | MagInc and the Company is considered paid in full. |
| **AK Steel Offtake Contract** | The AK Steel Offtake Contract will be assumed, rejected, or assumed as modified each to the satisfaction of the Ad Hoc Committee. |
| **Existing Equity Interests** | On the Effective Date, holders of the existing common stock of Magnetation ("Existing Common Stock") will be extinguished. |
| **Restructuring Advisory Agreement** | The Company and MagInc will enter into a Restructuring Advisory Agreement pursuant to which MagInc will pay the Company an advisory fee equal to 15% of the Net Proceeds (as defined below) of any disposition or sale of MagInc's assets (excluding any value attributable to MagInc's equity in the Company and sales in the ordinary course of business). For the purposes of this provision, "Net Proceeds" means the amount of the proceeds from the disposition or sale of MagInc's assets in excess of (i) any debt of MagInc payable in connection with the disposition or sale of such assets plus (ii) the reasonable transaction costs incurred in connection with such disposition or sale, excluding any value attributable to MagInc's equity in the Company and sales in the ordinary course of business.<br><br>The Restructuring Advisory Agreement shall include the following provisions: (i) MagInc will provide the Company quarterly reports with regard to the activities of MagInc (including, without limitation, audited and unaudited financial statements), (ii) the Company may assign the Restructuring Advisory Agreement, and MagInc consents to such assignment, to any purchaser of or equity holders of the Company, (iii) the Restructuring Advisory Agreement shall be in effect for the period of 20 years after the Effective Date, and (iv) during the term of the Restructuring Advisory Agreement, other than dividends/distributions made to MagInc from Company and distributions to Mag Inc shareholders to pay taxes on allocated income, there will be no restricted payments by MagInc. The parties acknowledge that Mag Inc is an S corporation. Nothing herein is intended to cause a termination of such status. If Mag Inc determines that these arrangements may cause such termination, Mag Inc and the Ad Hoc Committee will negotiate other arrangements intended to preserve such status and achieve the economic |

|  | objectives reflected in these terms. |
|---|---|
| **Employees of MagInc** | All employees of MagInc shall be transitioned to and become employees of the Company. |
| **Management Incentive Plan** | Compensation for the Senior Management of MagInc shall include the following: (i) 25% of the New Common Stock at emergence (including anti-dilution protection to maintain a 25% ownership in the event the New Convertible Preferred Stock is converted), and (ii) 10% of New Convertible Preferred Stock to be distributed in accordance with Schedule 1 attached hereto, _provided, however_, that in no event shall Senior Management be entitled to more than 25% of the fully diluted equity of the Company, after giving effect to the New Convertible Preferred.<br><br>All New Preferred Convertible Stock and New Common Stock distributed pursuant to the Management Incentive Plan shall vest upon the earlier of (i) 3 years with 1/3 vesting annually for each year; or (ii) upon a sale of the Company (including, without limitation, the sale of substantially all or all of the Company's assets or stock, a merger, or the combination of any of the foregoing).   In the event of a Senior Management Departure (as defined below), the equity to former shareholders of MagInc shall be terminated.   For the purposes of this provision, a "Senior Management Departure" means that any two of Larry Lehtinen, Matt Lehtinen, or Joe Broking voluntarily terminating their employment or greater than 50% of the entire management team voluntarily terminating their employment within a 6 month period. |
| **Section 363 Sale Process** | If requested by the Ad Hoc Committee as contemplated by the milestones set forth in the DIP Credit Agreement and the DIP Order, the Company will pursue a sale of all or substantially all of the Company's assets pursuant to section 363(b) of the Bankruptcy Code. |
| **Chapter 11 Litigation** | Nothing in this Term Sheet shall impair the Company's right to pursue estate causes of action against any party, including creditors or equityholders of any Debtor. |

| OTHER PROVISIONS | |
|---|---|
| **Board of Directors** | The New Board will consist of one member appointed by MagInc, which initially is Larry Lehtinen and 6 additional members to be appointed by the Ad Hoc Committee in consultation with Larry Lehtinen. |
| **Organizational Documents** | The organizational documents of each of the reorganized Debtors, including (upon agreement by the Company and the Ad Hoc Committee) a stockholders agreement of reorganized Magnetation (the "Stockholders Agreement"), shall contain terms and provisions, and be in form and substance, satisfactory to the Ad Hoc Committee and the Company, and, solely with respect to the Stockholders Agreement, Senior Management, provided that the consent of the Senior Management to agree to the form and substance of the Stockholders Agreement shall not be unreasonably withheld. If a Stockholders Agreement is put in place, any holder of a claim that is to be distributed shares of New Common Stock pursuant to the Plan shall have duly executed and delivered to reorganized Magnetation, as an express condition precedent to such holder's receipt of such shares of New Common Stock, a counterpart to the Stockholders Agreement. |
| **Exemption from Registration** | The issuance of all securities under the Plan will be exempt from registration with the Securities Exchange Commission under section 1145 of the Bankruptcy Code to the extent permitted by applicable law. |
| **Conditions to Effective Date** | The Plan shall contain customary conditions to confirmation/effectiveness to be agreed upon by the Company and the Ad Hoc Committee, including, among other conditions, that:

1) The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the Debtors and the Ad Hoc Committee, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2) The Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order (a) shall be in form and substance acceptable to the Debtors and the Ad Hoc Committee and (b) shall not be subject to a stay or have been vacated on appeal.

3) All of the schedules, documents, supplements, and exhibits |

|  | to the Plan shall be in form and substance as required by the RSA. |
|---|---|
|  | 4) The RSA shall not have been terminated. |
|  | 5) The aggregate amount of allowed administrative expense claims of each of the Debtors (excluding professional fees and expenses incurred by persons or firms retained by the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Ad Hoc Committee and the Official Committee of Unsecured Creditors) of each of the Debtors shall not exceed an amount to be determined by the Debtors and the Ad Hoc Committee. |
| **Fiduciary Out** | The RSA shall provide that nothing will prevent any of the Debtors from taking or failing to take any action that it is obligated to take (or fail to take) in the performance of any fiduciary duty or as otherwise required by applicable law that such Debtor owes to any other person or entity under applicable law. |

Hɪɢʜʟʏ Cᴏɴꜰɪᴅᴇɴᴛɪᴀʟ

**<u>Schedule 1</u>**

**EXHIBIT B**
**JOINDER AGREEMENT**

[        ], 2015

The undersigned ("**Transferee**") hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement, dated as of June 1, 2015, a copy of which is attached hereto as Annex I (as amended, supplemented or otherwise modified from time to time, the "**Agreement**"), by and among Magnetation LLC, a Delaware limited liability company ("**Mag LLC**"), and its direct and indirect subsidiaries parties thereto (together with Mag LLC, the "**Company**") and the entities and persons named therein as "**Consenting Noteholders**" t, as consented to by Magnetation Inc., a Minnesota corporation, and that it has been represented, or has had the opportunity to be represented, by counsel with respect to the Agreement. Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

1.      *Agreement to be Bound*. The Transferee hereby agrees to be bound by all of the terms of the Agreement. The Transferee shall hereafter be deemed to be a "**Consenting Noteholder**" and a "**Party**" for all purposes under the Agreement and with respect to all Claims and Interests held by such Transferee.

2.      *Representations and Warranties*. The Transferee hereby makes the representations and warranties of the Consenting Noteholders set forth in Section 8 of the Agreement to each other Party or only the Company (as applicable).

3.      *Governing Law*. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

     IN WITNESS WHEREOF, the Transferee has caused this Joinder Agreement to be executed as of the date first written above.

Name of Transferor: _____

Name of Transferee: _____

By: _____

  Name: _____

  Title: _____

Notice Address:

_____

_____

Attention: _____

with a copy to:

_____

_____

Attention: _____

Principal Amount of Note Claims:  $ _____

Principal Amount of Other Claims:  $ _____

*[Joinder Agreement to Restructuring Support Agreement Signature Page]*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **Jointly Administered under**<br>**Case No. 15-50307** |
| MAGNETATION LLC, et al, | Court File No. 15-50307 (GFK) |
| Debtors. | |
| (includes: | Court File Nos.: |
| Mag Lands, LLC | 15-50308 (GFK) |
| Mag Finance Corp. | 15-50309 (GFK) |
| Mag Mining, LLC | 15-50310 (GFK) |
| Mag Pellet LLC) | 15-50311 (GFK) |
| | Chapter 11 Cases<br>Chief Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ORDER AUTHORIZING AND APPROVING THE DEBTORS'**
**ENTRY INTO A RESTRUCTURING SUPPORT AGREEMENT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Upon the Motion[1] of Magnetation LLC and its subsidiaries that are debtors and debtors in

possession (collectively, the "**Debtors**") for an order, pursuant to sections 105(a) and 363(b) of

the Bankruptcy Code, authorizing and approving the Debtors' entry into the RSA, all as more

fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and

the requested relief being a core proceeding the Bankruptcy Court can determine pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

1409; and due and proper notice of the Motion having been provided to the parties in interest as specified in Local Rule 9013-3(a)(2), and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the Court having determined that the relief requested is necessary to avoid immediate and irreparable harm; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS ORDERED:

1.      The relief requested in the Motion is GRANTED.

2.      The Debtors are authorized, pursuant to section 363 of the Bankruptcy Code, to enter into the RSA and all instruments, documents and papers contemplated thereby, and to fully perform thereunder.

3.      The RSA and the Debtors' obligations thereunder, including the payment of the Transaction Expenses, are hereby approved.

4.      The RSA shall be binding and enforceable against the Debtors and each of the Supporting Parties in accordance with its terms.

5.      The Debtors are authorized to enter into amendments to the RSA, from time to time as necessary, subject to the terms and conditions set forth in the RSA and without further order of the Court.

6.      The Debtors are authorized and empowered to take all actions necessary to implement and effectuate the terms of this Order.

7.      Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule, the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

8.      This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

Dated:

_____
Gregory F. Kishel
Chief United States Bankruptcy Judge